1  CHARLES THOMPSON, State Bar No. 139841
     thompsoncha@gtlaw.com
2  DAVID BLOCH, State Bar No. 184530
     guzmanan@gtlaw.com
3  MELISSA KENDRA, State Bar No. 291905
     melissa.kendra@gtlaw.com
4  ANTHONY E. GUZMAN II, State Bar No. 311580
     guzmanan@gtlaw.com
5  GREENBERG TRAURIG, LLP
   101 Second Street, Suite 2200
6  San Francisco, California 94105
   Telephone: 415.655.1300
7  Facsimile: 415.707.2010
8
9  Attorneys for Defendant
   BYTEDANCE INC.
10

11  **THE UNITED STATES DISTRICT COURT**

12  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13

14  YINTAO YU, an individual,                    Case No.  4:23-cv-04910-SI

15      Plaintiff                **DECLARATION OF DR. LINTON
                                                MOHAMMED IN SUPPORT OF
16      v.                       MOTION TO COMPEL
                                                ARBITRATION** [**REDACTED**]
17  BYTEDANCE, INC., a Delaware
   Corporation; SHUYI (SELENE) GAO, an          [Originally San Francisco Superior Court
18  individual,                                  No. CGC-23-608845]

19      Defendants.            State Action filed:  September 5, 2023
                                                Removal Date:         September 25, 2023
20                                              Trial Date:           None

21

22

23

24

25

26

27

28

**DECLARATION OF DR. LINTON MOHAMMED IN SUPPORT OF MOTION TO COMPEL
ARBITRATION**

I, DR. LINTON MOHAMMED, declare the following:

1.      I am over 18-years-old, competent to testify on the matters set forth herein, and would so testify if called to do so. The statements herein are based upon my own personal knowledge.

2.      I am a forensic document examiner with Forensic Science Consultants, Inc.

3.      I was retained to perform an independent assessment of the authenticity of certain signatures that purport to be from Yintao (Roger) Yu. I prepared a Document Examination Report outlining my analysis and conclusion. My Document Examination Report also includes several relevant appendices, including:

      a.      Appendix 1: The documents bearing the signatures in question.

      b.      Appendix 2: The reference documents with known signatures.

      c.      Appendix 3: A composite chart of all questioned and known signatures.

      d.      Appendix 4: A copy of the ANSI/ABS standards.

      e.      Appendix 5: A copy of the SWGDOC standards.

      f.      Appendix 6: My curriculum vitae.

      g.      Appendix 7: My testimony in matters over the last four years.

A true and correct copy of the Document Examination Report I authored, including all appendices, is attached hereto as **Exhibit 1**.

*        *        *

Pursuant to the laws of the State of California, I declare under penalty of perjury that the foregoing is true and correct. Executed this _4_ th day of October 2023, at Poway, California.

Dr. Linton Mohammed

DECLARATION OF DR. LINTON MOHAMMED IN SUPPORT OF MOTION **TO COMPEL ARBITRATION**

# Ex. 1

# Forensic Science Consultants, Inc.

14450 Kentfield Place
Poway, CA  92064

Tel: 858-883-4065 [O]; 415-672-3514 [C]
lamqde@gmail.com
www.qdexams.com

Linton A. Mohammed, Ph.D.
Forensic Document Examiner

Diplomate: American Board of Forensic Document Examiners
Diploma in Document Examination - Forensic Science Society (England)
American Society of Questioned Document Examiners (Member & Past-President)
American Academy of Forensic Sciences (Fellow)
Chartered Society of Forensic Science (Fellow)

September 29, 2023

Anthony Guzman
Greenberg Traurig, LLP
101 Second Street
Suite 2200
San Francisco, CA  94105

## DOCUMENT EXAMINATION REPORT
Re: Yintao Yu

## QUALIFICATIONS

I have been continuously certified by the American Board of Forensic Document Examiners (ABFDE) since August 1998. ABFDE is a certifying board for Forensic Document Examiners in North America. It is sponsored by the American Society of Questioned Document Examiners, the Canadian Society of Forensic Science, the Southwestern Association of Forensic Document Examiners, the Southeastern Association of Forensic Document Examiners, and is recognized by the American Academy of Forensic Sciences. Additionally, ABFDE is accredited by the Forensic Specialties Accreditation Board. I also have earned a Diploma in Document Examination from the Forensic Science Society (now the Chartered Society of Forensic Sciences).

I am a member and Past-President of the American Society of Questioned Document Examiners (ASQDE). I previously served on the ASQDE's Executive Committee as President (2010-2012), Vice President (2008-2010), Treasurer (2006-2008), and Director (2004-2006). I am a Fellow of the Questioned Documents Section of the American Academy of Forensic Sciences (AAFS), and served as the Section Chair of the Questioned Documents Section of AAFS from 2016-2018.

I am a Fellow of the Chartered Society of Forensic Sciences, and a member of the Canadian Society of Forensic Science.

I graduated from the University of the West Indies in 1984 with a Bachelor of Science Degree. I trained full time in Document Examination from 1986 to 1988 at the Trinidad and Tobago Forensic Science Center, Port of Spain, Trinidad & Tobago and worked as a Forensic Document Examiner in Trinidad & Tobago from 1989 to 1993. In this role, I examined, reported on, and testified in criminal and civil cases in Trinidad & Tobago and other Caribbean islands. In 1993, I relocated to England and worked as a Forensic Document Examiner at the Laboratory of the Government Chemist until 1996. In August 1996, I accepted a position as a Forensic Document Examiner with the San Diego County Sheriff's Crime Laboratory. I was promoted to Senior Forensic Document Examiner in 2002. My duties involved conducting examinations in the most

DOCUMENT EXAMINATION REPORT
Re: Yintao Yu

complex cases, training junior examiners, and providing expert testimony for cases that were
investigated by agencies of the County of San Diego, and by several local police, State, and
Federal agencies.

I earned a PhD (Human Biosciences) at La Trobe University, Melbourne, Australia in 2012. My
thesis topic was "Elucidating static and dynamic features to discriminate between handwriting
disguise and handwriting forgery behavior."

My publications and presentations are detailed in my curriculum vitae which is attached as
**APPENDIX 6.** A Testimony Listing for the past 4 years is attached as **APPENDIX 7.**

**COMPENSATION FOR EXAMINATIONS & TESTIMONY**

For my examinations, reports, depositions, and testimony in this case, I am charging a rate of
$500.00 per hour. My fees are not contingent on the results of the examination or conclusions
expressed.

**DOCUMENTS SUBMITTED FOR EXAMINATION**

The following documents were submitted for examination:

QUESTIONED

Q1    Copy of an Employee Confidentiality and Inventions Assignment Agreement dated
August 30, 2017.

Q2    Copy of a Patent Assignment Agreement dated August 22, 2017 and a Side Letter dated
08/27/17.

Q3    Copy of a Notice of Stock Option Award dated 08/30/2017.

Copies of these documents are attached as **APPENDIX 1**.

KNOWN

K1    Copies of documents bearing specimen signatures in the name of Yintao Yu:

a.    Offer Letter dated 06/07/17.

b.    Request for Personnel File dated 07/30/19.

c.    Return to Work note dated 07/18/18.

d.    USCIS Form I-9 dated 08/30/17.

e.    Grant Deed 2017-066003 dated 07/31/17.

f.    Affidavit – Change of Trustee dated 11/12/20.

g.    Grant Deed 23715945 dated 07/31/17.

h.    Affidavit – Change of Trustee dated 01/09/23.

DOCUMENT EXAMINATION REPORT
Re: Yintao Yu

      i.   Deed of Trust 2020-001161, Fixed/Adjustable Rate Rider, and Inter Vivos Revocable Trust Rider dated 01/06/20.

      j.   Statement and Designation by Foreign Corporation 3827005 dated 09/18/15.

      k.   Affidavit – Change of Trustee dated 11/12/20.

      l.   Grant Deed 23715945 dated 07/31/17.

      m.  Deed of Trust 23388464, Family Rider, and Fixed/Adjustable Rate Rider dated 07/29/16.

      n.  Grant Deed 2017169661 dated 07/31/17.

      o.  Grant Deed 2017169660 dated 07/31/17.

      p.  Deed of Trust 2013235138 dated 07/02/13.

      q.  Deed of Trust 2015234653 and Fixed/Adjustable Rate Rider dated 08/14/15.

      r.  Deed of Trust 2020-001161, Fixed/Adjustable Rate Rider, and Inter Vivos Revocable Rate Rider dated 01/06/20.

      Copies of these documents are attached as **APPENDIX 2**.

## PURPOSE OF EXAMINATION

To determine whether the K1 writer (Yintao Yu) wrote the questioned signatures in the name of Yintao Yu on Items Q1 through Q3.

## NATURE OF THE EXAMINATION

Signatures/Handwriting Examination Method

Signatures and handwriting are complex products of neuro-muscular coordination. When a child learns to write, they are normally taught a copybook system. The copybook system will have *class characteristics* which will be common to those who learned to write with it. The child starts by drawing the letter forms and then as their skill becomes greater, they can start to handprint. Eventually, the child moves on to cursive handwriting where the letters are joined. Each person's handwriting is a product of how they were taught, their skill level, the amount that they write, and sometimes even their occupation.

Learning to write is similar to learning to play a musical instrument or activities involved in sports such as golf or tennis racket swing. The individual develops a motor program which then executes the particular act. The motor program enables an individual to accomplish as task quickly and accurately without much pre-planning or forethought. A skilled writer is said to exhibit open loop control (see Figure 1), whereas an unskilled writer or a simulator may exhibit closed loop control (see Figure 2) where feedback is required. The writing movement caused by the latter type of loop control may be exhibited in the writing line as lack of speed, heavy pen pressure, and tremor.

DOCUMENT EXAMINATION REPORT
Re: Yintao Yu



**Figure 1**    *Open loop control*

**Figure 2**    *Closed loop control showing feedback.*

As the child begins to write more, departures from the copybook system occur. This may be due to the writer making shortcuts or simply lacking the skill to follow the copybook system at higher speed. These departures are referred to as *individual characteristics,* and it is these which have more weight in the examination of signatures.

As handwriting is the product of neuro-muscular coordination, it follows that there will be variations in everyone's handwriting. The principle of natural variation states that a writer never writes exactly the same way twice. Individual writers have ranges of variation depending on their skill level. Trained, skilled writers tend to have a narrow range of variation whereas an unskilled writer may have a wide range of variation. It is important to note that there are several factors which may impact a writer's range of variation such as age, illness, medication, alcohol, drugs, writing conditions, and even writing instruments.

In order to determine a person's range of variation it is necessary to have an adequate sampling of their handwriting. This sample should be contemporaneous with the disputed handwriting.

In handwriting examinations, differences outweigh similarities. Repeated, unexplainable differences between two sets of handwriting are indicative of different writers. Differences are considered to be features which are outside of the range of natural variation of an individual.

During each phase of the examinations, the reliable principles and methods of forensic document examination were applied in accordance with the standard practices and procedures of the field, including procedures in compliance with the relevant portions of the ANSI/ASB Standard 070, First Edition[1] 2022 *Standard Guide for Examination of Handwritten Items.* The Conclusion term used in this report is in accordance with the relevant sections of SWGDOC[2] *Standard Terminology for Expressing Conclusions of Forensic Document Examiners*.

Copies of the ANSI/ASB and SWGDOC standards are attached as **APPENDICES 4** and **5**.

---

[1] www.aafs.org/academy-standards-board.
[2] www.swgdoc.org

DOCUMENT EXAMINATION REPORT
Re: Yintao Yu

**OBSERVATIONS**

1.  Items Q1 through Q3 and K1 were all copies submitted in Portable Document Format (pdf). This placed limitations on the examination as features such as line quality, pen pressure, and speed cannot be assessed fully. Nevertheless, the copies were of adequate quality to allow for examination and comparison.

2.  The questioned signatures on Items Q1 through Q3 were examined. The signatures are written in a stylized form as no allographs are discernable. Within the limitations of the copies, they appear to have been written quickly and fluently. There is variation between the signatures, and no two questioned signatures are exactly alike.

3.  The K1 signatures were examined and inter-compared. The K1 signatures are of moderate complexity with a wide range of variation. The K1 signatures, with the exception of K1(h), are written in a stylized form. K1(h) illustrated below in Figure 3 is written in a text-based format.



**FIGURE 3**   *K1(h) signature*

4.  K1 signatures are dated from 2013 through 2023 and are contemporaneous with the questioned signatures on Items Q1through Q3. No evidence of multiple authorship was observed and the K1 signatures were taken as representative of the signature style of Yintao Yu. Items K1(i) and K1(r) were duplicates of the same document. K1(h) was not used for the comparison because its text-based format is not comparable with the stylized format of the questioned signatures.

5.  A significant combination of similarities were found between the Q1, Q2, Q3 and K1 signatures together with no fundamental differences. The similarities include:

    i.      formations

    ii.     relative heights,

    iii.    size,

    iv.     slant,

    v.      baseline alignment,

    vi.     use or no use of punctuation,

    vii.    spacing between the first and last names,

    viii.   pen lifts,

    ix.     connecting strokes,

    x.      lead-in strokes,

    xi.     terminal strokes.

DOCUMENT EXAMINATION REPORT
Re: Yintao Yu

6. Some of these similarities are illustrated in Figure 4 which is a composite chart of the questioned and selected K1 signatures. Note the variation in spacing between the first and last names which are indicated by non-annotated arrows or double-headed arrows.



**FIGURE 4** *Composite chart of Questioned signatures and selected K1 signatures.*

7. A composite chart of all the questioned and known signatures in chronological order is attached as **APPENDIX 3**.

8. The variation observed in the questioned signatures on Items Q1 through Q3 falls within the range of variation of the K1 signatures.

9. The variation observed in the questioned signatures makes it extremely unlikely that the questioned signatures are produced using a copy/cut and paste process.

DOCUMENT EXAMINATION REPORT
Re: Yintao Yu

**CONCLUSION**

The K1 writer (Yintao Yu) probably wrote the questioned signatures in the name of Yintao Yu on Items Q1 through Q3.  A determination of "probable" means that the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual.

**EXAMINER'S NOTES**

1.  The Conclusion expressed above is based on the SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners. A copy of this Standard is attached as **APPENDIX 5**.

2.  If a further examination is required, the originals of Items Q1 through Q3 should be submitted together with original specimen signatures of the K1 writer.

Respectfully submitted,

Linton A. Mohammed, Ph.D., D-ABFDE
Forensic Document Examiner

**DOCUMENT EXAMINATION REPORT**
Re: Yintao Yu

**APPENDIX 1**

[For California Employees]

## STATEMENT REGARDING EMPLOYEE CONFIDENTIALITY AND INVENTIONS ASSIGNMENT AGREEMENT

Attached to this statement is your Employee Confidentiality and Inventions Assignment Agreement (the "Agreement").

Please take the time to review the Agreement carefully. It contains material restrictions on your right to disclose or use, during or after your employment, certain information and technology learned by you during your employment.

[Bytedance Inc.] considers this Agreement to be very important to the protection of its business. It intends to enforce the terms of the Agreement and to pursue, appropriate, injunctions, restraining orders, and money damages, should you violate the Agreement.

It is a condition of your employment and certain payments and benefits to be provided to you by [Bytedance Inc.] and its affiliates that you execute this Agreement.

If you have any questions concerning this Agreement, you may wish to consult an attorney. The employees and agents of [Bytedance Inc.] and its affiliates are not authorized to, and will not, give you legal advice concerning this Agreement.

If you have read and understand the Agreement, and if you agree to its terms and conditions, please return a fully executed copy, retaining one copy for yourself.

1

**EMPLOYEE CONFIDENTIALITY AND INVENTIONS ASSIGNMENT AGREEMENT**

This Employee Confidentiality and Inventions Assignment Agreement (the "Agreement") is entered into as of [August 30th, 2017] (the "Effective Date"), by and between [Bytedance Inc.] and its affiliates (collectively, "Employer") and [Yintao Yu] ("Employee").

As a condition of Employee's employment and certain payments and benefits to be provided to Employee by Employer, which Employee acknowledges to be good and valuable consideration for Employee's obligations hereunder, Employer and Employee hereby agree as follows:

1.    **Confidentiality.**

    A.    **Definitions.**

        1.    "Confidential Information" includes materials and information of and relating to Employer or its business, regardless of (i) whether marked as "confidential" or "proprietary," (ii) whether or not patentable, copyrightable, or registrable under any intellectual property laws or industrial property laws in the United States or elsewhere, and (iii) whether generated by Employer or its employees, consultants or agents or received by Employer from third parties such as clients/customers, suppliers, licensors, licensees, partners and collaborators of Employer.

            Confidential Information shall include information of a technical nature such as software, source code, trade secrets, processes, designs, methodologies, technology, know-how, algorithms, data, ideas, analytic insights, techniques, discoveries and inventions, as well as terms of agreements (including, without limitation, the terms of this Agreement), transactions and pending negotiations for transactions, financial information, client/customer and supplier information, marketing and product development plans, forecasts, and other information concerning Employer's or its clients'/customers' actual or anticipated products or services, business, research or development, or any information which is received in confidence by or for Employer from any other person.

            Employee understands that the foregoing is not an exhaustive list, and that Confidential Information also includes other information that is marked or otherwise identified as "confidential" or "proprietary," or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. Confidential Information shall not include any information that (i) is or becomes publicly known through lawful means, or (ii) was rightfully in Employee's possession or part of Employee's general knowledge prior to Employee's employment by Employer, including any Employee Pre-Existing Intellectual Property (as defined in Section 2.A).

        2.    "Employer Materials" means any documents, media or other items that contain or embody Confidential Information, whether or not labeled

"confidential" or "proprietary." Employer Materials include blueprints, drawings, photographs, charts, graphs, notebooks, client/customer lists, software, computer disks, tapes or printouts, sound recordings and other electronic, digital, printed, typewritten or handwritten documents or emails, sample products, prototypes and models.

B.    **Employee Acknowledgments**.

1.    Employee understands and acknowledges that, during the course of employment by Employer, Employee will have access to and learn about Confidential Information of and relating to Employer and its business and existing and prospective clients/customers, suppliers, investors and other associated third parties. Employee further understands and acknowledges that such Confidential Information and Employer's ability to reserve the Confidential Information for the exclusive knowledge and use of Employer is of great competitive importance and commercial value to Employer and third parties disclosing such information to Employer, and that improper use or disclosure of the Confidential Information by Employee might cause Employer and such third parties to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages and/or criminal penalties.

2.    Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's employment by Employer shall be subject to the terms and conditions of this Agreement as if Employer furnished such Confidential Information to Employee in the first instance.

3.    Employee understands and acknowledges that Employee's obligations under this Agreement with regard to any particular Confidential Information, including the obligation not to use or disclose trade secrets of Employer, shall commence immediately upon Employee's first having access to such Confidential Information (regardless of when such Confidential Information is received) and shall continue during and after Employee's employment by Employer until such time as the Confidential Information shall become public knowledge, other than as a result of Employee's breach of this Agreement or breach by those acting in concert with Employee or on Employee's behalf.

C.    **Non-Disclosure Obligations.**

Employee agrees and covenants:

1.    to treat all Confidential Information as strictly confidential and as the sole and exclusive property of Employer;

2.    not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow Confidential Information to be disclosed, published, communicated or made available, in whole or part,

3

to any entity or person whatsoever and, in any event, not to anyone outside of the direct employ of Employer except as required in the performance of Employee's authorized employment duties to Employer or with prior consent of an authorized officer acting on behalf of Employer in each instance, but only to the extent of such duties or consent;

3. to comply with Employer's procedures and policies pertaining to the management and protection of Confidential Information and trade secrets, as such procedures and policies may be updated from time to time;

4. to use the Confidential Information only for the benefit of Employer and not to use or attempt to use any Confidential Information for Employee's own purposes or for any other purposes;

5. not to use or attempt to use any Confidential Information in any manner which may injure or cause loss either directly or indirectly to the Employer or its businesses, or which may be likely so to do;

6. to use all reasonable efforts to prevent the publication, disclosure or use of any Confidential Information in any way or any form not authorized hereunder;

7. to immediately notify the Employer of any suspected or actual unauthorized use, copying or disclosure of any Confidential Information by Employee or any other person;

8. allow the Employer to inspect any electronic device in Employee's possession or under Employee's control which is or was used by Employee in the course of Employee's employment in order for the Employer to satisfy itself of Employee's compliance with the terms of this clause C; and

9. upon the termination of Employee's employment, to immediately return or destroy, at Employer's sole option, all Employer Materials in Employee's possession and, at Employer's request, execute a termination certificate in the form set forth in Exhibit A attached hereto, stating that all such materials have been returned or destroyed and Employee's acknowledgement of its continuing obligations under this Section 1.

D. **Required Disclosures; Whistleblower Protection**. Notwithstanding any other provision of this Agreement (including Section 1.C), nothing in this Agreement shall be construed to prevent disclosure of Confidential Information to the extent required by law or a valid court order, provided that the Employee's disclosure does not exceed the minimum extent required by law or order and Employee provides prompt written notice of such requirement to an authorized officer of Employer and provides all assistance Employer reasonably requires to contest such disclosure. In addition, nothing in this Agreement shall be construed to prevent Employee from making any disclosure or communication protected by

4

law or to prohibit Employee from reporting possible violations of law to a governmental agency or entity or require Employee to seek authorization from Employer or to notify Employer if Employee makes such reports.

E.  **Defense of Trade Secrets Act**. Under the U.S. Defend Trade Secrets Act (18 U.S.C. section 1833(b)(1)), Employee shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and Employee does not disclose the trade secret except pursuant to a court order.

2.  **Ownership of Work Product**

    A.  **Definitions.**

        1.  "Intellectual Property Rights" means: all (i) trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service names and service name rights, domain names and social media handles and all rights therein (together with the goodwill associated with any of the foregoing), (ii) patents and patent rights, (iii) copyrights and copyright rights, (iv) trade secret rights, rights of publicity, mask work rights, rights of privacy, Moral Rights (as defined in Section 2.D), data, database and software rights, and all other intellectual property rights and proprietary rights as may exist now or hereafter come into existence, regardless of whether such rights arise under the laws of the United States or any other jurisdiction or under any treaty or convention, and all registrations, applications, extensions, continuations, revisions, reissues, and renewals in connection with any of the foregoing, as well as all rights of priority and all rights to sue for past, present and future infringement, misappropriation, dilution, misuse or other violation of any of the foregoing, including for injury to goodwill, and to recover all proceeds relating to any of the foregoing, including licenses, royalties, income, payments, claims, damages (including attorneys' fees and expert fees) and proceeds from lawsuits under the laws of any jurisdiction worldwide.

        2.  "Work Product" means all writings, works of authorship, technology, inventions, discoveries, designs, graphics, source code (including HTML and other code), trade secrets, ideas, analytic insights, improvements, developments, technology, formulas, compositions, algorithms, software, audio or video files or other types of work product that are authored, invented, created, developed, amended, conceived or reduced to practice by Employee individually or jointly with others during the period of Employee's employment by Employer or completed within one (1) year thereafter, with respect to any specific Work Product that was

5

substantially begun during the course of Employee's period of employment by Employer and (i) was created using Employer's resources or (ii) relates in any way to the business or contemplated business, research or development activities of Employer (regardless of when or where the Work Product is prepared or whose equipment or other resources are used in preparation of such Work Product), including in any case all printed, physical and electronic copies and other tangible embodiments and notes or materials related thereto. Work Product shall not include any Employee Pre-Existing Intellectual Property.

B. **Disclosure and Ownership.** Employee hereby acknowledges and agrees that all Confidential Information, Employer Materials and Work Product shall be the sole and exclusive property of Employer to the maximum extent permitted by law. Employee agrees to disclose fully in writing all Work Product to Employee's immediate supervisor or as otherwise designated by Employer promptly following the creation or development thereof. Employee agrees that, to the maximum extent permitted by applicable law, all Work Product and all Intellectual Property Rights therein and thereto shall be the sole and exclusive property of Employer. Employee further acknowledges and agrees that all of the Work Product consisting of copyrightable subject matter, including any computer program, programming documentation, and other work of authorship is "work made for hire" as defined in in the Copyright Act of 1976 (17 U.S.C. §101), as amended), and such copyrights are therefore owned by Employer. To the extent that all worldwide rights, title and interests, including all Intellectual Property Rights, in and to any Work Product do not, by operation of law or otherwise, vest solely and exclusively in Employer, Employee hereby irrevocably assigns and transfers solely and exclusively to Employer (by way of present assignment of existing and future rights), all Work Product and all worldwide rights, title, and interests, including all Intellectual Property Rights, in and to such Work Product, free and clear of any liens and other encumbrances and without reservations of any kind. Each such assignment and transfer shall be deemed effective as of the date that such Work Product is first created or developed or otherwise reduced to practice. Employee understands and agrees that the foregoing assignment includes a present conveyance to Employer of ownership of Work Product and Intellectual Property Rights that are not yet in existence.

C. **Employee Pre-Existing Intellectual Property.**

1. Employee has attached hereto as Exhibit B, a complete list of all existing Intellectual Property Rights and writings, works of authorship, technology, inventions, discoveries, designs, graphics, source code (including HTML and other code), trade secrets, ideas, analytic insights, inventions, improvements, developments, technology, formulas, compositions, algorithms, software, audio or video files or other work product or materials to which Employee claims ownership (whether partial or in its entirety) separate from Employee's employment by Employer as of the date of this Agreement and which relate, directly or indirectly, to

6

Employer's existing or proposed business, products, or research and development (the "Employee Pre-Existing Intellectual Property"). If no list is attached to this Agreement, Employee represents and warrants that there is no such Employee Pre-Existing Intellectual Property. Employee will inform Employer in writing, and obtain Employer's express written permission, before incorporating any Employee Pre-Existing Intellectual Property into any Work Product or otherwise utilizing such Employee Pre-Existing Intellectual Property in the course of Employee's employment with Employer.

2.      To the extent any Work Product includes, is based on, or is a derivative or improvement of, or cannot reasonably be made, used, imported, sold, reproduced, distributed, modified, adapted, displayed, performed or otherwise exploited without using or violating any Employee Pre-Existing Intellectual Property or any other Intellectual Property Rights that Employee owns or licenses that have not been assigned hereunder, Employee hereby grants to Employer a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, transferable, non-exclusive right and license (with the right to grant and authorize sublicenses through multiple levels of sublicensees) to exploit and exercise all such Pre-Existing Intellectual Property and other Intellectual Property Rights in support of Employer's making, having made, using, importing, offering for sale, selling, reproducing, distributing, modifying, adapting, preparing derivative works of, displaying, performing, and otherwise exploiting any such Work Product (including any embodiments, modifications, improvements and derivatives thereof.)   Each such license shall be deemed effective as of the date that such Work Product is first created or developed or otherwise reduced to practice.

D.      **Assignment or Waiver of Moral Rights and Other Intellectual Property Rights.**  Any assignment of Work Product hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, modification, attribution, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" anywhere in the world (collectively, "Moral Rights") and rights under section 987 of the California Civil Code. To the extent that any Moral Rights or any other Intellectual Property Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where such Moral Rights or such other Intellectual Property Rights exist, Employee hereby waives such Moral Rights and such other Intellectual Property Rights and consents to any action of Employer and its successors, assigns and (sub)licensees that would violate such Moral Rights and other Intellectual Property Rights in the absence of such consent. Employee shall confirm any such waivers and consents from time to time as requested by Employer. Additionally, to the extent any rights hereunder cannot be waived, Employee hereby grants to Employer, its successors and assigns, a perpetual, irrevocable, exclusive, worldwide, royalty-free license, with the right to grant and

7

authorize sublicenses through multiple tiers of sublicensees, to do anything the owner of such rights could do.

E.   **Statutory Limitations**.  Employer acknowledges that this Agreement does not apply, and no assignment made hereunder shall apply, to any Work Product which qualifies fully under section 2870 of the California Labor Code, a copy of which is attached as Exhibit C.

F.   **Execution of Documents**.  Employee agrees to perform all acts or refrain from taking action, as required, and agrees to execute and deliver to Employer any and all applications, oaths, declarations, affidavits, waivers, assignments and other documents and instruments as shall be deemed necessary or desirable by Employer (either during or after Employee's employment) to evidence, obtain, perfect, transfer to Employer or enforce any of the Intellectual Property Rights related to the Work Product or other rights in this Section 2, and Employer's ownership or other rights thereto, throughout the world and to render all lawful assistance in connection with the same.  Employee agrees that the obligations set forth in this Section 2 shall continue after the termination or expiration of this Agreement and after the termination of Employee's employment for any reason.

G.   **Power of Attorney**.  Employee hereby irrevocably designates and appoints Employer and its duly authorized officers and agents, as Employee's agents and attorney-in-fact to act for and on Employee's behalf to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth above in this Section 2, including the perfection of assignment and the prosecution and issuance of Intellectual Property Rights or other rights in connection with the Work Product and improvements thereto with the same legal force and effect as if executed by Employee.  This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

H.   **Open Source**.  Employee shall not incorporate any open source or other third party code into any Work Product or into any of Employer's products or services without Employer's prior written consent.

I.   **Records**. Employee shall maintain adequate, current, and accurate written records with respect to all Work Product.  As between Employer and Employee, the records are and will be available to and remain the sole and exclusive property of Employer at all times.

## 3.   Publicity

Employee hereby consents to any and all uses and displays by Employer and its agents of Employee's name, voice, likeness, image, appearance and biographical information in or in connection with any printed, electronic or digital materials, including any pictures, audio or video recordings, digital images, websites, television programs, advertising, sales or marketing brochures, printed materials and computer media, throughout the world and at any time during or

8

after Employee's employment by Employer for all legitimate business purposes of Employer (the "Permitted Use"). Employee hereby forever releases Employer and its directors, officers, employees, representatives and agents from any and all claims, actions, damages, losses, costs, expenses and liability of any kind arising under any legal or equitable theory whatsoever at any time during or after the period of Employee's employment by Employer in connection with any Permitted Use.

**4.     Non-Disparagement**

Employee agrees and covenants that Employee will not at any time, during or after Employee's employment, make, publish or communicate, or encourage others to make, publish, or communicate, to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning Employer or Employer's affiliates, any of their respective businesses, products, services or activities, or any of their respective current or former officers, directors, managers, employees or agents. This Section 4 shall not prohibit Employee from providing truthful testimony in response to a validly issued subpoena.

**5.     Solicitation of Employees**

Employee agrees that any attempt on Employee's part to induce others to leave Employer's employ, or any effort by Employee to interfere with Employer's relationship with its other employees and consultants would be harmful and damaging to Employer. Employee agrees that during the term of Employee's employment and for a period of one year following the termination of Employee's relationship with Employer for any reason, whether voluntary or involuntary, Employee will not in any way, directly or indirectly, without prior written consent from the Employer, (i) induce or attempt to induce any employee or consultant of Employer to quit Employer; (ii) otherwise interfere with or disrupt Employer's relationship with its employees or consultants; (iii) solicit, entice, or hire away any employee or consultant of Employer; or (iv) hire, engage, or do business with any employee or consultant of Employer. The restrictions of this Section 5 shall apply to any former employee or consultant of Employer whose employment or engagement with Employer ceased less than six (6) months before the inducement, interference, hiring, or solicitation. This Section 5 shall survive the termination or expiration of this Agreement and the termination of Employee's employment for any reason.

**6.     Former Employer Information; No Conflict; Compliance with Rules**

A.     Employee represents that the performance of the terms of this Agreement and acting as an employee of Employer do not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by Employee in confidence or in trust prior to employment by Employer, and Employee shall not disclose to Employer or induce Employer to use any confidential or proprietary information or materials belonging to any previous employers or others. Employee further agrees not to bring onto Employer's premises or transfer onto Employer's systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless

9

disclosure to, and use by, Employer has been consented to in writing by such third party.

B.   Employee has not entered into and shall not enter into any agreement, either written or oral, in conflict with this Agreement or in conflict with Employee's employment with Employer.

C.   Employee shall comply with all rules and policies of Employer, as they may be amended from time to time, including with respect to access, safekeeping and return of Confidential Information, Employer Materials and Work Product.

## 7.   At-Will Employment

Employee agrees and understands that employment with Employer is "at-will," meaning that it is not for any specified period of time and can be terminated by Employee or by Employer at any time, with or without advance notice, and for any or no particular reason or cause. Employee understands and agrees that it also means that job duties, title and responsibility and reporting level, compensation and benefits, as well as Employer's personnel policies and procedures, may be changed at any time at will by Employer. Employee understands and agrees that nothing about the fact or the content of this Agreement is intended to, nor should be construed to, alter the at-will nature of Employee's employment by Employer.

## 8.   Notice of New Business; Authorization to Notify Others

Throughout Employee's employment and for a period of one year following the termination of Employee's relationship with Employer for any reason, whether voluntary or involuntary, Employee shall give advance notice to Employer of each new employment or other business activity Employee undertakes, which notice shall state the name and address of the person or entity for whom such activity is to be undertaken and the nature of Employee's business relationship(s) and position(s) with such person or entity. Employee agrees that Employer shall have the right to provide notice of Employee's obligations under this Agreement and/or a copy of this Agreement to any person or entity that is an employer or prospective employer of Employee, and any person or entity that may engage Employee to otherwise provide services or that otherwise may engage with Employee in a new business activity. Employee agrees to defend, indemnify and hold all employees, directors, and officers of Employer harmless from any and all claims, costs and damages in any way arising in connection with Employer providing notice of Employee's obligations under this Agreement and/or a copy of this Agreement to any person.

