# EXHIBIT A

CHARLES O. THOMPSON (SBN CA 139841)
  Charles.Thompson@gtlaw.com
DAVID BLOCH (SBN CA 184530)
  David.Bloch@gtlaw.com
MELISSA J. KENDRA (SBN CA 291905)
  Melissa.Kendra@gtlaw.com
ANTHONY E. GUZMAN (SBN CA 311580)
  guzmanan@gtlaw.com
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Facsimile: 415.707.2010

Attorneys for Defendant / Counter-Claimant
BYTEDANCE, INC.

[*Additional Counsel on Next Page*]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YINTAO YU, an individual, | CASE NO. 3:23-cv-04910-SI |
| Plaintiff, | |
| v. | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION** |
| BYTEDANCE, INC., a Delaware Corporation; SHUYI (SELENE) GAO, an individual, | |
| Defendants. | [*Filed concurrently with: Notice of Motion; Compendium of Evidence; Declaration of Jinmei Xiao; Declaration of Meili Wu; Declaration of Yuanyuan Xin; Declaration of Shawn Wu; Declaration of Aidan Booth; Declaration of Charles O. Thompson; and Proposed Order*] |
| BYTEDANCE, INC. a Delaware Corporation, | |
| Counter-Claimant, | |
| v. | Hearing Date:  October 11, 2024 |
| | Hearing Time:  10:00 a.m. |
| YINTAO YU, an individual, | |
| Counter-Defendant. | State Action Filed:  September 5, 2023 |
| | Removal Date:  September 25, 2023 |
| | Trial Date:  November 18, 2024 |

### REDACTED VERSION

1

## **ADDITIONAL COUNSEL**

2

3  DEMERY RYAN, State Bar No. 217176
   dryan@littler.com
4  DAVID S. MAOZ, State Bar No. 233857
   dmaoz@littler.com
5  LITTLER MENDELSON, P.C. 2049
   Century Park East, 5th Floor
6  Los Angeles, California 90067
   Telephone: 310.553.0308
7  Facsimile: 800.715.1330

8  GREGORY ISKANDER, State Bar No. 200215
   giskander@littler.com
9  LITTLER MENDELSON, P.C.
   Treat Towers 1255 Treat Boulevard, Suite 600
10 Walnut Creek, California 94597
   Telephone: 925.932.2468
11 Facsimile: 925.946.9809

12 Attorneys for Defendant
   SHUYI (SELENE) GAO

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO SUMMARY ADJUDICATION**

## **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................5

II.    STATEMENT OF FACTS .....................................................................................6

     A.     In 2017, After Recently Launching in the United States, BDI Began to Build Out the Newly Acquired Video Editor and Music Platform, Flilpagram .....................................................6

     B.     In June 2017, Yu Executes His Offer, Which Includes a Short-Form Grant of 220,000 Stock Options Subject to His Continued Employment, with Additional Details to be Provided ...6

     C.     In Fall 2017, Yu Signs Various Employment Documents, Including the Long-Form Option Agreement Providing Him With 220,000 Options .............................................................7

     D.     In May 2017 and August 2019, BDI Re-Circulated the Signed Option Agreement to Yu, Who Did Not Object or Otherwise Voice Concern Over the Agreement..........................9

     E.     In 2022 and 2023, Yu Filed Three Separate Complaints Against BDI Publicly Alleging That He Entered a Written Stock Option Agreement on or Around September 30, 2017..........10

III.    LEGAL STANDARD ...........................................................................................11

IV.    LEGAL ARGUMENT...........................................................................................12

     A.     There is No Genuine Dispute That Yu Signed the Option Agreement as Seen Through His Own Admissions and the Overwhelming Weight of the Record ......................................12

     B.     Yu Also Consented to the Option Agreement by His Subsequent Conduct, Rendering Disputes Over His Signature Immaterial .................................................................15

V.     CONCLUSION ....................................................................................................19

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO SUMMARY ADJUDICATION**

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ...................................................................................................15

*Applied Elastomerics, Inc. v. Z-Man Fishing Prod., Inc.*
521 F. Supp. 2d 1031 (N.D. Cal. 2007) ..............................................................14, 17

*Degla Grp. for Invs., Inc. v. Boconcept USA, Inc.*
2010 WL 11509053 (C.D. Cal. Sept. 30, 2010) .........................................................14

*Duffy v. Scott*
2009 U.S. Dist. LEXIS 35667 (N.D. Cal. 2009) ........................................................16

*Fed. Deposit Ins. Corp. v. Ultra Escrow, Inc.*
2012 WL 12953088 (C.D. Cal. Oct. 15, 2012) ...................................................passim

*Hammond v. Compak Asset Mgmt., Inc.*
2010 WL 11463177 (C.D. Cal. Apr. 29, 2010) ..........................................................19

*Hansen v. LMB Mortg. Servs., Inc.*
1 F. 4th 667 (9th Cir. 2021) .......................................................................................11

*Karrigan v. DataX*
2014 WL 2215853 (N.D. Cal. May 29, 2014) (Illston, J.) ...........................6, 12, 19

*Stafford v. BAART Behavioral Health Services*
2015 WL 13764217 (C.D. Cal. July 20, 2015) ..........................................................15

*White v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
2023 WL 5665765 (9th Cir. Sept. 1, 2023) ..........................................................11, 15

