**EXHIBIT C**

1  CHARLES O. THOMPSON, State Bar No. 139841
     thompsoncha@gtlaw.com
2  DAVID BLOCH, State Bar No. 184530
     guzmanan@gtlaw.com
3  MELISSA J. KENDRA, State Bar No. 291905
     melissa.kendra@gtlaw.com
4  ANTHONY E. GUZMAN II, State Bar No. 311580
     guzmanan@gtlaw.com
5  GREENBERG TRAURIG, LLP
6  101 Second Street, Suite 2200
7  San Francisco, California 94105
   Telephone: 415.655.1300
8  Facsimile: 415.707.2010

9  Attorneys for Defendant
   BYTEDANCE INC.

10

11  **THE UNITED STATES DISTRICT COURT**

12  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13

14  YINTAO YU, an individual,                    Case No.  4:23-cv-04910-SI
                                                [FILED UNDER SEAL]
15        Plaintiff                            **DECLARATION OF MEILI WU IN**
                                              **SUPPORT OF MOTION FOR**
16        v.                                   **SUMMARY ADJUDICATION**

17  BYTEDANCE INC., a Delaware Corporation;    [Originally San Francisco Superior Court
    SHUYI (SELENE) GAO, an individual,         No. CGC-23-608845]
18
                                              State Action filed:  September 5, 2023
19        Defendants.                          Removal Date:        September 25, 2023
                                              Trial Date:          November 18, 2024
20

21

22

23                              **REDACTED VERSION**

24

25

26

27

28

1
**DECLARATION OF MEILI WU ISO SUMMARY ADJUDICATION**

1     I, MEILI WU, declare the following:

2     1.    I am over 18 years old, competent to testify on the matters set forth herein, and

3 would so testify if called to do so. The statements herein are based upon my own personal

4 knowledge.

5     2.    I am an employee of a ByteDance[1] group entity and have been since 2016.

6     3.    In 2017, I worked in the Long-Term Incentives Team within ByteDance's

7 Performance & Incentives department. As part of my regular and normal duties in 2017, I helped

8 prepare and present stock option awards and related documents to ByteDance employees for

9 execution, which I would then subsequently collect and physically store.

10     4.    In this position, I became familiar with and had access to certain of ByteDance's

11 business records and, specifically, notices and agreements related to the award and execution of

12 conditional employee option grants. These records were regularly created at or near the time of the

13 relevant events as part of ByteDance's usual practices and maintained in the ordinary course of its

14 business. I regularly helped create, maintain, and reference such records and have found these

15 record-keeping practices to be accurate and trustworthy.

16     5.    I personally helped with the preparation, presentation, and execution of the Notice

17 of Stock Option Award and Stock Option Award Agreement (collectively, the "Option

18 Agreement") for Yintao "Roger" Yu's ("Yu") grant of 220,000 stock options in ByteDance Ltd.

19 ("BDL")—the Cayman Islands corporate entity, which is the ultimate parent company of

20 ByteDance Inc. ("BDI").

21     6.    In September 2017, Global Director of Human Resources Jinmei Xiao directed me

22 to prepare the Option Agreement for Yu to sign. On September 22, 2017, I coordinated with in-

23 house counsel Yuanyuan Xin to

24 In so doing, I notified her that

25 A true and correct copy of

26

[1] "ByteDance" refers to the ByteDance group of entities, which is inclusive of ByteDance Ltd.

27 ("BDL"), ByteDance Inc. ("BDI"), and other relevant operating entities.

28

**DECLARATION OF MEILI WU ISO SUMMARY ADJUDICATION**

ACTIVE 701173482v5

1  my September 22, 2017 email, including a certified translation, is attached hereto as **Exhibit 1**,

2  while a ███████████████████████████████████████ that I attached to that email is attached

3  as **Exhibit 2**.

4        7.    On September 24, 2017, Xin emailed me ████████████████████

5  ██████████████████████████ A true and correct copy of Xin's September 24, 2017 email,

6  including a certified translation, is attached hereto as **Exhibit 3**, while a ████████████████

7  ████████████████████████ she attached to that email is attached as **Exhibit 4**.

8        8.    On or around September 25, I printed out two identical copies of the revised Option

9  Agreement (without highlighting) in preparation to meet with and have Yu execute the agreement.

10  Before meeting with Yu, I brought both printed copies to the Legal Department, where I (with

11  Jinmei Xiao's authorization) executed them on behalf of the company by doing the following:

12  First, I affixed the official BDL ink stamp around the signature line for "BYTEDANCE LTD" in

13  the upper right corner of the second page of the Option Agreement, rendering the language "For

14  and on behalf of ByteDance Ltd." slightly above the signature line and "Authorized Signature"

15  slightly below the signature line. Second, I applied the official signature stamp of then BDL

16  Chairman Yiming Zhang ("Zhang") to the same signature line, just underneath the language "For

17  and on behalf of ByteDance Ltd." and above the language "Authorized Signature" rendered by the

18  BDL ink stamp. It was (and still is) my habit and custom to print and prepare two copies of any

19  option award notices and agreements that I intended to present to other employees—one for

20  mutual execution and retention by ByteDance and the other for the employee's own records.