## 9.   Obligations and Remedies

A.   Employee agrees that an impending or existing violation of any of the covenants contained in this Agreement would cause Employer and its affiliates irreparable injury for which they would have no adequate remedy at law and agrees that Employee further agrees that nothing in this Agreement is intended to limit any remedy of Employer under the Uniform Trade Secrets Act. Employer shall be entitled to obtain injunctive relief prohibiting such violation, in addition to any other rights and remedies available to it in contract, at law, in equity, by statute or

10

otherwise. Employee agrees and consents that Employer shall be entitled to a temporary or permanent injunction or other equitable relief against any such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. Employee also agrees that, in the event that Employee breaches any of the covenants contained in this Agreement or initiates legal action to challenge any such covenant, Employee shall be liable to Employer for attorneys' fees and costs incurred in any legal activity engaged in, defended by, or prosecuted by Employer to enforce such covenant or seek remedy of such breach.

B.  Employee's obligations under each of the provisions of this Agreement are independent, separable, and independently enforceable of each other and of any legal obligations that may exist between Employer and Employee. The real or perceived existence of any claim or cause of action of Employee against Employer, whether predicated on this Agreement or some other basis, shall not alleviate Employee of Employee's obligations under this Agreement and shall not constitute a defense to the enforcement by Employer of the restrictions and covenants contained herein. No right, power or remedy conferred upon a party in this Agreement shall be exclusive, and each such right, power and remedy shall be cumulative and in addition to every other right, power, or remedy, whether conferred in this Agreement, the Employment Agreement or any other agreement, or now or hereafter available at law, in contract, in equity, by statute or otherwise.

## 10.  General

A.  **Governing Law**. This Agreement will be governed and interpreted in accordance with the laws of California, without giving effect to provisions governing the choice of law.

B.  **Arbitration and Class Action Waiver**. Employee agrees that any dispute, controversy or claim arising out of or relating to or resulting from Employee's employment with Employer, including any alleged violation of statute, common law or public policy shall be submitted to final and binding arbitration before the American Arbitration Association ("AAA") to be held in Los Angeles County, California before a single arbitrator, in accordance with the then-current Employment Arbitration Rules and Mediation Procedures of the AAA and the Federal Arbitration Act, as modified by the terms and conditions contained in this paragraph. By signing this Agreement, Employee agrees to waive all rights to a jury trial and the right to pursue any class or representative claims to the maximum extent allowed by law. To the extent a class or representative claim may not be waived, Employee agrees to stay any such claims until after all claims subject to arbitration are fully resolved. The arbitrator shall be selected by mutual agreement of the parties or, if the parties cannot agree, then by striking from a list of arbitrators supplied by the AAA. The arbitrator shall issue a written opinion stating the essential findings and conclusions on which the arbitrator's award is based. Employer will pay the arbitrator's fees and arbitration expenses and any

11

other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). This agreement to arbitrate has been freely negotiated and is mutually entered into between the parties. Employee fully understands and agrees that Employee is giving up certain rights otherwise afforded to Employee by civil court actions, including but not limited to the right to a jury trial.

C.   **Assignment; Beneficiaries.** The terms, provisions, covenants and agreements contained in this Agreement shall apply to, be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns. Employer may assign this Agreement to its successors or affiliates. Employee may not assign this Agreement. If this Agreement is assigned to an affiliate of Employer, or any other assignee, in connection with the transfer of Employee's employment to such member or other assignee, to the extent appropriate and on a going forward basis, references to "Employer" shall be deemed replaced with references to such new employer. Employee understands and agrees that the terms of this Agreement will continue to apply to and bind Employee even if Employee is transferred at some time from Employer or any of its affiliates or subsidiaries to another of Employer or any of its affiliates or subsidiaries. Employee acknowledges further that Employer's affiliates are intended beneficiaries of this Agreement.

D.   **Modification and Waiver.** No provision of this Agreement may be amended, modified or waived unless such amendment, modification or waiver is agreed to in writing and signed by Employee and by a duly authorized officer of Employer (other than Employee). No delay or omission by the parties in exercising any right under this Agreement will operate as a waiver of that or any other right. No waiver or consent given by a party on any occasion will be construed as a bar to or as a continuing waiver of any right on any other occasion.

E.   **Construction.** This Agreement shall be deemed drafted equally by both Employer and Employee. The headings in this Agreement are only for convenience and are not intended to affect construction or interpretation. Any references to paragraphs, subparagraphs, sections or subsections are to those parts of this Agreement, unless the context clearly indicates to the contrary. Unless the context clearly indicates to the contrary, (i) the plural includes the singular and the singular includes the plural; (ii) "includes," "including" and other similar words are each "without limitation"; (iii) "herein," "hereof," "hereunder" and other similar compounds of the word "here" refer to the entire Agreement and not to any particular paragraph, subparagraph, section or subsection; and (vi) all pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to may require.

F.   **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions shall be modified to the

minimum extent necessary to comply with applicable law and the intent of the parties. If any provision of this Agreement, or application of it to any person, place, or circumstances, shall be held by an arbitrator or court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect. Employee and Employer agree that, except as may be otherwise set forth in Section 10.B., the arbitrator or court of competent jurisdiction is expressly authorized to modify any unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as its deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent of the law.

G.  **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding between Employer and Employee relating to the subject matter herein and, as of the Effective Date, supersedes all prior discussions between the parties. Employee understands and acknowledges that (i) no other representation or inducement has been made to Employee, (ii) Employee has relied on Employee's own judgment and investigation in accepting employment with Employer, and (iii) Employee has not relied on any representation or inducement made by any officer, employee or representative of Employer.  Employee understands and agrees that any subsequent change or changes in Employee's duties, salary or compensation will not affect the validity or scope of this Agreement.

H.  **Counterparts.**  This Agreement may be executed by facsimile or other electronic transmission and in counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one agreement binding on the parties.

EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS ITS TERMS.  EMPLOYEE ACCEPTS THE OBLIGATIONS THIS AGREEMENT IMPOSES WITHOUT RESERVATIONS.  NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO EMPLOYEE TO INDUCE THE ENTRY INTO THIS AGREEMENT THAT ARE NOT EXPRESSLY CONTAINED HEREIN. AT THE TIME OF SIGNING, EMPLOYEE HAS COMPLETELY DESCRIBED IN SUFFICIENT DETAIL ON EXHIBIT B ANY EMPLOYEE PRE-EXISTING INTELLECTUAL PROPERTY.

*[Signature Page Follows]*

13

IN WITNESS WHEREOF, the parties have agreed to and accepted this Agreement as of the Effective Date.


EMPLOYEE                                          [BYTEDANCE INC.]


_____          _____
Employee Signature

Yintao Yu                                         By:_____
Employee Name (Please Print)

                                                  Title:_____


*[Signature page for Confidentiality and Inventions Assignment Agreement]*

**EXHIBIT A**

FORM OF TERMINATION CERTIFICATE

This is to certify that I do not have in my possession, nor have I failed to return, any Employer Materials or other documents, material, equipment or other property belonging to Employer.

I further certify that I have complied with and will continue to comply with all the terms of the Employee Confidentiality and Inventions Assignment Agreement which I signed.

I further agree that, in accordance with the Employee Confidentiality and Inventions Assignment Agreement, I will preserve as confidential and not use any Confidential Information or other information which has or could have commercial value or disclosure of which could be detrimental to the interests of Employer, whether or not such information is identified as Confidential Information by Employer.

Signed: _____

Dated: _____8/30/2017_____

## EXHIBIT B

1. The following is a complete list of all inventions, confidential information, work product or other materials or Intellectual Property Rights relevant to the subject matter of my employment with Employer that have been made, discovered, conceived, first reduced to practice or developed by me or jointly with others prior to my employment by Employer that I desire to remove from the operation of the Employee Confidentiality and Inventions Assignment Agreement except as provided in Section 2.C.

      \_\_\_    No Intellectual Property.

      \_\_\_    See below:  Any and all Intellectual Property regarding:

      \_\_\_    Additional sheets attached.

2. I propose to bring to my employment the following materials and documents of a former employer:

      \_\_\_    No materials or documents

      \_\_\_    See below:

Date: 8/30/2017        Employee Signature: _____

**EXHIBIT C**

**California Labor Code § 2870**

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

ZN2017 0823006

Dated August 22, 2017

**Tank Exchange, Inc.**
(as Assignor)

and

**Bytedance Inc.**
(as Assignee)

---

## Patent Assignment Agreement

---

# CONTENTS

**Clause**                                                                                      **Page**

| 1. | DEFINITIONS AND INTERPRETATION | 2 |
| 2. | ASSIGNMENT | 3 |
| 3. | FURTHER ASSURANCE | 3 |
| 4. | GENERAL | 4 |
| **SCHEDULE 1 THE PATENTS** | | 6 |
| | Part 1 Registered Patents | 6 |

LO\2894760.1                                                                    8/22/2017

**THIS AGREEMENT** is made on _____, 2017.

**BETWEEN:**

(1) **Tank Exchange, Inc.**, a company incorporated and registered in **Delaware, United States**, with company number **5744699** (the "**Assignor**"); and

(2) **Bytedance Inc.**, a company incorporated and registered in **Delaware, United States**, with company number **5943290** (the "**Assignee**").

**BACKGROUND**

(A) Pursuant to the (i) Patent Registration Application for "Commodity Exchange for Pre-Purchasing Commodities and Trading Future Rights to Receive Commodities" and (ii) Combined Assignment/Declaration by Yintao Yu dated December 5, 2015, the Assignor is the owner of Patents (as defined below).

(B) The Assignor and Assignee desire that the Patents be assigned by the Assignor to the Assignee on the terms set out in this Agreement.

IT IS AGREED as follows:

## I. DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

In this Agreement, save as otherwise specifically provided the following words have the following meanings:

"**Agreement**" means this Patent assignment;

"**Encumbrance**" means any mortgage, charge, pledge, option, licence, attachment, restriction, prior assignment, security interest, title retention, preferential right, lien, right of pre-emption, right of set-off or any limitation or restriction howsoever created or arising upon the ability of the Assignor to assign the Patents; and

"**Patents**" means the registered Patents and the applications owned by the Assignor, short particulars of which are set out in Schedule 1, together with any and all inventions subsisting therein or relating thereto. The Combined Assignment/Declaration by Yintao Yu dated December 5, 2015 is also set out in Schedule 1.

### 1.2 Interpretation

In this Agreement (except where the context otherwise requires):

(a) any reference to the Background or a Clause or Schedule is to the relevant background item, clause or schedule of or to this Agreement. Any reference to a paragraph is to the relevant paragraph of the Schedule in which it appears;

(b) the index and clause headings are included for convenience only and shall not affect the interpretation of this Agreement;

(c) reference to a party includes its successors and permitted assigns;

(d) reference to "writing" or "written" includes faxes and any non-transitory form of visible reproduction of words (but not e-mail).

3

1.3     **Schedules**

The Schedules form part of this Agreement and shall have effect as if set out in full in the body of this Agreement and any reference to this Agreement includes the Schedules.

**2.      ASSIGNMENT**

2.1     In return for a consideration of **US$600,000** from the Assignee, wired to the Assignor's bank account:



Title of account: Tank Exchange, Inc.

and receipt of which the Assignor hereby acknowledges, the Assignor hereby assigns with full title guarantee to the Assignee absolutely all its right, title and interest in and to the Patents, subject to all Encumbrances, including:

(a)     the absolute entitlement to any registered Patents granted pursuant to any of the applications comprised in the Patents; and

(b)     the right to bring, make, oppose, defend, appeal proceedings, claims or actions and obtain relief (and to retain any damages recovered) in respect of any infringement, or any other cause of action arising from ownership of any of the Patents whether occurring before, on or after the date of this Agreement;

(c)     all rights to claim priority from the Patents;

(d)     all rights to any extensions, renewals or amendments to the Patents;

(e)     the right to file divisional applications based on any Patent and to prosecute and obtain grant of patent on each and any such divisional application;

(f)     in respect of each and any invention disclosed in the Patents, the right to file an application, claim priority from such application, and prosecute and obtain grant of patent or similar protection in or in respect of any country or territory in the world; and

(g)     the right to extend to or register in, or in respect of, any country or territory in the world each and any of the Patents, and each and any of the applications comprised in the Patents or filed as aforesaid, and to extend to or register in or in respect of any country or territory in the world any patent or like protection granted on any of such applications;

**3.      FURTHER ASSURANCE**

3.1     The Assignor shall, at its own cost, perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution or delivery of) all further documents, necessary or desirable and requested by the Assignee in order to ensure that the full benefit of the right, title and interest assigned and transferred to the Assignee under this Agreement vests in the Assignee, including registration of the Assignee as applicant or registered proprietor of the Patents listed in Part 1 and Part 2 of Schedule 1 at the relevant intellectual property registry or authority.

4

## 4.    GENERAL

### 4.1    Waivers

No failure or delay by either party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or operate or be construed as a waiver or variation of it or preclude its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

### 4.2    Amendment

No variation of this Agreement shall be valid unless it is in writing and signed by or on behalf of both parties.

### 4.3    Severability

If and to the extent that any provision of this Agreement is held to be illegal, void or unenforceable, such provision shall be given no effect and shall be deemed not to be included in this agreement but without invalidating any of the remaining provisions of this agreement.

### 4.4    Entire Agreement

This agreement sets out the entire agreement and understanding between the parties in respect of the subject matter of this Agreement. It is agreed that:

(a)    neither party has entered into this Agreement in reliance upon any representation, warranty or undertaking of the other party which is not expressly set out in this Agreement;

(b)    neither party shall have any remedy in respect of misrepresentation or untrue statement made by the other party which is not contained in this Agreement;

(c)    this clause shall not exclude any liability for, or remedy in respect of, fraudulent misrepresentation.

### 4.5    Governing law and Dispute Resolution

(a)    This Agreement, the relationship between the parties and any non-contractual rights and the performance of the obligations in connection with this Agreement, shall be governed by, and interpreted in accordance with Hong Kong Law.

(b)    Each of the parties agree that any dispute, controversy or claim arising out of or relating to this Agreement, including any alleged violation of statute, common law or public policy shall be submitted to final and binding arbitration before Hong Kong International Arbitration Centre (the "HKIAC") to be held in Hong Kong before a single arbitrator, in accordance with the Hong Kong International Arbitration Centre Administered Arbitration Rules (the "HKIAC Rules") then in force.  Each party to the arbitration shall cooperate with each other party to the arbitration in making full disclosure of and providing complete access to all information and documents reasonably requested by such other party in connection with such arbitral proceedings, subject only to any confidentiality obligations binding on such party. The award of the arbitral tribunal shall be final and binding upon the parties thereto, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award. During the course of the arbitral tribunal's adjudication of any dispute, this Award Agreement shall continue to be performed except with respect to the part in dispute and under adjudication.

5

4.6    **No Third Party Rights**

A person who is not a party to this Agreement shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

**EACH PARTY** has executed this Agreement, or caused this Agreement to be executed by its duly authorised representatives.

6

## SCHEDULE 1

### THE PATENTS

**Part 1**
**Registered Patents and/or Patents Applications**

| Country | Title | Filing No. | Filing Date | Registration Date | Registration No. |
|---------|-------|-----------|-------------|-------------------|------------------|
| U S | Commodity ... | 14/918,279 | Oct 20, 2015 | Oct 20, 2015 | 14/918,279 |

**Part 2**

Combined Assignment/Declaration by Yintao Yu dated December 5, 2015

7

8/22/2017

**SIGNATURES**

SIGNED by                                          )
Yintao Yu

Title: 𝐶𝐸𝑂                                         )

on behalf of Tank Exchange, Inc.  )
                                                   )


SIGNED by                                          )
Yiming Zhang

Title: Director                                    )

on behalf of                                       )
Bytedance Inc.                                     )

### Side Letter

This side letter (the "Sider Letter") is made as of *Aug 27*, 2017 by and between Bytedance Inc. (the "Company"), a company incorporated in Delaware, United States, and **Yintao Yu**, a PRC citizen with PRC passport number E90558407 (the "Employee"), an employee of the Company or its affiliate.

### W I T N E S S E T H:

WHEREAS, the Employee signed an offer letter with Bytedance Inc. on _____, 2017, pursuant to which the Company offered to give a payment for acquisition of US$600,000.

WHEREAS, on *Aug 22*, 2017, the Company and Tank Exchange, Inc., a company incorporated in Delaware, United States, entered into a patent assignment agreement (the "Patent Assignment Agreement"), pursuant to which the Company agreed to pay US$600,000 for the acquisition of certain patent held by Tank Exchange, Inc.

THEREFORE, the Employee hereby confirms that: by signing and executing the Patent Assignment Agreement with Tank Exchange, Inc., the Company has satisfied its obligation under the offer letter for a payment for acquisition of US$600,000.

*(Remainder of page intentionally left blank.)*

IN WITNESS WHEREOF, each party hereto has caused this Side Letter to be duly executed as of the day and year first above written.

BYTEDANCE INC.

By: _____

Name: YINTAO YU

Title:

Employee:

By: _____

[*Signature Page*]

2

## BYTEDANCE LTD. 2012 STOCK INCENTIVE PLAN

### NOTICE OF STOCK OPTION AWARD

Grantee's Name and Address:     YINTAO "ROGER" YU

You (the "Grantee") have been granted an option to purchase Ordinary Shares, subject to the terms and conditions of this Notice of Stock Option Award (the "Notice"), the BYTEDANCE LTD. 2012 Stock Incentive Plan, as amended from time to time (the "Plan") and the Stock Option Award Agreement (the "Option Agreement") attached hereto, as follows. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Notice.

| | |
|---|---|
| Award Number | |
| Grant Date | September 30, 2017 |
| Vesting Commencement Date | August 30, 2017 |
| Exercise Price per Share | US$ 0.02 |
| Total Number of Ordinary Shares Subject to the Option (the "Shares") | 220,000 |
| Total Exercise Price | US$ 4,400 |
| Expiration Date: | September 30, 2027 |
| Post-Termination Exercise Period: | Three (3) Months |

Vesting Schedule:

Subject to the Grantee's Continuous Service and other limitations set forth in this Notice, the Plan and the Option Agreement, the Option may be exercised, in whole or in part, in accordance with the Schedule as below:

15% of the Shares subject to the Option shall vest on the first anniversary of the Vesting Commencement Date, 25% of the Shares subject to the Option shall vest on the second anniversary of the Vesting Commencement Date, 25% of the Shares subject to the Option shall vest on the third anniversary of the Vesting Commencement Date, and the remaining 35% of the Shares subject to the Option shall vest on the fourth anniversary of the Vesting Commencement Date.

During any authorized leave of absence, the Company shall have the right to suspend the vesting of the Option as provided in this schedule if, in addition to the applicable paid leave of absence that the Grantee is entitled to pursuant to the applicable laws and the Company's policies, such leave of absence exceeds an accumulative period of ten (10) days within a 12-month period. Vesting of the Option shall resume upon the Grantee's termination of the leave of absence and return to service to the Company or a Related Entity. The vesting schedule of the Option shall be extended by the length of the suspension.

In the event of termination of the Grantee's Continuous Service for Cause (as defined below), the Grantee's right to exercise the Option shall terminate concurrently with the termination of the Grantee's Continuous Service, except as otherwise determined by the administrator of the Plan, which shall be the Board of Directors or any person designated by the Board of Directors (the "Administrator"), and the Company shall have rights to repurchase

all vested options purchased by the Grantee, under the sole discretion of the Administrator, at the par value of the Shares.

The Grantee grants a power of attorney to the Board or any person designated by the Board to exercise the voting rights with respect to the Shares.

IN WITNESS WHEREOF, the Company and the Grantee have executed this Notice and agree that the Option is to be governed by the terms and conditions of this Notice, the Plan, and the Option Agreement.

BYTEDANCE LTD.
a company incorporated under the laws of the
Cayman Islands
For and on behalf of
**Bytedance Ltd.**

By: _____

Title: _____
*Authorized Signature(s)*

THE GRANTEE ACKNOWLEDGES AND AGREES THAT ANY EXERCISE OF THE OPTION SHALL BE STRICTLY COMPLIANCE WITH APPLICABLE LAWS, INCLUDING WITHOUT LIMITATION, THOSE REGULATIONS ENACTED BY THE STATE ADMINISTRATION OF FOREIGN EXCHANGE OF THE PRC.

THE GRANTEE ACKNOWLEDGES AND AGREES THAT THE SHARES SUBJECT TO THE OPTION SHALL VEST, IF AT ALL, ONLY DURING THE PERIOD OF THE GRANTEE'S CONTINUOUS SERVICE (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THE OPTION OR ACQUIRING SHARES HEREUNDER). THE GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS NOTICE, THE OPTION AGREEMENT, OR THE PLAN SHALL CONFER UPON THE GRANTEE ANY RIGHT WITH RESPECT TO FUTURE AWARDS OR CONTINUATION OF THE GRANTEE'S CONTINUOUS SERVICE, NOR SHALL IT INTERFERE IN ANY WAY WITH THE GRANTEE'S RIGHT OR THE RIGHT OF THE COMPANY OR RELATED ENTITY TO WHICH THE GRANTEE PROVIDES SERVICES TO TERMINATE THE GRANTEE'S CONTINUOUS SERVICE, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE. THE GRANTEE ACKNOWLEDGES THAT UNLESS THE GRANTEE HAS A WRITTEN EMPLOYMENT AGREEMENT WITH THE COMPANY TO THE CONTRARY, THE GRANTEE'S STATUS IS AT WILL.

The Grantee acknowledges receipt of a copy of the Plan and the Option Agreement, and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts the Option subject to all of the terms and provisions hereof and thereof. The Grantee has reviewed this Notice, the Plan, and the Option Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Notice, and fully understands all provisions of this Notice, the Plan and the Option Agreement. The Grantee hereby agrees that all questions of interpretation and administration relating to this Notice, the Plan and the Option Agreement shall be resolved by the Administrator in accordance with Section 19 of the Option Agreement. The Grantee further agrees to the Dispute Resolution and Arbitration Procedures in accordance with Section 20 of the Option Agreement. The Grantee further agrees to notify the Company upon any change in the residence address indicated in this Notice.

Dated: _____        Signed: _____
                                                        Grantee

Award Number: _____

## BYTEDANCE LTD. 2012 STOCK INCENTIVE PLAN

### STOCK OPTION AWARD AGREEMENT

1.    Grant of Option.  **BYTEDANCE LTD.**, a company incorporated under the laws of the Cayman Islands (the "Company"), hereby grants to the Grantee (the "Grantee") named in the Notice of Stock Option Award (the "Notice"), an option (the "Option") to purchase the Total Number of Ordinary Shares subject to the Option (the "Shares") set forth in the Notice, at the Exercise Price per Share set forth in the Notice (the "Exercise Price") subject to the terms and provisions of the Notice, this Stock Option Award Agreement (the "Option Agreement") and the Company's 2012 Stock Incentive Plan, as amended from time to time (the "Plan"), which are incorporated herein by reference. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Option Agreement.

2.    Exercise of Option.

(a)    Right to Exercise.  The Option shall be exercisable only in compliance with Applicable Laws. The Option shall be exercisable during its term in accordance with the vesting schedule set out in the Notice and with the applicable provisions of the Plan and this Option Agreement. The Option shall be subject to the provisions of Section 11 of the Plan relating to the exercisability or termination of the Option in the event of a Corporate Transaction or Change in Control. The Grantee shall be subject to reasonable limitations on the number of requested exercises during any monthly or weekly period as determined by the Administrator. In no event shall the Company issue fractional Shares.

(b)    Method of Exercise.  The Option shall be exercisable by delivery of an exercise notice (a form of which is attached as Exhibit A) or by such other procedure as specified from time to time by the Administrator which shall state the election to exercise the Option, the whole number of Shares in respect of which the Option is being exercised, and such other provisions as may be required by the Administrator. The exercise notice shall be delivered in person, by certified mail, or by such other method (including electronic transmission) as determined from time to time by the Administrator to the Company accompanied by payment of the Exercise Price. The Option shall be deemed to be exercised upon receipt by the Company of such notice accompanied by the Exercise Price, which, to the extent selected, shall be deemed to be satisfied by use of the broker-dealer sale and remittance procedure to pay the Exercise Price provided in Section 4(d), below.

(c)    Taxes.  No Shares will be delivered to the Grantee or other person pursuant to the exercise of the Option until the Grantee or other person has made arrangements acceptable to the Administrator for the satisfaction of applicable income tax and employment tax withholding obligations. Upon exercise of the Option, the Company or the Grantee's employer may offset or withhold (from any amount owed by the Company or the Grantee's employer to the Grantee) or collect from the Grantee or other person an amount sufficient to satisfy such tax withholding obligations.

3.    Grantee's Representations.  The Grantee understands that neither the Option nor the Shares exercisable pursuant to the Option have been registered under the Securities Act of

1933, as amended or any United States securities laws. In the event the Shares purchasable pursuant to the exercise of the Option have not been registered under the Securities Act of 1933, as amended, at the time the Option is exercised, the Grantee shall, if requested by the Company, concurrently with the exercise of all or any portion of the Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as Exhibit B.

4.      Method of Payment. Payment of the Exercise Price shall be made by any of the followings, or a combination thereof, at the election of the Grantee; provided, however, that such exercise method does not then violate any Applicable Law, provided further, that the portion of the Exercise Price equal to the par value of the Shares must be paid as consideration with the Plan following methods:

      (a)    cash;

      (b)    check;

      (c)    if the exercise occurs on or after the Registration Date (as defined below), surrender of Shares or delivery of a properly executed form of attestation of ownership of Shares as the Administrator may require which have a Fair Market Value on the date of surrender or attestation equal to the aggregate Exercise Price of the Shares as to which the Option is being exercised, provided, however, that Shares acquired under the Plan or any other equity compensation plan or agreement of the Company must have been held by the Grantee for a period of more than six (6) months (and not used for another Award exercise by attestation during such period); or

      (d)    if the exercise occurs on or after the Registration Date, payment through a broker-dealer sale and remittance procedure pursuant to which the Grantee (i) shall provide written instructions to a Company-designated brokerage firm to effect the immediate sale of some or all of the purchased Shares and remit to the Company sufficient funds to cover the aggregate exercise price payable for the purchased Shares and (ii) shall provide written directives to the Company to deliver the certificates for the purchased Shares directly to such brokerage firm in order to complete the sale transaction.

5.      Restrictions on Exercise. The Option may not be exercised if the issuance of the Shares subject to the Option upon such exercise would constitute a violation of any Applicable Laws. In addition, the Option may not be exercised until such time as the Plan has been approved by the shareholders of the Company. If the exercise of the Option within the applicable time periods set forth in Section 6, 7 and 8 of this Option Agreement is prevented by the provisions of this Section 5, the Option shall remain exercisable until one (1) month after the date the Grantee is notified by the Company that the Option is exercisable, but in any event no later than the Expiration Date set forth in the Notice.

6.      Termination or Change of Continuous Service. In the event the Grantee's Continuous Service terminates, other than for Cause, the Grantee may, but only during the Post-Termination Exercise Period, exercise the portion of the Option that was vested at the date of such termination (the "Termination Date"). The Post-Termination Exercise Period shall commence on the Termination Date. In the event of termination of the Grantee's Continuous Service for Cause, the Grantee's right to exercise the Option shall, except as otherwise determined by the Administrator, terminate concurrently with the termination of the Grantee's Continuous Service (also the "Termination Date"). In no event, however, shall the Option be

exercised later than the Expiration Date set forth in the Notice. Except as provided in Sections 7 and 8 below, to the extent that the Option was unvested on the Termination Date, or if the Grantee does not exercise the vested portion of the Option within the Post-Termination Exercise Period, the Option shall terminate.

To avoid any doubt, "Cause" shall mean, for the Grantee, any act, subject to then applicable laws, including without limitation (a) willful failure to perform, or gross negligence in performing his/her duties and responsibilities to the Company and any of its affiliates (as applicable), (b) commission of any act of theft, forgery, fraud, embezzlement, dishonesty or any other willful misconduct, (c) conviction of a felony under the laws of the PRC or any foreign jurisdiction, (d) breach of any confidentiality agreement, non-competition agreement or invention assignment agreement between he/she and the Company or any of its affiliates (as applicable), including without limitation an unauthorized use or disclosure of any confidential information or trade secrets, (e) continuous breach or failure to perform assigned duties after receiving written notification of such breach or failure from the respective board of directors of the Company or any of its affiliates (as applicable), (f) any material failure to comply with any written policies or rules of the Company as adopted by the board of directors of the Company or any of its affiliates (as applicable), or (g) any other intentional misconduct which has a material adverse effect to any Company or any of its affiliates (as applicable).

7.      Disability of Grantee.  In the event the Grantee's Continuous Service terminates as a result of his or her Disability, the Grantee may, but only within twelve (12) months commencing on the Termination Date (but in no event later than the Expiration Date), exercise the portion of the Option that was vested on the Termination Date. To the extent that the Option was unvested on the Termination Date, or if the Grantee does not exercise the vested portion of the Option within the time specified herein, the Option shall terminate. Section 22(e)(3) of the Code provides that an individual is permanently and totally disabled if he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.

8.      Death of Grantee.  In the event of the termination of the Grantee's Continuous Service as a result of his or her death, or in the event of the Grantee's death during the Post-Termination Exercise Period or during the twelve (12) month period following the Grantee's termination of Continuous Service as a result of his or her Disability, the person who acquired the right to exercise the Option pursuant to Section 9 may exercise the portion of the Option that was vested on the Termination Date within twelve (12) months commencing on the date of death (but in no event later than the Expiration Date). To the extent that the Option was unvested on the date of death, or if the vested portion of the Option is not exercised within the time specified herein, the Option shall terminate.

9.      Transferability of Option.  The Grantee may designate one or more beneficiaries of the Grantee's Option in the event of the Grantee's death on a beneficiary designation form provided by the Administrator. Following the death of the Grantee, the Option, to the extent provided in Section 8, may be exercised (a) by the person or persons designated under the deceased Grantee's beneficiary designation or (b) in the absence of an effectively designated beneficiary, by the Grantee's legal representative or by any person empowered to do so under the deceased Grantee's will or under the then applicable laws of descent and distribution. The terms of the Option shall be binding upon the executors, administrators, heirs, successors and transferees of the Grantee.

10.     Term of Option. The Option must be exercised no later than the Expiration Date set forth in the Notice or such earlier date as otherwise provided herein. After the Expiration Date or such earlier date, the Option shall be of no further force or effect and may not be exercised.

11.     Company's Right of First Refusal.

(a) Transfer Notice.   Neither the Grantee nor a transferee (either being sometimes referred to herein as the "Holder") shall sell, hypothecate, encumber or otherwise transfer any Shares or any right or interest therein without first complying with the provisions of this Section 11 or obtaining the prior written consent of the Company. In the event the Holder desires to accept a bona fide third-party offer for any or all of the Shares, the Holder shall provide the Company with written notice (the "Transfer Notice") of:

(i)     The Holder's intention to transfer;

(ii)    The name of the proposed transferee;

(iii)   The number of Shares to be transferred; and

(iv)    The proposed transfer price or value and terms thereof.

If the Grantee proposes to transfer any Shares to more than one transferee, the Grantee shall provide a separate Transfer Notice for the proposed transfer to each transferee. The Transfer Notice shall be signed by both the Grantee and the proposed transferee and must constitute a binding commitment of the Grantee and the proposed transferee for the transfer of the Shares to the proposed transferee subject to the terms and conditions of this Option Agreement.

(b) Bona Fide Transfer. If the Company determines that the information provided by the Grantee in the Transfer Notice is insufficient to establish the bona fide nature of a proposed voluntary transfer, the Company shall give the Grantee written notice of the Grantee's failure to comply with the procedure described in this Section 11, and the Grantee shall have no right to transfer the Shares without first complying with the procedure described in this Section 11. The Grantee shall not be permitted to transfer the Shares if the proposed transfer is not bona fide.

(c) First Refusal Exercise Notice. The Company shall have the right to purchase (the "Right of First Refusal") all or partial, of the Shares which are described in the Transfer Notice (the "Offered Shares") at any time within forty-five (45) days after receipt of the Transfer Notice (the "Option Period"). The Offered Shares shall be repurchased at (i) the per share price or value and in accordance with the terms stated in the Transfer Notice (subject to Section 11(d) below) or (ii) the Fair Market Value of the Shares on the date on which the purchase is to be effected if no consideration is paid pursuant to the terms stated in the Transfer Notice, which Right of First Refusal shall be exercised by written notice (the "First Refusal Exercise Notice") to the Holder.

(d) Payment Terms. The Company shall consummate the purchase of the Offered Shares on the terms set forth in the Transfer Notice within 30 days after delivery of the First Refusal Exercise Notice; provided, however, that in the event the Transfer Notice provides for the payment for the Offered Shares other than in cash, the Company and/or its

assigns shall have the right to pay for the Offered Shares by the discounted cash equivalent of the consideration described in the Transfer Notice as reasonably determined by the Administrator. Upon payment for the Offered Shares to the Holder or into escrow for the benefit of the Holder, the Company or its assigns shall become the legal and beneficial owner of the Offered Shares and all rights and interest therein or related thereto, and the Company shall have the right to transfer the Offered Shares to its own name or its assigns without further action by the Holder.

(e) Assignment. Whenever the Company shall have the right to purchase Shares under this Right of First Refusal, the Company may designate and assign one or more employees, officers, directors or shareholders of the Company or other persons or organizations, to exercise all or a part of the Company's Right of First Refusal.

(f) Non-Exercise. If the Company and/or its assigns do not collectively elect to exercise the Right of First Refusal within the Option Period or such earlier time if the Company and/or its assigns notifies the Holder that it will not exercise the Right of First Refusal, then the Holder may transfer the Shares upon the terms and conditions stated in the Transfer Notice, provided that:

　　　　　(i)　　The transfer is made within 90 days of the earlier of (Λ) the date the Company and/or its assigns notify the Holder that the Right of First Refusal will not be exercised or (B) the expiration of the Option Period; and

　　　　　(ii)　　The transferee agrees in writing that such Shares shall be held subject to the provisions of this Option Agreement.