*Whitlock v. Pepsi Americas*
2010 WL 11582919 (N.D. Cal. Jan. 26, 2010) (Illston, J.) ...............................13, 14

*Wong Lai v. Nw. Mut.*
2014 WL 4827885 (N.D. Cal. Sept. 26, 2014) (Illston, J.) .......................................11

**Statutes**

9 U.S.C. § 4 ...............................................................................................................11

Cal. Civ. Code § 1584 ...............................................................................................16

Cal. Code Civ. Proc. § 128.7 .......................................................................10, 11, 13

**Rules**

Fed. R. Civ. Proc. 56(a) .............................................................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On September 25, 2017, ByteDance Inc. ("BDI" or the "Company") presented Yintao (Roger) Yu ("Yu") with the Notice of Stock Option Award and Stock Option Award Agreement (the "Option Agreement") in fulfillment of his original employment offer. Yu accepted the Option Agreement both when he signed the agreement and through his subsequent conduct in continuing to work for and demand consideration from BDI. Defendants now move to summarily adjudicate the limited issue of whether this Option Agreement was formed.

First, there is no genuine dispute that Yu signed the Option Agreement. Yu does not dispute that, on June 7, 2017, he executed an offer letter (the "Offer") indicating that BDI would provide him 220,000 options and that he would receive further details within two months of his start date. Within those first two months, on September 25, 2017, ByteDance[1]  employee Meili Wu ("Meili") printed out two copies of the final Option Agreement (one for Yu's execution and one for his retention), executed them on behalf of the company, and brought them to Yu for signing. Meili physically witnessed Yu execute one of those copies by writing his name ("Yintao 'Roger' Yu") on the first page (in what he has subsequently admitted appears to be his own handwriting) and signing his name on the third page. After, she collected the fully executed Option Agreement for storage. Yu retained the other (unexecuted) copy of the Option Agreement, which he has produced during the course of this litigation and which he has admitted is identical to the fully executed original copy of the Option Agreement that BDI produced in discovery and now seeks to enforce.

Second, Yu's subsequent conduct renders any dispute over the authenticity of the Option Agreement's signature immaterial to whether he accepted its terms. After Yu received a copy of the Option Agreement in September 2017, he continued to work for BDI until the termination of his employment in July 2018 without making any written objection to the Option Agreement or its terms, even after ByteDance employee Shawn Wu emailed Yu a signed copy of that same Option Agreement on May 4, 2018. And after the termination of his employment, Yu confirmed his execution of the Option Agreement publicly by filing three complaints wherein he alleged (among other things) that: "[o]n or about September 30, 2017, [he]

---

[1] "ByteDance" refers to the ByteDance group of entities, which is inclusive of ByteDance Ltd. ("BDL"), ByteDance Inc. ("BDI"), and other relevant operating entities.

and [BDI] entered into a written stock incentive plan [that] awarded 220,000 shares . . . vesting over a four year period," under which he sought "the options owed to him."

Despite the above, Yu now recants and—with neither witness nor evidentiary support—claims that he did not enter into the Option Agreement that Meili personally watched him sign in September 2017. Notably, however, courts "need not draw all possible inferences in [a non-movant's] favor, only all reasonable ones." *Karrigan v. DataX*, 2014 WL 2215853, at *7 (N.D. Cal. May 29, 2014) (Illston, J.). And, here, all reasonable inferences point to one conclusion: Yu signed the Option Agreement. As such, Defendants now move for summary adjudication on the limited issue of whether the Parties entered into the Option Agreement because: (a) there is no genuine dispute over whether Yu's signature is authentic; and (b) regardless, Yu accepted the terms of the Option Agreement through his subsequent conduct. For these and other reasons set forth below, Defendants respectfully request the Court grant their motion for summary adjudication by finding that there is no genuine and/or material dispute of fact that the Parties entered into the Option Agreement.

## II.    STATEMENT OF FACTS

### A.    In 2017, After Recently Launching in the United States, BDI Began to Build Out the Newly Acquired Video Editor and Music Platform, Flilpagram

BDI is a technology company that creates and supports mobile applications and social media / entertainment platforms that are used by consumers across the United States and around the world. Declaration of Jinmei Xiao ("Xiao Dec.") ¶ 2. It is an operating subsidiary of the Cayman Islands corporation and ultimate parent entity, ByteDance Ltd. ("BDL"). Xiao Dec. ¶ 2. In 2017, after recently launching its U.S. operations, BDI began supporting the recently acquired video editor and music platform, Flipagram, by, among other things, helping recruit and develop its leadership and engineering teams. Xiao Dec. ¶ 3.

### B.    In June 2017, Yu Executes His Offer, Which Includes a Short-Form Grant of 220,000 Stock Options Subject to His Continued Employment and With Additional Details to be Provided

Beginning in February 2017, BDI began recruiting Yu as the new potential head of Flipagram's engineering team. Xiao Dec. ¶ 3. By April 2017, Global Director of Human Resources Jinmei Xiao began

negotiating the terms of Yu's offer and, on June 7, 2017, Yu executed his final offer letter (the "Offer"). Xiao Dec. ¶ 4, Ex. 1. The Offer promised Yu a conditional grant of 220,000 stock options and contained the following language: "[f]urther details on the stock option [program] will be available to you in the two months [after] your start date. Please be aware that this program and subsequent processes could be changed at any time, at the discretion of the Board." Xiao Dec. ¶ 4, Ex. 1.