21        9.    On the same day (September 25, 2017), I brought both copies of the Option

22  Agreement to ByteDance's Zhonghang Square building in Beijing, China, where I met with Yu.

23  During this meeting:

24          a.    I first provided and had Yu sign a copy for mutual execution and official

25               retention by the company. I personally observed Yu write his name "Yintao

26               'Roger' Yu" at the top of the first page of one copy of the Option

27               Agreement—I recall this vividly because it was when I first learned that

28               Yu's Chinese name was Yintao as, prior to that, I had only known him by

3

his English name, Roger. I then personally observed Yu sign his handwritten, wet signature above the Grantee signature line on the third page of the same copy. A true and correct copy of the fully executed Option Agreement is attached hereto as **Exhibit 5**.

b.  Yu retained the unexecuted copy of the Option Agreement (bearing Zhang's signature stamp and BDL ink stamp) for his personal records. I have personally reviewed a copy of the unexecuted Option Agreement Yu submitted to the Court in ECF 53-1, a true and correct copy of which is attached hereto as **Exhibit 6**. It is the same revised version of the Option Agreement ████████████████████████████ nd bears the same Zhang signature stamp and BDL ink stamp in the same general location, size, and color that I remember affixing them. I have no doubt that Exhibit 6 is the same unexecuted copy of the Option Agreement that I provided to Yu on September 25, 2017 for his own personal records.

c.  At no point during our September 25, 2017 meeting, or at any point thereafter, did Yu object to or refuse to sign the Option Agreement, whether based on its inclusion of an arbitration clause or on any other ground.

10.  After Yu executed the Option Agreement during our September 25, 2017 meeting, I collected the fully executed Option Agreement from him and placed it in the locked storage file at ByteDance's Zhonghang Square building in Beijing, China, where ByteDance stored hardcopy originals of other equity agreements entered into by and amongst other ByteDance affiliates and their employees.

11.  In May 2024, I retrieved the original, hardcopy Option Agreement signed by Yu from storage and provided it to Melanie Carmosino, Head of Global Legal Operations, for purposes of the instant litigation. The document was slightly aged, as expected, but otherwise looked exactly as I remembered it when I first watched Yu write and sign his name to the agreement at Zhonghang Square back in September 2017.

**DECLARATION OF MEILI WU ISO SUMMARY ADJUDICATION**

Docusign Envelope ID: 0B2E5A7B-7635-44E2-8872-3B54632CEBD0

1

\*        \*        \*

2        Pursuant to the laws of the State of California, I declare under penalty of perjury that the

3   foregoing is true and correct. Executed this 6.00 day of September 2024, in Beijing, China.

Signed by:

Meili Wu

5        MEILI WU

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF MEILI WU ISO SUMMARY ADJUDICATION**

ACTIVE 701173482v5

# EXHIBIT 1

---

Message
_____

**From:**      吴美丽 [wumeili@bytedance.com]
**Sent:**      9/22/2017 6:21:21 AM
**To:**        Xin, Yuanyuan [xinyuanyuan@bytedance.com]
**CC:**        fanlinlinfll [fanlinlinfll@bytedance.com]; 王晓东 [wangxiaodong@bytedance.com]; 李诚
               [licheng.kyle@bytedance.com]; Ben Li [lizhi.ben@bytedance.com]
**Subject:**   ███████████████████
**Attachments:** ████████████████████████████████████████

███████████████

████████████████████████████████████████████████████████████

████████████████████████████████

--
吴美丽  今日头条 人力资源部 薪酬福利
电话：010-58341778
公司：北京字节跳动科技有限公司
地址：北京市海淀区北三环西路43号中航广场1号楼今日头条
邮编：100086

                                                BDI_001095

**TRANSLATION**

**TRANSLATION**

**TRANSLATION**

**TRANSLATION**

**TRANSLATION**

Message
_____

**From:**        Wu Meili [wumeili@bytedance.com]
**Sent:**        9/22/2017 6:21:21 AM
**To:**          Xin, Yuanyuan [xinyuanyuan@bytedance.com]
**CC:**          fanlinlinfll [fanlinlinfll@bytedance.com]; Wang Xiaodong [wangxiaodong@bytedance.com]; Li Cheng
                 [licheng.kyle@bytedance.com]; Ben Li [lizhi.ben@bytedance.com]
**Subject:**     ███████████████████████████████
**Attachments** ██████████████████████████████████████

██████████████

████████████████████████████████████████████████████████████
██████████████████████████████████████

███████████████████████████████████████████████████

--

Wu Meili Jinri Toutiao Human Resources Department Compensation and Benefits

Phone: 010-58341778

Company: Beijing ByteDance Technology Co., Ltd.

Jinri Toutiao, Building 1, China Aviation Plaza, No. 43, North Third Ring West Road, Haidian District, Beijing

Postal code: 100086

CONFIDENTIAL                                                              BDI_001095



City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "**BDI_001095**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Shayna Himelfarb

Sworn to before me this
September 6, 2024

Signature, Notary Public



Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# EXHIBIT 2

# EXHIBIT REDACTED FILED UNDER SEAL

# EXHIBIT 3

Message

| | |
|---|---|
| **From**: | Yuanyuan Xin [xinyuanyuan@bytedance.com] |
| **Sent**: | 9/24/2017 8:23:21 AM |
| **To**: | 吴美丽 [wumeili@bytedance.com] |
| **CC**: | fanlinlinfll [fanlinlinfll@bytedance.com]; 王晓东 [wangxiaodong@bytedance.com]; 李诚 [licheng.kyle@bytedance.com]; Ben Li [lizhi.ben@bytedance.com] |
| **BCC**: | xinyuanyuan@bytedance.com |
| **Subject**: | ▮▮▮▮▮▮▮▮▮▮ |
| **Attachments**: | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Regards,
Yuanyuan

---

**发件人:** 吴美丽 <wumeili@bytedance.com>

**日期:** 2017年9月22日 星期五 14:21

**收件人:** "Xin, Yuanyuan" <xinyuanyuan@bytedance.com>

**抄送:** fanlinlinfll <fanlinlinfll@bytedance.com>, 王晓东 <wangxiaodong@bytedance.com>, 李诚 <licheng.kyle@bytedance.com>, Ben Li <lizhi.ben@bytedance.com>