The Company shall have the right to demand further assurances from the Grantee and the transferee (in a form satisfactory to the Company) that the transfer of the Offered Shares was actually carried out on the terms and conditions described in the Transfer Notice. No Offered Shares shall be transferred on the books of the Company until the Company has received such assurances, if so demanded, and has approved the proposed transfer as bona fide.

(g) Expiration of Transfer Period. Following such 90-day period, no transfer of the Offered Shares and no change in the terms of the transfer as stated in the Transfer Notice (including the name of the proposed transferee) shall be permitted without a new written Transfer Notice prepared and submitted in accordance with the requirements of this Right of First Refusal.

(h) Termination of Right of First Refusal. The provisions of this Right of First Refusal shall terminate as to all Shares upon the Registration Date.

(i) Additional Shares or Substituted Securities. In the event of any transaction described in Sections 10 or 11 of the Plan, any new, substituted or additional securities or other property which is by reason of any such transaction distributed with respect to the Shares shall be immediately subject to the Right of First Refusal, but only to the extent the Shares are at the time covered by such right.

12.　　Stop-Transfer Notices. In order to ensure compliance with the restrictions on transfer set forth in this Option Agreement, the Notice or the Plan, the Company may issue

appropriate "stop transfer" instructions to its transfer agent, if any, and, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

13.     Refusal to Transfer. The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Option Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

14.     Repurchase Right. The Company shall have rights to repurchase the vested Shares at the par value of the Shares upon resignation or termination with Cause.

15.     Lock-Up Agreement.

        (a)     Agreement. The Grantee, if requested by the Company and the lead underwriter of any public offering of the Ordinary Shares (the "Lead Underwriter"), hereby irrevocably agrees not to sell, contract to sell, grant any option to purchase, transfer the economic risk of ownership in, make any short sale of, pledge or otherwise transfer or dispose of any interest in any Ordinary Shares or any securities convertible into or exchangeable or exercisable for or any other rights to purchase or acquire Ordinary Shares (except Ordinary Shares included in such public offering or acquired on the public market after such offering) during the 180-day period following the effective date of a registration statement of the Company (the "Registration Date") filed under the Securities Act of 1933, as amended, or such shorter or longer period of time as the Lead Underwriter shall specify. The Grantee further agrees to sign such documents as may be requested by the Lead Underwriter to effect the foregoing and agrees that the Company may impose stop-transfer instructions with respect to such Ordinary Shares subject to the lock-up period until the end of such period. The Company and the Grantee acknowledge that each Lead Underwriter of a public offering of the Company's stock, during the period of such offering and for the lock-up period thereafter, is an intended beneficiary of this Section 15.

        (b)     No Amendment Without Consent of Underwriter. During the period from identification of a Lead Underwriter in connection with any public offering of the Company's Ordinary Shares until the earlier of (i) the expiration of the lock-up period specified in Section 15(a) in connection with such offering or (ii) the abandonment of such offering by the Company and the Lead Underwriter, the provisions of this Section 15 may not be amended or waived except with the consent of the Lead Underwriter.

16.     Rights as Shareholder.  The Grantee hereby irrevocably grants a power of attorney to the Board or any person designated by the Board to exercise the voting rights with respect to the Shares.

17.     Entire Agreement; Governing Law. The Notice, the Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Grantee with respect to the subject matter hereof, and may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee. Nothing in the Notice, the Plan and this Option Agreement (except as expressly provided therein) is intended to confer any rights or remedies on any persons other than the parties. The Notice, the Plan and this Option Agreement are to be construed in accordance with and governed by the

laws of Cayman Islands without regard to conflict of law principles thereunder. Should any provision of the Notice, the Plan or this Option Agreement be determined to be illegal or unenforceable, such provision shall be enforced to the fullest extent allowed by law and the other provisions shall nevertheless remain effective and shall remain enforceable.

18.     Construction.  The captions used in the Notice and this Option Agreement are inserted for convenience and shall not be deemed a part of the Option for construction or interpretation. Except when otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular. Use of the term "or" is not intended to be exclusive, unless the context clearly requires otherwise.

19.     Administration and Interpretation.  Any question or dispute regarding the administration or interpretation of the Notice, the Plan or this Option Agreement shall be submitted by the Grantee or by the Company to the Administrator. The resolution of such question or dispute by the Administrator shall be final and binding on all persons.

20.     Dispute Resolution and Arbitration Procedures.  The Grantee acknowledges and agrees that any dispute, controversy or claim arising out of or relating to the Notice, the Plan or this Option Agreement, including any alleged violation of statute, common law or public policy shall be submitted to final and binding arbitration before Hong Kong International Arbitration Centre (the "HKIAC") to be held in Hong Kong before a single arbitrator, in accordance with the Hong Kong International Arbitration Centre Administered Arbitration Rules (the "HKIAC Rules") then in force. Each party to the arbitration shall cooperate with each other party to the arbitration in making full disclosure of and providing complete access to all information and documents reasonably requested by such other party in connection with such arbitral proceedings, subject only to any confidentiality obligations binding on such party. The award of the arbitral tribunal shall be final and binding upon the parties thereto, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award. During the course of the arbitral tribunal's adjudication of any dispute, this Award Agreement shall continue to be performed except with respect to the part in dispute and under adjudication.

21.     Notices.  Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery, upon deposit for delivery by an internationally recognized express mail courier service or upon deposit in the United States mail by certified mail (if the parties are within the United States), with postage and fees prepaid, addressed to the other party at its address as shown in these instruments, or to such other address as such party may designate in writing from time to time to the other party.

22.     No Disparagement.  The Grantee hereby covenants that, at any time after the date hereof, the Grantee shall not directly or indirectly make any critical, adverse, or disparaging statement or comment about the Company or any of the Company's subsidiaries, affiliates, directors, officers, or employees.

23.     Non-Competition.  The Grantee hereby agrees that for a period commencing on the date hereof and ending on two (2) years from the Termination Date, the Grantee will not, without the express written consent of the Company, directly or indirectly, engage in any business activity which is, or participate or invest in, or provide or facilitate the provision of financing to, or assist (whether as owner, part-owner, shareholder, partner, director, officer, employee, agent or consultant, or in any other capacity) any business, organization or person other than the Company (or any subsidiary of the Company) whose business, activities, products

or services are competitive with any of the business activities, products or services conducted or offered by the Company and its affiliates.

24.   Non-Solicitation.  The Grantee hereby agrees that for a period commencing on the date hereof and ending on two (2) years from the Termination Date, the Grantee will not, without the express written consent of the Company, (i) solicit, entice, encourage or intentionally influence, or attempt to solicit, entice, encourage or influence, any officer or employee of the Company or any of its affiliates to terminate his or her relationship or employment with the Company or any of its affiliates, (y) solicit, entice, encourage or intentionally influence, or attempt to solicit, entice, encourage or influence, any client, supplier or business partner of the Company or any of its affiliates to alter, reduce or terminate its business relationship with the Company or any of its affiliates.

25.   Confidentiality.  From the date hereof to the fifth (5th) anniversary of the Termination Date, the Grantee or his/her permitted assignees pursuant to Section 9 hereof shall keep confidential the terms, conditions, and existence of the Notice of Stock Option Award, the Option Agreement, this Amendment and any related documentation and discussions, the identities of the Parties, the trade secrets and confidential and proprietary information of the Company or any of its affiliates, and other information of a non-public nature in connection herewith and therewith except as the Parties mutually agree or to the extent required by applicable laws.

26.   Repurchase of the Shares.  Except as otherwise provided in this Agreement, in the case of a material breach of any covenant or undertaking given by the Grantee under Section 23, 24 or 25 of this Agreement, the Company shall have the right (but not the obligation) to repurchase any or all of the Shares which have been issued to the Grantee or other person pursuant to the exercise of the Option at the par value per share of such Shares at any time after such breach. Notwithstanding the foregoing, Grantee shall indemnify, defend and hold harmless the Company and its affiliates, officers, directors, employees and representatives from and against any and all actions, damages, losses, liabilities and expenses in connection with or arising from such breach.

27.   This Agreement shall only be binding on and enure for the benefit of the successors, heirs and permitted assignees of the Parties.

**[END OF AGREEMENT]**

## **EXHIBIT A**

## **BYTEDANCE LTD. 2012 STOCK INCENTIVE PLAN**

## **EXERCISE NOTICE**

Attention: Secretary

1.      Effective as of today, _____, the undersigned (the "Grantee") hereby elects to exercise the Grantee's option to purchase _____ Ordinary Shares (the "Shares") of BYTEDANCE LTD. (the "Company") under and pursuant to the Company's BYTEDANCE LTD. 2012 Stock Incentive Plan, as amended from time to time (the "Plan") and the Stock Option Award Agreement (the "Option Agreement") and Notice of Stock Option Award (the "Notice") dated _____, _____.  Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Exercise Notice.

2.      Representations of the Grantee.  The Grantee acknowledges that the Grantee has received, read and understood the Notice, the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

3.      Rights as Shareholder.  Until the stock certificate evidencing such Shares is issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Shares, notwithstanding the exercise of the Option.  The Company shall issue (or cause to be issued) such stock certificate promptly after the Option is exercised, provided however that the issuance of the stock certificate and entry on the register of members of the Company shall be subject to the registration or approval requirement under then applicable laws.  No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 10 of the Plan. Subject to the provisions under the Plan and at the discretion of the Administrator, any Shares issued by the Company may be represented by depositary shares or any other securities representing the ordinary shares, and the Grantee's name may be entered into the register book of the depositary, transfer agent or share plan administrator.

The Grantee shall enjoy rights as a shareholder until such time as the Grantee disposes of the Shares or the Company and/or its assignee(s) exercises the Right of First Refusal.  Upon such exercise, the Grantee shall have no further rights as a holder of the Shares so purchased except the right to receive payment for the Shares so purchased in accordance with the provisions of the Option Agreement, and the Grantee shall forthwith cause the certificate(s) evidencing the Shares so purchased to be surrendered to the Company for transfer or cancellation.

Notwithstanding anything to the contrary set forth herein, the Grantee hereby irrevocably grants a power of attorney to the Board or any person designated by the Board to exercise the voting rights with respect to the Shares.

4.      Delivery of Payment.  The Grantee herewith delivers to the Company the full Exercise Price for the Shares, which, to the extent selected, shall be deemed to be satisfied by

use of the broker-dealer sale and remittance procedure to pay the Exercise Price provided in Section 4(d) of the Option Agreement.

5. <u>Tax Consultation</u>. The Grantee understands that the Grantee may suffer adverse tax consequences as a result of the Grantee's purchase or disposition of the Shares. The Grantee represents that the Grantee has consulted with any tax consultants the Grantee deems advisable in connection with the purchase or disposition of the Shares and that the Grantee is not relying on the Company for any tax advice.

6. <u>Taxes</u>. The Grantee agrees to satisfy all applicable income tax and employment tax withholding obligations and herewith delivers to the Company the full amount of such obligations or has made arrangements acceptable to the Company to satisfy such obligations. If the Company is required to satisfy any applicable income or employment tax withholding obligations as a result of such an early disposition, the Grantee agrees to satisfy the amount of such withholding in a manner that the Administrator prescribes.

7. <u>Restrictive Legends</u>. The Grantee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws of the United States:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE OPTION AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

8. <u>Successors and Assigns</u>. The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this agreement shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon the Grantee and his or her heirs, executors, administrators, successors and assigns.

9.      Construction.  The captions used in this Exercise Notice are inserted for convenience and shall not be deemed a part of this agreement for construction or interpretation. Except when otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular.  Use of the term "or" is not intended to be exclusive, unless the context clearly requires otherwise.

10.     Administration and Interpretation.  The Grantee hereby agrees that any question or dispute regarding the administration or interpretation of this Exercise Notice shall be submitted by the Grantee or by the Company to the Administrator.  The resolution of such question or dispute by the Administrator shall be final and binding on all persons.

11.     Governing Law; Severability.  This Exercise Notice is to be construed in accordance with and governed by the internal laws of Cayman Islands without regard to conflict of law principles thereunder.  Should any provision of this Exercise Notice be determined by a court of law to be illegal or unenforceable, such provision shall be enforced to the fullest extent allowed by law and the other provisions shall nevertheless remain effective and shall remain enforceable.

12.     Notices.  Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery, upon deposit for delivery by an internationally recognized express mail courier service or upon deposit in the United States mail by certified mail (if the parties are within the United States), with postage and fees prepaid, addressed to the other party at its address as shown below beneath its signature, or to such other address as such party may designate in writing from time to time to the other party.

13.     Further Instruments.  The parties agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this agreement.

14.     Entire Agreement.  The Notice, the Plan and the Option Agreement are incorporated herein by reference and together with this Exercise Notice constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Grantee with respect to the subject matter hereof, and may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee. Nothing in the Notice, the Plan, the Option Agreement and this Exercise Notice (except as expressly provided therein) is intended to confer any rights or remedies on any persons other than the parties.

Submitted by:

GRANTEE:

_____
(Signature)

Address:

_____


Accepted by:

BYTEDANCE LTD.

By: _____

Title: _____

Address:

_____

## EXHIBIT B

## BYTEDANCE LTD. 2012 STOCK INCENTIVE PLAN

## INVESTMENT REPRESENTATION STATEMENT

GRANTEE: _____

COMPANY:      BYTEDANCE LTD.

SECURITY:     ORDINARY SHARES

AMOUNT: _____

DATE: _____

In connection with the purchase of the above-listed Securities, the undersigned Grantee represents to the Company the following:

(a)     Grantee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Grantee is acquiring these Securities for investment for Grantee's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

(b)     Grantee acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon among other things, the bona fide nature of Grantee's investment intent as expressed herein. Grantee further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Grantee further acknowledges and understands that the Company is under no obligation to register the Securities. Grantee understands that the certificate evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel satisfactory to the Company.

(c)     Grantee is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to the Grantee, the exercise will be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of certain of the conditions specified by Rule 144, including: (1) the resale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker (as said term is defined under the Securities Exchange Act of 1934); and, in the case of an affiliate, (2) the availability of certain public information about the Company, (3) the amount of Securities being sold during any three month period not exceeding the limitations specified in Rule 144(e), and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which requires the resale to occur not less than one year after the later of the date the Securities were sold by the Company or the date the Securities were sold by an affiliate of the Company, within the meaning of Rule 144; and, in the case of acquisition of the Securities by an affiliate, or by a non-affiliate who subsequently holds the Securities less than two (2) years, the satisfaction of the conditions set forth in sections (1), (2), (3) and (4) of the paragraph immediately above.

(d)      Grantee further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Grantee understands that no assurances can be given that any such other registration exemption will be available in such event.

(e)      Grantee represents that Grantee is a resident of _____.

Signature of Grantee:

_____

Date: _____, _____

**DOCUMENT EXAMINATION REPORT**
Re: Yintao Yu

**APPENDIX 2**

# Bytedance Inc.

Room 137, 68 Willow Road
Menlo Park, CA 94025

June 7, 2017

Dear Mr. Roger Yu,

Thank you for your interest in Bytedance! Bytedance (the "Company") is delighted to offer you a full-time position. We believe your expertise skills, and experience will be among our most valuable assets. This offer letter (the "Agreement") confirms the terms of your employment with the Company, including the terms as follows:

1. **Salary**
   a. Your base salary will be $13,333.33 USD per month, payable in accordance with the Company's standard payroll practice, subject to applicable United States government required deductions and withholding taxes. Because your position is the exempt employee, your duties may necessitate working overtime for no additional compensation from the Company or its subsidiaries. Your performance and salary will be reviewed periodically by the management team.

2. **Benefits**
   a. As an employee of the Company, you will be offered a number of Company-paid benefits in the United States including the following:
      i. Medical insurance
      ii. Dental Insurance
      iii. Vision Insurance
      iv. 401K
   b. When the insurances and 401K can be enrolled in and activated, the Company will cover the employee part of your medical, dental, and vision insurance premiums. Other parts of the medical, dental, and vision insurance premiums will be covered by yourself, depending on the insurance plan.
   c. Based on your attendance, $35 for three meals per working day will be offered. However, if you take any sick leave or vacation, it will not be applied for those specific days.
   d. If you are to travel for business, full travel insurance can be reimbursed by the Company.
   e. All the benefits are at the sole discretion of the Company, and can be adjusted anytime based on the performance of the Company.

3. **Vacation, Holidays, and Sick Days**

Bates000015

   a. Vacation / PTO: You will be offered a total of 10 paid time off days per yearly anniversary from your Start Date. Each vacation day will accumulate at a rate of 1 day per month. You can aggregate up to a maximum of 10 vacation days over time.

   b. Holidays: The Company, for its US employees allows employees to have the following statutory holidays as paid holiday vacation.

      i. American Holidays

1. New Year's Day, one day off, on the 1st of January
2. Martin Luther King Jr. Day, one day off, on the third Monday in January
3. President's Day, one day off, on the third Monday in February
4. Memorial Day, one day off, on the last Monday in May
5. Independence Day, one day off, on the 4th of July
6. Labor Day, one day off, on the first Monday in September
7. Columbus Day, one day off, on the second Monday in October
8. Thanksgiving Day, one day off, on the fourth Thursday in November
9. Christmas Day, one day off, on the 25th of December

   c. Sick Days: You will receive a total of 4 sick days per half year, immediately available upon the commencement of your employment.

   d. All the Vacation, Holidays, and Sick Days are at the sole discretion of the Company, and can be adjusted anytime based on the performance of the Company.

**4. Travel**

   a. Your role at the Company will require that you travel for work-related duties and business. Your travel expenses which include lodging and transportation will be reimbursed by providing the related bills and invoices.

**5. Bonus Target**

   a. You are eligible to participate in the Company bonus target plan. Your annual bonus target will range from 0-6 months of your monthly salary. The exact bonus amount is at the sole discretion of the Company, based on your performance and the performance of the Company. The components of your bonus are subject to periodic review. The annual performance bonus evaluation and payment will occur at every April regardless of your Start Date.

**6. Payment for acquisition**

   a. Amount of $ 600,000 USD will be paid within 30 days since the offer was signed.

**7. Stock Option**

   a. Upon approval by our Board of Directors, you will be granted 220,000 shares of Bytedance ordinary share option. The stock option offered will vest in the following schedule starting from your Start Date, and is only offered upon the condition of your continued employment with the Company.

      i. 15% on the one-year anniversary date of your Start Date, and
      ii. 25% on the second year anniversary of your Start Date, and
      iii. 25% on the third year anniversary of your Start Date, and
      iv. 35% on the fourth year anniversary date of your Start Date.

Bates000016

The exercise price of the stock will be $0.02 per share, further details on the stock option will be available to you in two months since your start date. Please be aware that this program and subsequent processes could be changed at any time, at the discretion of the Board.

**8. Background Check**

    a.   This offer is contingent on the successful completion of a background check.

**9. At-Will Employment**

    a . If you accept our offer of employment, you will be an employee-at-will, meaning that either you or the Company may terminate our relationship and this Agreement at any time for any reason, with or without cause.

**10. Confidential Information**

    a.   During your employment, you may have access to confidential, proprietary, and/or trade secret information belonging to the Company. You agree that you will keep all of this information strictly confidential and refrain from using it for your own purposes or from disclosing it to anyone outside the Company.

**11. Return of Property and Documents**

    a.   You agree that, upon conclusion of the employment, you will immediately return to the Company all of its property, equipment, and documents, including electronically stored information.

**12. Employment Eligibility**

    a.   To comply with immigration laws, you must provide the Company with documentation of your identity and eligibility for employment in the United States; please bring such documentation on your first day of hire. In addition, if you are working in the United States pursuant to a US visa status, please provide new or renewed evidence of your eligibility for employment before the expiration of your initial work authorization.

In addition, by accepting this offer, you agree that you will follow all of the Company's policies that apply to full-time employees.

This letter constitutes the complete understanding between you and the Company regarding your employment and supersedes all prior discussions or agreements. This letter may only be modified by a written agreement signed by both of us.

Bates000017

This offer will remain open for **3** (three) business days following your receipt of this letter. To indicate your acceptance of Bytedance's offer, you will sign and date this Agreement. The offer will not be effective until the Company countersigns the Agreement.

Roger, we are very excited about the possibility of you joining us. Please let us know if we can answer any questions for you about any of the matters outlined in this official offer letter.

Sincerely,

*Jinmei Xiao*

Jinmei Xiao
Director of Human Resources
Bytedance Inc.

06/07/2017

I, *Roger Yu*, accept employment with Bytedance Inc. under the terms set forth in this letter.

---------------------------------                    06/07/2017
**Signature**                                        ----------------------------------
                                                     **Date**
Yintao Roger Yu
                                                     (mm/dd/yyyy)

July 30, 2019

**VIA U.S. CERTIFIED MAIL AND EMAIL**

Shuyi ("Selene") Gao
Head of HR
Bytedance Inc.
3000 EL CAMINO REAL, BUILDING 2, SUITE 400
PALO ALTO, CA 94306
E-mail: selenegao@bytedance.com

Dear Ms. Gao or Whom It May Concern/HR Manager at Bytedance Inc.:

I am writing to request that you provide me with all personnel records related to my
employment. This request is made pursuant to California Labor Code Sections 1198.5 and 432.
These laws state that I am entitled to access all my personnel records, regardless of whether they
are kept in a formal personnel file or not, including my employment contract, any documents that
I have signed, any documents that relate to the employee's job performance, any documents that
relate to any grievance raised by the employee, and all other records related to the employment.

I also request all records required to be kept by the company pursuant to Labor Code Section 226
for the entire period of my employment, including wages earned, total hours/days worked by the
employee, and all deductions.

Please note that the company is obligated to provide the contents of **all** my personnel records
within a reasonable amount of time, but no later than 30 calendar days from the receipt of this
request.  (California Labor Code Sections 1198.5)  Failure to promptly comply with these legal
obligations may result in a penalty and an action for injunctive relief to ensure compliance.

Please provide **all** my personnel records, as soon as possible to my email roger@rogeryu.org and
my address 380 Hamilton Ave Unit 363, Palo Alto, CA 94301.

Again, these records include my employment contract, any documents that I have signed, any
documents that relate to the employee's job performance, any documents that relate to any
grievance raised by the employee, and all other records related to the employment, regardless of
whether they are kept in a formal personnel file or not, as well as all records required to be kept
by the company pursuant to Labor Code Section 226 for the entire period of my employment,
including wages earned, total hours/days worked by the employee, and all deductions.

Thank you for your prompt attention to this matter.

Yintao ("Roger") Yu



To HR Manager of Bytedance Inc.,

This mail hereby confirms that according to doctor's suggestion, and per my manager Harry Han Li's instruction, I anticipate to return to work at Bytedance, Inc. on September 11, 2018.

Yintao (Roger) Yu

7/18/2018



**Employment Eligibility Verification**
**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-9**
OMB No. 1615-0047
Expires 08/31/2019

▶ **START HERE: Read instructions carefully before completing this form. The instructions must be available, either in paper or electronically, during completion of this form. Employers are liable for errors in the completion of this form.**

**ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work-authorized individuals. Employers **CANNOT** specify which document(s) an employee may present to establish employment authorization and identity. The refusal to hire or continue to employ an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Attestation** *(Employees must complete and sign Section 1 of Form I-9 no later than the first day of employment, but not before accepting a job offer.)*

| Last Name (Family Name) | First Name (Given Name) | Middle Initial | Other Last Names Used (if any) |
|---|---|---|---|
| YU | YZNTAo | | |

| Address (Street Number and Name) | Apt. Number | City or Town | State | ZIP Code |
|---|---|---|---|---|
| | | | | |

| Employee's E-mail Address | Employee's Telephone Number |
|---|---|
| RoGERYU 201R@GMAIL.com | |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following boxes):

- ☐ 1. A citizen of the United States
- ☐ 2. A noncitizen national of the United States *(See instructions)*
- ☒ 3. A lawful permanent resident    (Alien Registration Number/USCIS Number):
- ☐ 4. An alien authorized to work    until (expiration date, if applicable, mm/dd/yyyy):
  Some aliens may write "N/A" in the expiration date field. *(See instructions)*

Aliens authorized to work must provide only one of the following document numbers to complete Form I-9:
An Alien Registration Number/USCIS Number OR Form I-94 Admission Number OR Foreign Passport Number.

1. Alien Registration Number/USCIS Number: _____
  **OR**
2. Form I-94 Admission Number: _____
  **OR**
3. Foreign Passport Number: _____
  Country of Issuance: _____

*QR Code - Section 1*
*Do Not Write In This Space*

| Signature of Employee | Today's Date (mm/dd/yyyy) |
|---|---|
| | 8/31/2017 |

**Preparer and/or Translator Certification (check one):**
☐ I did not use a preparer or translator.    ☐ A preparer(s) and/or translator(s) assisted the employee in completing Section 1.
*(Fields below must be completed and signed when preparers and/or translators assist an employee in completing Section 1.)*
I attest, under penalty of perjury, that I have assisted in the completion of Section 1 of this form and that to the best of my knowledge the information is true and correct.

| Signature of Preparer or Translator | Today's Date (mm/dd/yyyy) |
|---|---|
| | |

| Last Name (Family Name) | First Name (Given Name) |
|---|---|
| | |

| Address (Street Number and Name) | City or Town | State | ZIP Code |
|---|---|---|---|
| | | | |

🔽   *Employer Completes Next Page*   🔽



**Employment Eligibility Verification**
**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-9**
OMB No. 1615-0047
Expires 08/31/2019

## Section 2. Employer or Authorized Representative Review and Verification

(Employers or their authorized representative must complete and sign Section 2 within 3 business days of the employee's first day of employment. You must physically examine one document from List A OR a combination of one document from List B and one document from List C as listed on the "Lists of Acceptable Documents.")

| Employee Info from Section 1 | Last Name (Family Name) Y u | First Name (Given Name) Y 2u 7 o | M.I. | Citizenship/Immigration Status 3 |
|---|---|---|---|---|

| List A<br>Identity and Employment Authorization | OR | List B<br>Identity | AND | List C<br>Employment Authorization |
|---|---|---|---|---|
| Document Title<br>*Permanent resident card* | | Document Title | | Document Title |
| Issuing Authority<br>USCIS | | Issuing Authority | | Issuing Authority |
| ▮▮▮▮▮▮▮ | | Document Number | | Document Number |
| ▮▮▮▮▮▮▮ | | Expiration Date (if any)(mm/dd/yyyy) | | Expiration Date (if any)(mm/dd/yyyy) |
| Issuing Authority | | Additional Information | | QR Code - Sections 2 & 3<br>Do Not Write In This Space |
| Document Number | | | | |
| Expiration Date (if any)(mm/dd/yyyy) | | | | |
| Document Title | | | | |
| Issuing Authority | | | | |
| Document Number | | | | |
| Expiration Date (if any)(mm/dd/yyyy) | | | | |

**Certification:** I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.

The employee's first day of employment (mm/dd/yyyy):  08 / 30 / 20 1  (See instructions for exemptions)

| Signature of Employer or Authorized Representative<br>J.ng J.ng Lu | Today's Date (mm/dd/yyyy)<br>12 / 28 / 201 | Title of Employer or Authorized Representative<br>HR Specialist |
|---|---|---|
| Last Name of Employer or Authorized Representative<br>Lu | First Name of Employer or Authorized Representative<br>Jing Jing | Employer's Business or Organization Name<br>Bytedance Inc. |
| Employer's Business or Organization Address (Street Number and Name)<br>68 Willow Road | City or Town<br>Menlo Park | State<br>CA | ZIP Code<br>94025 |

## Section 3. Reverification and Rehires *(To be completed and signed by employer or authorized representative.)*

| A. New Name (if applicable) | | | B. Date of Rehire (if applicable) |
|---|---|---|---|
| Last Name (Family Name) | First Name (Given Name) | Middle Initial | Date (mm/dd/yyyy) |

C. If the employee's previous grant of employment authorization has expired, provide the information for the document or receipt that establishes continuing employment authorization in the space provided below.

| Document Title | Document Number | Expiration Date (if any) (mm/dd/yyyy) |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Today's Date (mm/dd/yyyy) | Name of Employer or Authorized Representative |
|---|---|---|

Form I-9 07/17/17 N

Page 2 of 3

**RECORDING REQUESTED BY**
First American Title Company

**MAIL TAX STATEMENT**
**AND WHEN RECORDED MAIL DOCUMENT TO:**
Yintao Yu
1047 Cherry Street
San Carlos, CA 94070

**2016-034297**

1:33 pm 04/14/16 DE Fee: 18.00
Count of Pages 2 SC
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder

* R 0 0 0 2 1 9 0 6 9 6 *

_____ Space Above This Line for Recorder's Use Only _____

A.P.N.: 046-126-210

File No.: 4101-5105485 (AS)

# GRANT DEED

The Undersigned Grantor(s) Declare(s): DOCUMENTARY TRANSFER TAX **$902.00**; CITY TRANSFER TAX $;
SURVEY MONUMENT FEE $

[  **X**  ]    computed on the consideration or full value of property conveyed, OR

[     ]    computed on the consideration or full value less value of liens and/or encumbrances remaining at time of sale,

[     ]    unincorporated area;  [ **X** ]  City of **San Carlos**, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **Charles R Rauch, Trustee of**
**The Hannel Family Trust DTD 10/12/1995**

hereby GRANTS to **Yintao Yu, a single man**

the following described property in the City of **San Carlos**, County of **San Mateo**, State of **California**:

    **LOT 26 IN BLOCK 5, AS DESIGNATED ON MAP ENTITLED, "HARBOR ADDITION TO SAN**
    **CARLOS MAP NO. 4 SAN CARLOS, CALIFORNIA", WHICH MAP WAS FILED IN THE OFFICE OF**
    **THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, ON MAY 6, 1927 IN**
    **BOOK 15 ON MAPS AT PAGE 60.**

    **JPN: 046-012-126-21A**

Mail Tax Statements To:  **SAME AS ABOVE**

-------------------------------------------------------------------------------------------------------------

‌

Grant Deed - continued

Date: **04/08/2016**

A.P.N.: 046-126-210

File No.: 4101-5105485 (AS)

Dated: April 08, 2016

Charles R Rauch, Trustee of The Hannel
Family Trust DTD 10/12/1995

Charles R Rauch , Trustee

---

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

---

STATE OF _California_ )SS

COUNTY OF _San Mateo_ )

On _April 11, 2016_ before me, Amanda Sanchez Notary Public, personally appeared
_Charles R. Rauch_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _amanda Sanchez_

This area for official notarial seal.



AMANDA SANCHEZ
Commission # 2124839
Notary Public - California
San Mateo County
My Comm. Expires Sep 21, 2019

**RECORDING REQUESTED BY:**

Yintao Yu

**When Recorded Mail Document To:**

Yintao Yu
PO Box 363
Palo Alto  CA 94302

## 2017-066003

4:39 pm 07/31/17 DE Fee: 18.00
Count of Pages 2
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder

* R 0 0 0 2 4 3 1 5 3 0 *

Property Address:  1047 Cherry Street
San Carlos, CA 94070

RECORDER'S USE

APN/Parcel ID(s):  046-126-210

## GRANT DEED

The undersigned grantor(s) declare(s)  This conveyance is a bonafide gift and the grantor received nothing
in return.  R & T Code 11930      *for the benefit of grantor*

( X ) This transfer is exempt from the documentary transfer tax.
( ) The documentary transfer tax is **Zero**  and is computed on:
( ) The full value of the interest or property conveyed.
( ) The full value less the liens or encumbrances remaining thereon at the time of sale.
The property is located in  ( ) an unincorporated area  ( X ) the **City of San Carlos**

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged**, Yintao Yu, a single man

**hereby GRANT(S) to**  Yolanda Jin, Trustee of The 1047 Cherry Street Trust, dated July 28, 2017

**the following described real property in the** City of **San Carlos**, County of **San Mateo**, State of California:

Lot 26 in Block 5, as designated on Map entitled, "Harbor Addition to San Carlos Map No. 4 San Carlos California", which Map was
filed in the office of The Recorder of the County of San Mateo, State of California, on May 6, 1927 in Book 15 on Maps at page 60.

Yintao Yu

## MAIL TAX STATEMENTS AS DIRECTED ABOVE

Grant Deed

**GRANT DEED**
(continued)

APN/Parcel ID(s):  046-126-210

## Notary Acknowledgement

Dated:  July 29, 2017

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____CALIFORNIA_____

County of _____SANTA CLARA_____

On _____7-31-2017_____ before me, _____RANDALL R. RAMIREZ_____, Notary Public,
(here insert name and title of the officer)

personally appeared _____YINTAO YU_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____Randall R. Ramirez_____
Signature

(Seal)

RANDALL R. RAMIREZ
Commission # 2055293
Notary Public - California
Santa Clara County
My Comm. Expires Jan. 15

Grant Deed

**2020-131158**

10:40 am 11/19/20 AFF Fee: 98.00
Count of Pages 3
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder

\* \$ R 0 0 0 2 9 5 5 1 9 3 \$ \*

**RECORDING REQUESTED BY:**
Fidelity National Title Company

**Escrow Order No.:** FSMO-1082002566

**When Recorded Mail Document To:**

Yintao Yu, Trustee of the 1047 Chery Street
Trust, dated July 28, 2017
939 Laurel St # D
San Carlos CA 94070

APN/Parcel ID(s): 046-126-210

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## AFFIDAVIT - CHANGE OF TRUSTEE
(California Probate Code Section 18105)

The undersigned being of legal age, declares under penalty of perjury:

1. Declarant(s) certifies the existence of the following described Trust and states that he/she/they are the successor Trustee(s) of the following described trust:

   Name of Trust:      The 1047 Cherry Street Trust

   Date of Trust:      July 28, 2017

   Trustor/Settlor(s):      Yintao Yu

   Former Trustee(s):      Yolanda Jin

2. The real property held by said trustee/successor trustee is located in the State of California, set forth as follows:

   SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

3. This Affidavit is prepared and executed pursuant to California Probate Code Section 18105.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

Dated: November 12, 2020

_____
Signature

Yintao Yu
Print Name

Affidavit (Change of Trustee)
SCA00002192.doc / Updated: 09.03.20

Page 1

Printed: 11.12.20 @ 03:46 PM
CA-FT-FSMO-01500.080108-FSMO-1082002566

Document Number: 2020-131158 Page: 1 of 3

## AFFIDAVIT - CHANGE OF TRUSTEE
(continued)

APN/Parcel ID(s): 046-126-210

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of _____California_____

County of _____San Mateo_____

Subscribed and sworn to (or affirmed) before me on this ___12___ day of ____NOV____, 20_20_, by
_____YINTAO YU_____,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_Loraine Anne Robbins_

Signature



LORAINE ANNE ROBBINS
Notary Public - California
San Mateo County
Commission # 2274060
My Comm. Expires Jan 29, 2023

Affidavit (Change of Trustee)
SCA00002192.doc / Updated: 09.03.20

Page 2

Printed: 11.12.20 @ 03:46 PM
CA-FT-FSMO-01500.080108-FSMO-1082002566

Document Number: 2020-131158 Page: 2 of 3

## EXHIBIT "A"
Legal Description

**For APN/Parcel ID(s): 046-126-210**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN CARLOS, COUNTY OF SAN MATEO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 26 IN BLOCK 5, AS DESIGNATED ON MAP ENTITLED, "HARBOR ADDITION TO SAN CARLOS MAP NO. 4 SAN CARLOS CALIFORNIA", WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, ON MAY 6, 1927 IN BOOK 15 ON MAPS AT PAGE 60.