### C.    In Fall 2017, Yu Signs Various Employment Documents, Including the Long Form Option Agreement Providing Him with 220,000 Options

Around August 30, 2017, Yu began onboarding with the Company at a ByteDance affiliate office in Beijing, China, where he continued with onboarding and orientation for the majority of September 2017. Xiao Dec. ¶ 5; Declaration of Charles O. Thompson ("Thompson Dec.") ¶ 7, Ex. 5 (Yu Supp. RFA Response 27) ("Plaintiff was in Beijing, China during the majority of September 2017"). While Yu was in China, Jinmei Xiao directed ByteDance Long-Term Incentives Team member Meili Wu ("Meili") to prepare the Notice of Stock Option Award and Stock Option Award Agreement (the "Option Agreement") for Yu's execution. Xiao Decl. ¶ 6; Declaration of Meili Wu ("M. Wu Dec.") ¶ 6.

On September 22, 2017, Meili requested that in-house counsel Yuanyuan Xin ████████████ ███████████████████████████████████████████████████████████████.[2] M. Wu Dec. ¶ 6, Exs. 1-2; Declaration of Yuanyuan Xin ("Xin Dec.") ¶ 4, Exs. 1-2. In so doing, Meili stated ████████████████ █████████████████████████████████ M. Wu Dec. ¶ 6, Exs. 1-2; Xin Dec. ¶ 4, Exs. 1-2. On September 24, 2017, Xin █████████████████████████████████████ ████████. M. Wu Dec. ¶ 7, Exs. 3-4; Xin. Dec. ¶¶ 5-6, Exs. 3-4.

The following day (Monday, September 25), Meili printed out two identical copies of the revised Option Agreement (without highlighting) that she planned to present to Yu later that day; this was consistent with Meili's habit and custom of providing employees with two copies at the time of signing—one for the employee's execution and storage with the Company, and the other for the employee's own

---

[2] Although subject to the attorney-client privilege, the information and documents exchanged between Meili Wui and Yuanyuan Xin have been produced to the other side subject to a narrow, limited use agreement entered into to facilitate open exchange and resolution. To the extent BDI does not waive this privilege, BDI has concurrently sought to have the information and documents sealed and otherwise kept from the public docket.

records. M. Wu Dec. ¶ 8; Xiao Dec. ¶ 6. As relevant here, the Option Agreement contained the same amount of shares and vesting schedule referenced in Yu's Offer. M. Wu Dec. ¶ 9(a), Ex. 5. It also noted a grant date of September 30, 2017 and contained the header "ByteDance Ltd. 2012 Stock Incentive Plan" at the top of the first page of both the Notice of Stock Option Award and the Stock Option Award Agreement. *Id.*

Before meeting with Yu, Meili brought both copies to the Legal Department, where—with Jinmei Xiao's authorization—Meili executed each copy on behalf of the Company by: (1) applying the official BDL ink stamp around the signature line for "BYTEDANCE LTD" in the upper right corner of the second page of the Option Agreement, rendering the language "For and on behalf of ByteDance Ltd." slightly above the signature line and "Authorized Signature" slightly below the signature line; and then (2) applying BDL Chairman Yiming Zhang's ("Zhang") official signature stamp to the same signature line, just underneath the language "For and on behalf of ByteDance Ltd." and above the language "Authorized Signature" rendered by the BDL ink stamp. M. Wu ¶ 8. Later that day, Meili met Yu at ByteDance's Zhonghang Square office building, where she presented him with both copies of the Option Agreement. M. Wu Dec. ¶ 9, 9(a); Thompson Dec. ¶ 3, Ex. 1, 178:12-24 ("Yu Depo.") ("[A]nything I sign[ed] [wa]s in that building").

On the first copy of the Option Agreement, she watched him write "Yintao 'Roger' Yu" on the first page and then sign his name on the third page. M. Wu Dec. ¶ 9(a); Yu Depo. at 206:11-15 (testifying "I think this handwriting looks like mine" in reference to the handwritten name at the top of the first page of the fully executed Option Agreement). Meili collected and placed the original, fully executed Option Agreement in a locked storage file in ByteDance's Zhonghang Square office building in Beijing, China. M. Wu Dec. ¶ 10. Meili later retrieved this Option Agreement from storage and provided it to the Head of Global Legal Operations in connection with this litigation. M. Wu Dec. ¶ 11. BDI then made the original, fully executed Option Agreement available for inspection at Yu's deposition in San Francisco on June 7, 2024. Thompson Dec. ¶ 2.

Yu retained the second (unexecuted) copy of the Option Agreement (bearing Zhang's signature stamp and the BDL ink stamp) for his personal records. M. Wu Dec. ¶ 9(b); ECF 53-1 (Yu attaching this unsigned "original hard-copy of the Stock Option Award Agreement signed by ByteDance LTD. [that was]

provided to me"). During this litigation, Yu produced this second unexecuted copy of the Option Agreement and admitted that, apart from any handwriting or signatures, his retained copy is otherwise identical to the original, executed copy of the Option Agreement that BDI now places at issue. Yu Depo. at 207:23-25, 208:1-4 ("It looks exactly the same").