**主题:** ▮▮▮▮▮▮▮▮▮

▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

--

吴美丽  今日头条 人力资源部 薪酬福利
电话：010-58341778
公司：北京字节跳动科技有限公司
地址：北京市海淀区北三环西路43号中航广场1号楼今日头条
邮编：100086

BDI_001113

**TRANSLATION**

**TRANSLATION**

**TRANSLATION**

**TRANSLATION**

**TRANSLATION**

**Message**

| | |
|---|---|
| **From:** | Yuanyuan Xin [xinyuanyuan@bytedance.com] |
| **Sent:** | 9/24/2017 8:23:21 AM |
| **To:** | Wu Meili [wumeili@bytedance.com] |
| **CC:** | fanlinlinfll [fanlinlinfll@bytedance.com]; Wang Xiaodong [wangxiaodong@bytedance.com]; Li Cheng [licheng.kyle@bytedance.com]; Ben Li [lizhi.ben@bytedance.com] |
| **BCC:** | xinyuanyuan@bytedance.com |
| **Subject:** | ███████████████████████ |
| **Attachments:** | ██████████████████████████████ |

███

███████████████████

████████████████████████████████████

██████
████

---

From: Wu Meili [wumeili@bytedance.com]

**Date**: Friday, September 22, 2017 02:21 p.m.

From: "Xin, Yuanyuan" <xinyuanyuan@bytedance.com>

**Cc:** fanlinfll <fanlinlinfll@bytedance.com>, Wang Xiaodong <wangxiaodong@bytedance.com>, Li Cheng <licheng.kyle@bytedance.com>, Ben Li <lizhi.ben@bytedance.com>

**Subject:** █████ ███████████████████████

██████

██████████████████████████████████████

████████████████████████

--

Wu Meili  Jinri Toutiao  Human Resources Department  Compensation and Benefits
Phone: 010-58341778
Company: Beijing ByteDance Technology Co., Ltd.
Jinri Toutiao, Building 1, China Aviation Plaza, No. 43, North Third Ring West Road, Haidian District, Beijing
Postal code: 100086

BDI_001113



City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "**BDI_001113**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_____
Shayna Himelfarb

Sworn to before me this
September 6, 2024

_____
Signature, Notary Public



_____
Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# EXHIBIT 4

# EXHIBIT REDACTED FILED UNDER SEAL

# EXHIBIT 5

## BYTEDANCE LTD. 2012 STOCK INCENTIVE PLAN

### NOTICE OF STOCK OPTION AWARD

Grantee's Name and Address:   YINTAO "ROGER" YU

You (the "Grantee") have been granted an option to purchase Ordinary Shares, subject to the terms and conditions of this Notice of Stock Option Award (the "Notice"), the BYTEDANCE LTD. 2012 Stock Incentive Plan, as amended from time to time (the "Plan") and the Stock Option Award Agreement (the "Option Agreement") attached hereto, as follows. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Notice.

| | |
|---|---|
| Award Number | |
| Grant Date | September 30, 2017 |
| Vesting Commencement Date | August 30, 2017 |
| Exercise Price per Share | US$ 0.02 |
| Total Number of Ordinary Shares Subject to the Option (the "Shares") | 220,000 |
| Total Exercise Price | US$ 4,400 |
| Expiration Date: | September 30, 2027 |
| Post-Termination Exercise Period: | Three (3) Months |

Vesting Schedule:

Subject to the Grantee's Continuous Service and other limitations set forth in this Notice, the Plan and the Option Agreement, the Option may be exercised, in whole or in part, in accordance with the Schedule as below:

15% of the Shares subject to the Option shall vest on the first anniversary of the Vesting Commencement Date, 25% of the Shares subject to the Option shall vest on the second anniversary of the Vesting Commencement Date, 25% of the Shares subject to the Option shall vest on the third anniversary of the Vesting Commencement Date, and the remaining 35% of the Shares subject to the Option shall vest on the fourth anniversary of the Vesting Commencement Date.

During any authorized leave of absence, the Company shall have the right to suspend the vesting of the Option as provided in this schedule if, in addition to the applicable paid leave of absence that the Grantee is entitled to pursuant to the applicable laws and the Company's policies, such leave of absence exceeds an accumulative period of ten (10) days within a 12-month period. Vesting of the Option shall resume upon the Grantee's termination of the leave of absence and return to service to the Company or a Related Entity. The vesting schedule of the Option shall be extended by the length of the suspension.

In the event of termination of the Grantee's Continuous Service for Cause (as defined below), the Grantee's right to exercise the Option shall terminate concurrently with the termination of the Grantee's Continuous Service, except as otherwise determined by the administrator of the Plan, which shall be the Board of Directors or any person designated by the Board of Directors (the "Administrator"), and the Company shall have rights to repurchase

BDI_000034

all vested options purchased by the Grantee, under the sole discretion of the Administrator, at the par value of the Shares.

The Grantee grants a power of attorney to the Board or any person designated by the Board to exercise the voting rights with respect to the Shares.

IN WITNESS WHEREOF, the Company and the Grantee have executed this Notice and agree that the Option is to be governed by the terms and conditions of this Notice, the Plan, and the Option Agreement.

> BYTEDANCE LTD.
> a company incorporated under the laws of the
> Cayman Islands
>
> For and on behalf of
> **Bytedance   Ltd.**
>
> By: _____
>
> Title: _____
> Authorized Signature(s)

THE GRANTEE ACKNOWLEDGES AND AGREES THAT ANY EXERCISE OF THE OPTION SHALL BE STRICTLY COMPLIANCE WITH APPLICABLE LAWS, INCLUDING WITHOUT LIMITATION, THOSE REGULATIONS ENACTED BY THE STATE ADMINISTRATION OF FOREIGN EXCHANGE OF THE PRC.