Affidavit (Change of Trustee)
SCA00002192.doc / Updated: 09.03.20

Page 3

Printed: 11.12.20 @ 03:46 PM
CA-FT-FSMO-01500.080108-FSMO-1082002566

Document Number: 2020-131158 Page: 3 of 3

**2022-066771**

Simplifile,
11:40 am 09/13/2022 NT Fee: $98.00
Count of Pages 3
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder

*$R00032882243$*

RECORDING REQUESTED BY
**Entra Default Solutions, LLC**

AND WHEN RECORDED MAIL TO:
**Entra Default Solutions, LLC**
**1355 Willow Way, Suite 115**
**Concord, California 94520**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

T.S. No.: **2022-05453**
A.P.N.: **046-126-210**

## NOTICE OF TRUSTEE'S SALE

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**[PURSUANT TO CIVIL CODE 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO ABOVE
IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES
PROVIDED TO THE TRUSTOR.]**

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 11/11/2020. UNLESS
YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A
PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE
PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

## A PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH, CASHIER'S
**CHECK/CASH EQUIVALENT** or other form of payment authorized by 2424h(b), (payable at the time of
sale in lawful money of the United States), will be held by the duly appointed trustee as shown below, of all right,
title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant
to a Deed of Trust described below. The sale will be made, but without covenant or warranty, expressed or implied,
regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed
of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of
Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial
publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day
of sale.

Trustor: **YINTAO YU, TRUSTEE OF THE 1047 CHERRY STREET TRUST, DATED JULY 28, 2017**
Duly Appointed Trustee: **Entra Default Solutions, LLC 1355 Willow Way, Suite 115, Concord, California
94520 Phone: (925)272-4993**
Deed of Trust Recorded **11/19/2020** as Instrument No. **2020-131159** in book , page  of Official Records in the
office of the Recorder of **San Mateo County**, California, to be sold:
Date of Sale: **10/12/2022** at **1:00 PM**
Place of Sale:     **At the Marshall Street entrance to the Hall of Justice and Records, 400 County Center,
Redwood City, CA 94061**
Amount of unpaid balance and other charges: **$338,690.01,**
Street Address or other common designation of real property:        **1047 CHERRY STREET
SAN CARLOS, CA 94070**

A.P.N.: **046-126-210**
The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common
designation, if any, shown above. **We are attempting to collect a debt and any information we obtain will be
used for that purpose.**

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand
that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself.
Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the
property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest
bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off,
before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size
of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance
company, either of which may charge you a fee for this information. If you consult either of these resources, you
should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times
by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law
requires that information about trustee sale postponements be made available to you and to the public, as a courtesy
to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable,
the rescheduled time and date for the sale of this property, you may call 800-683-2468 option 1 or visit this Internet
Web site www.servicelinkASAP.com, using the file number assigned to this case 2022-05453. Information about
postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately
be reflected in the telephone information or on the Internet Web site. The best way to verify postponement
information is to attend the scheduled sale.

NOTICE TO TENANT: You may have a right to purchase this property after the trustee auction pursuant to Section
2924m of the California Civil Code. If you are an "eligible tenant buyer," you can purchase the property if you
match the last and highest bid placed at the trustee auction. If you are an "eligible bidder," you may be able to
purchase the property if you exceed the last and highest bid placed at the trustee auction. There are three steps to
exercising this right of purchase. First, 48 hours after the date of the trustee sale, you can call 800-683-2468 option
1, or visit this internet website www.servicelinkASAP.com, using the file number assigned to this case 2022-05453
to find the date on which the trustee's sale was held, the amount of the last and highest bid, and the address of the
trustee. Second, you must send a written notice of intent to place a bid so that the trustee receives it no more than 15
days after the trustee's sale. Third, you must submit a bid so that the trustee receives it no more than 45 days after
the trustee's sale. If you think you may qualify as an "eligible tenant buyer" or "eligible bidder," you should
consider contacting an attorney or appropriate real estate professional immediately for advice regarding this
potential right to purchase.

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.

Date: 9/12/2022

**Entra Default Solutions, LLC**

**Marisa Vidrine, Foreclosure Specialist**

**RECORDING REQUESTED BY:**
Yolanda Jin
1047 Cherry Street
San Carlos, CA 94070-3206

**AND WHEN RECORDED MAIL DOCUMENT TO:**

Yolanda Jin
1047 Cherry Street
San Carlos, CA 94070-3206

**2022-076492**

3:18 pm 10/31/2022 AFF Fee: $98.00

Count of Pages 3

Recorded In Official Records

County of San Mateo

Mark Church

Assessor-County Clerk-Recorder



Space Above This Line for Recorder's Use Only

Property Address: 1047 Cherry Street, San Carlos, CA 94070
APN: 046-126-210

## AFFIDAVIT CHANGE OF TRUSTEE
### (California Probate Code 18105)

The undersigned, being of legal age, declares under penalty of perjury:

1. Declarant(s) certify(ies) that he/she/they is/are the sole successor trustee of the following described trust:

   Name of Trust:   The 1047 Cherry Street Trust

   Date of Trust:   July 28, 2017

   Trustor(s)/Settlor(s):   Yolanda Jin

   Former Trustee(s):   Yolanda Jin, Yintao Yu

2. The real property held by said trustee(s)/successor trustee(s) is located in the City of San Carlos County of San Mateo, State of California, set forth as follows:

   **SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF FOR LEGAL DESCRIPTION**

3. This Affidavit is prepared and executed pursuant to California Probate Code Section 18105.

I/We,   am/are named as successor trustee(s) in the aforementioned trust and hereby consent to act as successor trustee(s) of the aforementioned trust and do hereby assume the powers and duties as successor trustee(s) of such trust.

This Affidavit is made for the protection and benefit of all persons hereafter acquiring an interest in or dealing with the property identified in this document.

Date: October 31, 2022

BY: _____

Yolanda Jin

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of San Mateo

Subscribed and sworn to (or affirmed) before me on this 31ˢᵗ day of October, 20 22, by Yolanda Jin, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature

 (Seal)

HELEN SUTHERLAND
COMM. # 2363802
NOTARY PUBLIC • CALIFORNIA
SAN MATEO COUNTY
Comm. Exp. JULY 27, 2025

## Exhibit A

APN: 046-126-210

LOT 26 IN BLOCK 5, AS DESIGNATED ON MAP ENTITLED, "HARBOR ADDITION TO SAN CARLOS MAP NO. 4 SAN CARLOS, CALIFORNIA", WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, ON MAY 6, 1927 IN BOOK 15 ON MAPS AT PAGE 60.

**2023-001847**

Simplifile,

8:09 am 01/17/2023 NT Fee: $98.00

Count of Pages 3

Recorded in Official Records

County of San Mateo

Mark Church

Assessor-County Clerk-Recorder

RECORDING REQUESTED BY
**Entra Default Solutions, LLC**

AND WHEN RECORDED MAIL TO:
**Entra Default Solutions, LLC**
**1355 Willow Way, Suite 115**
**Concord, California 94520**

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
* $ R 0 0 0 3 3 2 4 0 5 2 $ *

---

T.S. No.: **2022-05453**
A.P.N.: **046-126-210**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF TRUSTEE'S SALE

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**[PURSUANT TO CIVIL CODE 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO ABOVE
IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES
PROVIDED TO THE TRUSTOR.]**

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 11/11/2020. UNLESS
YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A
PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE
PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

### A PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH, CASHIER'S

**CHECK/CASH EQUIVALENT** or other form of payment authorized by 2424h(b), (payable at the time of
sale in lawful money of the United States), will be held by the duly appointed trustee as shown below, of all right,
title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant
to a Deed of Trust described below. The sale will be made, but without covenant or warranty, expressed or implied,
regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed
of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of
Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial
publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day
of sale.

Trustor: **YINTAO YU, TRUSTEE OF THE 1047 CHERRY STREET TRUST, DATED JULY 28, 2017**
Duly Appointed Trustee: **Entra Default Solutions, LLC 1355 Willow Way, Suite 115, Concord, California
94520 Phone: (925)272-4993**
Deed of Trust Recorded **11/19/2020** as Instrument No. **2020-131159** in book , page  of Official Records in the
office of the Recorder of San Mateo County, California, to be sold:
Date of Sale: **2/22/2023 at 1:00 PM**
Place of Sale:     **At the Marshall Street entrance to the Hall of Justice and Records, 400 County Center,
            Redwood City, CA 94061**
Amount of unpaid balance and other charges: **$346,483.57,**
Street Address or other common designation of real property:     **1047 CHERRY STREET
                                    SAN CARLOS, CA 94070**

A.P.N.: **046-126-210**
The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common
designation, if any, shown above.  **We are attempting to collect a debt and any information we obtain will be
used for that purpose.**

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand
that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself.
Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the
property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest
bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off,
before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size
of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance
company, either of which may charge you a fee for this information. If you consult either of these resources, you
should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times
by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law
requires that information about trustee sale postponements be made available to you and to the public, as a courtesy
to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable,
the rescheduled time and date for the sale of this property, you may call 800-683-2468 option 1 or visit this Internet
Web site www.servicelinkASAP.com, using the file number assigned to this case 2022-05453. Information about
postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately
be reflected in the telephone information or on the Internet Web site. The best way to verify postponement
information is to attend the scheduled sale.

NOTICE TO TENANT: You may have a right to purchase this property after the trustee auction pursuant to Section
2924m of the California Civil Code. If you are an "eligible tenant buyer," you can purchase the property if you
match the last and highest bid placed at the trustee auction. If you are an "eligible bidder," you may be able to
purchase the property if you exceed the last and highest bid placed at the trustee auction. There are three steps to
exercising this right of purchase. First, 48 hours after the date of the trustee sale, you can call 800-683-2468 option
1, or visit this internet website www.servicelinkASAP.com, using the file number assigned to this case 2022-05453
to find the date on which the trustee's sale was held, the amount of the last and highest bid, and the address of the
trustee. Second, you must send a written notice of intent to place a bid so that the trustee receives it no more than 15
days after the trustee's sale. Third, you must submit a bid so that the trustee receives it no more than 45 days after
the trustee's sale. If you think you may qualify as an "eligible tenant buyer" or "eligible bidder," you should
consider contacting an attorney or appropriate real estate professional immediately for advice regarding this
potential right to purchase.

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.

Date: 1/12/2023                                    **Entra Default Solutions, LLC**

**Marisa Vidrine, Foreclosure Specialist**

✔ . ◦ ◗

**2023-023217**

12:21 pm 05/17/2023 ST RE Fee: $187.00

Count of Pages 2

Recorded in Official Records

County of San Mateo

Mark Church

Assessor-County Clerk-Recorder



\* $ R 0 0 0 3 3 5 8 2 3 0 $ \*

Recording Requested By and
When Recorded Mail To:

Douglas Sykes
275 Alvarado Road
Berkeley, CA 94705

## SUBSTITUTION OF TRUSTEE AND DEED OF FULL RECONVEYANCE

WHEREAS, the undersigned is the **Beneficiary** of a Note and
Deed of Trust in the original principal amount of $308,000,
executed by **YINTAO YU, TRUSTEE OF THE 1047 CHERRY STREET TRUST,
DATED JULY 28, 2017 (Trustor)**, in favor of **DOUGLAS G. SYKES
(Beneficiary)**, secured by a Deed of Trust dated November 12,
2020, and recorded with the Recorder of SAN MATEO COUNTY on
November 19, 2020, as Recording Number **2020-131159. ENTRA
DEFAULT SOLUTIONS, LLC** is the present **Trustee**. The APN of the
secured property is **046-126-210**. The property is known and
described as 1047 Cherry Street, San Carlos, CA 94070.

The present beneficiary hereby substitutes **DOUGLAS G. SYKES**
as Trustee in lieu of the present Trustee and vests in said
substituted Trustee, all the rights, title, estate, power, duty
and trusts conferred by said Deed of Trust upon the Trustee
therein named. **DOUGLAS G. SYKES** hereby accepts the
Substitution.

In accordance with the Deed of Trust the undersigned
Substituted Trustee does hereby reconvey without warranty to the
person or persons legally entitled thereto all estate now held
by said Substituted Trustee under said Deed of Trust.

IN WITNESS WHEREOF, the present Beneficiary above named,
and Douglas G. Sykes as Substituted Trustee, have caused this
instrument to be executed, each in its respective interest.

Dated: May ___1___, 2023

**Substituted Trustee**            **Beneficiary**

Douglas G. Sykes                   Douglas G. Sykes
Substituted Trustee

> A notary public or other
> officer completing this
> certificate verifies only
> the identity of the
> individual who signed the
> document to which this
> certificate is attached, and
> not the truthfulness,
> accuracy, or validity of
> that document.

STATE OF CALIFORNIA
COUNTY OF ALAMEDA

    On May 1 , 2023, before me, _Richard Craig_ , a
notary public, personally appeared DOUGLAS G. SYKES, who proved
to me on the basis of satisfactory evidence to be the person(s)
whose name(s) is/are subscribed to the within instrument, and
acknowledged to me that he executed the same in his authorized
capacity, and that by his signature(s) on the instrument the
person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the
State of California that the foregoing paragraph is true and
correct.

Witness my hand and official seal.

_____
Notary's Signature

RICHARD CRAIG
COMM. # 2288264
NOTARY PUBLIC · CALIFORNIA
ALAMEDA COUNTY
COMM. EXPIRES JUNE 8, 2023

_Richard Craig_
_____
Name (typed or printed)

**2023-023599**

Simplifile,

8:04 am 05/19/2023 NR Fee: $92.00

Count of Pages 1

Recorded in Official Records

County of San Mateo

Mark Church

Assessor-County Clerk-Recorder

RECORDING REQUESTED BY:
Entra Default Solutions, LLC

AND WHEN RECORDED MAIL TO
YINTAO YU
1047 CHERRY STREET
SAN CARLOS, CA 94070

\* $ R 0 0 0 3 3 5 8 8 3 8 $ \*

T.S. No.: **2022-05453**
A.P.N.: **046-126-210**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF RESCISSION OF NOTICE OF DEFAULT

**NOTICE IS HEREBY GIVEN:** That **Entra Default Solutions, LLC** is duly appointed Trustee under a Deed of Trust dated **11/11/2020**, executed by **YINTAO YU, TRUSTEE OF THE 1047 CHERRY STREET TRUST, DATED JULY 28, 2017**, as Trustor, to secure certain obligations in favor of **DOUGLAS G. SYKES**, as original Beneficiary, recorded **11/19/2020**, as Instrument No.**2020-131159**, in book , page , of Official Records in the Office of the Recorder of **San Mateo** County, California describing land therein as more fully described on the above referenced deed of trust.

said obligations including one note or notes for the sum of **$308,000.00**.

Whereas, the present beneficiary under that certain Deed of Trust herein above described, heretofore delivered to the Trustee thereunder written instructions to commence foreclosure proceedings; and Whereas, Notice was heretofore given of breach of obligations for which said Deed of Trust is security and of election to cause to be sold the property therein described; and Whereas, a Notice of Default was recorded on the day and in the book and page set forth below:

Notice of Default was recorded on **6/9/2022** in the office of the Recorder of **San Mateo** County, California, Instrument No. **2022-046950**, in Book , Page , of Official Records.

**NOW; THEREFORE, NOTICE IS HEREBY GIVEN** that the present Beneficiary and/or the Trustee, does hereby rescind, cancel and withdraw said Notice of Default ; it being understood, however, that this rescission shall not in any manner be construed as waiving or affecting any breach or default past, present or future under said Deed of Trust, or as impairing any right or remedy thereunder, but is, and shall be deemed to be, only an election, without prejudice, not to cause a sale to be made pursuant to said Notice, and shall no way jeopardize or impair any right, remedy or privilege secured to the Beneficiary and/or the Trustee, under said Deed of Trust, nor modify nor alter in any respect any of the terms, covenants, conditions or obligations thereof, and said Deed of Trust and all obligations secured thereby are hereby reinstated and shall be and remain in force and effect the same as if said Notice of Default had not been made and given.

Dated: 5/17/2023

Entra Default Solutions, LLC

By:

Katie Milne, Vice President

**RECORDING REQUESTED BY:**

Yintao Yu

**When Recorded Mail Document To:**

Yintao Yu
PO Box 363
Palo Alto  CA 94302

# 23715945

Regina Alcomendras
Santa Clara County - Clerk-Recorder

07/31/2017 03:48 PM

Titles: 1      Pages: 2

Fees:  $28.00
Taxes: $0.00
Total: $28.00

Property Address: 115 College Avenue
Mountain View, CA 94040

SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN/Parcel ID(s):  148-38-109

## GRANT DEED

**The undersigned grantor(s) declare(s)  This conveyance is a bonafide gift and the grantor received nothing in return.  R & T Code 11930**

(  X  )  This transfer is exempt from the documentary transfer tax.
(     )  The documentary transfer tax is **Zero**  and is computed on:
(     )  The full value of the interest or property conveyed.
(     )  The full value less the liens or encumbrances remaining thereon at the time of sale.
The property is located in  (  )  an unincorporated area   ( X )  the **City of Mountain View**

Declaring Agent – Transfer Tax

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged**, Yintao Yu, a single man

**hereby GRANT(S) to** Ben Yu, Trustee of The 115 College Avenue Trust, dated July 28, 2017
YINTAO
**the following described real property in the** City of **Mountain View**, County of **Santa Clara**, State of California:

Lot 31 in Block 6 of University Park in the City of Mountain View, County of Santa Clara, State of California, as shown on Map filed Book M, Page 9 of Maps, in the Office of The County Recorder of said county.

Yintao Yu

## MAIL TAX STATEMENTS AS DIRECTED ABOVE

Grant Deed

## GRANT DEED
(continued)

APN/Parcel ID(s): 148-38-109

### Notary Acknowledgement

Dated: July 29, 2017

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of ___CALIFORNIA___

County of ___SANTA CLARA___

On ___7-31-17___ before me, ___RANDALL R. RAMINEZ___, Notary Public,
(here insert name and title of the officer)

personally appeared ___YINTAO Yu___
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.

WITNESS my hand and official seal.

Randall R. Ramirez
Signature

(Seal)

RANDALL R. RAMIREZ
Commission # 2055293
Notary Public - California
Santa Clara County
My Comm. Expires Jan 16, 2018

Grant Deed

This is to certify that this is a
true copy of the document
on file in this office.
ATTEST:

Regina Alcomendras

CLERK-RECORDER
Santa Clara, CA
08/17/2023

RECORDING REQUESTED BY:
Yintao Yu, Ben Yu
115 College Ave
Mountain View, CA

# 25424753

Regina Alcomendras
Santa Clara County — Clerk-Recorder

01/11/2023 08:43 AM

AND WHEN RECORDED MAIL DOCUMENT TO:

Yintao Yu, Ben Yu
115 College Ave
Mountain View, CA

Titles: 1      Pages: 3
Fees:  $108.00
Taxes: $0
Total: $108.00

Space Above This Line for Recorder's Use Only

Property Address: 115 College Avenue, Mountain View, CA 94040
APN: 148-38-109

## AFFIDAVIT CHANGE OF TRUSTEE
### (California Probate Code 18105)

The undersigned, being of legal age, declares under penalty of perjury:

1. Declarant(s) certify(ies) that he/she/they is/are the successor trustee(s) of the following described trust:

   Name of Trust:           The 115 College Avenue Trust

   Date of Trust:           July 28, 2017

   Trustor(s)/Settlor(s):   Ben Yu

   Former Trustee(s):       Ben Yu

2. The real property held by said trustee(s)/successor trustee(s) is located in the City of Mountain View County of Santa Clara, State of California, set forth as follows:

**SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF FOR LEGAL DESCRIPTION**

3. This Affidavit is prepared and executed pursuant to California Probate Code Section 18105.

I/We, am/are named as successor trustee(s) in the aforementioned trust and hereby consent to act as successor trustee(s) of the aforementioned trust and do hereby assume the powers and duties as successor trustee(s) of such trust.

This Affidavit is made for the protection and benefit of all persons hereafter acquiring an interest in or dealing with the property identified in this document.

Date: January 9, 2023

BY: _Y Roger Yu_ _____          _Ba Yu_ _____

        Yintao Yu                                Ben Yu

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of San Mateo

Subscribed and sworn to (or affirmed) before me on this 09 day of January , 20 23 , by Yintao Yu , Ben Yu _____, proved to me on the basis of satisfactory evidence to

be the person(s) who appeared before me.

Signature _____

_____ (Seal)

RUBEN DARIO RAMOS PRADO
Notary Public - California
San Mateo County
Commission # 2291186
My Comm. Expires Jun 2, 2023

## Exhibit A

APN: 046-126-210

LOT 26 IN BLOCK 5, AS DESIGNATED ON MAP ENTITLED, "HARBOR ADDITION TO SAN CARLOS MAP NO. 4 SAN CARLOS, CALIFORNIA", WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, ON MAY 6, 1927 IN BOOK 15 ON MAPS AT PAGE 60.

This is to certify that this is a
true copy of the document
on file in this office.
ATTEST:

*Regina Alcomeadras*

CLERK-RECORDER
Santa Clara, CA
08/17/2023

1    Jeffrey H. Lowenthal (State Bar No. 111763)
     Jill K. Cohoe (State Bar No. 296844)
2    STEYER LOWENTHAL BOODROOKAS
       ALVAREZ & SMITH LLP
3    235 Pine Street, 15th Floor
     San Francisco, California 94104
4    Telephone:   (415) 421-3400
     Facsimile:   (415) 421-2234
5    E-mail:      jlowenthal@steyerlaw.com
                  jcohoe@steyerlaw.com
6
     Attorneys for Plaintiff
7    PNC Bank, N.A.

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        FOR THE COUNTY OF SAN MATEO

10

11   PNC BANK, N.A.,                      Case No.     23-CIV-02234

12                  Plaintiff,
                                          **COMPLAINT FOR DECLARATORY RELIEF**
13        v.

14   YINTAO YU, as Trustee of the Golden
     Aurora Trust dated 10/3/2019 and amended
15   on 12/31/2019; and DOES 1-50, inclusive,

16                  Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

---

COMPLAINT FOR DECLARATORY RELIEF                                              1

2019186.1 - F.GOLDENAURA

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON    5/15/2023
By    **/s/ Jennifer Torres**
            **Deputy Clerk**

Plaintiff PNC Bank, N.A. ("Plaintiff") hereby alleges as follows:

**FIRST CAUSE OF ACTION**

(Declaratory Relief against All Defendants)

1.      This action concerns the real property located at 2990 Ralston Avenue, Belmont, California ("Subject Property"), which is legally described in Exhibit 1 attached hereto.

2.      Plaintiff is informed and believes that the Subject Property is comprised of Lots 4, 5, 6 and portions of Lots 2, 3, 34, 35, 36, and 37 as reflected in the legal description and four Assessor Parcels designated by the San Mateo County Assessor with the following Assessor's Parcel Numbers ("APN"): 043-102-170, 043-102-260, 043-102-270, and 043-102-180.  Plaintiff is informed and believes that the Subject Property is and at all times relevant herein has been improved with a single-family residence.

3.      Plaintiff is informed and believes that defendant Yintao Yu, as Trustee of the Golden Aurora Trust dated 10/3/2019 and amended on 12/31/2019 ("Yu"), is the current owner of the Subject Property who took title pursuant to a Grant Deed executed on January 3, 2020 by Jiangjiang "Jimmy" Gu, Trustee of the Sequoia Hill Lake Trust dated July 28, 2017 ("Gu"), and recorded in the Official Records of San Mateo County on January 7, 2020 as Document No. 2020-001160 ("Original Grant Deed"). A true and correct copy is attached hereto as Exhibit 2.

4.      Plaintiff is informed and believes that Yu is the borrower on a purchase-money loan from Plaintiff in the principal amount of $1,264,000 ("PNC Loan"), secured against the Subject Property by a Deed of Trust given by Yu, as trustor and borrower, recorded on January 7, 2020 in the Official Records of San Mateo County as Document No. 2020-001161 ("PNC Deed of Trust").  A true and correct copy is attached hereto as Exhibit 3.

5.      Plaintiff is informed and believes that due to fraud and/or mistake, the Original Grant Deed and PNC Deed of Trust identified the Subject Property by common address and multiple APNs, but only included the legal descriptions of Lots 4, 5, and 6 and omitted the legal descriptions of portions of Lots 2, 3, 34, 35, 36, and 37.

6.      Plaintiff is informed and believes that on January 10, 2020, Gu executed a Corrected Grant Deed in favor of Yu that included the correct common address, the APNs of all

2

four parcels that comprise the Subject Property, and the legal descriptions of Lots 4, 5, 6 and portions of Lots 2, 3, 34, 35, 36, and 37 (the "Corrected Grant Deed").  Plaintiff is further informed and believes that the Corrected Grant Deed was recorded in the Official Records of San Mateo County on December 31, 2020 as Document No. 2020-155714, a true and correct copy is attached hereto as <u>Exhibit 4</u>.

7.     Plaintiff is informed and believes that at all relevant times, Yu agreed, acknowledged, affirmed and represented that the PNC Loan would be secured by the PNC Deed of Trust recorded in first position against the entirety of the Subject Property, including the single-family residence located thereon, all four APNs, Lots 4, 5, 6 and portions of Lots 2, 3, 34, 35, 36, and 37.

8.     Plaintiff is informed and believes that due to fraud and/or mistake, the PNC Deed of Trust identifies the Subject Property by common address and references APNs 043-102-180, 043-102-170, and 043-102-260, but only includes the legal description for Lots 4, 5, and 6 and omits the legal descriptions for the portions of Lots 2, 3, 34, 35, 36, and 37.

9.     Plaintiff is informed and believes that notwithstanding the foregoing, at all relevant times, Plaintiff and Yu intended and agreed that the PNC Deed of Trust would be a valid and enforceable first position lien against the entirety of the Subject Property, including the single-family residence located thereon, all four APNs, and Lots 4, 5, 6 and portions of Lots 2, 3, 34, 35, 36, and 37.

10.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this complaint to allege said defendants' true names and capacities after they have been ascertained.  Plaintiff is informed and believes that each of the fictitiously named defendants is in some manner legally responsible with respect to the matters herein alleged and/or claims some right, title, estate, right, title or interest in the Subject Property.

11.     Plaintiff is informed and believes that at all times relevant to this action, each defendant, including those unknown and those fictitiously named, was the agent, servant, employee, subtenant, assignee, partner, joint venturer, or surety of the other defendants and was

COMPLAINT FOR DECLARATORY RELIEF                                                          3

2019186.1 - F.GOLDENAURA

1    acting in the course and scope of that relationship, with the knowledge and consent or ratification

2    of each other defendant in the doing of the things alleged in this complaint.

3         12.    An actual controversy has arisen and now exists between Plaintiff and defendants

4    in that Plaintiff contends and, Plaintiff is informed and believe that defendants deny, that the PNC

5    Deed of Trust is a valid and enforceable first position lien against the entirety of the Subject

6    Property, including the single-family residence located thereon, all four APNs, and Lots 4, 5, 6

7    and portions of Lots 2, 3, 34, 35, 36, and 37 based upon, among other things, the intent and

8    agreement of the parties, fraud and/or mistake, and the doctrine of after acquired title.

9         13.    Plaintiff seeks a declaration that the PNC Deed of Trust is a valid and enforceable

10   first position lien against the entirety of the Subject Property, including the single-family

11   residence located thereon, all four APNs, and Lots 4, 5, 6 and portions of Lots 2, 3, 34, 35, 36,

12   and 37.  Plaintiff is informed and believes that defendants claim that the PNC Deed of Trust

13   encumbers only Lots 4, 5, and 6, which Plaintiff denies.

14        14.    Plaintiff is entitled to a judicial declaration that the PNC Deed of Trust is a valid

15   and enforceable first position lien against the entirety of the Subject Property, including the

16   single-family residence located thereon, all four APNs, and Lots 4, 5, 6 and portions of Lots 2, 3,

17   34, 35, 36, and 37.  Such a declaration is necessary and appropriate at this time so that all parties

18   identified herein may ascertain their rights and duties with respect to the Subject Property.

19        WHEREFORE, Plaintiff demands judgment against defendants as follows:

20        1.    For a declaration of the rights and duties of Plaintiff and defendants with regard to

21   the matters described herein;

22        2.    For costs of suit incurred herein, including reasonable attorney's fees as permitted

23   by law; and

24        3.    For such further relief as this Court may deem just and proper.

25   / / /

26   / / /

27   / / /

28   / / /

1    Dated:  May 15, 2023                    STEYER LOWENTHAL BOODROOKAS
                                             ALVAREZ & SMITH LLP
2

3                                            By: _Jill Cohoe_____
                                                 Jeffrey H. Lowenthal
4                                                Jill K. Cohoe
                                                 Attorneys for Plaintiff
5                                                PNC Bank, N.A.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY RELIEF                                            5
2019186.1 - F.GOLDENAURA

# EXHIBIT 1

**PARCEL ONE:**

LOTS 4, 5 AND 6 IN BLOCK 111, AS DESIGNATED ON THE MAP ENTITLED "MAP OF SUBDIVISION NO. 8 BELMONT COUNTRY CLUB PROPERTIES BELMONT SAN MATEO COUNTY CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON DECEMBER 24, 1926 IN BOOK 14 OF MAPS AT PAGES 65 TO 68 INCLUSIVE.

**PARCEL TWO:**

PORTION OF LOTS 2, 3, 34, 35, 36 AND 37 IN BLOCK 111, AS DESIGNATED ON THE MAP ENTITLED "MAP OF SUBDIVISION NO. 8 BELMONT COUNTRY CLUB PROPERTIES BELMONT, SAN MATEO COUNTY, CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON DECEMBER 24, 1926 IN BOOK 14 OF MAPS AT PAGES 65 TO 68 INCLUSIVE, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF BELMONT CANYON ROAD, DISTANT THEREON 14.30 FEET NORTHEASTERLY ON THE ARC OF A CURVE TO THE LEFT WITH A RADIUS OF 150 FEET, FROM THE SOUTHWESTERLY CORNER OF LOT 2 IN BLOCK 111, AS SAID LOT, BLOCK AND ROAD ARE SHOWN ON THE MAP HEREIN MENTIONED, THENCE FROM SAID POINT OF BEGINNING ALONG SAID EASTERLY LINE ON THE ARC OF A CURVE TO THE LEFT HAVING RADIUS OF 150 FEET, AN ARC DISTANCE OF 15.70 FEET TO A POINT; THENCE 2 DEGREES 34 MINUTES WEST 10.20 FEET TO THE NORTHWESTERLY LINE OF SAID LOT 3; THENCE LEAVING SAID EASTERLY LINE OF BELMONT CANYON ROAD AND RUNNING ALONG THE DIVIDING LINE BETWEEN LOTS 3 AND 4, SOUTH 82 DEGREES 58 MINUTES EAST 79.98 FEET TO THE DIVIDING LINE BETWEEN LOTS 3, 4, AND 37; THENCE NORTHWESTERLY ALONG THE DIVIDING LINE BETWEEN LOTS 3, 4, 5 AND 37, 58.25 FEET TO THE COMMON CORNER OF LOTS 5, 6 AND 37, THENCE NORTHEASTERLY ALONG THE NORTHWESTERLY

LINE OF LOTS 37, 36, 35, AND 34, 155.52 FEET TO THE MOST NORTHERLY CORNER OF LOT 34, THENCE SOUTHWESTERLY ALONG THE DIVIDING LINE BETWEEN LOTS 33 AND 34, SOUTH 11 DEGREES 26 MINUTES WEST 102.61 FEET TO THE NORTHERLY LINE OF THE PRESENT STATE HIGHWAY ROUTE 214, AS SAID NORTHERLY LINE WAS ESTABLISHED BY DEED FROM WESTERN TITLE INSURANCE COMPANY, A CORPORATION TO THE COUNTY OF SAN MATEO DATED FEBRUARY 9, 1940 AND RECORDED FEBRUARY 27, 1940 IN BOOK 898 OF OFFICIAL RECORDS AT PAGE 1; THENCE WESTERLY ALONG SAID NORTHERLY LINE ON THE ARC OF A CURVE TO THE RIGHT WITH A RADIUS OF 1950 FEET, AN ARC DISTANCE OF 193.31 FEET TO THE POINT OF BEGINNING.