### D.   In May 2017 and August 2019, BDI Re-Circulated the Signed Option Agreement to Yu, Who Did Not Object or Otherwise Voice Concern Over the Agreement

In March 2018, Yu began a several-month leave of absence, during which time he continued to use his BDI email account, rogeryu@bytedance.com, to communicate with BDI personnel. Declaration of Shawn Wu ("S. Wu Dec.") ¶ 4. On May 4, 2018, BDI Human Resources Business Partner ("HRBP") Shawn Wu ("Shawn") notified Yu via email that pursuant to the terms of his Option Agreement (which was attached to the email), the vesting of his options under the Option Agreement would be paused while he remained on leave but would resume upon his return. S. Wu Dec. ¶ 4, Ex. 1. Shawn sent the email to the same BDI email account that Yu had utilized throughout his employment with BDI. S. Wu Dec. ¶ 4. Yu did not respond or otherwise object to BDI's reliance on the Option Agreement, the handwritten name across the top of the first page, the wet signature on the last page, or the arbitration clause therein. *Id.*

In August 2019, following the termination of Yu's employment, BDI once again provided Yu a copy of the signed Option Agreement, this time in response to his request for his personnel file. Thompson Dec. ¶¶ 10-11, Exs. 8-9. And, once again, neither Yu nor his counsel objected to BDI's continued reliance on the Option Agreement, the handwritten name across the top of the first page, the wet signature on the last page, or the arbitration clause therein. *Id.*

Indeed, Yu admits to having never sent any email, letter, or other writing objecting to the Option Agreement or its terms. *Compare* Yu Depo. at 206:19-16 (testifying that his only objection to the Option Agreement was that "[t]here was an arbitration clause in it") *with* Thompson Dec. ¶ 7, Ex. 5 (admitting his only documented communication objecting to an arbitration clause objection was in email exchange "[t]hrough [his] former counsel" around "January 10, 2021" (years later) over "disputed ECIAA," (not the Option Agreement)); Thompson Dec. ¶ 11, Ex. 9 (documenting Aug. 2019 personnel file production).

**E.**  **In 2022 and 2023, Yu Filed Three Separate Complaints Against BDI Publicly Alleging That He Entered a Written Stock Option Agreement on or Around September 30, 2017**

On November 17, 2022, Yu filed a *pro se* Complaint in San Francisco Superior Court, Case No. CGC-22-603019, alleging (among other employment claims) that BDI breached a written option contract with terms identical to the Option Agreement. Thompson Dec. ¶ 4, Ex. 2 (*Pro Se* Complaint). Specifically, Yu sought "compensation owed under" the agreement based on the following:

> On or around September 30, 2017, Plaintiff and Defendant ByteDance Inc. entered into a written stock incentive plan, whereby [he] was awarded 220,000 shares in Defendant vesting over a four year period … [after which] Defendant breached the contract by failing to award [him] the options owed to him under the incentive plan.

*Id.* ¶ 66. Notably, Yu's complaint describes the Option Agreement using the same language found in the agreement's heading (i.e., "stock incentive plan,"), identifies the agreement by the same date noted as the grant date ("September 30, 2017"), and notes the same number of shares and the same vesting schedule identified therein (220,000 shares over four years).  *Id.*; M. Wu Dec. ¶ 9(a), Ex. 5. Yu endorsed his pro se Complaint.[3]  Thompson Dec. ¶ 4, Ex. 2.

On May 1, 2023, Yu filed a second Complaint in San Francisco Superior Court, Case No. CGC-23-606246, alleging—once again—that BDI breached his written "stock incentive plan" by "failing to award [him] the options to him under" its terms. Thompson Dec. ¶ 5, Ex. 3 (Second Complaint). Yu's description of this claim was identical:

> On or around September 30, 2017, Plaintiff and Defendant ByteDance Inc. entered into a written stock incentive plan, whereby [he] was awarded 220,000 shares in Defendant vesting over a four year period … [after which] Defendant breached the contract by failing to award [him] the options owed to him under the incentive plan.

*Id.* ¶ 61. This time, however, Yu's Complaint was endorsed by his counsel, subject to California's own procedural version of Rule 11. *Id.*; Cal. Code Civ. Proc. § 128.7(b)(3) (signed filings certify that "factual contentions have evidentiary support" unless "specifically so identified").

---

[3]  Ultimately, BDI removed this action to this Court and moved to compel arbitration, after which Yu abandoned the proceeding, leading this Court to dismiss the action for failure to prosecute.

1  On May 12, 2023, Yu filed a third Complaint with another identical breach of contract claim against

2  BDI when he filed his First Amended Complaint in the second action. Thompson Dec. ¶ 6, Ex. 4 (Third

3  Complaint), ¶ 69 ("On or around September 30, 2017, Plaintiff and Defendant ByteDance Inc. entered into

4  a written stock incentive plan . . ."). This Complaint was similarly endorsed by Yu's counsel under

5  California Code of Civil Procedure section 128.7(b)(3). *Id.*

6  On September 5, 2023, Yu filed this fourth Complaint (third separate action), seeking a judicial

7  determination that he did not sign the Employee Confidentiality and Inventions Assignment Agreement

8  ("ECIAA") and, by extension, that his prior claims could not be compelled to arbitration thereunder. ECF 1,

9  Ex. 2-A (Yu's Third Action). In response, BDI removed this action and—for the first time—moved to

10  compel Yu's claims to arbitration, not only under the ECIAA, but also under several other agreements

11  containing arbitration clauses (including the Option Agreement) that Yu similarly executed in connection

12  with his employment at BDI. ECF 14. Only then did Yu begin to claim—contrary to each of his prior