THE GRANTEE ACKNOWLEDGES AND AGREES THAT THE SHARES SUBJECT TO THE OPTION SHALL VEST, IF AT ALL, ONLY DURING THE PERIOD OF THE GRANTEE'S CONTINUOUS SERVICE (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THE OPTION OR ACQUIRING SHARES HEREUNDER). THE GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS NOTICE, THE OPTION AGREEMENT, OR THE PLAN SHALL CONFER UPON THE GRANTEE ANY RIGHT WITH RESPECT TO FUTURE AWARDS OR CONTINUATION OF THE GRANTEE'S CONTINUOUS SERVICE, NOR SHALL IT INTERFERE IN ANY WAY WITH THE GRANTEE'S RIGHT OR THE RIGHT OF THE COMPANY OR RELATED ENTITY TO WHICH THE GRANTEE PROVIDES SERVICES TO TERMINATE THE GRANTEE'S CONTINUOUS SERVICE, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE. THE GRANTEE ACKNOWLEDGES THAT UNLESS THE GRANTEE HAS A WRITTEN EMPLOYMENT AGREEMENT WITH THE COMPANY TO THE CONTRARY, THE GRANTEE'S STATUS IS AT WILL.

The Grantee acknowledges receipt of a copy of the Plan and the Option Agreement, and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts the Option subject to all of the terms and provisions hereof and thereof. The Grantee has reviewed this Notice, the Plan, and the Option Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Notice, and fully understands all provisions of this Notice, the Plan and the Option Agreement. The Grantee hereby agrees that all questions of interpretation and administration relating to this Notice, the Plan and the Option Agreement shall be resolved by the Administrator in accordance with Section 19 of the Option Agreement. The Grantee further agrees to the Dispute Resolution and Arbitration Procedures in accordance with Section 20 of the Option Agreement. The Grantee further agrees to notify the Company upon any change in the residence address indicated in this Notice.

BDI_000035

Dated: _____          Signed: _____

                                                            Grantee

BDI_000036

Award Number: _____

## BYTEDANCE LTD. 2012 STOCK INCENTIVE PLAN

### STOCK OPTION AWARD AGREEMENT

1.      Grant of Option.  **BYTEDANCE LTD.**, a company incorporated under the laws of the Cayman Islands (the "Company"), hereby grants to the Grantee (the "Grantee") named in the Notice of Stock Option Award (the "Notice"), an option (the "Option") to purchase the Total Number of Ordinary Shares subject to the Option (the "Shares") set forth in the Notice, at the Exercise Price per Share set forth in the Notice (the "Exercise Price") subject to the terms and provisions of the Notice, this Stock Option Award Agreement (the "Option Agreement") and the Company's 2012 Stock Incentive Plan, as amended from time to time (the "Plan"), which are incorporated herein by reference. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Option Agreement.

2.      Exercise of Option.

(a)      Right to Exercise.  The Option shall be exercisable only in compliance with Applicable Laws.  The Option shall be exercisable during its term in accordance with the vesting schedule set out in the Notice and with the applicable provisions of the Plan and this Option Agreement.  The Option shall be subject to the provisions of Section 11 of the Plan relating to the exercisability or termination of the Option in the event of a Corporate Transaction or Change in Control.  The Grantee shall be subject to reasonable limitations on the number of requested exercises during any monthly or weekly period as determined by the Administrator.  In no event shall the Company issue fractional Shares.

(b)      Method of Exercise.  The Option shall be exercisable by delivery of an exercise notice (a form of which is attached as Exhibit A) or by such other procedure as specified from time to time by the Administrator which shall state the election to exercise the Option, the whole number of Shares in respect of which the Option is being exercised, and such other provisions as may be required by the Administrator.  The exercise notice shall be delivered in person, by certified mail, or by such other method (including electronic transmission) as determined from time to time by the Administrator to the Company accompanied by payment of the Exercise Price.  The Option shall be deemed to be exercised upon receipt by the Company of such notice accompanied by the Exercise Price, which, to the extent selected, shall be deemed to be satisfied by use of the broker-dealer sale and remittance procedure to pay the Exercise Price provided in Section 4(d), below.

(c)      Taxes.  No Shares will be delivered to the Grantee or other person pursuant to the exercise of the Option until the Grantee or other person has made arrangements acceptable to the Administrator for the satisfaction of applicable income tax and employment tax withholding obligations.  Upon exercise of the Option, the Company or the Grantee's employer may offset or withhold (from any amount owed by the Company or the Grantee's employer to the Grantee) or collect from the Grantee or other person an amount sufficient to satisfy such tax withholding obligations.

3.      Grantee's Representations.  The Grantee understands that neither the Option nor the Shares exercisable pursuant to the Option have been registered under the Securities Act of

BDI_000037

1933, as amended or any United States securities laws. In the event the Shares purchasable pursuant to the exercise of the Option have not been registered under the Securities Act of 1933, as amended, at the time the Option is exercised, the Grantee shall, if requested by the Company, concurrently with the exercise of all or any portion of the Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as Exhibit B.