PARCEL THREE:

A NON EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER A PORTION OF BLOCK 111, AS DESIGNATED ON THE MAP ENTITLED "MAP OF SUBDIVISION NO. 5 BELMONT COUNTRY CLUB PROPERTIES BELMONT, SAN MATEO COUNTY, CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON DECEMBER 24, 1956 (SIC) IN BOOK 14 OF MAPS AT PAGES 65 TO 68 INCLUSIVE, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHWESTERLY LINE OF LOT 33 IN BLOCK 111, AS SAID LOT AND BLOCK ARE SHOWN ON THE ABOVE DESCRIBED MAP, DISTANT THEREON SOUTH 13 DEGREES 26 MINUTES WEST 69.61 FEET FROM THE NORTHWESTERLY CORNER THEREOF; THENCE FROM SAID POINT OF BEGINNING, LEAVING SAID LINE SOUTH 95 DEGREES 52 MINUTES 51 SECONDS EAST 119.74 FEET TO A POINT IN THE NORTHERLY LINE OF RALSTON AVENUE; THENCE ALONG SAID LINE OF RALSTON AVENUE SOUTH 79 DEGREES 15 MINUTES WEST 80.00 FEET; THENCE NORTH 81 DEGREES 07 MINUTES 55 SECONDS WEST 45.32 FEET TO A POINT IN THE SAID NORTHWESTERLY LINE OF SAID LOT 33; THENCE ALONG SAID LINE NORTH 13 DEGREES 26 MINUTES EAST 17.00 FEET TO THE POINT OF BEGINNING.

JPN: 043-010-102-01A, 043-010-102-02A, 043-010-102-12A AND 043-010-102-13A,

APN:  043-102-180, 043-102-170, 043-102-260, 043-102-270
The property more commonly known as: 2990 Ralston Avenue, Belmont, CA 94002

# EXHIBIT 2

**2020-001160**

10:24 am 01/07/20 DE Fee: 17.00
Count of Pages 2 BL
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder

**RECORDING REQUESTED BY:**
First American Title Company

**MAIL TAX STATEMENT
AND WHEN RECORDED MAIL DOCUMENT TO:**
Golden Aurora Trust
2990 Ralston Ave
Belmont, CA 94002

\* $ R 0 0 0 2 8 0 5 1 0 0 $ \*

Space Above This Line for Recorder's Use Only

A.P.N.: 043-102-180

File No.: 4307-6015940 (jc)

# GRANT DEED

The Undersigned Grantor(s) Declare(s): DOCUMENTARY TRANSFER TAX **$1,738.00**; CITY TRANSFER TAX **$0.00**;
SURVEY MONUMENT FEE **$0.00**
[ **X** ]   computed on the consideration or full value of property conveyed, OR
[   ]   computed on the consideration or full value less value of liens and/or encumbrances remaining at time of sale,
[   ]   unincorporated area; [ **X** ] City of **Belmont**, and
EXEMPT FROM BUILDING HOMES AND JOBS ACTS FEE PER GOVERNMENT CODE 27388.1(a)(2)

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **Jiangjiang "Jimmy" Gu,
Trustee of The Sequoia Hill Lake Trust dated July 28, 2017**

hereby GRANTS to **Yintao Yu, as Trustee of the Golden Aurora Trust dated 10/3/2019 and amended
on 12/31/2019**

the following described property in the City of **Belmont**, County of **San Mateo**, State of **California**:

**LOTS 4, 5 AND 6 IN BLOCK 111, AS DESIGNATED ON THE MAP ENTITLED "MAP OF
SUBDIVISION NO. 8 BELMONT COUNTRY CLUB PROPERTIES BELMONT SAN MATEO COUNTY
CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO,
STATE OF CALIFORNIA ON DECEMBER 24, 1926 IN BOOK 14 OF MAPS AT PAGES 65 TO 68
INCLUSIVE.**

**JPN: 043-010-102-01A**

Mail Tax Statements To:  **SAME AS ABOVE**

Grant Deed - continued

Date: **01/03/2020**

A.P.N.: 043-102-180

File No.: 4307-6015940 (jc)

Dated:  January 03, 2020

Jiangjiang "Jimmy" Gu, Trustee of The Sequoia
Hill Lake Trust dated July 28, 2017

_____
Jiangjiang "Jimmy" Gu, Trustee

---

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

---

STATE OF     _Callfornia_____     )SS
COUNTY OF   _San Mateo_____     )

On ___January 3rd, 2020_____, before me, _____Emilia T. Liu_____, Notary
Public, personally appeared
_____Jiangjiang "Jimmy" Gu_____
_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.                    *This area for official notarial seal*

_____
Notary Signature

EMILIA T. LIU
COMM. #2186580
Notary Public - California
San Mateo County
My Comm. Expires Apr. 11, 2021

11

# EXHIBIT 3

**2020-001161**

**RECORDING REQUESTED BY:**
**First American Title Company**

**WHEN RECORDED MAIL DOCUMENT TO:**

PNC Mortgage, NA
PO Box 8800
Dayton, OH 45401-8800

10:24 am 01/07/20 DT Fee: 71.00
Count of Pages 20
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder



\* $ R 0 0 0 2 8 0 5 1 0 1 $ \*

_____ Space Above This Line for Recorder's Use Only _____

A.P.N.:   043-102-180, 043-102-170, 043-102-260, 043-10
2990 Ralston Avenue, Belmont, CA 94002

File No.:   4307-6015940

DEED OF TRUST
(Please fill in document title(s) on this line)

( X ) Exempt from fee under GC 27388.1 (a) (2) due to being recorded in connection with a concurrent transfer that is subject to the imposition of documentary transfer tax, or

( ) Exempt from fee under GC Sec 27388.1 (a) (1); fee cap of $225 reached on concurrent documents in this transaction, or

( ) Exempt from fee under GC 27388.1 (a) (2) due to being recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier, or

( ) Exempt from fee under GC 27388.1 (a) (1); Not related to real property, or,

( ) Exempt from fee under GC 27388.1 (a) (1) for the following reasons:

NOTE: The following exemptions **may not be acceptable for use in all counties:**

( ) Exempt from fee under GC 27388.1 due to being recorded in connection with a transaction that was subject to documentary transfer tax which was paid on document recorded _____ as Document No. _____ of Official Records, or

( ) Exempt from fee under GC 27388.1 due to the maximum fees having been paid on document(s) recorded _____ as Document No. _____ of Official Records, or

( ) Exempt from fee under GC 27388.1 due to it being recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded _____ as Document No. _____ of Official Records.

THIS PAGE ADDED TO PROVIDE EXEMPTION INFORMATION FOR THE BUILDING HOMES AND JOBS ACT FEE
(SB-2; AFFORDABLE HOUSING FEE)
(Additional recording fee applies)

Recording Requested By /
Return To:
**PNC Bank, N.A.**
**P. O. Box 8800**
**Dayton, OH 45401-8800**

ATTN: **PNC Bank, N.A.**

Prepared By:
**Alexander Tripp**
**PNC Bank, N.A.**
**P. O. Box 8800**
**Dayton, OH 45401-8800**

[Space Above This Line For Recording Data]

# DEED OF TRUST

**YU**
Loan #: **xxxxxx3074**
PIN: **043-102-180**

Trustor/Borrower:
**YINTAO YU**
**1047 Cherry St, San Carlos, CA 94070**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **January 6, 2020**, together with all Riders to this document.

**(B) "Borrower"** is **Yintao Yu, as Trustee of the Golden Aurora Trust dated 10/3/2019 and amended on 12/31/2019.** Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is **PNC Bank, N.A..** Lender is a **National Association** organized and existing under the laws of **THE UNITED STATES**. Lender's address is **3232 Newmark Drive, Miamisburg, OH 45342**. Lender is the beneficiary under this Security Instrument.

**(D) "Trustee"** is **Clear Recon Corp.**

**(E) "Note"** means the promissory note signed by Borrower and dated **January 6, 2020**. The Note states that Borrower owes Lender **One Million Two Hundred Sixty-Four Thousand And 00/100** Dollars (U.S. **$1,264,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **February 1, 2050**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
€⊞  312.39                                Page 1 of 12                                Form 3005 1/01

Initials: _____ Y Y _____



xxxxxx3074

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider
☐ Balloon Rider     ☐ Planned Unit Development Rider     ☐ Biweekly Payment Rider
☐ 1-4 Family Rider     ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** of **San Mateo**:
**See Attached Exhibit A**
which currently has the address of **2990 Ralston Ave, Belmont, CA 94002** ("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
312.39                          Page 2 of 12                          Form 3005 1/01

Initials: _____ YY

xxxxxx3074

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such

Initials: _____ YY _____

xxxxxx3074

waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower

xxxxxx3074

subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

CALIFORNIA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
312.39                                          Page 5 of 12                                          Form 3005 1/01

Initials: _____ _YY_____



xxxxxx3074

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
312.39                                           Page 6 of 12                                           Form 3005 1/01

Initials: ___ Y Y _____



xxxxxx3074

required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

EX  312.39                                    Page 7 of 12                                    Form 3005 1/01

Initials: ___YY___

xxxxxx3074

taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
⊂⊠  312.39                                          Page 8 of 12                                          Form 3005 1/01

Initials: _____ Y Y



principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
☯☯   312.39                                 Page 9  of 12                                 Form 3005 1/01

Initials: _____ **YY**



xxxxxx3074

one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless**

Initials: _____ YY _____

xxxxxx3074

Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.



24

xxxxxx3074

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above.

_____   1/6/2020_____

**YINTAO YU, AS TRUSTEE OF THE Golden Aurora Trust UNDER TRUST INSTRUMENT DATED October 3, 2019 - DATE -**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____Ca_____   )
County of _____Santa   Clara_____   )
                                       )
On ___1/6/2020_____ before me, __Julia   S.   Clothier,   Notary   public,__
                                        (here insert name and title of the officer)

personally appeared

_____Yintao   Yu_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

JULIE S. CLOTHIER
Notary Public - California
Santa Clara County
Commission # 2246428
My Comm. Expires Jun 21, 2022

Individual Loan Originator: **Sheng Hua**, NMLSR ID: **1552269**
Loan Originator Organization: **PNC Bank, National Association**, NMLSR ID: **446303**

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
312.39                              Page 12 of 12                         Form 3005 1/01



**Exhibit "A"**

**Legal Description**

A.P.N.: 043-102-180

Real property in the City of Belmont, County of San Mateo, State of California, described as follows:

LOTS 4, 5 AND 6 IN BLOCK 111, AS DESIGNATED ON THE MAP ENTITLED "MAP OF SUBDIVISION NO. 8 BELMONT COUNTRY CLUB PROPERTIES BELMONT SAN MATEO COUNTY CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON DECEMBER 24, 1926 IN BOOK 14 OF MAPS AT PAGES 65 TO 68 INCLUSIVE.

JPN: 043-010-102-01A

## FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*)-Rate Caps)

YU
Loan #: **xxxxxx3074**

THIS FIXED/ADJUSTABLE RATE RIDER is made this **6th** day of **January, 2020**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **PNC Bank, N.A.** ("Lender") of the same date and covering the property described in the Security Instrument and located at:

**2990 Ralston Ave, Belmont, CA 94002**
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of **3.625**%. The Note also provides for

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR** --Single Family--
**Fannie Mae Uniform Instrument**
⌖ 758.33

Form 3187 6/01 (rev. 6/16)
*(Page 1 of 4)*



27

xxxxxx3074

a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **February, 2027**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two And One-Half** percentage points (**2.500%**) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **8.625%** or less than **2.500%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **8.625%** or less than the Margin.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR** --Single Family--
**Fannie Mae Uniform Instrument**
☒ 758.33

**Form 3187 6/01 (rev. 6/16)**
*(Page 2 of 4)*



28

xxxxxx3074

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to.

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR --Single Family--Fannie Mae Uniform Instrument**
⸬ 758.33                                    **Form 3187 6/01 (rev. 6/16)**
                                            *(Page 3 of 4 )*



xxxxxx3074

a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____  1/6/2020
YINTAO YU, AS TRUSTEE OF THE Golden Aurora Trust UNDER TRUST
INSTRUMENT DATED October 3, 2019 - DATE -

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR --Single Family--
Fannie Mae Uniform Instrument**
☒ 758.33                                        Form 3187 6/01 (rev. 6/16)
                                                *(Page 4 of 4)*

30

## INTER VIVOS REVOCABLE TRUST RIDER

**YU**

Loan #: **xxxxxx3074**

**DEFINITIONS USED IN THIS RIDER.**

(A) "Revocable Trust." The **Golden Aurora Trust** created under trust instrument dated **October 3, 2019**, for the benefit of _____.

(B) "Revocable Trust Trustee(s)." **YINTAO YU**, trustee(s) of the Revocable Trust.

(C) "Revocable Trust Settlor(s)." **YINTAO YU**, settlor(s) of the Revocable Trust.

(D) "Lender." **PNC Bank, N.A.**.

(E) "Security Instrument." The Deed of Trust, Mortgage or Security Deed and any riders thereto of the same date as this Rider given to secure the Borrower's Note to Lender of the same date and covering the Property (as defined below).

(F) "Property." The property described in the Security Instrument and located at:

**2990 Ralston Ave, Belmont, CA 94002**.

[Property Address]

THIS INTER VIVOS REVOCABLE TRUST RIDER is made this **6th** day of **January, 2020**, and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

**CALIFORNIA INTER VIVOS REVOCABLE TRUST RIDER**

☒ 1482.49                                Page 1 of 2



xxxxxx3074

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and Lender further covenant and agree as follows:

### A. ADDITIONAL BORROWER(S)

The term "Borrower" when used in the Security Instrument shall refer to the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and the Revocable Trust, jointly and severally. Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein or by acknowledging all of the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as "Borrower" on the first page of the Security Instrument, each covenant and agreement and undertaking of the "Borrower" in the Security Instrument shall be such party's covenant and agreement and undertaking as "Borrower" and shall be enforceable by the Lender as if such party were named as "Borrower" in the Security Instrument.

BY SIGNING BELOW, the Revocable Trust Trustee(s) and the Revocable Trust Settlor(s) accept and agree to the terms and covenants contained in this Inter Vivos Revocable Trust Rider.

*YINTAO YU*  1/6/2020
_____
YINTAO  YU,  AS  TRUSTEE  OF  THE  Golden  Aurora  Trust  UNDER  TRUST
INSTRUMENT  DATED  October  3,  2019  -  DATE  -

*YINTAO YU*  1/6/2020
_____
- REVOCABLE  TRUST  SETTLOR  -  YINTAO  YU  -  DATE  -

*[Sign Original Only]*

**CALIFORNIA INTER VIVOS REVOCABLE TRUST RIDER**
☒ 1482.49                              Page 2 of 2



# EXHIBIT 4

**2020-155714**

2:33 pm 12/31/20 DE Fee: 29.00
Count of Pages 5
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder

**RECORDING REQUESTED BY**

**AND WHEN RECORDED MAIL DOCUMENT TO:**

Golden Aurora Trust
2990 Ralston Ave
Belmont, CA 94002

Space Above This Line for Recorder's Use Only

A.P.N.: 043-102-180, 043-102-170, 043-102-260, 043-102-270

File No.: 4307-6015940 (jc)

## GRANT DEED

*This grant deed is being re-recorded solely to correct the vesting and to include the parcel number(s) only.*

OWNER OCCUPIED

CORRECTING

DOC # 2020-001160

SEPARATE PAGE PURSUANT TO GOVT CODE 27361.6

34

**2020-001160**

10:24 am 01/07/20 DE Fee: 17.00
Count of Pages 2 BL
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder

**RECORDING REQUESTED BY:**
First American Title Company

**MAIL TAX STATEMENT**
**AND WHEN RECORDED MAIL DOCUMENT TO:**
Golden Aurora Trust
2990 Ralston Ave
Belmont, CA 94002

\* $ R 0 0 0 2 8 0 5 1 0 0 $ \*

_____ Space Above This Line for Recorder's Use Only _____

A.P.N.: 043-102-180, 043-102-170,
043-102-260, 043-102-270

**GRANT DEED**

File No.: 4307-6015940 (jc)

The Undersigned Grantor(s) Declare(s): DOCUMENTARY TRANSFER TAX $1,738.00; CITY TRANSFER TAX $0.00;
SURVEY MONUMENT FEE $0.00

[  **X**  ] computed on the consideration or full value of property conveyed, OR

[    ] computed on the consideration or full value less value of liens and/or encumbrances remaining at time of sale,

[    ] unincorporated area; [ X ] City of **Belmont**, and

EXEMPT FROM BUILDING HOMES AND JOBS ACTS FEE PER GOVERNMENT CODE 27388.1(a)(2)

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **Jiangjiang "Jimmy" Gu,**
**Trustee of The Sequoia Hill Lake Trust dated July 28, 2017**

hereby GRANTS to **Yintao Yu, as Trustee of the Golden Aurora Trust dated 10/3/2019 and amended**
**on 12/31/2019**

the following described property in the City of **Belmont**, County of **San Mateo**, State of **California**:

PARCEL ONE:
LOTS 4, 5 AND 6 IN BLOCK 111, AS DESIGNATED ON THE MAP ENTITLED "MAP OF
SUBDIVISION NO. 8 BELMONT COUNTRY CLUB PROPERTIES BELMONT SAN MATEO COUNTY
CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO,
STATE OF CALIFORNIA ON DECEMBER 24, 1926 IN BOOK 14 OF MAPS AT PAGES 65 TO 68
INCLUSIVE.

PARCEL TWO:
PORTION OF LOTS 2, 3, 34, 35, 36 AND 37 IN BLOCK 111, AS DESIGNATED ON THE MAP
ENTITLED "MAP OF SUBDIVISION NO. 8 BELMONT COUNTRY CLUB PROPERTIES BELMONT,
SAN MATEO COUNTY, CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE
COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON DECEMBER 24, 1926 IN BOOK 14 OF
MAPS AT PAGES 65 TO 68 INCLUSIVE, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY LINE OF BELMONT CANYON ROAD, DISTANT
THEREON 14.30 FEET NORTHEASTERLY ON THE ARC OF A CURVE TO THE LEFT WITH A
RADIUS OF 150 FEET, FROM THE SOUTHWESTERLY CORNER OF LOT 2 IN BLOCK 111 , AS
SAID LOT, BLOCK AND ROAD ARE SHOWN ON THE MAP HEREIN MENTIONED, THENCE FROM
SAID POINT OF BEGINNING ALONG SAID EASTERLY LINE ON THE ARC OF A CURVE TO THE
LEFT HAVING RADIUS OF 150 FEET, AN ARC DISTANCE OF 15.70 FEET TO A POINT; THENCE
2 DEGREES 34 MINUTES WEST 10.20 FEET TO THE NORTHWESTERLY LINE OF SAID LOT 3;
THENCE LEAVING SAID EASTERLY LINE OF BELMONT CANYON ROAD AND RUNNING ALONG
THE DIVIDING LINE BETWEEN LOTS 3 AND 4, SOUTH 82 DEGREES 58 MINUTES EAST 79.98
FEET TO THE DIVIDING LINE BETWEEN LOTS 3, 4, AND 37; THENCE NORTHWESTERLY
ALONG THE DIVIDING LINE BETWEEN LOTS 3, 4, 5 AND 37, 58.25 FEET TO THE COMMON
CORNER OF LOTS 5, 6 AND 37, THENCE NORTHEASTERLY ALONG THE NORTHWESTERLY

Mail Tax Statements To:  **SAME AS ABOVE**

----------------------------------------------------------------------------------------------

35

Grant Deed - continued

Date: **01/03/2020**

LINE OF LOTS 37, 36, 35, AND 34, 155.52 FEET TO THE MOST NORTHERLY CORNER OF LOT 34, THENCE SOUTHWESTERLY ALONG THE DIVIDING LINE BETWEEN LOTS 33 AND 34, SOUTH 11 DEGREES 26 MINUTES WEST 102.61 FEET TO THE NORTHERLY LINE OF THE PRESENT STATE HIGHWAY ROUTE 214, AS SAID NORTHERLY LINE WAS ESTABLISHED BY DEED FROM WESTERN TITLE INSURANCE COMPANY, A CORPORATION TO THE COUNTY OF SAN MATEO DATED FEBRUARY 9, 1940 AND RECORDED FEBRUARY 27, 1940 IN BOOK 898 OF OFFICIAL RECORDS AT PAGE 1; THENCE WESTERLY ALONG SAID NORTHERLY LINE ON THE ARC OF A CURVE TO THE RIGHT WITH A RADIUS OF 1950 FEET, AN ARC DISTANCE OF 193.31 FEET TO THE POINT OF BEGINNING.

PARCEL THREE:

A NON EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER A PORTION OF BLOCK 111, AS DESIGNATED ON THE MAP ENTITLED "MAP OF SUBDIVISION NO. 5 BELMONT COUNTRY CLUB PROPERTIES BELMONT, SAN MATEO COUNTY, CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON DECEMBER 24, 1956 (SIC) IN BOOK 14 OF MAPS AT PAGES 65 TO 68 INCLUSIVE, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHWESTERLY LINE OF LOT 33 IN BLOCK 111, AS SAID LOT AND BLOCK ARE SHOWN ON THE ABOVE DESCRIBED MAP, DISTANT THEREON SOUTH 13 DEGREES 26 MINUTES WEST 69.61 FEET FROM THE NORTHWESTERLY CORNER THEREOF; THENCE FROM SAID POINT OF BEGINNING, LEAVING SAID LINE SOUTH 95 DEGREES 52 MINUTES 51 SECONDS EAST 119.74 FEET TO A POINT IN THE NORTHERLY LINE OF RALSTON AVENUE; THENCE ALONG SAID LINE OF RALSTON AVENUE SOUTH 79 DEGREES 15 MINUTES WEST 80.00 FEET; THENCE NORTH 81 DEGREES 07 MINUTES 55 SECONDS WEST 45.32 FEET TO A POINT IN THE SAID NORTHWESTERLY LINE OF SAID LOT 33; THENCE ALONG SAID LINE NORTH 13 DEGREES 26 MINUTES EAST 17.00 FEET TO THE POINT OF BEGINNING.

JPN: 043-010-102-01A, 043-010-102-02A, 043-010-102-12A AND 043-010-102-13A,

APN:  043-102-180, 043-102-170, 043-102-260, 043-102-270
The property more commonly known as: 2990 Ralston Avenue, Belmont, CA 94002

Grant Deed - continued

Date: **01/03/2020**

A.P.N.: **043-102-180**, 043-102-170, 043-102-260, 043-102-270         File No.: 4307-6015940 (jc)

Dated:  January 03, 2020

Jiangjiang "Jimmy" Gu, Trustee of The Sequoia
Hill Lake Trust dated July 28, 2017

_____

Jiangjiang "Jimmy" Gu, Trustee

---

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

---

STATE OF     _California_     )SS
COUNTY OF   _Santa Clara_     )

On _1 | 10 | 2020_ _____, before me, ___Tram Tran_____, Notary
Public, personally appeared
_____ Jiangjiang "Jimmy" Gu_____
_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.         *This area for official notarial seal*

_____
Notary Signature

TRAM TRAN
COMM. #2181284
Notary Public · California
Santa Clara County
My Comm. Expires Jan. 23, 2021

37

3827005

| **S&DC-S/N** | **Statement and Designation by Foreign Corporation** |
|---|---|

To qualify a corporation from another state or country to transact intrastate business in California, fill out this form, and submit for filing along with:

− A **$100** filing fee (for a foreign stock corporation) or **$30** filing fee (for a foreign nonprofit corporation), and

− A certificate of good standing, issued within the last six (6) months by the agency where the corporation was formed. **Note:** If the corporation is a nonprofit, the certificate of good standing also must indicate the corporation is a nonprofit or nonstock corporation.

−. A separate, non-refundable **$15** service fee also must be included, if you **drop off** the completed form.

**Important!** Corporations in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

**FILED** ᛔᴡ
Secretary of State
State of California

SEP 1 8 2015  iᴍᶜ

ɪᴄᴄ      This Space For Office Use Only

**For questions about this form, go to www.sos.ca.gov/business/be/filing-tips.htm.**

**Corporate Name** (List the exact name of the corporation, as shown in the certificate of good standing. If the name of the corporation is not available for use in the State of California, the corporation must qualify under an assumed name. E.g., "[list the exact name] which will do business in California as [list the proposed assumed name]." For general corporate name requirements and restrictions in California, go to www.sos.ca.gov/business/be/name-availability.htm.)

① Tank Exchange, Inc.

**Corporate History**

② State or foreign country where this corporation was formed: Delaware

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your agent to accept service of process in case your corporation is sued. You may list any adult who lives in California. You may **not** list your own corporation as the agent. **Do not** list an address if the agent is a California registered corporate agent as the address for service of process is already on file.)

③ a. Yintao Yu
   *Agent's Name*

   b. 645 High Street                Palo Alto                          **CA** 94301
   *Agent's Street Address (if agent is not a corporation) - Do not list a P.O. Box*   *City (no abbreviations)*   *State   Zip*

   The corporation named in Item 1 above irrevocably consents to service of process directed to it upon the agent designated above, and to service of process on the California Secretary of State if that agent or that agent's successor is no longer authorized to act or cannot be found at the address given.

**Corporate Addresses**

④ a. 645 High Street               Palo Alto                          CA    94301
   *Street Address of Principal Executive Office - Do not list a P.O. Box*   *City (no abbreviations)*   *State   Zip*

   b.                                                                  CA
   *Street Address of Principal Office in California, if any - Do not list a P.O. Box*   *City (no abbreviations)*   *State   Zip*

   c.
   *Mailing Address of Principal Executive Office, if different from 4a or 4b*   *City (no abbreviations)*   *State   Zip*

**Read and sign below:** This form must be signed **by an officer** of the foreign corporation.

▶ *(signature)*                 Yintao Yu                          Chief Executive Officer
   Sign here                    Print your name here                Your officer title

| Make check/money order payable to: **Secretary of State** | **By Mail** | **Drop-Off** |
|---|---|---|
| Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | Secretary of State Business Entities, P.O. Box 944260 Sacramento, CA 94244-2600 | Secretary of State 1500 11th Street, 3rd Floor Sacramento, CA 95814 |

3827005

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY "TANK EXCHANGE, INC." IS DULY

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD

STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS

OF THIS OFFICE SHOW, AS OF THE EIGHTEENTH DAY OF SEPTEMBER, A.D.

2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE

BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "TANK EXCHANGE,

INC." WAS INCORPORATED ON THE ELEVENTH DAY OF MAY, A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE

BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

5744699  8300

SR# 20150178090

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 10088724

Date: 09-18-15

**2020-131158**

10:40 am 11/19/20 AFF Fee: 98.00
Count of Pages 3
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder

**RECORDING REQUESTED BY:**
Fidelity National Title Company

**Escrow Order No.:** FSMO-1082002566

**When Recorded Mail Document To:**

Yintao Yu, Trustee of the 1047 Chery Street
Trust, dated July 28, 2017
939 Laurel St #D
San Carlos CA 94070

*$R0002955193$*

APN/Parcel ID(s):  046-126-210

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# AFFIDAVIT - CHANGE OF TRUSTEE
### (California Probate Code Section 18105)

The undersigned being of legal age, declares under penalty of perjury:

1. Declarant(s) certifies the existence of the following described Trust and states that he/she/they are the successor Trustee(s) of the following described trust:

   | | |
   |---|---|
   | Name of Trust: | The 1047 Cherry Street Trust |
   | Date of Trust: | July 28, 2017 |
   | Trustor/Settlor(s): | Yintao Yu |
   | Former Trustee(s): | Yolanda Jin |

2. The real property held by said trustee/successor trustee is located in the State of California, set forth as follows:
   
   SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

3. This Affidavit is prepared and executed pursuant to California Probate Code Section 18105.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

Dated:  November 12, 2020

_____
Signature

Yintao Yu
Print Name

Printed:  11.12.20 @ 03:46 PM
CA-FT-FSMO-01500.080108-FSMO-1082002566

## AFFIDAVIT - CHANGE OF TRUSTEE
(continued)

APN/Parcel ID(s):  046-126-210

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____California_____

County of _____San Mateo_____

Subscribed and sworn to (or affirmed) before me on this __12__ day of _____NOV_____, 20_20_ by

_____YINTAO YU_____ ,



proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_Laraine Anne Robbens_

Signature

LORAINE ANNE ROBBINS
Notary Public - California
San Mateo County
Commission # 2274060
My Comm. Expires Jan 29, 2023

# EXHIBIT "A"
Legal Description

**For APN/Parcel ID(s):  046-126-210**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN CARLOS, COUNTY OF SAN MATEO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 26 IN BLOCK 5, AS DESIGNATED ON MAP ENTITLED, "HARBOR ADDITION TO SAN CARLOS MAP NO. 4 SAN CARLOS CALIFORNIA", WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, ON MAY 6, 1927 IN BOOK 15 ON MAPS AT PAGE 60.

**RECORDING REQUESTED BY:**

Yintao Yu

**When Recorded Mail Document To:**

Yintao Yu
PO Box 363
Palo Alto  CA 94302

**23715945**

Regina Alcomendras
Santa Clara County - Clerk-Recorder

07/31/2017  03:48 PM

Titles: 1      Pages: 2
Fees:  $28.00
Taxes: $0.00
Total: $28.00

---

Property Address:  115 College Avenue
Mountain View, CA 94040

SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN/Parcel ID(s):   148-38-109

## GRANT DEED

**The undersigned grantor(s) declare(s)  This conveyance is a bonafide gift and the grantor received nothing in return.   R & T Code 11930**

( X ) This transfer is exempt from the documentary transfer tax.
(   ) The documentary transfer tax is **Zero**  and is computed on:
(   ) The full value of the interest or property conveyed.
(   ) The full value less the liens or encumbrances remaining thereon at the time of sale.
The property is located in  (  ) an unincorporated area   ( X ) the **City of Mountain View**

_____
Declaring Agent – Transfer Tax

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,** Yintao Yu, a single man

**hereby GRANT(S) to** ~~Ben~~ Yu, Trustee of The 115 College Avenue Trust, dated July 28, 2017
        YINTAO
**the following described real property in the** City of **Mountain View**, County of **Santa Clara**, State of California:

Lot 31 in Block 6 of University Park in the City of Mountain View, County of Santa Clara, State of California, as shown on Map filed Book M, Page 9 of Maps, in the Office of The County Recorder of said county.

_____
Yintao Yu

## MAIL TAX STATEMENTS AS DIRECTED ABOVE

Grant Deed

# GRANT DEED
### (continued)

APN/Parcel ID(s):  148-38-109

## Notary Acknowledgement

Dated:  July 29, 2017

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _CALIFORNIA_

County of _SANTA CLARA_

On _7-31-17_ before me, _RANDALL R. RAMIREZ_, Notary Public,
(here insert name and title of the officer)

personally appeared _YINTAO YU_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Randall R. Ramirez_
Signature

(Seal)

RANDALL R. RAMIREZ
Commission # 2055293
Notary Public - California
Santa Clara County
My Comm. Expires Jan 16, 2018

Grant Deed

**RECORDING REQUESTED BY:**
Chicago Title Company – Palo Alto
**Order No.:** FWPS-2989160613 – KR

**When Recorded Mail Document To:**
HSBC Bank US NA
Attn: Collateral Team-PHH
1500 Solana Blvd, Bldg 6, Suite 6200
Westlake, TX 76262

| DOCUMENT:   23388464 | Pages:   28 |
|---|---|
| | Fees          96.00 |
| | Taxes |
| | Copies |
| | AMT PAID      96.00 |

REGINA ALCOMENDRAS          RDE #  007
SANTA CLARA COUNTY RECORDER  8/02/2016
Recorded at the request of  10:21 AM
Title Company

APN/Parcel ID(s):  148-38-109

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Deed of Trust

Exempt from real estate fraud fee under
GC 27388; recorded concurrently in
connection with a transfer subject to the
imposition of documentary transfer tax

**THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**(Additional recording fee applies)**

*Chicago Title*
*2989160613*
**Recording Requested By:**
*PA - KR*

**Return To: HSBC Bank USA, N.A.**
         **Attn: Collateral Team - PHH, 1500 Solana Blvd, Bldg. 6, Suite 6200**
         **Westlake, TX 76262**

---

**Title(s) of Document:**  Declaration of Exemption from Real Estate Fraud Prosecution Trust Fee
                            Deed of Trust

**Date of Document:  July 29, 2016**

**Borrower(s): Yintao Yu**

**Assessor Parcel Number (APN):**

**Property Address: 115 College Ave**

                    **Mountain View, CA 94040**

Loan origination organization  HSBC Bank USA, N.A.
NMLS ID  399799
Loan originator  Xin Shen
NMLS ID  321917

---

2059600953
APN Coversheet-CA
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services  © 2015

VMP368C(CA) (1511)
Page 1 of 1



**Recording Requested By:**

**Return To:**
HSBC Bank USA, N.A.
Attn: Collateral Team - PHH, 1500 Solana Blvd, Bldg. 6, Suite 6200, Westlake TX 76262

**Prepared By:**
Jake Ano
c/o PHH Mortgage, 1 Mortgage Way, Mount Laurel, NJ 08054

# Deed of Trust

**MIN:** 100298920596009538

Exempt from fee under GC27388: Recorded concurrently in connection with a transfer subject to the imposition of documentary transfer tax.

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated July 29, 2016 , together with all Riders to this document.

(B) **"Borrower"** is Yintao Yu , a single man

Borrower's address is 115 College Ave Mountain View, CA 94040
. Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is HSBC Bank USA, N.A.