13  Complaints—that he did not sign the Option Agreement. Thompson ¶ 8, Ex. 6 (Yu Interrogatory Response

14  No. 19) ("Plaintiff did not sign any version of the purported Stock Option Agreement.").

15  **III.    LEGAL STANDARD**

16  Under the Federal Arbitration Act ("FAA"), summary judgment as to the formation of an arbitration

17  agreement is appropriate "if the movant shows that there is no genuine dispute as to any material fact"

18  concerning the "the making of the arbitration agreement." Fed. R. Civ. Proc. 56(a); *Hansen v. LMB Mortg.*

19  *Servs., Inc.*, 1 F. 4th 667, 670 (9th Cir. 2021) ("In applying [the FAA's] language [under 9 U.S.C. § 4],

20  district courts rely on the summary judgment standard of Rule 56"). The moving party bears the initial

21  burden, after which "the burden shifts to the non-moving party to set out specific facts showing a genuine

22  issue for trial." *Wong Lai v. Nw. Mut.*, 2014 WL 4827885, at *12 (N.D. Cal. Sept. 26, 2014) (Illston, J.).

23  While all "reasonable doubts and inferences" are construed in the non-movant's favor, the non-moving

24  party must "do more than simply show that there is some metaphysical doubt as to the material facts. The

25  mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury

26  could reasonably find for the [non-moving party]." *Id.* at *12 (internal quotations omitted). This is true

27  even where a party alleges forgery. *White v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2023 WL

28  5665765, *1 (9th Cir. Sept. 1, 2023) (finding "district court did not err in determining that no material

issues of fact existed that would call into question the formation of an arbitration agreement" because "[e]ven with the benefit of all reasonable doubts and inferences in White's favor, there is simply no evidence that White's signature was forged … or that the relevant arbitration language was added to those documents after he signed them.").

## IV.   LEGAL ARGUMENT

All evidence in this action points to one reasonable conclusion: Yu entered into the Option Agreement presented to him by Meili Wu in September 2017. Defendants therefore move to summarily adjudicate the Option Agreement's formation because: (1) Yu has failed to create a genuine factual dispute over whether he signed the Option Agreement; and (2) even if genuine, a dispute over the Option Agreement's signature is not material where Yu's undisputed subsequent conduct independently establishes that he accepted the Option Agreement's terms after (admittedly) receiving a copy around September 2017. Either ground is sufficient standing alone and both exist here.

### A.   <u>There is No Genuine Dispute That Yu Signed the Option Agreement as Seen Through His Own Admissions and the Overwhelming Weight of the Record</u>

Yu has failed to create a genuine dispute of fact over whether he signed the September 2017 Option Agreement for four reasons: (1) the undisputed and material facts contained in the record support that Yu signed the Option Agreement Meili presented him in September 2017, including eye witness testimony and metadata-backed emails; (2) Yu admitted to signing the Option Agreement in several court filings; (3) Yu has not and cannot plausibly explained the disparities between his past admissions and current position; and (3) Yu has failed to provide any specific facts supporting his forgery theory.

Factual disputes are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fed. Deposit Ins. Corp. v. Ultra Escrow, Inc.*, 2012 WL 12953088, *5 (C.D. Cal. Oct. 15, 2012). Non-moving parties must "set out specific facts" to support their claims, and courts have no obligation to adopt disingenuous or strained inferences to salvage a non-moving party's otherwise defunct legal theories. *Karrigan v. DataX*, 2014 WL 2215853, at *7 (N.D. Cal. May 29, 2014) (Illston, J.) ("At summary judgment, this Court need not draw all possible inferences in [plaintiff's favor], but only all reasonable ones."). Moreover, "[a] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statements." *Whitlock*

*v. Pepsi Americas*, 2010 WL 11582919, at *4 (N.D. Cal. Jan. 26, 2010) (Illston, J.). Yu has failed to meet this burden.

First, the overwhelming weight of the record demonstrates that Yu signed the Option Agreement. Meili Wu confirmed that she applied the official Zhang signature stamp and BDL seal to both of the copies she provided to Yu in September 2017, including: (1) the original signed copy BDI produced with the handwritten name "Yintao 'Roger' Yu" at the top that even Yu admits appears to be in his handwriting[4]; and (2) the original unsigned copy Yu personally retained, produced in this litigation,[5] and admitted receiving "around September 2017." Apart from the handwriting and signatures, Yu admitted in deposition that the two Option Agreements were otherwise "identical"—corroborating: (a) Meili's September 22, 2017 email asking Xin to ██████████████████████████████████████ M. Wu Dec. ¶ 6, Ex. 1; (b) Xin's September 24, 2017 email ████████████████████████████████████, Xin Dec. ¶¶ 5-6, Ex. 3, 4; and (c) Xiao's independent confirmation that it was Meili's habit and custom to print and present two copies of these agreements during the signing process. Xiao Dec. ¶ 6.[6]

Second, Yu admitted to signing the Option Agreement in several Complaints. Until BDI moved to compel arbitration under the Option Agreement, Yu repeatedly represented:

> On or around September 30, 2017, Plaintiff and Defendant ByteDance Inc. entered into a written stock incentive plan, whereby Plaintiff was awarded 220,000 shares in Defendant vesting over a four-year period.