      4.    <u>Method of Payment</u>. Payment of the Exercise Price shall be made by any of the followings, or a combination thereof, at the election of the Grantee; provided, however, that such exercise method does not then violate any Applicable Law, provided further, that the portion of the Exercise Price equal to the par value of the Shares must be paid as consideration with the Plan following methods:

      (a)    cash;

      (b)    check;

      (c)    if the exercise occurs on or after the Registration Date (as defined below), surrender of Shares or delivery of a properly executed form of attestation of ownership of Shares as the Administrator may require which have a Fair Market Value on the date of surrender or attestation equal to the aggregate Exercise Price of the Shares as to which the Option is being exercised, provided, however, that Shares acquired under the Plan or any other equity compensation plan or agreement of the Company must have been held by the Grantee for a period of more than six (6) months (and not used for another Award exercise by attestation during such period); or

      (d)    if the exercise occurs on or after the Registration Date, payment through a broker-dealer sale and remittance procedure pursuant to which the Grantee (i) shall provide written instructions to a Company-designated brokerage firm to effect the immediate sale of some or all of the purchased Shares and remit to the Company sufficient funds to cover the aggregate exercise price payable for the purchased Shares and (ii) shall provide written directives to the Company to deliver the certificates for the purchased Shares directly to such brokerage firm in order to complete the sale transaction.

      5.    <u>Restrictions on Exercise</u>. The Option may not be exercised if the issuance of the Shares subject to the Option upon such exercise would constitute a violation of any Applicable Laws. In addition, the Option may not be exercised until such time as the Plan has been approved by the shareholders of the Company. If the exercise of the Option within the applicable time periods set forth in Section 6, 7 and 8 of this Option Agreement is prevented by the provisions of this Section 5, the Option shall remain exercisable until one (1) month after the date the Grantee is notified by the Company that the Option is exercisable, but in any event no later than the Expiration Date set forth in the Notice.

      6.    <u>Termination or Change of Continuous Service</u>. In the event the Grantee's Continuous Service terminates, other than for Cause, the Grantee may, but only during the Post-Termination Exercise Period, exercise the portion of the Option that was vested at the date of such termination (the "Termination Date"). The Post-Termination Exercise Period shall commence on the Termination Date. In the event of termination of the Grantee's Continuous Service for Cause, the Grantee's right to exercise the Option shall, except as otherwise determined by the Administrator, terminate concurrently with the termination of the Grantee's Continuous Service (also the "Termination Date"). In no event, however, shall the Option be

BDI_000038

exercised later than the Expiration Date set forth in the Notice. Except as provided in Sections 7 and 8 below, to the extent that the Option was unvested on the Termination Date, or if the Grantee does not exercise the vested portion of the Option within the Post-Termination Exercise Period, the Option shall terminate.

To avoid any doubt, "Cause" shall mean, for the Grantee, any act, subject to then applicable laws, including without limitation (a) willful failure to perform, or gross negligence in performing his/her duties and responsibilities to the Company and any of its affiliates (as applicable), (b) commission of any act of theft, forgery, fraud, embezzlement, dishonesty or any other willful misconduct, (c) conviction of a felony under the laws of the PRC or any foreign jurisdiction, (d) breach of any confidentiality agreement, non-competition agreement or invention assignment agreement between he/she and the Company or any of its affiliates (as applicable), including without limitation an unauthorized use or disclosure of any confidential information or trade secrets, (e) continuous breach or failure to perform assigned duties after receiving written notification of such breach or failure from the respective board of directors of the Company or any of its affiliates (as applicable), (f) any material failure to comply with any written policies or rules of the Company as adopted by the board of directors of the Company or any of its affiliates (as applicable), or (g) any other intentional misconduct which has a material adverse effect to any Company or any of its affiliates (as applicable).

7.     Disability of Grantee.  In the event the Grantee's Continuous Service terminates as a result of his or her Disability, the Grantee may, but only within twelve (12) months commencing on the Termination Date (but in no event later than the Expiration Date), exercise the portion of the Option that was vested on the Termination Date.  To the extent that the Option was unvested on the Termination Date, or if the Grantee does not exercise the vested portion of the Option within the time specified herein, the Option shall terminate.  Section 22(e)(3) of the Code provides that an individual is permanently and totally disabled if he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.

8.     Death of Grantee.  In the event of the termination of the Grantee's Continuous Service as a result of his or her death, or in the event of the Grantee's death during the Post-Termination Exercise Period or during the twelve (12) month period following the Grantee's termination of Continuous Service as a result of his or her Disability, the person who acquired the right to exercise the Option pursuant to Section 9 may exercise the portion of the Option that was vested on the Termination Date within twelve (12) months commencing on the date of death (but in no event later than the Expiration Date).  To the extent that the Option was unvested on the date of death, or if the vested portion of the Option is not exercised within the time specified herein, the Option shall terminate.

9.     Transferability of Option.  The Grantee may designate one or more beneficiaries of the Grantee's Option in the event of the Grantee's death on a beneficiary designation form provided by the Administrator.  Following the death of the Grantee, the Option, to the extent provided in Section 8, may be exercised (a) by the person or persons designated under the deceased Grantee's beneficiary designation or (b) in the absence of an effectively designated beneficiary, by the Grantee's legal representative or by any person empowered to do so under the deceased Grantee's will or under the then applicable laws of descent and distribution.  The terms of the Option shall be binding upon the executors, administrators, heirs, successors and transferees of the Grantee.

BDI_000039

10.     Term of Option.  The Option must be exercised no later than the Expiration Date set forth in the Notice or such earlier date as otherwise provided herein.  After the Expiration Date or such earlier date, the Option shall be of no further force or effect and may not be exercised.

11.     Company's Right of First Refusal.

(a) Transfer Notice.  Neither the Grantee nor a transferee (either being sometimes referred to herein as the "Holder") shall sell, hypothecate, encumber or otherwise transfer any Shares or any right or interest therein without first complying with the provisions of this Section 11 or obtaining the prior written consent of the Company.  In the event the Holder desires to accept a bona fide third-party offer for any or all of the Shares, the Holder shall provide the Company with written notice (the "Transfer Notice") of:

(i)      The Holder's intention to transfer;

(ii)     The name of the proposed transferee;

(iii)    The number of Shares to be transferred; and

(iv)     The proposed transfer price or value and terms thereof.