Lender is a National Bank
organized and existing under the laws of United States of America
Lender's address is 452 Fifth Avenue, New York, NY 10018

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1509)
Page 1 of 18

**(D)** "Trustee" is **First American Title**

**(E)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument**. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)** "Note" means the promissory note signed by Borrower and dated   **July 29, 2016**                    . The Note states that Borrower owes Lender
**Five Hundred Nine Thousand Six Hundred Dollars and Zero Cents**
Dollars (U.S. **$509,600.00**                ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 01, 2046**                 .

**(G)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** "Escrow Items" means those items that are described in Section 3.

**(N)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 2 of 18

of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|  | **County** | of | **SANTA CLARA** | : |
|--|--|--|--|--|
|  | *(Type of Recording Jurisdiction)* |  | *(Name of Recording Jurisdiction)* |  |

**See Attached Legal Description**

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 3 of 18

| | |
|---|---|
| **Parcel ID Number:** | which currently has the address of |
| **115 College Ave** | *(Street)* |
| **MOUNTAIN VIEW** | *(City)*, California **94040**     *(Zip Code)* |
| ("Property Address"): | |

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
   Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

   Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services
Form 3005 1/01
VMP6A(CA) (1502)
Page 4 of 18

prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 5 of 18

accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 6 of 18

notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services
Form 3005 1/01
VMP6A(CA) (1502)
Page 7 of 18

period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1409)
Page 8 of 16

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services
Form 3005 1/01
VMP6A(CA) (1502)
Page 9 of 18

full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such

Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 11 of 18

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

2059600953

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 12 of 18

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services
Form 3005 1/01
VMP6A(CA) (1502)
Page 13 of 18

pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice

2059600953

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 14 of 18

of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies**

2059600953

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 15 of 18

permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

Form 3005 1/01
VMP6A(CA) (1502)
Page 16 of 18

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above. A copy of any Notice of Default and any Notice of Sale will be sent only to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____   7/29/2016
                                    _____ (Seal)
**Yintao Yu**                       -Borrower

_____
                                    _____ (Seal)
                                    -Borrower

_____
                                    _____ (Seal)
                                    -Borrower

_____
                                    _____ (Seal)
                                    -Borrower

[ ]  Refer to the attached *Signature Addendum* for additional parties and signatures.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**
**County of SANTA CLARA**
On **July 29, 2016**               , before me *P. Robertson*
Notary Public, personally appeared
**Yintao Yu**

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

K. ROBERTSON
COMM. # 2136092
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
COMM. EXPIRES JAN. 6, 2020

*Notary Public*

*My commission expires:* 1/6/20

Loan origination organization  **HSBC Bank USA, N.A.**
NMLS ID  **399799**
Loan originator  **Xin Shen**
NMLS ID  **321917**

2059600953
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS                Form 3005 1/01
Bankers Systems™ VMP®                                                                       VMP6A(CA) (1502)
Wolters Kluwer Financial Services                                                           Page 18 of 18

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this       29th     day of            July, 2016          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to **HSBC Bank USA, N.A.**

(the
"Lender") of the same date and covering the Property described in the Security Instrument
and located at:  **115 College Ave Mountain View, CA 94040**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter
attached to the Property to the extent they are fixtures are added to the Property description,
and shall also constitute the Property covered by the Security Instrument: building materials,
appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or
intended to be used in connection with the Property, including, but not limited to, those for
the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light,
fire prevention and extinguishing apparatus, security and access control apparatus, plumbing,
bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers,
disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades,
curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain
a part of the Property covered by the Security Instrument. All of the foregoing together with
the Property described in the Security Instrument (or the leasehold estate if the Security
Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security
Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has agreed
in writing to the change. Borrower shall comply with all laws, ordinances, regulations and
requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow
any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in
addition to the other hazards for which insurance is required by Section 5.

2059600953
**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3170 1/01**

Wolters Kluwer Financial Services
VMP ® -57R (0811)
Page 1 of 3          Initials: _YY_



**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

2059600953

**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
VMP®-57R (0811)          Page 2 of 3          Initials: _____ Form 3170 1/01



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ 7/29/2016 _____ (Seal)          _____ (Seal)
Yintao Yu                                     -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                              -Borrower

2059600953

**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
VMP®-57R (0811)                     Page 3 of 3                     Form 3170 1/01

Loan origination organization  **HSBC Bank USA, N.A.**
NMLS ID  **399799**



# FIXED/ADJUSTABLE RATE RIDER
**(LIBOR One-Year Index (As Published In** *The Wall Street Journal*)**- Rate Caps)**

THIS FIXED/ADJUSTABLE RATE RIDER is made this **29th** day of **July, 2016**
, and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given
by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the
"Note") to **HSBC Bank USA, N.A.**

("Lender") of the same date and covering the property described in the Security Instrument
and located at:  **115 College Ave Mountain View, CA 94040**

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of **3.008%**. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first day of **August, 2023**, and the adjustable interest rate I will pay may change
on that day every 12th month thereafter. The date on which my initial fixed interest rate
changes to an adjustable interest rate, and each date on which my adjustable interest rate
could change, is called a "Change Date."

2059600953
**MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR** - Single Family -
**Fannie Mae Uniform Instrument**

**Form 3187 6/01**
Wolters Kluwer Financial Services
VMP®-168R (0807)
**Page 1 of 4**          Initials:



**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in <u>The Wall Street Journal</u>. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and Twenty-Five / Hundredths** percentage points ( **2.250%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.008%** or less than **2.250%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **8.008%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a

2059600953

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family - Fannie Mae Uniform Instrument

VMP®-168R (0807)          Page 2 of 4          Initials: Y Y          Form 3187 6/01



bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2059600953

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family -
Fannie Mae Uniform Instrument**
VMP®-168R (0807)               **Page 3 of 4**        Initials: ___        **Form 3187 6/01**



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ 7/29/2016 (Seal)          _____ (Seal)
Yintao Yu                          -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                          -Borrower

2059600953

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family - Fannie Mae Uniform Instrument**                          **Form 3187 6/01**
VMP®-168R (0807)                          |   **Page 4 of 4**

Loan origination organization  **HSBC Bank USA, N.A.**
NMLS ID  **399799**



# EXHIBIT A

**Order No.:**   FWPS-2989160613

**For APN/Parcel ID(s):  148-38-109**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF MOUNTAIN VIEW, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 31 IN BLOCK 6 OF UNIVERSITY PARK IN THE CITY OF MOUNTAIN VIEW, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AS SHOWN ON MAP FILED BOOK M, PAGE 9 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. .

RECORDING REQUESTED BY:

Yintao Yu

**When Recorded Mail Document To:**

Yintao Yu
PO  Box 363
Palo Alto  CA 94302

2017169661      08/02/2017 04:06 PM
OFFICIAL RECORDS OF ALAMEDA COUNTY
STEVE MANNING
RECORDING FEE:      24.00

2   PGS

Property Address:  36500 Alder Court
                   Fremont, CA 94536

APN/Parcel ID(s):  501-1808-068-00

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT DEED

**The undersigned grantor(s) declare(s) This conveyance is a bonafide gift and the grantor received nothing in return.  R & T Code 11930**

( X ) This transfer is exempt from the documentary transfer tax.
(   ) The documentary transfer tax is **Zero**  and is computed on:
(   ) The full value of the interest or property conveyed.
(   ) The full value less the liens or encumbrances remaining thereon at the time of sale.
The property is located in   (   ) an unincorporated area     ( X ) the **City of Fremont**

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,** Yintao Yu, a single man

**hereby GRANT(S) to**  Brian Yu, Trustee of the 36500 Alder Court Trust, dated July 28, 2017

**the following described real property in the** City of **Fremont**, County of **Alameda**, State of California:

Lot 12, Block 1, Tract 3405, Filed November 2, 1972, Map Book 77, Pages 5 through 9, Alameda County Records.

_____
Yintao Yu

## MAIL TAX STATEMENTS AS DIRECTED ABOVE

Grant Deed

# GRANT DEED
### (continued)

APN/Parcel ID(s):  501-1808-068-00

## Notary Acknowledgement

Dated:  July 29, 2017

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of __CALIFORNIA__

County of __SANTA CLARA__

On __7-31-17__ before me, __RANDALL R. RAMIREZ__, Notary Public,
(here insert name and title of the officer)

personally appeared __YINTAO YU__

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature

(Seal)

RANDALL R. RAMIREZ
Commission # 2055293
Notary Public - California
Santa Clara County
My Comm. Expires Jan 16, 2018

Grant Deed

**RECORDING REQUESTED BY:**

Yintao Yu

**When Recorded Mail Document To:**

Yintao Yu
PO Box 363
Palo Alto  CA 94302



2017169660       08/02/2017 04:06 PM
OFFICIAL RECORDS OF ALAMEDA COUNTY
STEVE MANNING
       RECORDING FEE:        24.00

2  PGS

---

Property Address:   37591 3rd Street
                    Fremont, CA 94536

SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN/Parcel ID(s)·  507-265-3

# GRANT DEED

**The undersigned grantor(s) declare(s)  This conveyance is a bonafide gift and the grantor received nothing in return.  R & T Code 11930**

( X  ) This transfer is exempt from the documentary transfer tax.
(    ) The documentary transfer tax is **Zero**  and is computed on:
(    ) The full value of the interest or property conveyed.
(    ) The full value less the liens or encumbrances remaining thereon at the time of sale.
        The property is located in (  ) an unincorporated area  ( X ) the **City of Fremont**

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,** Yintao Yu, a single man

**hereby GRANT(S) to**  Harry Yu, Trustee of The 37591 Third Street Trust, dated July 28, 2017

**the following described real property in the** City of **Fremont**, County of **Alameda**, State of California:

Lot 10 in Block C as said Lot and Block are shown on that certain Map entitled, "Map of the Mary E. Mortimer Addition to Niles.  Washington. Alameda County California, surveyed April, 1906, by Thos B. Russell.  C.E.  "filed June 5, 1906, in Liber 21 of Maps.  At page 28, in the Office of the County Recorder of Alameda County.

_Yintao Yu (signature)_

Yintao Yu

# MAIL TAX STATEMENTS AS DIRECTED ABOVE

Grant Deed

## GRANT DEED
(continued)

APN/Parcel ID(s):  507-265-3

Notary Acknowledgement

Dated:  July 29, 2017

> A notary public or other officer completing this certificate
> verifies only the identity of the individual who signed the
> document to which this certificate is attached, and not the
> truthfulness, accuracy, or validity of that document.

State of _CALIFORNIA_

County of _SANTA CLARA_

On _7-31-2017_ before me, _RANDALL R. RAMIREZ_, Notary Public,
(here insert name and title of the officer)

personally appeared _YINTAO    YU_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.

WITNESS my hand and official seal.

_Randall R. Ramirez_
Signature

(Seal)

> RANDALL R. RAMIREZ
> Commission # 2055293
> Notary Public - California
> Santa Clara County
> My Comm. Expires Jan 16, 2018

Grant Deed



2013235138   07/09/2013 09:34 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:   64.00

14 PGS

Recording Requested By:
*Vinny Tan*
*SIERRA PACIFIC MORTGAGE COMPANY, INC.*
*1800 SUTTER STREET, #650*
*CONCORD, CA 94520*
*925-349-7300*

After Recording Mail To:
*MIP INSURING DEPARTMENT*
*SIERRA PACIFIC MORTGAGE COMPANY, INC.*
*1180 IRON POINT ROAD, SUITE 200*
*FOLSOM, CA  95630*
*916-932-1700*

---

[Space Above This Line For Recording Data]

Loan No:     *0000904726*
Assessor's Identification No:   *507-265-3*

# DEED OF TRUST

MIN:   *1000703-0000904726-4*

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated   *JUNE 29, 2013*  together with all Riders to this document.

(B) **"Borrower"** is   *YINTAO YU, A SINGLE MAN*

Borrower's address is   *37591 3RD ST, FREMONT, CA 94536*

Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is   *SIERRA PACIFIC MORTGAGE COMPANY, INC.; NMLS: 1788*

Lender is a   *CORPORATION*   organized and existing under the laws of   *CALIFORNIA*
Lender's address is   *1180 IRON POINT ROAD, SUITE 200, FOLSOM, CA  95630*

(D) **"Trustee"** is   *GREENHEAD INVESTMENTS, INC., A CALIFORNIA CORPORATION*

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P. O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated    *JUNE 29, 2013*    .
The Note states that Borrower owes Lender
   *TWO HUNDRED TWENTY THOUSAND and NO/100-----*    **Dollars**
(U.S. $    *220,000.00*    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    *AUGUST 1, 2028*    .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[　] Adjustable Rate Rider 　　[　] Condominium Rider 　　　　　　[　] Second Home Rider
[　] Balloon Rider 　　　　　　[　] Planned Unit Development Rider [　] Other(s) [specify]
[　] 1-4 Family Rider 　　　　 [　] Biweekly Payment Rider
[　] V. A. Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005 　　1/01
DRAW.MERS.CA.CVL.DT.2.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL) 　　　　　　　　　*(page 2 of 13 pages)*

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as a nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii)the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of   ALAMEDA                                         :

*LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.*

See "exhibit A"

which currently has the address of   37591 3RD ST                                    [Street]
FREMONT                         [City], California   94536   [Zip Code]   ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005                    1/01
DRAW.MERS.CA.CVL.DT.3.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)                              *(page 3 of 13 pages)*

not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005     1/01
DRAW.MERS.CA.CVL.DT.4.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)     *(page 4 of 13 pages)*

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005                    1/01
DRAW.MERS.CA.CVL.DT.5.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)                                    *(page 5 of 13 pages)*

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Loan No: 0000904726

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005       1/01
DRAW.MERS.CA.CVL.DT.6.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)                    (page 6 of 13 pages)

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005                                    1/01
DRAW.MERS.CA.CVL.DT.7.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)                                           *(page 7 of 13 pages)*

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has [a] if any [a] with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005      1/01
DRAW.MERS.CA.CVL.DT.8.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)                    *(page 8 of 13 pages)*

Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys'fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005                        1/01
DRAW.MERS.CA.CVL.DT.9.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)                        *(page 9 of 13 pages)*

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005      1/01
DRAW.MERS.CA.CVL.DT.10.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)      *(page 10 of 13 pages)*

are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005      1/01
DRAW.MERS.CA.CVL.DT.11.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)                                     *(page 11 of 13 pages)*

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

*Loan No: 0000904726*

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005          1/01
DRAW.MERS.CA.CVL.DT.12.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)          *(page 12 of 13 pages)*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above.**

_____ (Seal)
YINTAO YU                        -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

STATE OF CALIFORNIA          SAN MATEO          , County ss:

On July 2Nd, 2013, before me Farhad Khan (Notary pub etc) personally appeared
Yintao Yu
, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.          (This area for official notarial seal)

_____ (Seal)

Commission Number: 1980108
My Commission Expires:
5/28/16

FARHAD KHAN
COMM. #1980108
Notary Public - California
San Joaquin County
My Comm. Expires May 28, 2016

Loan Officer: TONY XU; NMLS.ID: 235481          Loan No: 0000904726

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Form 3005          1/01
DRAW.MERS.CA.CVL.DT.13.WPF (0101DOCS\DEEDS\CVL\CA_MERS.CVL)          (page 13 of 13 pages)

# Exhibit "A"

Lot 10 in Block C, as said Lot and Block are shown on that certain Map entitled, "Map of the Mary E. Mortimer Addition to Niles, Washington, Alameda County, California, surveyed April, 1906, by Thos. B. Russell, C.E., "filed June 5, 1906, in Liber 21 of Maps, at Page 28, in the Office of the County Recorder of Alameda County.

Recording Requested By:
K. COULSON
CHICAGO TITLE
After Recording Return To:
BANK OF AMERICA, N.A.

Doc Processing TX2-979-01-19
4500 Amon Carter Blvd.
Ft. Worth, TX 76155
Prepared By:
GRACE PERALTA



2015234653    08/21/2015 02:12 PM
OFFICIAL RECORDS OF ALAMEDA COUNTY
STEVE MANNING
RECORDING FEE:    79.00

19  PGS

**RECORDING REQUESTED BY**
## CHICAGO TITLE COMPANY

———————————— [Space Above This Line For Recording Data] ————————————

********300808015
[Doc ID #]

# DEED OF TRUST

MIN 1000157-0009142408-1

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "**Security Instrument**" means this document, which is dated  AUGUST 14, 2015       , together with all Riders to this document.
(B)  "**Borrower**" is

YINTAO YU

Borrower's address is
37591 3RD ST, FREMONT, CA 94536-2845

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)                    Form 3005  1/01

MERS Deed of Trust-CA
1006A-CA (02/15)(d/i)                              Page 1 of 14





FWAC 5801500861/Frem/ Wal

DOC ID #: ********300808015

Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is
BANK OF AMERICA, N.A.
Lender is a NATIONAL ASSOCIATION
organized and existing under the laws of THE UNITED STATES
Lender's address is
101 South Tryon Street, Charlotte, NC 28255

**(D) "Trustee"** is
RECONTRUST COMPANY, N.A.
1800 TAPO CANYON RD, SIMI VALLEY, CA 93603

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated   AUGUST 14, 2015     . The Note states that Borrower owes Lender
SEVEN HUNDRED FIFTY TWO THOUSAND and 00/100

Dollars (U.S. $ 752,000.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   SEPTEMBER 01, 2045 .

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

DOC ID #: ********300808015

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY                          of                          ALAMEDA                    :
[Type of Recording Jurisdiction]                                [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.


## SEE ATTACHED EXHIBIT "A"


Parcel ID Number: 501-1808-68                                              which currently has the
address of

36500 ALDER CT, FREMONT
[Street/City]

California 94536-3507 ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.


CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)                    Form 3005 1/01

MERS Deed of Trust-CA
1006A-CA (02/15)                                    Page 3 of 14

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.     **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.     **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.     **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If

DOC ID #: ********300808015

Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)**                          Form 3005  1/01

MERS Deed of Trust-CA
1006A-CA (02/15)                                        Page 5 of 14

DOC ID #: ********300808015

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

DOC ID #: ********300808015

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.   Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)**                    Form 3005  1/01

MERS Deed of Trust-CA
1006A-CA (02/15)                                    Page 7 of 14

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)  **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b)  **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.  Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

DOC ID #: ********300808015

**15.  Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.  Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.  Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18.  Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.  Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)                    Form 3005  1/01

DOC ID #: ********300808015

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.

If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.   **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23.   **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24.   **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

DOC ID #: ********300808015

25.   **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above. A copy of any Notice of Default and any Notice of Sale will be sent only to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
YINTAO YU                                      - Borrower

_____ (Seal)
                                               - Borrower

_____ (Seal)
                                               - Borrower

_____ (Seal)
                                               - Borrower

ANGELA LIU                          NMLS#
Home Loan Consultant -External      633553

Bank of America, N.A.               NMLS#
                                    399802

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)        Form 3005  1/01

MERS Deed of Trust-CA
1006A-CA (02/15)                        Page 13 of 14

DOC ID #: ********300808015

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California

County of _____ SAN MATEO _____

On ___8/14/2015___ before me, ___MANJIT SINGH NOTARY PUBLIC___, personally appeared ____ YINTAO YU ____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Signature _____ (Seal)

> **MANJIT SINGH**
> Comm. #1957794
> Notary Public · California
> Alameda County
> Comm. Expires Nov 19, 2015

---

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)          Form 3005  1/01

MERS Deed of Trust-CA
1006A-CA (02/15)                    Page 14 of 14

# FIXED/ADJUSTABLE RATE RIDER
## LIBOR TWELVE MONTH INDEX - RATE CAPS

00025372300808015
[Doc ID #]

THIS FIXED/ADJUSTABLE RATE RIDER is made this FOURTEENTH                day of AUGUST, 2015        , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to

BANK OF AMERICA, N.A.

("Lender") of the same date and covering the property described in the Security Instrument and located at:

36500 ALDER CT, FREMONT, CA 94536-3507

[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.   ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of        3.250 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

ARM Fixed Period LIBOR Rider
1U652-XX (10/08)(d/i)

Page 1 of 4





DOC ID #: 00025372300808015

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A)   Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first       day of SEPTEMBER, 2022  and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change is called a "Change Date."

### (B)   The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of Interbank offered rates for twelve month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each change date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C)   Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUARTER              percentage points (    2.250  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D)   Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than    8.250  % or less than    2.250  %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    8.250  %.

### (E)   Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F)   Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1.   Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

ARM Fixed Period LIBOR Rider
1U652-XX (10/08)                    Page 2 of 4

DOC ID #: 00025372300808015

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

ARM Fixed Period LIBOR Rider
1U652-XX (10/08)                    Page 3 of 4

DOC ID #: 00025372300808015

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
YINTAO YU                                         -Borrower

_____ (Seal)
                                                          -Borrower

_____ (Seal)
                                                          -Borrower

_____ (Seal)
                                                          -Borrower

ARM Fixed Period LIBOR Rider
1U652-XX (10/08)                    Page 4 of 4

# EXHIBIT "A"
Legal Description

For APN/Parcel ID(s):  501-1808-068-00

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF FREMONT, COUNTY OF ALAMEDA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 12, BLOCK 1, TRACT 3405, FILED NOVEMBER 2, 1972, MAP BOOK 77, PAGES 5 THROUGH 9, ALAMEDA COUNTY RECORDS.

**RECORDING REQUESTED BY:**
**First American Title Company**

**WHEN RECORDED MAIL DOCUMENT TO:**

PNC Mortgage, NA
PO Box 8800
Dayton, OH 45401-8800

**2020-001161**

10:24 am 01/07/20 DT Fee: 71.00
Count of Pages 20
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder



\* $ R 0 0 0 2 8 0 5 1 0 1 $ \*

_____ Space Above This Line for Recorder's Use Only _____

A.P.N.:   043-102-180, 043-102-170, 043-102-260, 043-10
2990 Ralston Avenue, Belmont, CA 94002

File No.:   4307-6015940

DEED OF TRUST
(Please fill in document title(s) on this line)

( X ) Exempt from fee under GC 27388.1 (a) (2) due to being recorded in connection with a concurrent transfer that is subject to the imposition of documentary transfer tax, or

( ) Exempt from fee under GC Sec 27388.1 (a) (1); fee cap of $225 reached on concurrent documents in this transaction, or

( ) Exempt from fee under GC 27388.1 (a) (2) due to being recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier, or

( ) Exempt from fee under GC 27388.1 (a) (1); Not related to real property, or,

( ) Exempt from fee under GC 27388.1 (a) (1) for the following reasons:

NOTE: The following exemptions **may not be acceptable for use in all counties:**

( ) Exempt from fee under GC 27388.1 due to being recorded in connection with a transaction that was subject to documentary transfer tax which was paid on document recorded _____ as Document No. _____ of Official Records, or

( ) Exempt from fee under GC 27388.1 due to the maximum fees having been paid on document(s) recorded _____ as Document No. _____ of Official Records, or

( ) Exempt from fee under GC 27388.1 due to it being recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier. The recorded document transferring the dwelling to the owner-occupier was recorded _____ as Document No. _____ of Official Records.

THIS PAGE ADDED TO PROVIDE EXEMPTION INFORMATION FOR THE BUILDING HOMES AND JOBS ACT FEE
(SB-2; AFFORDABLE HOUSING FEE)
(Additional recording fee applies)

Recording Requested By /
Return To:
**PNC Bank, N.A.**
**P. O. Box 8800**
**Dayton, OH 45401-8800**

ATTN: **PNC Bank, N.A.**

Prepared By:
**Alexander Tripp**
**PNC Bank, N.A.**
**P. O. Box 8800**
**Dayton, OH 45401-8800**

[Space Above This Line For Recording Data]

# DEED OF TRUST

YU
Loan #: xxxxxx3074
PIN: 043-102-180

Trustor/Borrower:
**YINTAO YU**
**1047 Cherry St, San Carlos, CA 94070**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **January 6, 2020**, together with all Riders to this document.
**(B) "Borrower"** is **Yintao Yu, as Trustee of the Golden Aurora Trust dated 10/3/2019 and amended on 12/31/2019.** Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **PNC Bank, N.A.**. Lender is a **National Association** organized and existing under the laws of **THE UNITED STATES.** Lender's address is **3232 Newmark Drive, Miamisburg, OH 45342.** Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is **Clear Recon Corp.**
**(E) "Note"** means the promissory note signed by Borrower and dated **January 6, 2020.** The Note states that Borrower owes Lender **One Million Two Hundred Sixty-Four Thousand And 00/100** Dollars (U.S. **$1,264,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **February 1, 2050.**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
&#9634;&#9634;  312.39                      Page 1 of 12                                    Form 3005 1/01

Initials: _____ *YY*



xxxxxx3074

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider      ☐ Condominium Rider      ☐ Second Home Rider
☐ Balloon Rider      ☐ Planned Unit Development Rider      ☐ Biweekly Payment Rider
☐ 1-4 Family Rider      ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** of **San Mateo**:
**See Attached Exhibit A**
which currently has the address of **2990 Ralston Ave, Belmont, CA 94002** ("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
    312.39                          Page 2 of 12                              Form 3005 1/01

Initials: _____ YY _____



xxxxxx3074

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such

Initials: _____ YY _____



waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
312.39                                          Page 4 of 12                                          Form 3005 1/01

Initials: _____ YY _____

xxxxxx3074

subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

xxxxxx3074

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
312.39                                      Page 6 of 12                                      Form 3005 1/01

Initials: ___Y Y_____



xxxxxx3074

required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial

Initials: _YY_

xxxxxx3074

taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
312.39                                    Page 8 of 12                                    Form 3005 1/01

Initials:  Y Y

xxxxxxx3074

principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Initials: ___*YY*_____



xxxxxx3074

one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless**



xxxxxx3074

Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: _YY_____



xxxxxx3074

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above.

*1/6/2020*

YINTAO YU, AS TRUSTEE OF THE Golden Aurora Trust UNDER TRUST INSTRUMENT DATED October 3, 2019 - DATE -

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____CA_____                          )

County of _____Santa Clara_____              )

On ___1/6/2020___ before me, ___Julin S. Clothier, Notary public___,
(here insert name and title of the officer)

personally appeared

_____Yintao Yu_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

JULIE S. CLOTHIER
Notary Public - California
Santa Clara County
Commission # 2246428
My Comm. Expires Jun 21, 2022

Individual Loan Originator: **Sheng Hua**, NMLSR ID: **1552269**
Loan Originator Organization: **PNC Bank, National Association**, NMLSR ID: **446303**

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
312.39                                Page 12 of 12                          Form 3005 1/01



**Exhibit "A"**

**Legal Description**

A.P.N.: 043-102-180

Real property in the City of Belmont, County of San Mateo, State of California, described as follows:

LOTS 4, 5 AND 6 IN BLOCK 111, AS DESIGNATED ON THE MAP ENTITLED "MAP OF SUBDIVISION NO. 8 BELMONT COUNTRY CLUB PROPERTIES BELMONT SAN MATEO COUNTY CALIFORNIA", FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON DECEMBER 24, 1926 IN BOOK 14 OF MAPS AT PAGES 65 TO 68 INCLUSIVE.

JPN: 043-010-102-01A

## FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal)*-Rate Caps)

YU
Loan #: xxxxxx3074

THIS FIXED/ADJUSTABLE RATE RIDER is made this **6th** day of **January, 2020,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **PNC Bank, N.A.** ("Lender") of the same date and covering the property described in the Security Instrument and located at:

**2990 Ralston Ave, Belmont, CA 94002**
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of **3.625%**. The Note also provides for

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR --Single Family-- Fannie Mae Uniform Instrument**
⊞ 758.33
**Form 3187 6/01 (rev. 6/16)**
*(Page 1 of 4 )*



xxxxxx3074

a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **February, 2027**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two And One-Half** percentage points (**2.500%**) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **8.625%** or less than **2.500%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **8.625%** or less than the Margin.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR** --Single Family--
**Fannie Mae Uniform Instrument**
758.33                                           **Form 3187 6/01 (rev. 6/16)**
*(Page 2 of 4)*



**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR --Single Family--Fannie Mae Uniform Instrument**

▭ 758.33

**Form 3187 6/01 (rev. 6/16)**
*(Page 3 of 4)*



xxxxxx3074

a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_(signature)_     1/6/2020

**YINTAO YU, AS TRUSTEE OF THE Golden Aurora Trust UNDER TRUST INSTRUMENT DATED October 3, 2019 - DATE -**

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR --Single Family--**
**Fannie Mae Uniform Instrument**
758.33                                                    Form 3187 6/01 (rev. 6/16)
                                                          *(Page 4 of 4)*

## INTER VIVOS REVOCABLE TRUST RIDER

YU
Loan #: **xxxxxx3074**

### DEFINITIONS USED IN THIS RIDER.

(A) "Revocable Trust." The **Golden Aurora Trust** created under trust instrument dated **October 3, 2019**, for the benefit of _____.

(B) "Revocable Trust Trustee(s)." **YINTAO YU**, trustee(s) of the Revocable Trust.

(C) "Revocable Trust Settlor(s)." **YINTAO YU**, settlor(s) of the Revocable Trust.

(D) "Lender." **PNC Bank, N.A.**.

(E) "Security Instrument." The Deed of Trust, Mortgage or Security Deed and any riders thereto of the same date as this Rider given to secure the Borrower's Note to Lender of the same date and covering the Property (as defined below).

(F) "Property." The property described in the Security Instrument and located at:

**2990 Ralston Ave, Belmont, CA 94002.**
[Property Address]

**THIS INTER VIVOS REVOCABLE TRUST RIDER** is made this **6th** day of **January, 2020**, and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

**CALIFORNIA INTER VIVOS REVOCABLE TRUST RIDER**
☞ 1482.49                                      Page 1 of 2



xxxxxx3074

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and Lender further covenant and agree as follows:

**A. ADDITIONAL BORROWER(S)**
The term "Borrower" when used in the Security Instrument shall refer to the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and the Revocable Trust, jointly and severally. Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein or by acknowledging all of the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as "Borrower" on the first page of the Security Instrument, each covenant and agreement and undertaking of the "Borrower" in the Security Instrument shall be such party's covenant and agreement and undertaking as "Borrower" and shall be enforceable by the Lender as if such party were named as "Borrower" in the Security Instrument.

BY SIGNING BELOW, the Revocable Trust Trustee(s) and the Revocable Trust Settlor(s) accept and agree to the terms and covenants contained in this Inter Vivos Revocable Trust Rider.



**YINTAO  YU,  AS  TRUSTEE  OF  THE  Golden  Aurora  Trust  UNDER TRUST INSTRUMENT  DATED  October  3,  2019  - DATE -**

**- REVOCABLE  TRUST  SETTLOR  -  YINTAO  YU  -  DATE  -**

*[Sign Original Only]*

**CALIFORNIA INTER VIVOS REVOCABLE TRUST RIDER**
☒ 1482.49                              Page 2 of 2

**DOCUMENT EXAMINATION REPORT**
Re: Yintao Yu

**APPENDIX 3**

# DOCUMENT EXAMINATION REPORT
## Re: Yintao Yu

| DOCUMENT | DATE | SIGNATURE |
|---|---|---|
| AFFIDAVIT – CHANGE OF TRUSTEE | 01/09/23 | |
| AFFIDAVIT - CHANGE OF TRUSTEE | 11/12/20 | |
| AFFIDAVIT – CHANGE OF TRUSTEE | 11/12/20 | |
| DEED OF TRUST 2020-001161 | 01/06/20 | FIXED/ADJUSTABLE RATE RIDER<br><br>INTER VIVOS REVOCABLE TRUST RIDER |
| DEED OF TRUST | 01/06/20 | FIXED/ADJUSTABLE RATE RIDER |
| PERSONNEL FILE REQUEST | 07/30/19 | |
| RETURN TO WORK NOTE | 07/18/18 | |
| Q3 STOCK OPTION AWARD AGREEMENT | 09/30/17 | |
| Q1 ECIAA | 08/30/17 | 08/30/17<br><br>EXHIBIT A 08/30/17 |

**APPENDIX 3**

## DOCUMENT EXAMINATION REPORT
### Re: Yintao Yu

| DOCUMENT | DATE | SIGNATURE |
|---|---|---|
|  |  | EXHIBIT B 08/30/17 |
| FORM I-9 | 08/30/17 |  |
| Q2 PATENT ASSIGNMENT AGREEMENT | 08/22/17 | ne: YINTAO YU e: SIDE LETTER 08/27/17 |
| GRANT DEED 2017169661 | 08/02/17 |  |
| GRANT DEED 2017169660 | 08/02/17 |  |
| GRANT DEED 2017-066003 | 07/31/17 |  |
| GRANT DEED 23715945 | 07/31/17 |  |
| GRANT DEED | 07/29/17 |  |
| OFFER LETTER | 06/07/17 |  |
| DEED OF TRUST | 07/29/16 | FAMILY RIDER |

**APPENDIX 3**

## DOCUMENT EXAMINATION REPORT
### Re: Yintao Yu

| DOCUMENT | DATE | SIGNATURE |
|---|---|---|
| | | FIXED/ADJUSTABLE RATE RIDER |
| STATEMENT AND DESIGNATION BY FOREIGN CORPORATION | 09/18/15 | |
| DEED OF TRUST 2015234653 | 08/14/15 | FIXED/ADJUSTABLE RATE RIDER |
| DEED OF TRUST 2013235138 | 07/29/13 | |

**APPENDIX 3**

**DOCUMENT EXAMINATION REPORT**
Re: Yintao Yu

**APPENDIX 4**

ANSI/ASB Standard 070, First Edition
2022

# Standard for Examination of Handwritten Items




*This document is copyrighted© by the AAFS Standards Board, LLC. 2022 All rights are reserved.*
*410 North 21st Street, Colorado Springs, CO 80904, www.aafs.org/academy-standards-board.*

ANSI/ASB Standard 070, 1st Ed. 2022

# Standard for Examination of Handwritten Items

ASB Approved April 2022

ANSI Approved October 2022



410 North 21st Street
Colorado Springs, CO 80904

This document may be downloaded from: www.aafs.org/academy-standards-board

*This document is provided by the AAFS Academy Standards Board. Users are permitted to print and download the document and extracts from the document for personal use, however the following actions are prohibited under copyright:*

—— *modifying this document or its related graphics in any way;*

—— *using any illustrations or any graphics separately from any accompanying text; and,*

—— *failing to include an acknowledgment alongside the copied material noting the AAFS Academy Standards Board as the copyright holder and publisher.*

*Users may not reproduce, duplicate, copy, sell, resell, or exploit for any commercial purposes this document or any portion of it. Users may create a hyperlink to www.aafs.org/academy-standards-board to allow persons to download their individual free copy of this document. The hyperlink must not portray AAFS, the AAFS Standards Board, this document, our agents, associates and affiliates in an offensive manner, or be misleading or false. ASB trademarks may not be used as part of a link without written permission from ASB.*

*The AAFS Standards Board retains the sole right to submit this document to any other forum for any purpose.*

*Certain commercial entities, equipment or materials may be identified in this document to describe a procedure or concept adequately. Such identification is not intended to imply recommendations or endorsement by the AAFS or the AAFS Standards Board, nor is it intended to imply that the entities, materials, or equipment are necessarily the best available for the purpose.*

*Proper citation of ASB documents includes the designation, title, edition, and year of publication. (See Annex I, ASB Guide 001)*

*This document is copyrighted© by the AAFS Standards Board, LLC. 2022 All rights are reserved.*
*410 North 21st Street, Colorado Springs, CO 80904, www.aafs.org/academy-standards-board*

ANSI/ASB Standard 070, 1st Ed. 2022

## Foreword

The procedures outlined here are grounded in the generally used body of knowledge and experience in the field of forensic document examination.