Thompson Dec. ¶ 4, Ex. 2, ¶¶ 66; *accord id* ¶ 5, Ex. 3, ¶¶ 61 and *id.* ¶ 6, Ex. 4, ¶¶ 69 (Atty Filed Civil Complaints) (identical language). At the time these were filed, Yu was already in possession of the signed copy of the Option Agreement emailed to him in both: (a) May 2018 by Shawn Wu while Yu was still employed; and (b) August 2019 in response to Yu's personnel file request. And, still, both he and his counsel continued to certify that he and BDI "entered into a written stock incentive plan" "around September 30, 2017" subject to California's Rule 11 equivalent. Cal. Code Civ. Proc. § 128.7(b)(3) (certifying the "factual contentions have evidentiary support" unless specified otherwise); *Applied*

---

[4] Yu Depo. At 206:11-15 ("I think this handwriting looks like mine").

[5] ECF 53-1 (attaching unsigned "original hard-copy of the Stock Option Award Agreement signed by ByteDance LTD. [that was] provided to me …").

[6] Yu Depo at 209:21-25 (testifying to receiving this copy "sometime in late August or early September").

1   *Elastomerics, Inc. v. Z-Man Fishing Prod., Inc.*, 521 F. Supp. 2d 1031, 1043 (N.D. Cal. 2007) (Wilkens,

2   J.) (supporting summary judgment in part because non-movant "admitted in its [Answer] that it entered

3   into the agreement [and] [t]his admission still carries weight, even though [non-movant] later amended its

4   Answer and revoked its admission). Yu's sudden about-face represents a manufactured contradiction

5   unworthy of reasonable inference and otherwise insufficient to create a genuine dispute of fact.

6       Third, Yu cannot "explain[] the contradiction or attempt[] to resolve the disparity" between the

7   admissions in his Complaints that he "entered into a written stock incentive plan" "around September 30,

8   2017" and the new position in his April 2024 interrogatories that he "did not sign any version of the

9   purported Stock Option Agreement." *Whitlock*, 2010 WL 11582919, at *4. This failure is particularly

10  glaring where: (a) Yu was in possession of signed copies of the Option Agreement when he filed the

11  Complaints, *supra*; and (b) the language he used in those Complaints directly tracks the Option

12  Agreement's "stock incentive plan" heading and "September 30, 2017" grant date, *supra*. Nor does Yu

13  explain why BDI would be in possession of an original copy of the Option Agreement that has "Yintao

14  'Roger' Yu" written across the top of its first page in what appears to be in his own handwriting. *Compare*

15  Yu Depo. at 206:7-15 ("Q: [T]hat is your handwriting on the front, though; correct? A: I think – I think

16  this handwriting looks like mine") *with Degla Grp. for Invs., Inc. v. Boconcept USA, Inc.*, 2010 WL

17  11509053, at *9 (C.D. Cal. Sept. 30, 2010) ("Counter-defendants assert that Hasan Sidky 'did not sign any

18  guarantee,' but do not address the fact that his name is handwritten in the signature block below the

19  Acknowledgment.").

20      Yu also fails to explain the lack of any email, letter, filing, or other protest to the Option

21  Agreement's allegedly forged signature that he has now been in possession of for several years, or why his

22  documented objections only arose after BDI first moved to compel arbitration under the Option Agreement.

23  Thompson Dec. ¶ 7, Ex. 5 (Yu Supp. RFA Response 35) (identifying that Yu first documented arbitration

24  clause wasn't until 2021 and involved a different agreement), ¶ 11, Ex. 9 (August 2019 personnel file

25  production with signed Option Agreement); S. Wu Dec. ¶ 4, Ex. 1 (May 2018 email attaching signed

26  Option Agreement).

27      Fourth, Yu presents no facts—beyond his bare assertions—suggesting that the signature on this

28  agreement is a forgery. *See, Stafford v. BAART Behavioral Health Services*, 2015 WL 13764217, at *5

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO SUMMARY ADJUDICATION**

(C.D. Cal. July 20, 2015) (In light of "Stafford's failure to provide anything more than bare assertions that the signature is not hers, the Court would find that Stafford's signature on the arbitration agreement is authentic."). For example, he has not "attest[ed] that []he witnessed h[is] records being forged, nor [has] []he explain[ed] in any detail who specifically committed the forgery, [or] when, how often, or how []he would have witnessed such conduct." *Spaeny*, 2022 WL 334186, at *2. When asked why BDI would forge his signature on the document that potentially afforded him lucrative equity interests, Yu had no working theory. Yu Depo at 95:7-17 ("A: I don't want to speculate, but that is a question for ByteDance. They forged my signature on … several documents, including [the] option agreement … So that's a good question for ByteDance, why they forge [sic] my signatures."). Nor could he explain with any particularity why he believed that the Option Agreement's signature was not his. Yu Depo. at 206:7-15 ("Q: How do you know it's not your signature? A: I know what my signature looks like. This is not my signature. It – I don't sign like this.").

In sum, ample evidence—including eyewitness testimony, emails supported by metadata, and Yu's own judicial admissions—demonstrates that there is only one reasonable conclusion: Yu signed the Option Agreement. Yu's new, contradictory, conclusory, and unsupported position that he "did not sign any version of the purported Stock Option Agreement" cannot manufacture the artifice of a genuine factual dispute where none truly exists. *White v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2023 WL 5665765, *1 (9th Cir. Sept. 1, 2023) ("Even with the benefit of all reasonable doubts and inferences in White's favor, there is simply no evidence that White's signature was forged on the relevant applications or that the relevant arbitration language was added to those documents after he signed them.").