If the Grantee proposes to transfer any Shares to more than one transferee, the Grantee shall provide a separate Transfer Notice for the proposed transfer to each transferee.  The Transfer Notice shall be signed by both the Grantee and the proposed transferee and must constitute a binding commitment of the Grantee and the proposed transferee for the transfer of the Shares to the proposed transferee subject to the terms and conditions of this Option Agreement.

(b) Bona Fide Transfer.  If the Company determines that the information provided by the Grantee in the Transfer Notice is insufficient to establish the bona fide nature of a proposed voluntary transfer, the Company shall give the Grantee written notice of the Grantee's failure to comply with the procedure described in this Section 11, and the Grantee shall have no right to transfer the Shares without first complying with the procedure described in this Section 11.  The Grantee shall not be permitted to transfer the Shares if the proposed transfer is not bona fide.

(c) First Refusal Exercise Notice.  The Company shall have the right to purchase (the "Right of First Refusal") all or partial, of the Shares which are described in the Transfer Notice (the "Offered Shares") at any time within forty-five (45) days after receipt of the Transfer Notice (the "Option Period").  The Offered Shares shall be repurchased at (i) the per share price or value and in accordance with the terms stated in the Transfer Notice (subject to Section 11(d) below) or (ii) the Fair Market Value of the Shares on the date on which the purchase is to be effected if no consideration is paid pursuant to the terms stated in the Transfer Notice, which Right of First Refusal shall be exercised by written notice (the "First Refusal Exercise Notice") to the Holder.

(d) Payment Terms.  The Company shall consummate the purchase of the Offered Shares on the terms set forth in the Transfer Notice within 30 days after delivery of the First Refusal Exercise Notice; provided, however, that in the event the Transfer Notice provides for the payment for the Offered Shares other than in cash, the Company and/or its

assigns shall have the right to pay for the Offered Shares by the discounted cash equivalent of the consideration described in the Transfer Notice as reasonably determined by the Administrator. Upon payment for the Offered Shares to the Holder or into escrow for the benefit of the Holder, the Company or its assigns shall become the legal and beneficial owner of the Offered Shares and all rights and interest therein or related thereto, and the Company shall have the right to transfer the Offered Shares to its own name or its assigns without further action by the Holder.

(e) Assignment. Whenever the Company shall have the right to purchase Shares under this Right of First Refusal, the Company may designate and assign one or more employees, officers, directors or shareholders of the Company or other persons or organizations, to exercise all or a part of the Company's Right of First Refusal.

(f) Non-Exercise. If the Company and/or its assigns do not collectively elect to exercise the Right of First Refusal within the Option Period or such earlier time if the Company and/or its assigns notifies the Holder that it will not exercise the Right of First Refusal, then the Holder may transfer the Shares upon the terms and conditions stated in the Transfer Notice, provided that:

(i) The transfer is made within 90 days of the earlier of (A) the date the Company and/or its assigns notify the Holder that the Right of First Refusal will not be exercised or (B) the expiration of the Option Period; and

(ii) The transferee agrees in writing that such Shares shall be held subject to the provisions of this Option Agreement.

The Company shall have the right to demand further assurances from the Grantee and the transferee (in a form satisfactory to the Company) that the transfer of the Offered Shares was actually carried out on the terms and conditions described in the Transfer Notice. No Offered Shares shall be transferred on the books of the Company until the Company has received such assurances, if so demanded, and has approved the proposed transfer as bona fide.

(g) Expiration of Transfer Period. Following such 90-day period, no transfer of the Offered Shares and no change in the terms of the transfer as stated in the Transfer Notice (including the name of the proposed transferee) shall be permitted without a new written Transfer Notice prepared and submitted in accordance with the requirements of this Right of First Refusal.

(h) Termination of Right of First Refusal. The provisions of this Right of First Refusal shall terminate as to all Shares upon the Registration Date.

(i) Additional Shares or Substituted Securities. In the event of any transaction described in Sections 10 or 11 of the Plan, any new, substituted or additional securities or other property which is by reason of any such transaction distributed with respect to the Shares shall be immediately subject to the Right of First Refusal, but only to the extent the Shares are at the time covered by such right.

12. Stop-Transfer Notices. In order to ensure compliance with the restrictions on transfer set forth in this Option Agreement, the Notice or the Plan, the Company may issue

BDI_000041

appropriate "stop transfer" instructions to its transfer agent, if any, and, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

13.     Refusal to Transfer.  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Option Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

14.     Repurchase Right.  The Company shall have rights to repurchase the vested Shares at the par value of the Shares upon resignation or termination with Cause.

15.     Lock-Up Agreement.

(a)     Agreement.  The Grantee, if requested by the Company and the lead underwriter of any public offering of the Ordinary Shares (the "Lead Underwriter"), hereby irrevocably agrees not to sell, contract to sell, grant any option to purchase, transfer the economic risk of ownership in, make any short sale of, pledge or otherwise transfer or dispose of any interest in any Ordinary Shares or any securities convertible into or exchangeable or exercisable for or any other rights to purchase or acquire Ordinary Shares (except Ordinary Shares included in such public offering or acquired on the public market after such offering) during the 180-day period following the effective date of a registration statement of the Company (the "Registration Date") filed under the Securities Act of 1933, as amended, or such shorter or longer period of time as the Lead Underwriter shall specify.  The Grantee further agrees to sign such documents as may be requested by the Lead Underwriter to effect the foregoing and agrees that the Company may impose stop-transfer instructions with respect to such Ordinary Shares subject to the lock-up period until the end of such period.  The Company and the Grantee acknowledge that each Lead Underwriter of a public offering of the Company's stock, during the period of such offering and for the lock-up period thereafter, is an intended beneficiary of this Section 15.