The American Academy of Forensic Sciences established the Academy Standards Board (ASB) in 2015 with a vision of safeguarding Justice, Integrity and Fairness through Consensus Based American National Standards. To that end, the ASB develops consensus based forensic standards within a framework accredited by the American National Standards Institute (ANSI), and provides training to support those standards. ASB values integrity, scientific rigor, openness, due process, collaboration, excellence, diversity and inclusion. ASB is dedicated to developing and making freely accessible the highest quality documentary forensic science consensus Standards, Guidelines, Best Practices, and Technical Reports in a wide range of forensic science disciplines as a service to forensic practitioners and the legal system.

This document was revised, prepared, and finalized as a standard by the Forensic Document Examination Consensus Body of the AAFS Standards Board (ASB). It was originally developed by the Scientific Working Group on Forensic Document Examination (SWGDOC). That document was updated by the Forensic Document Examination Committee under the Organization of Scientific Area Committees (OSAC) for Forensic Science, who in turn updated and approved the draft document.

Questions, comments, and suggestions for the improvement of this document can be sent to AAFS-ASB Secretariat, asb@aafs.org or 401 N 21st Street, Colorado Springs, CO 80904.

All hyperlinks and web addresses shown in this document are current as of the publication date of this standard.

ASB procedures are publicly available, free of cost, at www.aafs.org/academy-standards-board.

**Keywords:** *handwriting, forensic document examination.*

# Table of Contents

1 Scope ...................................................................................................................................1

2 Normative References .......................................................................................................1

3 Terms and Definitions .......................................................................................................1

4 Technical Discussion .........................................................................................................1
4.1 Significance and Use .........................................................................................................1
4.2 Interferences .......................................................................................................................1

5 Equipment and Requirements .........................................................................................2

6 Procedure............................................................................................................................2
6.1 General ................................................................................................................................2
6.2 Scope of Examination........................................................................................................3
6.3 Examination of the Questioned Writing..........................................................................4
6.4 Examination of the Known Writing..................................................................................6
6.5 Comparison of the Bodies of Writing (questioned writing to known writing or exclusively questioned writing) ......................................................................................7
6.6 Evaluation of Observations...............................................................................................9
6.7 Review of Work ..................................................................................................................9
6.8 Results .................................................................................................................................9

Annex A (informative) Bibliography ........................................................................................10

ANSI/ASB Standard 070, 1ˢᵗ Ed. 2022

# Standard for Examination of Handwritten Items

## 1   Scope

This standard provides procedures used by forensic document examiners for examinations and comparisons involving handwritten items. These procedures apply to the examination and comparison of questioned and known items or of exclusively questioned items. The procedures in this standard include evaluation of the sufficiency of the material (questioned, or known, or both) available for examination.

The particular methods employed in a given case depend upon the nature of the material available for examination. This standard might not cover all aspects of unusual or uncommon examinations of handwritten items.

This standard cannot replace the requisite knowledge, skills, or abilities acquired through task-specific education, training, research, and experience.

## 2   Normative References

There are no normative reference documents. Annex A, Bibliography, contains informative references.

## 3   Terms and Definitions

Refer to Section 3 of the *SWGDOC Standard for Examination of Handwritten Items*[a] and Section 3 of the *SWGDOC Standard Terminology Relating to the Examination of Questioned Documents*[b].

## 4   Technical Discussion

### 4.1   Significance and Use

The procedures outlined in Section 6 are grounded in the generally used body of knowledge and experience in the field of forensic document examination. These procedures shall be used by a forensic document examiner trained in the procedures and instruments described in this document.

### 4.2   Interferences

Items submitted for examination may have inherent limitations that can interfere with the procedures in this standard. Limitations should be noted and recorded.

**4.2.1**   Limitations can be due to such factors as the submission of non-original documents, the condition of the items submitted for examination, the quantity, complexity, or comparability of the writing submitted, alphabet, language, or absent or insufficient characteristics. Such features are taken into account in this standard. The effects of prior storage, handling, testing, or chemical

---

[a] Available from: http://www.swgdoc.org/documents/SWGDOC%20Standard%20for%20Examination%20of%20Handwritten%20Items.pdf

[b] Available from: http://www.swgdoc.org/documents/SWGDOC%20Standard%20Terminology%20Relating%20to%20the%20Examination%20of%20Questioned%20Documents.pdf

processing (for example, for latent prints) can interfere with the ability of the examiner to see certain characteristics, or can eradicate writing entirely. Whenever possible, document examinations should be conducted prior to any chemical processing. Items should be handled to avoid compromising subsequent examinations.

Caution should be exercised when evaluating quantity and comparability of known materials collected by a stakeholder.  Stakeholder selected specimens may not reflect a writer's full range of variation.

**4.2.2**  Limitations can be due to unnaturalness of any writings.

Consideration shall be given to the various forms of simulations, imitations, and duplications of handwriting that can be generated by computer and other means.

The drawn nature of many handwritten simulations and tracings can limit their comparability with known writing. It is not always possible to differentiate between handwritten simulations and tracings.

Distorted writing can appear similar to some forms of simulation or tracing, or may be the product of other intrinsic or extrinsic factors.

## 5   Equipment and Requirements

**5.1**   The items in 5.2 through 5.6 are required for forensic document examination of handwritten items. Their use is case specific.

**5.2**   Light source(s) of intensity and appropriate type to allow fine detail to be distinguished shall be used. Light sources include those capable of producing transmitted lighting, oblique lighting, vertical incident lighting, and other alternative lighting and filters.

**5.3**   The examiner shall use necessary magnification that allows pertinent fine detail to be distinguished. Magnification may include low power hand lenses but may require higher magnification such as a stereomicroscope, or digital microscope, with a range of magnification.

**5.4**   Photographic or other imaging equipment for recording observations shall be available. This may include: image capture device(s) capable of resolution to reliably record pertinent details; image output device(s) (for display or hardcopy production) capable of resolution and color balance for the intended purpose(s), and; media and appropriate systems for intermediate storage and archiving of images.

**5.5**   The examiner should utilize other apparatus and software as appropriate.

**5.6**   There shall be adequate time and facilities to complete all applicable procedures.

## 6   Procedure

### 6.1   General

The examiner shall not treat, handle, alter, or mark a document in any way that will affect the examination integrity of the document.

If permission is granted or required by the laboratory to label the document sets, it shall be done in a manner that does not affect the examination integrity of the document.

The examiner shall contemporaneously document the examinations performed, relevant observations, and basis for results, in detail to allow for an internal or external review and assessment of the utilized examination processes by a forensic document examiner. The documentation shall include any relevant information, method(s), interpretation(s), evaluation(s), and conclusion(s), opinion(s), or other finding(s).

At various points in these procedures, a determination that an important character or feature is not present or that an item is lacking in quality, quantity, or comparability can indicate that the examiner should discontinue or limit the procedure(s). It is at the discretion of the examiner to discontinue the procedure at that point and report accordingly or to continue with the applicable procedures to the extent possible. The examiner shall document the reason(s) for such a decision.

NOTE  Although there is some support within forensic disciplines for the evaluation and documentation of the questioned material prior to the evaluation of the known material, there are currently limited studies specific to handwriting examinations that support requiring the evaluation of the questioned material first.

## 6.2    Scope of Examination

**6.2.1**    The examiner shall perform and document all applicable procedures in sections 6.2.2 through 6.2.6. These procedures need not be performed in the order given. Deviations from these procedures shall be documented and justified.

**6.2.2**    The examiner shall determine whether the examination is a comparison of questioned writing to known writing or a comparison of questioned writing to questioned writing.

**6.2.3**    If the scope of the examinations to be undertaken is not clear based upon submission materials or communication(s) with the submitter, the examiner shall endeavor to clarify the examination(s) to be undertaken or question(s) to be evaluated.

**6.2.4**    The examiner shall document the scope of the examinations and comparisons. The scope can be as simple as a statement of the initial relevant question(s) to be answered.

NOTE  The scope may be written as two or more mutually exclusive competing hypotheses and propositions for each set of comparisons. There are typically two competing hypotheses for each set of comparisons; however, sub-hypotheses may also arise.

Commonly encountered hypotheses which, when mutually exclusive, may be combined as competing hypotheses for evaluation, include:

a)    the questioned material was written by the writer of the known material;

b)    the questioned material was written by a random and unspecified writer in a relevant alternative population;

c)    the questioned material was written by another specified writer;

d)    the questioned material was written by the writer of the known material in a distorted manner.

**6.2.5**    The examiner shall analyze the submitted item(s) to determine sufficiency relative to the scope.

**6.2.6**    The examiner shall consider factors that might affect the writing (i.e., unnatural writing, simulation, tracing, reproduction). The examiner may consider information regarding intrinsic or extrinsic factors that might affect the writing.

**6.2.7**    The examiner shall endeavor to avoid exposure to potentially biasing information that is not necessary for evaluation purposes within the examination process.

**6.2.8**    If modification of the original scope is appropriate during the examination (6.3 through 6.6), the examiner shall document the reason and restate the scope. If modifications are made to the scope, the examiner shall reconsider aspects of 6.2.

**6.3    Examination of the Questioned Writing**

**6.3.1**    The examiner shall perform and document all applicable procedures in sections 6.3.2 through 6.3.10. These procedures need not be performed in the order given. Deviations from these procedures shall be documented and justified.

**6.3.2**    The examiner shall determine whether the questioned writing is original writing. If it is not original writing, request the original.

If the original questioned writing is not submitted, the examiner shall evaluate the quality of the submitted reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for analysis and comparison purposes and proceed to the extent possible. The degree of limitation will vary depending upon the specifics of the case. If the writing has not been reproduced with sufficient clarity for meaningful analysis or comparison purposes, the examiner shall discontinue these procedures and report accordingly.

NOTE  The absence of original writing does not preclude the examinations in this standard; however, examination of the original writing is preferable. Limitations associated with reproductions can include the inability to detect: guide lines; writing instrument type; direction of stroke; pressure; sequence of strokes; hesitations and stops; indentations; erasures; line quality; and artifacts of cut and paste alterations. The extent of these limitations may vary greatly.

**6.3.3**    The examiner shall examine the questioned writing for characteristics of duplication, such as those of cut and paste manipulation, by electronic or other means.

**6.3.4**    The examiner shall evaluate the questioned writing for the following.

a) *Type of Writing*—If there is more than one type of writing (hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures) within the questioned writing, separate the questioned writing into groups of single types of writing.

b) *Internal Consistency*—If there are inconsistencies within any one of the groups created in a) (for example, suggestive of multiple writers), divide the group(s) into consistent sub-groups.

c) *Complexity*—Assess the perceived ease or difficulty with which the questioned writing could be simulated by another writer for purposes of determining the suitability of the questioned writing for comparison purposes.  Factors to be considered include speed, skill, style, construction, changes of directions, retracings, pen lifts, level of stylization, and degree of repetitive movements or shapes. This includes the examiner's assessment of overall rarity or generic nature of the characteristics.

Proceed to 6.3.5 for the questioned writing. If it is sub-divided, proceed for each group or subgroup created.

**6.3.5**   The examiner shall perform an analysis of the questioned writing.

NOTE  Among the features to be considered are elements of the writing such as: abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; distortion; embellishments; formation; freedom of execution; inconsistencies; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; sister lines; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation, both overall and with respect to each of the above features/elements.

**6.3.6**   The examiner shall examine the questioned writing for characteristics indicative of speed of execution.

NOTE  Features that may indicate rapid execution include: varied pen pressure; tapered beginning and ending strokes; and smooth, continuous strokes. Features that may indicate slow execution include: lifts, stops, and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unvaried pressure; and unnatural tremor.

**6.3.7**   The examiner shall determine whether the questioned writing appears to be distorted.

NOTE  Distortion can be attributable to internal or external factors and can be intentional. Features that may indicate distortion include: poor line quality; excessive angularity; unusual overall size; tremor; and wide variation in slant, shapes, spacing, and size.

**6.3.8**   The examiner shall examine the questioned writing for indicia of simulation and tracing. Consideration shall be given to the following:

— if characteristics of slow execution are observed, determine whether these characteristics are specifically indicative of an attempt to simulate or to trace;

   NOTE  Some handwritten simulations and tracings might not display significant characteristics of slow execution (for example, practiced freehand simulations). Simulations and tracings executed in a rapid manner can reflect the preparer's individual writing habits.

— whether guide lines or sister lines are present;

— whether, including the above factors, there is an unnatural similarity between multiple questioned items;

— if indicia of simulation or tracing are found, see 6.5.6 through 6.5.6.1.

**6.3.9**   The examiner shall consider additional features such as date, nature of the substrate, writing instrument, document type, margins, and the area available for writing.

**6.3.10**   If the examination is a comparison of exclusively questioned writing, go to 6.5.

## 6.4    Examination of the Known Writing

**6.4.1**    The examiner shall perform and document all applicable procedures in sections 6.4.2 through 6.4.7. These procedures need not be performed in the order given. Deviations from these procedures shall be documented and justified.

**6.4.2**    For known writing submitted, the examiner shall determine whether the known writing is original writing. If it is not original writing, the examiner may request the original. .

If no original known writing is submitted, the examiner shall evaluate the quality of the submitted reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for analysis and comparison purposes and proceed to the extent possible. The degree of limitation will vary depending upon the specifics of the case. If both original and non-original known writings are submitted, the examiner shall evaluate the known writings as a group. If the writing has not been reproduced with sufficient clarity for any analysis or comparison purposes, and neither the original nor better copies are available, the examiner may discontinue these procedures and report accordingly.

NOTE  The absence of original writing does not preclude the examinations in this standard; however, examination of the original writing is preferable. Limitations associated with reproductions can include the inability to detect: guide lines; writing instrument type; direction of stroke; pressure; sequence of strokes; hesitations and stops; indentations; erasures; line quality; and artifacts of cut and paste alterations. The extent of these limitations may vary greatly.

**6.4.3**    The examiner shall evaluate the known writing for the following.

a)  *Type of Writing*—If there is more than one type of writing (hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures) within the known writing, separate the known writing into groups of single types of writing.

b)  *Internal Consistency*—If there are unresolved inconsistencies within any of the groups created in 6.4.3 a) (for example, suggestive of multiple writers), contact the submitter for authentication. If any inconsistencies are not resolved to the examiner's satisfaction, discontinue these procedures for the affected group(s), and report accordingly.

c)  *Source of Specimens*— Known specimens may include both those written in the normal course of business and those that were written specifically at request for comparison purposes. Known specimens solely collected by a stakeholder may not reflect a writer's full range of variation.

Proceed to 6.4.4 for the known writing. If it is sub-divided, proceed for each group or subgroup created.

**6.4.4**    The examiner shall determine whether any of the known writing appears to be distorted. If it appears to be distorted, the examiner shall determine whether it is possible to establish that the distorted writing is natural writing.

If it is not possible to establish whether apparently distorted writing is natural writing, the examiner shall determine whether the writing is suitable for analysis and comparison and proceed to the extent possible. It should be determined whether additional known writing could be of assistance, and if so, it should be requested. If the available known writing is not suitable for any analysis or comparison, the examiner shall discontinue these procedures and report accordingly.

**6.4.5**   The examiner shall perform an analysis of the known writing (see Note in 6.3.5).

**6.4.6**   The examiner shall examine the known writing for characteristics indicative of speed of execution (see NOTE in 6.3.6).

**6.4.7**   The examiner shall consider additional features such as date, nature of the substrate, writing instrument, document type, margins, and the area available for writing.

**6.5   Comparison of the Bodies of Writing (questioned writing to known writing or exclusively questioned writing)**

**6.5.1**   The examiner shall perform and note all applicable procedures in sections 6.5.2 through 6.5.6.1. These procedures need not be performed in the order given. Deviations from these procedures shall be documented and justified.

**6.5.2**   The examiner shall evaluate the comparability of the bodies of writing.

**6.5.2.1**   Features limiting comparability may include the type of writing, non-contemporaneousness, dissimilarities in text content, capture methods, writing instruments, and writing surfaces. Consideration of factors in 6.5.4 shall be taken into account regardless of whether contemporary writings are available.

NOTE  A lack of contemporaneous writings can hamper the assessment of characteristic dissimilarities. The consideration of the quality of any submitted known writings that are nearest in date to the item(s) in question may indicate if more contemporary writings are needed.

**6.5.2.2**   The evaluation of pictorial images from digitally captured signatures (DCS, also known as electronically captured signatures) generally follows the procedures outlined in this standard. However, the pictorial characteristics of such images may exhibit poor quality and distortion. The examination of the data utilized to create those signatures (i.e., X and Y position of the stylus tip, timing of execution, and exercised Force) may prove useful, but is beyond the scope of this document.

**6.5.2.3**   In questioned to questioned examinations, if the bodies of writing are not comparable, the examiner shall discontinue and report accordingly per laboratory policy. In questioned to known examinations, if the bodies of writing are not comparable, the examiner shall request additional known writing per laboratory policy.

**6.5.2.4**   If contemporaneous writings are requested but not obtained, continue as appropriate.

**6.5.2.5**   If additional known writing is made available, return to 6.4.

**6.5.3**   The examiner shall conduct a side-by-side comparison of comparable portions of the bodies of writing.

NOTE  In some cases, when known writings are submitted from multiple writers, the volume of material may require a methodical assessment of characteristics for comparability, also known as screening. The screening process is used to denote certain significant characteristics that tend to be obvious, particularly uncommon, or in some other way may allow for comparisons of limited characteristics in a timely manner and may include questioned or known material. Once the screening process is complete, the selected items will be fully examined.

ANSI/ASB Standard 070, 1st Ed. 2022

**6.5.3.1**   The examiner shall note absent characters relevant to the comparison.

**6.5.3.2**   The examiner shall evaluate the quantity and quality of writing (questioned writing, or known writing, or both) with respect to all of the characteristics (see Note in 6.3.5).

**6.5.4**   If distortion or affects were previously noted in the questioned or known writing, such distortion or affects shall be considered in the comparison process. Factors which might affect writing include age; illness or injury; medication, drugs or alcohol (intoxication or withdrawal); awkward writing position; writing instrument(s); substrate(s); cold or heat; fatigue; haste or carelessness; nervousness; nature of the document, use of the unaccustomed hand; attempts to disguise should be considered.

**6.5.5**   The examiner shall evaluate the significance of dissimilarities and similarities, individually and in combination, with respect to discriminating elements (see Note in 6.3.5.).

NOTE  A dissimilarity is a feature within the questioned writing that is not found in any of the submitted known specimens. The presence of a feature, even in one specimen, constitutes evidence that the feature is within the repertoire of the writer and cannot be assessed as a dissimilarity.  The assessment of a dissimilarity being evidence of a different source (writer) is in large part relative to the confidence level of the assessment that the provided handwriting specimens constitute a comprehensive sample of the writer's full range of variation as opposed to a feature that is not present within the specimen samples. This is a very high level of proof requiring extensive known specimens from multiple sources, over a large timeframe, and with a well-defined and well-established range of variation.

**6.5.6**   If indicia of simulation or tracing are noted in the examination of the questioned writing, the examiner shall determine whether the model(s) is among the submitted writings. The examiner shall individually evaluate the presence of unnatural pictorial similarities in order to determine whether the known writing was used as a model or if two or more questioned writings are simulations or tracings based on a common model. Overlay comparisons have been found to be an effective method of evaluation. If the model(s) is located among the submitted writings, report accordingly. If the model(s) is not located among the submitted writings, a request for additional materials may be appropriate.

NOTE  Tracings can be produced by various techniques, including: direct tracing, where the model is placed behind the target and seen through the target by ambient light; transmitted light tracing, where the model is placed between the target and a light source; or guideline tracing, where an intermediate model, such as an indentation or a carbon, pencil or printed image, is transferred to the target and overwritten following the intermediate model. Tracings might not involve an exact overlay of an entire signature or entry(s). A segmented tracing can result from shifts in the substrate, hesitations during the tracing process, or the use of multiple models in its creation. Distortion due to copying or reproduction of an intermediate model may also preclude an exact overlay.

**6.5.6.1**   The examiner shall evaluate for evidence of exact replication among multiple writings indicative of duplication by electronic or other means.

**6.5.6.2**   The examiner shall evaluate features of the questioned writing that deviate from the characteristics of the purported writer to determine whether they include natural handwriting characteristics of the person making the simulation or tracing.

ANSI/ASB Standard 070, 1st Ed. 2022

**6.6   Evaluation of Observations**

The examiner shall consider the results of the above procedures in relation to the scope of examination based on the characteristics, features, or information under observation as interpreted with the knowledge, skills, and abilities acquired through appropriate education, training, and experience.

The examiner shall form a conclusion for each set of comparisons with respect to the results of the above procedures and report accordingly.

The bases and reasons for the conclusion(s) and opinion(s) shall be included in the examiner's documentation. Limitations shall also be documented if present.

**6.7   Review of Work**

The examiner shall review all observations, comparisons, evaluations, and relevant documentation in accordance with applicable standards and policies. The examiner shall consider alternative interpretations.

**6.8   Results**

**6.8.1**   Conclusion(s), or opinion(s), or observation(s) may be reached after following the appropriate procedures outlined in this standard. A conclusion is not based solely upon any one characteristic, but rather on the combination of characteristics within the set of writing in conjunction with any limitations that may be present. The number and nature of the examination results are dependent on the question(s) at hand.

**6.8.2**   Methods of reporting may be dictated by confidentialities, laboratory policy, and rules of procedure.

**6.8.3**   For generally accepted phrases expressing conclusions, refer to professional Forensic Document Examination organizations and published standards.

## Annex A
(informative)

## Bibliography

The following bibliography is not intended to be an all-inclusive list, review, or endorsement of literature on this topic. The goal of the bibliography is to provide published standards directly used in the preparation of this standard.

1]   SWGDOC *Standard for Examination of Handwritten Items*, 2013.[c]

2]   SWGDOC *Standard Terminology Relating to the Examination of Questioned Documents,* 2013.[3]

---

[c] Available from: http://www.swgdoc.org/index.php/standards/published-standards



Academy Standards Board
410 North 21st Street
Colorado Springs, CO 80904

www.aafs.org/academy-standards-board.

**DOCUMENT EXAMINATION REPORT**
Re: Yintao Yu

**APPENDIX 5**

**SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners**

**1. Scope**
1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.
1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[1]

**2. Referenced Documents**
2.1 *Standards*
SWGDOC Standard for Scope of Work of Forensic Document Examiners

**3. Significance and Use**
3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.
3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be guidelines without sharply defined boundaries.
3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.
3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.
3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in SWGDOC Standard for Scope of Work of Forensic Document Examiners, and it may be used by forensic examiners in other areas, as appropriate.
3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

**4. Terminology**
4.1 *Recommended Terms:*
**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.
*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.
**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order; however, the examiner is virtually certain that the questioned and known writings were written by the same individual.
*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.
DISCUSSION—Some examiners doubt the desirability of differentiating between strong probability and probable, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

---

[1] McAlexander T.V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol 36, No. 2, March 1991, pp. 311–319.

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the " virtually certain" degree of confidence. *Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion. DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another. *Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term that is, it is a very weak opinion. *Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence suggest*s* that the John Doe of the known material did not write the questioned material, or I found indicatio*n*s that the John Doe of the known material did no*t* write the questioned material but the evidence is far from conclusive.

See Discussion after indications.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

4.2 *Deprecated and Discouraged Expressions*:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**— these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as. "I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

Copyright by SWGDOC (all rights reserved); Wed Jan 14 13:26:05 CDT 2015

**DOCUMENT EXAMINATION REPORT**
Re: Yintao Yu

**APPENDIX 6**

# Forensic Science Consultants, Inc.

14450 Kentfield Place
Poway, CA  92064
USA

Tel: 858-883-4065 [O]
    415-672-3514 [C]
lamqde@gmail.com
www.qdexams.com

Linton A. Mohammed, Ph.D.
Forensic Document Examiner

Diplomate: American Board of Forensic Document Examiners
Diploma in Document Examination - Forensic Science Society (England)
American Society of Questioned Document Examiners (Life Member & Past-President)
American Academy of Forensic Sciences (Fellow)

## Linton A. Mohammed
### CURRICULUM VITAE

## WORK EXPERIENCE

**Forensic Science Consultants, Inc., 01/2012 - present**
Poway, CA
Duties: Forensic Document Examination, expert testimony; research; management.

**dba Rile, Hicks, & Mohammed, Forensic Document Examiners, 10/2010 – 01/2012**
Long Beach, CA; San Francisco, CA
Duties: Forensic Document Examination, expert testimony; research; management.

**dba Associated Document Examiners, 10/1997 – 09/2010**
[with approval of San Diego County Sheriff's Department]
San Diego, CA
       Duties: Forensic Document Examination, expert testimony; research; management.

**San Diego County Sheriff's Department Regional Crime Laboratory, 08/1996 – 10/2010**
San Diego, CA
Senior Forensic Document Examiner, (2002 – 2010)
Forensic Document Examiner, (1996 – 2002) Duties:
Conducted examinations in the most complex cases involving: signatures, handwriting, typewriting, machine printing, commercial printing, photocopies, hand stamps, ink, paper, indented impressions, binding materials; restoration and decipherment of alterations, erasures, and obliterations.
Technical Lead - Questioned Documents Section.
Provided training and mentorship for junior examiners. Principal trainer in Forensic Document Examination for Marie Durina (07/2003- 08/2006) and Brenda Lanners (10/2009- 09/2010).
Provided training for investigators and attorneys.
Provided expert testimony in courts of law.

CURRICULUM VITAE – LINTON A. MOHAMMED

Conducted research, presented results at forensic science conferences, and published in peer-reviewed journals.
Produced and maintained the Questioned Documents Section Quality Manuals.
Oversaw the Questioned Documents Section's ASCLD-LAB accreditation status.
Acted as an Audit Team Captain or part of audit teams as per the Laboratory's ASCLD-LAB accreditation protocols.
Participated in proficiency testing.

**Laboratory of the Government Chemist, 07/1993 – 07/1996**
Teddington, Middlesex, England
Forensic Document Examiner

**Caribbean Institute of Forensic Investigations Ltd., 06/1992 – 07/1993**
Forensic Document Examiner
Trinidad, West Indies

**Trinidad and Tobago Forensic Science Center, 01/1989 – 06/1992**
Forensic Document Examiner; Safety Officer
Trinidad, West Indies

**Trinidad and Tobago Forensic Science Center, 12/1986 – 12/1988**
Chemist 1
Two-year full-time training program in Document Examination. (December 1986-December 1988) at the Trinidad and Tobago Forensic Science Center, Port of Spain, Trinidad. Mr. Robert Fawcett (Staff Sergeant [retired], Royal Canadian Mounted Police) conducted the training, which included the examination of: signatures, handwriting, typewriting, machine printing, commercial printing, photocopies, hand stamps, ink, paper, indented impressions, binding materials; restoration of alterations, erasures, and obliterations, photography, and court testimony.

## EDUCATION

**Ph.D. (Human Biosciences)**
La Trobe University, Melbourne, Australia, 2012 Thesis: "*Elucidating spatial and dynamic features to discriminate between signature disguise and signature forgery behavior*"
Supervisors: Assoc. Prof. Doug Rogers and Dr. Bryan Found

**Master of Forensic Sciences**
National University, San Diego, CA, 2005

**Bachelor of Science (General) [Honors]**
University of the West Indies, St. Augustine, Trinidad & Tobago, 1984

CURRICULUM VITAE – LINTON A. MOHAMMED

## TEACHING EXPERIENCE

**Oklahoma State University, 2006 – present:**
**Adjunct Assistant Professor**
Master of Forensic Sciences Administration and Graduate Certificate in Questioned Documents (online programs)

- o  Graduate course: Historical Aspects of Questioned Documents (4 hours per week during a semester)
- o  Graduate course: Technical Aspects of Questioned Documents (4 hours per week during a semester).

## PROFESSIONAL CERTIFICATIONS

- ▪  Certificate of Qualification in Forensic Document Examination (No. 298) *American Board of Forensic Document Examiners, Inc.,* 1998 (re-certified every 5 years since 1998 to present).

- ▪  Diploma in Document Examination *Chartered Society of Forensic Sciences*, 1996 (formerly The Forensic Science Society). (renewed every 5 years since 1996 to present).

## TESTIMONY EXPERIENCE

Testified over 200 times as an expert witness in Forensic Document Examination in USA (Federal & State courts, depositions), England (High Court & Magistrates' Court), and the Caribbean (High Court & Magistrates' Court).

## AWARDS

2022**: Albert S. Osborn Award of Excellence –** American Society of Questioned Document Examiners.

2019: **Ordway Hilton Award** – American Academy of Forensic Sciences Questioned Documents Section (In Recognition of Outstanding Contributions to Forensic Document Examination).

2012: **New Horizon Award** – American Board of Forensic Document Examiners, Inc. (In Recognition of Exceptional Contributions in Scientific Research for the Advancement of Forensic Document Examination).

## PUBLICATIONS

### Books

Mohammed, L. *Forensic Examination of Signatures*. Elsevier, 2019.

Caligiuri, M. & Mohammed, L. *The Neuroscience of Handwriting: Applications for Forensic Document Examination.* Taylor & Francis: Boca Raton, 2012.

CURRICULUM VITAE – LINTON A. MOHAMMED

### Papers

1. Vaccarone, P., Mohammed, L. (2022). *Line Quality in Non-original Documents Expert Opinions and Conclusions*. Journal of the American Society of Questioned Document Examiners, Vol. 25, No. . pp. 9-19.

2. Dror, I., Scheer, K., Mohammed, L., MacLean, C., Cunningham, L. (2021). *Biasibility and Reliability of Forensic Document Examiners*. Forensic Science International, Vol. 318, January 2021, 110610.

3. Caligiuri, M., & Mohammed, L. (2019). *Signature Dynamics in Alzheimer's Disease*. Forensic Science International 302 (2019)109880.

4. Ascicioglu, F., Tekin, T., Ozbek, N., Cevik, F., Ozcan, F., Mohammed, L. (2019). *Prepared Disappearing Ink and Decipherment of Documents*. J. Forens. Sci. doi: 10.1111/1556-4029.14084

5. Sang, J., Mohammed, L., McClary, C. (2019). "*The Future of Forensic Document Examination*" in The Future of Forensic Science, D. Martell (Ed), Hoboken, NJ: John Wiley & Sons, Inc. pp. 121-157.

6. Caligiuri, M., Mohammed, L., Lanners, B., Hunter. G. (2018). *Kinematic Validation of FDE Determinations about Writership in Handwriting Examination: A preliminary study*. Journal of the American Society of Questioned Document Examiners, Vol, 21, No. 1.

7. Mohammed, L., Found, B., Caligiuri, M., Rogers, D. (2015). *Dynamic Characteristics of Signatures: Effects of Writer Style on Genuine and Simulated Signatures*. Journal of Forensic Sciences, January 2015, Vol. 60, No.1.

8. Mohammed L.A. (2013). *History of the Forensic Examination of Documents*. In: Siegel JA and Saukko PJ (eds.) Encyclopedia of Forensic Sciences, Second Edition, pp. 386-390. Waltham: Academic Press.

9. Caligiuri, M., Mohammed, L., Found, B., & Rogers, D. (2012). *Nonadherence to the Isochrony Principle in Forged Signatures*. Forensic Science International 223 (2012) 228–232.

10. Mohammed, L., Found, B., Caligiuri, M., Rogers, D. (2011). *The Dynamic Character of Disguise Behavior for Text-Based, Mixed, and Stylized Signatures.* J Forensic Sci, January 2011, Vol. 56, No. S1 pp. S136-141).

11. Mohammed, L., Ostrum, B. (2010). *Using Adobe Photomerge™ for Demonstrative Evidence*, Journal of the American Society of Questioned Document Examiners, Vol. 13, No. 1.

CURRICULUM VITAE – LINTON A. MOHAMMED

12. Mohammed, L.A. (2009). *Alterations, Erasures, and Obliterations of Documents,* in Wiley Encyclopedia of Forensic Science, Jamieson, A., Moenssens, A. (eds). John Wiley & Sons Ltd., Chichester, UK, pp. 128-134.