### B. Yu Also Consented to the Option Agreement by His Subsequent Conduct, Rendering Disputes Over His Signature Immaterial

Alternatively, the Court should grant summary adjudication on the ground that any dispute (genuine or not) over the authenticity of Yu's signature on the Option Agreement is immaterial because the Parties' subsequent objective conduct demonstrates that Yu nonetheless accepted its terms as a matter of law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted" as material); *Fed. Deposit Ins. Corp. v. Ultra Escrow, Inc*., 2012 WL 12953088, *5 (C.D. Cal. Oct. 15, 2012) (granting summary judgment irrespective of "whether the alleged

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO SUMMARY ADJUDICATION**

forgery raises a 'genuine' issue because the Court finds that whether Ms. Dang actually signed the [documents] is not material to whether the [terms] are binding"); *Duffy v. Scott*, 2009 U.S. Dist. LEXIS 35667, *2-3 (N.D. Cal. 2009) (declining to rule on defendant's "dubious" claim that his signature on a contract was forged because the parties' compliance with contract terms showed it was binding).

"Mutual consent" to a contract's formation "is determined under an objective standard applied to the outward manifestations or expressions of the parties, *i.e.*, the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Ultra Escrow, Inc.*, 2012 WL 12953088, *5 (internal quotations omitted). As such, where "one party signs and delivers a written contract but the receiving party does not sign it, the receiving party is still bound by its terms if the receiving party accepted the contract." *Id.* at *5 (citing *White v. Autozone*, 213 Fed. Appx. 628, 630 (9th Cir. 2006)). A receiving party accepts by conduct when it either "[p]erform[s] the conditions of [the] proposal or accept[s] the consideration offered" therewith. *Ultra Escrow,* 2012 WL 12953088, at *4 (quoting Cal. Civ. Code § 1584).

For example, in *Ultra Escrow, Inc.*, 2012 WL 12953088, Ultra Escrow attempted to avoid certain obligations under a real estate closing contract by claiming that its escrow agent's signature had been forged, as purportedly evidenced by the facts that: (a) its files only contained an unsigned copy; (b) its policy was to make and retain copies after (not before) signing; and (c) the alleged signature was inconsistent with other "genuine" examples with which another employee was personally familiar. *Id.* at *4. Although the Court "share[d] some of [the] concerns about the[] forgery allegations," it concluded that it need <u>not decide whether the alleged forgery raise[d] a 'genuine' issue</u> because … whether [the agent] actually signed the closing [contract] [wa]s not material to whether the[y] [we]re binding." *Id.* at *4 (emphasis added). The court determined that "any reasonable jury would [still] find that [Ultra Escrow] accepted the terms by … performing the escrow services and accepting payment" after it "received [a copy of] the closing [contract]"—facts that were undisputed. *Ultra Escrow,* 2012 WL 12953088, at *5. Prior to the litigation, "neither [p]arty ha[d] claimed that Ultra Escrow representatives ever told [the bank] that it rejected or wished to modify the terms of the closing [contract]." *Id.* at *5. As such, Ultra Escrow's "allegation that [the agent] never signed the closing [contract], <u>even if true</u>, [could] not negate the overwhelming evidence of acceptance" by conduct. *Id.* at *5 (emphasis added); *accord Applied*

*Elastomerics, Inc. V. Z–Man Fishing Products*, 521 F. Supp. 2d 1031, 1043 (N.D. Cal 2007) (Wilken, J.) ("[H]ad defendant believed there was no contract between it and the plaintiff, but only an unaccepted [offer], it would not have performed under the contract, nor expected plaintiff to do so"). The court therefore found "no genuine, material dispute of fact" concerning formation. *Ultra Escrow,* 2012 WL 12953088, at \*4, 6.

Here, the facts are even stronger and compel the same result. Yu does not dispute that his Offer stated that his option grant was "only offered upon the condition of his continued employment" and that he would receive more details within two (2) months of starting. Xiao Dec. Ex. 1. Nor, like in *Ultra Escrow*, does Yu dispute the following dispositive facts:

- **Received Agreement**: That, at minimum, he received an original unsigned copy of the Option Agreement,[7] around September 2017 (*i.e.*, within two (2) months of starting)[8], otherwise identical to the signed Option Agreement,[9] and which reaffirmed that his exercise remained "[s]ubject to [his] continued service";[10]

- **Continued Performance**: That he continued his employment with, and performed services for, BDI after receiving his identical copy of long-form Option Agreement, up until his termination the following year; and

- **Demanded Consideration**: That he repeatedly demanded consideration for his continued employment with BDI in, at minimum, one *pro se* complaint and two complaints filed by his counsel. Thompson Dec. ¶ 4, Ex. 2 ¶¶ 66, 69 (*Pro Se* Civil Complaint) (seeking "options owed to him" after he "entered into a written stock incentive plan" with BDI "[o]n or around September 30, 2017"); ¶ 5, Ex. 3, ¶¶ 61, 64 and ¶ 6, Ex. 4, ¶¶ 69, 72 (Atty Filed Civil Complaints) (identical language).

---

[7] ECF 53-1 (attaching unsigned "original hard-copy of the Stock Option Award Agreement signed by ByteDance LTD. [that was] provided to me . . .).

[8] Yu Depo. at 209:21-25 (testifying to receiving this copy "sometime in late August or early September").