(b)     No Amendment Without Consent of Underwriter.  During the period from identification of a Lead Underwriter in connection with any public offering of the Company's Ordinary Shares until the earlier of (i) the expiration of the lock-up period specified in Section 15(a) in connection with such offering or (ii) the abandonment of such offering by the Company and the Lead Underwriter, the provisions of this Section 15 may not be amended or waived except with the consent of the Lead Underwriter.

16.     Rights as Shareholder.   The Grantee hereby irrevocably grants a power of attorney to the Board or any person designated by the Board to exercise the voting rights with respect to the Shares.

17.     Entire Agreement; Governing Law.  The Notice, the Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Grantee with respect to the subject matter hereof, and may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee. Nothing in the Notice, the Plan and this Option Agreement (except as expressly provided therein) is intended to confer any rights or remedies on any persons other than the parties.  The Notice, the Plan and this Option Agreement are to be construed in accordance with and governed by the

laws of Cayman Islands without regard to conflict of law principles thereunder. Should any provision of the Notice, the Plan or this Option Agreement be determined to be illegal or unenforceable, such provision shall be enforced to the fullest extent allowed by law and the other provisions shall nevertheless remain effective and shall remain enforceable.

18.     Construction.  The captions used in the Notice and this Option Agreement are inserted for convenience and shall not be deemed a part of the Option for construction or interpretation. Except when otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular.  Use of the term "or" is not intended to be exclusive, unless the context clearly requires otherwise.

19.     Administration and Interpretation.   Any question or dispute regarding the administration or interpretation of the Notice, the Plan or this Option Agreement shall be submitted by the Grantee or by the Company to the Administrator.  The resolution of such question or dispute by the Administrator shall be final and binding on all persons.

20.     Dispute Resolution and Arbitration Procedures.  The Grantee acknowledges and agrees that any dispute, controversy or claim arising out of or relating to the Notice, the Plan or this Option Agreement, including any alleged violation of statute, common law or public policy shall be submitted to final and binding arbitration before Hong Kong International Arbitration Centre (the "HKIAC") to be held in Hong Kong before a single arbitrator, in accordance with the Hong Kong International Arbitration Centre Administered Arbitration Rules (the "HKIAC Rules") then in force. Each party to the arbitration shall cooperate with each other party to the arbitration in making full disclosure of and providing complete access to all information and documents reasonably requested by such other party in connection with such arbitral proceedings, subject only to any confidentiality obligations binding on such party. The award of the arbitral tribunal shall be final and binding upon the parties thereto, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award. During the course of the arbitral tribunal's adjudication of any dispute, this Award Agreement shall continue to be performed except with respect to the part in dispute and under adjudication.

21.     Notices.  Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery, upon deposit for delivery by an internationally recognized express mail courier service or upon deposit in the United States mail by certified mail (if the parties are within the United States), with postage and fees prepaid, addressed to the other party at its address as shown in these instruments, or to such other address as such party may designate in writing from time to time to the other party.

22.     No Disparagement.  The Grantee hereby covenants that, at any time after the date hereof, the Grantee shall not directly or indirectly make any critical, adverse, or disparaging statement or comment about the Company or any of the Company's subsidiaries, affiliates, directors, officers, or employees.

23.     Non-Competition.  The Grantee hereby agrees that for a period commencing on the date hereof and ending on two (2) years from the Termination Date, the Grantee will not, without the express written consent of the Company, directly or indirectly, engage in any business activity which is, or participate or invest in, or provide or facilitate the provision of financing to, or assist (whether as owner, part-owner, shareholder, partner, director, officer, employee, agent or consultant, or in any other capacity) any business, organization or person other than the Company (or any subsidiary of the Company) whose business, activities, products

BDI_000043

or services are competitive with any of the business activities, products or services conducted or offered by the Company and its affiliates.

24.    Non-Solicitation.  The Grantee hereby agrees that for a period commencing on the date hereof and ending on two (2) years from the Termination Date, the Grantee will not, without the express written consent of the Company, (i) solicit, entice, encourage or intentionally influence, or attempt to solicit, entice, encourage or influence, any officer or employee of the Company or any of its affiliates to terminate his or her relationship or employment with the Company or any of its affiliates, (y) solicit, entice, encourage or intentionally influence, or attempt to solicit, entice, encourage or influence, any client, supplier or business partner of the Company or any of its affiliates to alter, reduce or terminate its business relationship with the Company or any of its affiliates.

25.    Confidentiality.   From the date hereof to the fifth (5th) anniversary of the Termination Date, the Grantee or his/her permitted assignees pursuant to Section 9 hereof shall keep confidential the terms, conditions, and existence of the Notice of Stock Option Award, the Option Agreement, this Amendment and any related documentation and discussions, the identities of the Parties, the trade secrets and confidential and proprietary information of the Company or any of its affiliates, and other information of a non-public nature in connection herewith and therewith except as the Parties mutually agree or to the extent required by applicable laws.

26.    Repurchase of the Shares.  Except as otherwise provided in this Agreement, in the case of a material breach of any covenant or undertaking given by the Grantee under Section 23, 24 or 25 of this Agreement, the Company shall have the right (but not the obligation) to repurchase any or all of the Shares which have been issued to the Grantee or other person pursuant to the exercise of the Option at the par value per share of such Shares at any time after such breach. Notwithstanding the foregoing, Grantee shall indemnify, defend and hold harmless the Company and its affiliates, officers, directors, employees and representatives from and against any and all actions, damages, losses, liabilities and expenses in connection with or arising from such breach.