13. Mohammed, L., Found, B., Rogers, D. (2008). *Frequency of Signature Styles in San Diego County* – Journal of the American Society of Questioned Document Examiners, Vol. 11 (1).

14. Mohammed, L., Richards, G. (2006). *Thinking Outside the Box* – Journal of the American Society of Questioned Document Examiners, Vol. 9 (2).

15. Mohammed, L., Jenkinson, G. (2002). *Association of counterfeit documents to a printing plate by means of half tone dots* – Journal of the American Society of Questioned Document Examiners, Vol. 5 (1).

16. Mohammed, L. (1999). *Write-On™: A new tool for handwriting comparison* - Journal of the American Society of Questioned Document Examiners, Vol. 2 (2).

17. Mohammed, L. (1999). *An evaluation of documents produced by a high-speed, high-volume scanning process* - Forensic Science Communications, Vol. 1 (3).

18. Mohammed, L. (1998). *Sequencing writing impressions and laser printing or ink- jet printing using the ESDA* - Journal of the American Society of Questioned Document Examiners, Vol. 1 (1).

19. Mohammed, L. (1993). *Signature disguise in Trinidad and Tobago* - Journal of the Forensic Science Society, Vol. 33 (1).

## PRESENTATIONS

### Workshops

- *The Robert Durst Case: Revisiting Myth of Handprinting Examinations;*
  *The Neuroscience and Kinematics of Handwriting;*
  *Forensic Evaluation of the Fine and Subtle Elements of Signatures and Handwriting II;*
  *Genuine, Disguised, and Simulated Signatures*
  - *Presented to Canadian Forensic Document Examiners at Algonquin College, Ottawa, Ontario, Canada  2023*

- *The Robert Durst Case: Revisiting Myth of Handprinting Examinations*
  - Co-presented with Lloyd Cunningham at the Australasian Society of Forensic Document Examiners Inc., Conference, Melbourne Australia  2023.

CURRICULUM VITAE – LINTON A. MOHAMMED

- *The Neuroscience and Kinematics of Handwriting*
  - o Co-presented with Prof. Michael Caligiuri at the Australasian Society of Forensic Document Examiners Inc., Conference, Melbourne, Australia  2023.

- *Forensic Evaluation of the Fine and Subtle Elements of Signatures and Handwriting II*
  - o Co-presented with Lloyd Cunningham at the 14th Conference of the European Network of Forensic Handwriting Examiners (ENFHEX), Zagreb, Croatia  2022.
  - o Co-presented with Lloyd Cunningham and Karen Nobles, American Academy of Forensic Sciences, Seattle,  WA 2022.

- *Special Topics In Disputed Document Testimony For The 21st Century*
  - o Co-presented with Lloyd Cunningham at the 80th Annual General Meeting of the American Society of Questioned Document Examiners, San Antonio, TX  2022.

- *The Robert Durst Case: Revisiting Myths Of Handprinting Examinations*
  - o Co-presented with Lloyd Cunningham at the 80th Annual General Meeting of the American Society of Questioned Document Examiners, San Antonio, TX  2022.

- *Fine and Subtle Elements of Signatures and Handwriting II*
  - o Co-presented with Karen J. Nobles and Lloyd Cunningham at the 74th Annual Conference of the American Academy of Forensic Science, Seattle, WA  2021.

- *Motor Control and Kinematics of Signatures and Handwriting*
  - o Presented at Inter Forensics, Iguassu Falls, PR, Brazil,  2021 (virtual).

- *The Neuroscience and Kinematics of Handwriting*
  - o Workshop for Trainees and Junior Examiners: co-presented with Prof. Michael Caligiuri at the 79th Annual General Meeting of the American Society of Questioned Document Examiners, August 2021 (virtual).

- *Development of an Evidence-Based Method for the Examination of Electronic Biodynamic Signatures*
  - o Co-presented with Veronica B. Dahir, Ph.D., Charles Edwards, Mara L. Merlino, Ph.D., Danica M. Ommen, Ph.D., & Brent Ostrum at the 13th European Network of Forensic Handwriting Examiners (ENFHEX) Conference and Business Meeting, June  2021 (virtual).

CURRICULUM VITAE – LINTON A. MOHAMMED

- *Dispelling the Myths About the Forensic Examination of Handprinting*
    - Co-presented with Brett Bishop, Katelyn Bruno, Lloyd Cunningham, and Linda Mitchell at the 72nd Annual Conference of the American Academy of Forensic Sciences, Anaheim, CA  2020.
    - Co-presented with Lloyd Cunningham at the Southwestern Association of Forensic Document Examiners (SWAFDE), Denver, CO  2019.

- *Non-Destructive Examination of Inks (4 hours).*
    - Co-presented with Peter V. Tytell and Derek J. Hammond at the 77th Annual General Meeting of the American Society of Questioned Document Examiners, Cary, NC  2019.

- *The Forensic Examination of Genuine, Disguised, and Simulated Signatures with an Introduction to the Neuroscience and Kinematics of Handwriting*
    - Presented at the Scottish Police Authority, Glasgow, Scotland 2018.

- *The Forensic Examination of Original and Copied Signatures*
    - Presented at The Midwestern Association of Forensic Sciences Conference, Cincinnati, OH  2017.

- *Likelihood Approach and Document Examination: What For?*
    - Co-presented with Liv Cadola and Tobin Tanaka at the 21st Triennial Meeting of the International Association of Forensic Sciences, Toronto, Canada  2017.

- *The Examination of Skillfully Simulated Arabic Signatures*
    - Presented at the 2nd Saudi International Conference on Forensic Medicine and Sciences, Riyadh, Kingdom of Saudi Arabia  2017.

- *The Forensic Examination of Genuine, Disguised, and Simulated Signatures with an Introduction to Kinematics of Handwriting*
    - Presented at the Midwestern Association of Forensic Sciences Conference, Branson, MO  2016.

- *Genuine, Disguised, and Simulated Signatures; Kinematics of Handwriting; Formal and Informal Signatures*
    - Co-presented with Lloyd Cunningham at the Australasian Society of Forensic Document Examiners, Inc., Sydney, Australia  2016.

- *Document Examination in the USA*
    - 2-day seminar presented at the Institute of Forensic Science Seminar, Beijing, China  2015.

CURRICULUM VITAE – LINTON A. MOHAMMED

- *Are Fountain Pens Back in Vogue? Characteristics of Fountain Pen Writing and Aqueous Ink Analysis*
  - Co-presented with Lloyd Cunningham, Dr. Valery Aginsky, & William J. Flynn at the 73rd Annual Meeting of the American Society of Questioned Document Examiners, Toronto, Canada  2015.

- *The Forensic Examination of Genuine, Disguised, and Simulated Signatures – with an introduction to the Neuroscience and Kinematics of Handwriting*
  - 2-day workshop conducted at the II Brazilian Symposium on Forensic Science, Brazilia, Brazil 2015.

- *The Examination of Skillfully Simulated Signatures*
  - Presented at the 67th Annual Meeting of the American Academy of Forensic Sciences, Orlando, FL  2015.
  - Presented at Canada Border Services Forensic Laboratory, Ottawa, Canada,  2015.

- *Skillful Freehand Signature Simulation*
  - Co-presented with Lloyd Cunningham at the Joint Meeting of the American Society of Questioned Documents Examiners, Inc. & the Australasian Society of Forensic Document Examiners, Inc., Honolulu, HI 2014.

- *Skillfully Simulated Signatures* – presented at the European Network of Forensic Handwriting Examiners (ENFHEX) meeting, Riga, Latvia, 2013.

- *Signature Examination of Healthy and Impaired Writers*
  - co-presented with Prof. Michael Caligiuri, UCSD, at the American Academy of Forensic Sciences Annual Conference, Washington DC, 2013.

- *Neural Bases and Characteristics of Signature Formation in Writers with Dementia*
  - Co-presented with Prof. Michael Caligiuri, UCSD, at the 70th Annual General Meeting of the American Society of Questioned Document Examiners, Charleston, SC  2012.

- *Signature Examination - Translating Basic Science into Practice*
  - Co-presented with Prof. Michael Caligiuri, UCSD at the American Academy of Forensic Sciences Annual Conference, Seattle, WA  2010.
  - Co-presented with Prof. Michael Caligiuri, UCSD at the American Society of Questioned Document Examiners 68th Annual General Meeting, Victoria, BC, Canada, 2010.

CURRICULUM VITAE – LINTON A. MOHAMMED

- *Genuine, Disguised, and Forged Signatures*
  - Presented at the 1st Eurasian Congress on Forensic Sciences, Istanbul, Turkey, 2008.
  - Presented at the Victoria Forensic Science Centre, Melbourne, Australia, 2008.
  - Presented at the European Network of Forensic Handwriting Experts (ENFHEX) Meeting, Krakow, Poland, 2009.

**Papers**

1. Mohammed, L. (2023). *Forensic Signature Examination: From Brain to Paper*. Presented at the Centre for Forensic Science, University of Technology Sydney, Sydney, Australia.

2. Do, D., & Mohammed, L. (2019). *An Evaluation of the Efficacy of an Electrostatic Detection Device as a Screening Tool for Latent Prints*. Presented at the 1st Joint Meeting of the European Network of Forensic Handwriting Experts (ENFHEX) and the European Fingerprint Working Group (EFP-WG), Porto Portugal; the 77th Annual General Meeting of the American Society of Questioned Document Examiners, Cary, NC, and the California State Division of the International Association for Identification Meeting, Burlingame, CA.

3. Caligiuri, M., Ommen, D., Fuglsby, C., Saunders, C., Mohammed, L., Morris, J., Bird, C. (2019). *The Kinematic Modeling of FDE Writership Opinion*. Presented at the 1st Joint Meeting of the European Network of Forensic Handwriting Experts (ENFHEX), and the European Fingerprint Working Group (EFP-WG), Porto Portugal; and the 77th Annual General Meeting of the American Society of Questioned Document Examiners, Cary, NC.

4. Ommen, D., Fuglsby, C., Saunders, C., Caligiuri, M., Mohammed, L., Buscaglia, J. (2019). *Pairwise Comparison Scores for Handwritten Questioned Documents*. Presented at the American Academy of Forensic Sciences 71st Annual Scientific Meeting. Baltimore, MD.

5. Fuglsby C, Mohammed L, Saunders C, Ommen D, Buscaglia J, Caligiuri M. (2018). *FDE Conclusion Scales Parts 1 & 2: Reverend Bayes or Professor Kirk?* Presented at the 76th Annual Conference of the American Society of Questioned Document Examiners,  Park City, UT.

6. Ommen, D., Fuglsby, C., Saunders, C.,  Caligiuri, M., Mohammed, L., Buscaglia, J. (2018). *Pairwise Scores for Designing Handwritten Document Comparisons*. Poster presented at Forensics @NIST, Gaithersburg, MD.

7. McClary, C., Mohammed, L., Caligiuri, M. (2018). *An Analysis of Forensic Document Examiner (FDE) Aptitude in Determining Velocity Rates of Strokes*. Presented at the American Academy of Forensic Sciences Conference, Seattle, WA.

CURRICULUM VITAE – LINTON A. MOHAMMED

8. Fuglsby, C., Mohammed, L., Buscaglia, J., Saunders, C. (2018). *Sufficiency and Complexity Factors in Handwriting Examination*. Presented at the Impression, Pattern, & Trace Evidence Symposium, Washington, DC.

9. Caligiuri, M., Mohammed, L. (2018). *Error Rates in Handwriting Examination*. Presented at the CSAFE Error Rates Symposium, Arlington, VA.

10. Caligiuri, M., Mohammed, L., Lanners, B. & Hunter G. (2017). *Kinematic Validation of FDE Determinations About Authorship in Handwriting Examination.* Presented at the 75th Annual Conference of the American Society of Questioned Document Examiners, San Diego, CA.

11. Mohammed, L. (2017). *The Kinematics of Signatures and Handwriting*. Presented at the 2nd Saudi International Conference on Forensic Medicine and Sciences, Riyadh, Kingdom of Saudi Arabia.

12. Domitrovich, S. Judge, Seaman Kelly, J., Mohammed, L. (2017). *A Review of the Almeciga V. Center for Investigative Reporting, Inc. Decision: Analysis and Counter-Analysis*. Presented at the American Academy of Forensic Science Conference, New Orleans, LA.

13. Mohammed, L. (2016). *Document Examination – not just handwriting*. Presented to the Young Forensic Scientists Forum, American Academy of Forensic Science Conference, Las Vegas, NV.

14. Mohammed, L. (2014). *Kinematic approach to signature analysis*. Presented at the 3rd. International Workshop on Automated Forensic Handwriting Analysis, Honolulu, HI.

15. Mohammed, L. (2013). *Handwriting stroke kinematics*. Presented at the Measurement Science and Standards in Forensic Handwriting Analysis conference, NIST, Gaithersburg, MD.

16. Mohammed, L., Found, B., Caligiuri, M., Rogers, D. (2012). *Dynamics of stroke direction in genuine and forged signatures.* Presented at the American Academy of Forensic Sciences Conference, Atlanta, GA.

17. Mohammed, L., Found, B., Caligiuri, M., Rogers, D. (2009). *Pen pressure as a discriminating feature between genuine and forged signatures* – Presented at the International Graphonomics Society Conference, Dijon, France.

18. Mohammed, L., Found, B., Caligiuri, M, Rogers, D. (2009). *Can dynamic features be used to discriminate between genuine, auto-simulated, and simulated signatures? -* Presented at the 61st Annual Conference of the American Academy of Forensic Sciences, Denver, CO.

CURRICULUM VITAE – LINTON A. MOHAMMED

19. Mohammed, L. (2008). *Judicial challenges to expert witness testimony in the USA: The Daubert Trilogy* - Presented at the 1st. Eurasian Congress on Forensic Sciences, Istanbul, Turkey.

20. Mohammed, L., Found, B., Rogers, D. (2008). *Genuine and disguised signatures – An empirical approach* - Presented at the 60th Annual Conference of the American Academy of Forensic Sciences, Washington, DC.

21. Mohammed, L., Williams, D. (2006). *Preparing demonstrative charts with the use of Adobe Photomerge®* - Poster presentation, American Academy of Forensic Sciences, Seattle, WA.

22. Mohammed, L. (2005). *The Edge of Light™ Scanner* - Presented at the American Academy of Forensic Sciences Conference, New Orleans, LA.

23. Mohammed, L. (2003). *Daubert and documents* – Presented at the California Association of Criminalists Fall Conference, San Diego, CA.

24. Mohammed, L. (2003). *A standardized training program for Forensic Document Examiners – A proposal* - Presented at the 61st Annual Conference of the American Society of Questioned Document Examiners, Baltimore, MD.

25. Mohammed, L. (2001). *Demonstrative evidence and multi-media technology* - Presented at the 59th Annual Conference of the American Society of Questioned Document Examiners, Des Moines, IA.

26. Mohammed, L., Buglio, J., Shafer, A. (2000). *The influence of paper on the performance of the VSC-2000 spectrometer* - Presented at the 58th Annual Conference of the American Society of Questioned Document Examiners, Ottawa, Ontario, Canada.

27. Mohammed, L., Buglio, J. (2000). *The Association of Forensic Document Examiners* - Prepared for the 58th Annual Conference of the American Society of Questioned Document Examiners, Ottawa, Ontario, Canada.

28. Mohammed, L. (1992). *Cocaine and handwriting* - presented at the 50th Annual Conference of the American Society of Questioned Document Examiners, Milwaukee, WI.

29. Mohammed, L. (1991). *Signature disguise in Trinidad and Tobago* - presented at the 49th Annual Conference of the American Society of Questioned Document Examiners, Orlando, FL.

CURRICULUM VITAE – LINTON A. MOHAMMED

**PROFESSIONAL AFFILIATIONS**

- American Society of Questioned Document Examiners
  - President, 2010 – 2012
  - Vice-President, 2008 – 2010
  - Treasurer, 2006 – 2008
  - Director, 2004 – 2006
  - Annual Conference Program Chair, 2006, 2017, & 2022.
  - Chair, Evaluation and Examination Committee, 2002 – 2006
  - Annual Conference Site Chair, 2002
  - Life Member (2021- ); Member (1991 - 2021)

- American Academy of Forensic Sciences
  - Board of Directors - 2021-
  - Fellow - Questioned Documents Section
  - Chair - Luncheon Seminars, 2023
  - Chair - Questioned Documents Section, 2016 – 2018
  - Chair - Inter-Disciplinary Symposium 2018
  - Co-Chair - Inter-Disciplinary Symposium 2017
  - Secretary - Questioned Documents Section, 2014 – 2016

- Fellow – Chartered Society of Forensic Sciences

- Member – Canadian Society of Forensic Science

**PROFESSIONAL ACTIVITIES**

- Member-Academy Standards Board, 2017- [Chair: 2020 – 2021].

- Member-Research and Technology Transfer Advisory Board, Center for Statistics and Applications in Forensic Evidence (2022 - ).

- Member – Expert Working Group on Human Factors in Handwriting Examination, National Institute of Standards and Technology, 2015 – 2017.

- Member – Physics/Pattern Scientific Area Committee within the National Institute of Standards and Technology Organization of Scientific Area Committees (NIST/OSAC), 2014 – 2016.

- Participant in the General Forensics Technology Working Group, National Institute of Justice, 2011.

- Participant in Scientific Working Group on Documents (SWGDOC), 2009 – present.

- Editor - Journal of the American Society of Questioned Document Examiners.

- Editorial Review Board Member:

  - Journal of Forensic Sciences (2005-2020).
  - Forensic Science and Technology (China) (2015-2020).

CURRICULUM VITAE – LINTON A. MOHAMMED

- Guest reviewer:
  - Forensic Science International.
  - Science & Justice.
  - Australian Journal of Forensic Science.
  - Egyptian Journal of Forensic Sciences.
  - Arab Journal of Forensic Sciences & Forensic Medicine.
  - IEEE Transactions on Cybernetics.
  - International Journal on Document Analysis and Recognition.

## CONTINUING EDUCATION

- American Academy of Forensic Sciences, Orlando, FL 2023
  - Report Writing in a New Rule 702 World-Handwriting Comparison Examination.
  - What Did the Lab Bench Say to the Court Bench? And What Did the Court Bench Hear?

- American Society of Questioned Document Examiners, Park City, UT  2018
  - Write-On 3.0 Workshop
  - The Greatest Forger to Ever Get Caught

- American Society of Questioned Document Examiners, San Diego, CA  2017
  - Forensic Science Research: Your Mission to Propose, Innovate, and Collaborate
  - Preparing a Digital Signature File for Forensic Analysis
  - Chinese Handwriting and Signatures Workshop: Hanzi Through the Eyes of the Forensic Document Examiner
  - Write or Wrong? Bias, Decision-Making, and the Use of Contextual Information in Forensic Document Examination

- American Society of Questioned Document Examiners, Pensacola, FL  2016
  - Measuring Frequency Occurrence in Handwriting and Hand Printing Characteristics
  - Sequence of Entries Determination – New Approach to Additional Print

- American Society of Questioned Document Examiners, Toronto, Canada  2016
  - Principles of Forensic Examination of Arabic Signatures

- American Society of Questioned Document Examiners, Honolulu, HI  2014
  - Adobe - Digital Media & Evidence

- American Academy of Forensic Sciences, Seattle, WA 2014
  - Science, Law, and the Inferential Process: The Epistemology of Scientific Conclusions

- National Institute of Standards and Technology (NIST), Gaithersburg, MD 2013.
  - Measurement Science and Standards in Forensic Handwriting Analysis

CURRICULUM VITAE – LINTON A. MOHAMMED

- American Academy of Forensic Sciences, Atlanta, GA 2012
  - Paper Fundamentals for Forensic Document Examiners
  - Digital Photography for Forensic Document Examiners

- American Society of Questioned Document Examiners, Philadelphia, PA 2011
  - Printing Process Identification for Forensic Document Examiners
  - Using Adobe Photoshop in a QD Workflow

- American Society of Questioned Document Examiners, Victoria, BC, Canada 2010
  - Electronic Recording and Analysis of Handwritten Signatures & Writing

- Cedar Crest College, Allentown, PA 2010
  - Multivariate Analysis for Forensic Scientists: Statistical Pattern Recognition for Physical Evidence Analysis and Chemometrics

- American Academy of Forensic Sciences, Denver, CO 2009
  - Estimation of Uncertainty – Is Anyone Certain What This Means?
  - Security Documents before and After the Crime: REAL ID, Physical and Electronic Security Features, Developments in Commercial Printing Technology, and an Introduction to Counterfeit Link Analysis

- American Academy of Forensic Sciences, Washington DC 2008
  - The Applications of Color Analysis and Light Theory in the Forensic Examination of Documents Workshop

- American Society of Questioned Document Examiners, Portland, OR 2006
  - Fine and Subtle Features of Handwriting Workshop
  - Signature Workshop

- Southeastern Association of Forensic Document Examiners, Atlanta, GA 2006
  - Disguised and Forged Signatures Workshop

- American Academy of Forensic Sciences, New Orleans, LA 2005
  - State of the Art Infrared and Ultraviolet Examinations of Documents by the Video Spectral Comparator

- California Criminalistics Institute, Sacramento, CA 2005
  - Technical Writing for Criminalists

- American Board of Forensic Document Examiners, Las Vegas, NV 2004
  - Daubert Seminar

- American Academy of Forensic Sciences, Chicago, IL 2002
  - Note Taking for Forensic Document Examiners Workshop

- Rochester Institute of Technology, Rochester, NY 2002
  - Printing Process Identification and Image Analysis for Forensic Document Examiners

CURRICULUM VITAE – LINTON A. MOHAMMED

- Limbic Systems, Inc., Bellingham, WA  2001:
  - o  Measurement of Internal Consistencies Software (MICS)

- American Board of Forensic Document Examiners, Norcross, GA  2000:
  - o  Canon Photocopier and Facsimile Training Workshop

- California Criminalistics Institute, Sacramento, CA  2000:
  - o  Special Topics in Questioned Documents

- Southwestern Association of Forensic Document Examiners, Las Vegas, NV 1999:
  - o  Typewriter Examination & Classification Workshop

- American Board of Forensic Document Examiners, Las Vegas, NV  1998:
  - o  Examination Techniques in Handwriting & Rubber Stamp Cases Seminar

- Canadian Society of Forensic Science 44th Annual Conference, Regina, Saskatchewan, Canada  1997:
  - o  Digital Image Processing Workshop

- California Criminalistics Institute, Sacramento, CA  1997:
  - o  Courtroom Presentation of Evidence

- American Society of Questioned Document Examiners 55th Annual Conference, Scottsdale, AZ  1997:
  - o  Handwriting Workshop

- American Society of Questioned Document Examiners 51st Annual Conference, Ottawa, Canada  1993:
  - o  Laser Printer Workshop
  - o  Miscellaneous Document Examination Workshop

- American Society of Questioned Document Examiners 50th Annual Conference, Milwaukee, WI 1992:
  - o  Signature Workshop

- American Society of Questioned Document Examiners 49th Annual Conference, Orlando, FL  1991:
  - o  Canon Fax Workshop
  - o  Deposition Testimony Workshop
  - o  Expert Witness Workshop
  - o  Signature Comparison Workshop

June 21, 2023

**DOCUMENT EXAMINATION REPORT**
Re: Yintao Yu

**APPENDIX 7**

# Forensic Science Consultants, Inc.

14450 Kentfield Place
Poway, CA  92064
USA

Tel: (858) 883-4065 [O]
     (415) 672-3514 [C]

lamqde@gmail.com
www.qdexams.com

Linton A. Mohammed, Ph.D.
Forensic Document Examiner

Diplomate: American Board of Forensic Document Examiners
Diploma in Document Examination - Forensic Science Society (England)
American Society of Questioned Document Examiners (Member & Past-President)
American Academy of Forensic Sciences (Fellow)
Chartered Society of Forensic Sciences (Fellow)

## Linton A. Mohammed
### Forensic Document Examiner

### TRIAL AND DEPOSITION RECORD (from 2019 to present)

| Date | Court | Case | Attorney | P/D |
|------|-------|------|----------|-----|
| 03/05/19 | Trial<br>Probate Court<br>Anchorage, AK<br>(By telephone) | Estate of Earl A. Williams | Artus | P |
| 04/02/19 | Trial<br>U.S. District Court<br>Los Angeles, CA<br>Dept. 10C<br>Judge Christina A. Snyder | United States v.<br>L. Vega | Windsor | D |
| 04/04/19 | Trial<br>Alameda County<br>Superior Court<br>Hayward, CA<br>Dept. 514<br>Judge Patrick McKinney | Eden Housing Management, Inc.<br>v. H. Gamer | Galvin | P |
| 06/26/19 | Trial<br>Polk County District Court<br>Des Moines, IA<br>Dept. 208<br>Judge Joseph Seidlin | League of United Latin<br>American Citizens of Iowa, et al<br>v.<br>Iowa Secretary of State Paul Pate,<br>in his official capacity | Perkins Coie | P |
| 07/17/19 | Trial<br>Santa Clara Superior Court<br>San Jose, CA<br>Dept. 12<br>Judge Cynthia C. Lie | Jacobs v. Ramachandran | Marks | P |

| **Date** | **Court** | **Case** | **Attorney** | **P/D** |
|---|---|---|---|---|
| 10/24/19 | Trial<br>Santa Clara Superior Court<br>San Jose, CA<br>Dept. 3<br>Judge Patricia Lucas | Pesic v. Zouves | Goodman | D |
| 12/19/19 | Deposition<br>Los Angeles, CA | Shenon v. New York Life | Shea | D |
| 12/19/19 | Hearing (by telephone)<br>Judge Garcia<br>JAMS<br>San Francisco, CA | Eden Housing Management<br>v.<br>Richardson | Gavin | P |
| 05/04/20 | Deposition (virtual)<br>Austin, TX | Richardson, et al<br>v.<br>Texas Secretary of State, et al | Mirza | P |
| 06/02/20 | Deposition (virtual)<br>San Francisco, CA | Patel v. Patel | Peretz | P |
| 07/27/20 | Trial<br>San Francisco Superior Court<br>Dept. 505<br>Judge Harold E. Kahn | Patel v. Patel | Peretz | P |
| 08/17/20 | Deposition (virtual)<br>San Francisco, CA | AB Stable VIII v.<br>Maps Hotels and Resorts LLC,<br>et al. | Gibson,<br>Dunn &<br>Crutcher LLP | P |
| 08/27/20 | Trial (virtual)<br>Court of Chancery<br>Delaware<br>Vice-Chancellor J. Travis Laster | AB Stable VIII v.<br>Maps Hotels and Resorts LLC,<br>et al. | Gibson<br>Dunn &<br>Crutcher LLP | P |
| 09/25/20 | Deposition (virtual)<br>Los Angeles, CA | Overland Direct Inc. v.<br>Esola Capital Investment LLC | Blanchard, Krasner<br>& French | P |
| 12/04/20 | Trial (virtual)<br>Phoenix, AZ<br>Judge Randall Warner | Ward v. Jackson | Perkins Coie | D |

| Date | Court | Case | Attorney | P/D |
|------|-------|------|----------|-----|
| 12/14/20 | Deposition (virtual) Los Angeles, CA | Julia M. Breitman v. Reid Breitman | Meyer, Olson, Lowy, Meyers | D |
| 09/01/21 | Trial San Diego Superior Court Dept. 73 Judge Joel R. Wohlfiel | Overland Direct Inc. v. Esola Capital Investment LLC | Blanchard, Krasner & French | P |
| 09/10/21 | Deposition San Francisco (Virtual) | Rago v. Wood Street Plaza, et al | Fidelity National Law Group | D |
| 10/06/21 | Deposition Chicago, IL (virtual) | Bata; Karmi v. Ismael | Collins, Bargione & Vukovich | D |
| 10/21/21 | Deposition Los Angeles, CA (virtual) | Iwanowski v. Mentzen | Borden Law Offices | P |
| 12/13/21 | Deposition Little Rock, AR (virtual) | The League of Women Voters of Arkansas and Arkansas United v. John Thurston, in his official capacity as Secretary of State, et al. | Perkins Coie | P |
| 12/30/21 | Hearing LACC-SMC Department 9 Judge Susan Matcham | Estate of Marie H. Weaver | Ribons | P |
| 03/16/22 | Trial Fifth Division Circuit Court Little Rock, AR Judge Wendell Griffen | League of Women Voters of Arkansas and Arkansas United, et al. v. Thurston, et al. | Perkins Coie | P |
| 03/21/22 | Deposition Orange County, CA (virtual) | Lal v. Shah | Shook, Hardy & Bacon | D |
| 06/01/22 | Deposition Stockton, CA (virtual) | Canvasback Trust | Hartog, Baer, Zabronsky, & Verriere | D |

| Date | Court | Case | Attorney | P/D |
|------|-------|------|----------|-----|
| 06/23/22 | Trial<br>Circuit Court of<br>Cook County<br>Chancery Division<br>Chicago, IL<br>Judge Thaddeus L. Wilson | Bata, et al<br>v Ismael, et al | Collins Bargione<br>& Vukovich | D |
| 08/13/22 | Deposition<br>Los Angeles, CA (virtual) | Ramsdell v. Ramsdell | Rosenfeld, Meyer<br>& Susman | P |
| 08/17/22 | Trial<br>Harris County Civil<br>Courthouse<br>Probate Court #2<br>Houston, TX<br>Judge Michael Newman | Estate of Lee Wah Keung | Alan Kwan | D |
| 08/22/22 | Deposition<br>Stockton, CA (virtual) | Wibbeler v. Kamath | The Goldman<br>Law Firm | D |
| 08/24, 29/22 | Trial<br>Los Angeles Superior Court<br>Los Angeles, CA<br>Dept. 64<br>Judge Mark A. Juhas | Ramsdell v. Ramsdell | Rosenfeld, Meyer<br>& Susman | P |
| 08/31/22 | Deposition<br>San Mateo, CA | Porter v.<br>Fox Bayshore<br>Investments, LLC, et al | Duane Morris LLP | P |
| 10/14/22 | Trial<br>Los Angeles, CA (virtual)<br>Dept. 56,<br>Judge Holly Fujie | Zubrick v. Akhtar | David Fu &<br>Associates | P |
| 11/08/22 | Trial<br>San Diego Superior Court<br>San Diego, CA<br>Dept. 801<br>Judge Sharon L. Kalemkiarian | Rudolph v. Rudolph | Higgs, Fletcher,<br>Mack | P |
| 11/17/22 | Deposition (Virtual)<br>Los Angeles, CA | Balboa Capital v.<br>Olympia Family Medicine | Salisian Lee LLP | P |

| Date | Court | Case | Attorney | P/D |
|------|-------|------|----------|-----|
| 12/12/22 | Deposition<br>Office of the Arkansas<br>Attorney General<br>Little Rock, AR | League of Women Voters of<br>Arkansas, et al<br>v. John Thurston, et al. | Debevoise &<br>Plimpton | P |
| 03/01/23 | Trial<br>Los Angeles Superior Court<br>Norwalk, CA<br>Dept. R<br>Judge Brian F. Gasdia | Belman v.<br>Los Bagres Corp. | Vistas Law Offices | D |
| 03/24/23 | Deposition<br>Laguna Niguel, CA | Estate of Milano Kay<br>(Kanzanjian) | Lagerlof<br>Lawyers, LLP | D |
| 04/20/23 | Deposition<br>Washington, DC<br>(virtual) | Certain Raised Garden Beds<br>and Components Thereof,<br>Case No. *337TA1334 in the<br>United States<br>International Trade Commission. | Locke Lord LLP | P |
| 04/26-27/23 | Trial<br>Los Angeles Superior<br>Court (Probate)<br>Department 5<br>Judge Jessica A. Uzcategui | Estate of Milano Kay<br>(Kanzanjian) | Lagerlof<br>Lawyers, LLP | D |
| 04/28/23 | Deposition<br>Seattle, WA (virtual) | Reyes v. Chilton, et al. | Gibbs Law Group | P |
| 05/23/23 | Administrative Law<br>Hearing<br>United States<br>International<br>Trade Commission<br>Washington, DC<br>Judge Doris Johnson Hines | Certain Raised Garden Beds<br>and Components Thereof,<br>Case No. *337TA1334 in the<br>United States International<br>Trade Commission | Locke Lord LLP | P |
| 06/29/23 | Deposition<br>Seattle, WA (virtual) | Vet Voice Foundation, et al<br>v. Hobbs, et al. | Perkins Coie | P |
| 07/17/23 | Deposition<br>Sarasota, FL (virtual) | Logan v. Logan | Shook, Hardy<br>& Bacon LLP | D |

| Date | Court | Case | Attorney | P/D |
|------|-------|------|----------|-----|
| 07/20/23 | Hearing<br>12th Judicial Center<br>Sarasota, FL.<br>Dept. 6A<br>Judge Charles E. Williams | Logan v. Logan | Shook, Hardy<br>& Bacon LLP | P |
| 08/21/23 | Arbitration<br>Irvine, CA (virtual) | Nunez v. Sammy's, Inc. | Chapman<br>Glucksman, P.C. | D |
| 08/23/23 | Trial<br>Orange County<br>Superior Court<br>Orange County, CA<br>Dept. 16<br>Judge David A. Hoffer | Edward W. Ray, Jr. vs.<br>Julie Basmadjian, et al. | Clark Hill | P |
| 09/14/23 | Deposition (virtual)<br>San Francisco, CA | Ho v. Chang | Hartog, Baer,<br>Zabronsky, Verriere | D |
| 09/21/23 | Deposition (virtual)<br>Denver, CO | Vet Voice Foundation, et al<br>v. Griswold, et al | Perkins Coie | P |
| 09/26/23 | Deposition (virtual)<br>St. Louis, MO | Missouri State Conference of<br>the NAACP, et al<br>v.<br>State of Missouri, et al. | ACLU | P |