[9] Yu Depo. at 207:23-25, 208:1-4 ("It looks exactly the same").

[10] M. Wu Dec. Ex. 5.

And while Yu's continued performance and/or repeated demands for consideration are each independently sufficient to show that Yu accepted the Option Agreement by conduct, *supra*,[11] as in *Ultra Escrow*, Yu also failed to document any rejection, concern, or requested modification to the Option Agreement at any point prior to this (his now third) lawsuit against the company. *Ultra Escrow, Inc.*, 2012 WL 12953088, at *5 ("Neither party has claimed that Ultra Escrow representatives ever told IndyMac that it rejected or wished to modify the terms of the Closing [contract], at least until Plaintiff requested summary judgment"). Specifically, Yu cannot now dispute that:

- ***Yu Consented to Arbitration***: Yu never sent an email or other writing to BDI objecting to any arbitration clause—whether in the Option Agreement or otherwise—during his employment or for several years thereafter, Thompson Dec. ¶ 7, Ex. 5 (Yu Supp. RFA Response No. 35) (identifying 2021 email from his prior counsel as Yu's first written denial of any agreement to arbitrate employment-related claims with BDI); or

- ***Yu Entered into the Option Agreement***: Yu never denied entering the September 2017 Option Agreement in any email, pleading, declaration, or other writing prior to his April 15, 2024 interrogatory responses over a half decade later and just months after BDI first invoked its arbitration clause. Thompson Dec. ¶ 8, Ex. 6 (Yu Interrogatory Response No. 19) ("Plaintiff did not sign any version of the purported Stock Option Agreement").

Unlike *Ultra Escrow*, however, the import of Yu's lack of documented rejection, concern, or even requested modification in the six years prior to the present suit is magnified by the fact that BDI had emailed Yu a copy of the Option Agreement bearing his signature as early as May 2018 <u>while Yu was still employed</u>. S. Wu Dec. ¶ 4, Ex. 1 (attaching signed Option Agreement to email sent to Yu's BDI email account); Booth Dec ¶¶ 5, 7 (confirming concurrent metadata production). Still worse, even had Yu documented a purported objection to the Option Agreement prior to this (third) suit, this would raise serious ethical questions concerning his and his counsel's prior, repeated representations to this and other courts during that same period that Yu had "entered into" a "written stock incentive plan" with BDI "on or around

---

[11] *See Ultra Escrow*, 2012 WL 12953088, at *4 ("Performance of the conditions of a proposal <u>or</u> the acceptance of the consideration offered with a proposal, is an acceptance of the proposal") (internal quotations omitted) (emphasis added).

September 30, 2017."[12] *Hammond v. Compak Asset Mgmt., Inc*., 2010 WL 11463177, at *5 (C.D. Cal. Apr. 29, 2010) (allowing arbitration agreement forgery claim to proceed but noting that, "[f]ollowing discovery, if there are demonstrable facts showing that any party has attempted to mislead the Court or has made false statements under oath, the Court will entertain a motion for sanctions").

Even based on conduct alone, no reasonable jury could find that Yu did not enter into the Option Agreement—whether by continuing to work after he received his own unexecuted copy of the Option Agreement around September 2017 or by repeatedly demanding the options thereunder in several public Complaints in the years that followed. *See Karrigan v. DataX*, 2014 WL 2215853, at *7 (N.D. Cal. May 29, 2014) (Illston, J.) ("At summary judgment, this Court need not draw all possible inferences in [plaintiff's favor], but only all reasonable ones"). Thus, even if the Court deems the dispute over the agreement's signature genuine (it is not), Yu's conduct renders his dispute immaterial. *Ultra Escrow,* 2012 WL 12953088, at *5 ("[W]hether [the agent] actually signed…is not material" when non-movant accepts by conduct). *Id.* at *4. Summary adjudication as to the formation of the Option Agreement must therefore be granted.

## V.   CONCLUSION

Ample evidence confirms that Yu signed the Option Agreement, including the original agreement, eyewitness testimony, metadata-supported emails, and Yu's own repeated admissions in public pleadings. Save for his own uncorroborated, conclusory allegations over six years later, Yu fails to adduce any evidence—let alone *sufficient* evidence—to raise a legitimate specter of genuinely disputed material facts capable of evading the otherwise simple question of whether Yu entered into the Option Agreement in or around September 2017. Defendants therefore respectfully request that this Court grant its pending motion for summary adjudication as to the Option Agreement's formation.

///

///

///

///

---

[12] Thompson Dec. ¶ 4 Ex. 2 ¶¶ 66, 69 (*Pro Se* Civil Complaint) (seeking "options owed to him" after he "entered into a written stock incentive plan" with BDI "[o]n or around September 30, 2017"); *Id.* ¶ 5, Ex. 3 ¶¶ 61, 64 and ¶ 6, Ex. 4 ¶¶ 69, 72 (Atty Filed Civil Complaints) (identical language).

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO SUMMARY ADJUDICATION**

DATED:  September 6, 2024                    GREENBERG TRAURIG, LLP


                                 By:      /s/ Charles O. Thompson
                                          Charles O. Thompson
                                          David Bloch
                                          Melissa J. Kendra
                                          Anthony E. Guzman II

                                          Attorneys for Defendant / Counter-Claimant
                                          BYTEDANCE, INC.

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO SUMMARY ADJUDICATION**