27.    This Agreement shall only be binding on and enure for the benefit of the successors, heirs and permitted assignees of the Parties.

**[END OF AGREEMENT]**

BDI_000044

# EXHIBIT 6

## BYTEDANCE LTD. 2012 STOCK INCENTIVE PLAN

### NOTICE OF STOCK OPTION AWARD

Grantee's Name and Address:      YINTAO YU

You (the "Grantee") have been granted an option to purchase Ordinary Shares, subject to the terms and conditions of this Notice of Stock Option Award (the "Notice"), the BYTEDANCE LTD. 2012 Stock Incentive Plan, as amended from time to time (the "Plan") and the Stock Option Award Agreement (the "Option Agreement") attached hereto, as follows. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Notice.

| | |
|---|---|
| Award Number | |
| Grant Date | September 30, 2017 |
| Vesting Commencement Date | August 30, 2017 |
| Exercise Price per Share | US$ 0.02 |
| Total Number of Ordinary Shares Subject to the Option (the "Shares") | 220,000 |
| Total Exercise Price | US$ 4,400 |
| Expiration Date: | September 30, 2027 |
| Post-Termination Exercise Period: | Three (3) Months |

Vesting Schedule:

Subject to the Grantee's Continuous Service and other limitations set forth in this Notice, the Plan and the Option Agreement, the Option may be exercised, in whole or in part, in accordance with the Schedule as below:

15% of the Shares subject to the Option shall vest on the first anniversary of the Vesting Commencement Date, 25% of the Shares subject to the Option shall vest on the second anniversary of the Vesting Commencement Date, 25% of the Shares subject to the Option shall vest on the third anniversary of the Vesting Commencement Date, and the remaining 35% of the Shares subject to the Option shall vest on the fourth anniversary of the Vesting Commencement Date.

During any authorized leave of absence, the Company shall have the right to suspend the vesting of the Option as provided in this schedule if, in addition to the applicable paid leave of absence that the Grantee is entitled to pursuant to the applicable laws and the Company's policies, such leave of absence exceeds an accumulative period of ten (10) days within a 12-month period. Vesting of the Option shall resume upon the Grantee's termination of the leave of absence and return to service to the Company or a Related Entity. The vesting schedule of the Option shall be extended by the length of the suspension.

In the event of termination of the Grantee's Continuous Service for Cause (as defined below), the Grantee's right to exercise the Option shall terminate concurrently with the termination of the Grantee's Continuous Service, except as otherwise determined by the administrator of the Plan, which shall be the Board of Directors or any person designated by the Board of Directors (the "Administrator"), and the Company shall have rights to repurchase

all vested options purchased by the Grantee, under the sole discretion of the Administrator, at the par value of the Shares.

The Grantee grants a power of attorney to the Board or any person designated by the Board to exercise the voting rights with respect to the Shares.

IN WITNESS WHEREOF, the Company and the Grantee have executed this Notice and agree that the Option is to be governed by the terms and conditions of this Notice, the Plan, and the Option Agreement.

BYTEDANCE LTD.
a company incorporated under the laws of the
Cayman Islands

By: _____

Title: _____

*Authorized Signature(s)*

THE GRANTEE ACKNOWLEDGES AND AGREES THAT ANY EXERCISE OF THE OPTION SHALL BE STRICTLY COMPLIANCE WITH APPLICABLE LAWS, INCLUDING WITHOUT LIMITATION, THOSE REGULATIONS ENACTED BY THE STATE ADMINISTRATION OF FOREIGN EXCHANGE OF THE PRC.

THE GRANTEE ACKNOWLEDGES AND AGREES THAT THE SHARES SUBJECT TO THE OPTION SHALL VEST, IF AT ALL, ONLY DURING THE PERIOD OF THE GRANTEE'S CONTINUOUS SERVICE (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THE OPTION OR ACQUIRING SHARES HEREUNDER). THE GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS NOTICE, THE OPTION AGREEMENT, OR THE PLAN SHALL CONFER UPON THE GRANTEE ANY RIGHT WITH RESPECT TO FUTURE AWARDS OR CONTINUATION OF THE GRANTEE'S CONTINUOUS SERVICE, NOR SHALL IT INTERFERE IN ANY WAY WITH THE GRANTEE'S RIGHT OR THE RIGHT OF THE COMPANY OR RELATED ENTITY TO WHICH THE GRANTEE PROVIDES SERVICES TO TERMINATE THE GRANTEE'S CONTINUOUS SERVICE, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE. THE GRANTEE ACKNOWLEDGES THAT UNLESS THE GRANTEE HAS A WRITTEN EMPLOYMENT AGREEMENT WITH THE COMPANY TO THE CONTRARY, THE GRANTEE'S STATUS IS AT WILL.

The Grantee acknowledges receipt of a copy of the Plan and the Option Agreement, and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts the Option subject to all of the terms and provisions hereof and thereof. The Grantee has reviewed this Notice, the Plan, and the Option Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Notice, and fully understands all provisions of this Notice, the Plan and the Option Agreement. The Grantee hereby agrees that all questions of interpretation and administration relating to this Notice, the Plan and the Option Agreement shall be resolved by the Administrator in accordance with Section 19 of the Option Agreement. The Grantee further agrees to the <u>Dispute Resolution and Arbitration Procedures</u> in accordance with Section 20 of the Option Agreement. The Grantee further agrees to notify the Company upon any change in the residence address indicated in this Notice.

Dated: _____    Signed: _____
                                                              Grantee