CHARLES THOMPSON, State Bar No. 139841
  thompsoncha@gtlaw.com
DAVID S. BLOCH, State Bar No. 184530
  blochd@gtlaw.com
MELISSA J. KENDRA, State Bar No. 291905
  Melissa.Kendra@gtlaw.com
ANTHONY E. GUZMAN II, State Bar No. 311580
  guzmanan@gtlaw.com
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105
Telephone: 415.655.1300
Facsimile: 415.707.2010

Attorneys for Defendant / Counter-Claimant
BYTEDANCE INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YINTAO YU, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>BYTEDANCE INC., a Delaware corporation; SHUYI (SELENE) GAO, an individual,<br><br>    Defendants.<br><br>BYTEDANCE INC., a Delaware Corporation,<br><br>    Counter-Claimant<br><br>vs.<br><br>YINTAO YU, an individual,<br><br>    Counter-Defendant. | Case No. 3:23-cv-04910-SI<br><br>**DECLARATION OF CHARLES O. THOMPSON ISO DEFENDANTS' MOTION FOR SANCTIONS AGAINST CHARLES JUNG AND JAIME DORENBAUM**<br><br>[Originally San Francisco Superior Court No. CGC-23-608845]<br><br>State Action Filed: September 5, 2023<br>Removal Date:  September 25, 2023<br>Trial Date:   November 18, 2024 |

## ADDITIONAL COUNSEL

DEMERY RYAN, State Bar No. 217176
   dryan@littler.com
LITTLER MENDELSON, P.C.
2049 Century Park East, 5th Floor
Los Angeles, California 90067
Telephone: 310.553.0308
Facsimile: 800.715.1330

GREGORY ISKANDER, State Bar No. 200215
   giskander@littler.com
LITTLER MENDELSON, P.C.
Treat Towers 1255 Boulevard, Suite 600
Walnut Creek, California 94597
Telephone:    925.932.2468
Facsimile:    925.946.9809

Attorneys for Defendant
SHUYI (SELENE) GAO

DECLARATION OF CHARLES O. THOMPSON ISO DEFENDANTS' MOTION FOR SANCTIONS AGAINST CHARLES JUNG AND JAIME DORENBAUM

I, CHARLES O. THOMPSON, declare the following:

1.    I am an attorney licensed to practice in the State of California, a Principal Shareholder of Greenberg Traurig, LLP, and counsel of record for Defendant ByteDance Inc. ("BDI") in the above-entitled matter against Plaintiff and Counter-Defendant Yintao Yu ("Yu"). I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify competently thereto.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of the *pro se* Complaint that Yu filed in his first action against BDI in the Superior Court of California, County of San Francisco, Case No. CGC-22-603019.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of the Complaint filed in Yu's second action against BDI on May 1, 2023, in the Superior Court of California, County of San Francisco, Case No. CGC-23-606246.

4.    Attached hereto as **Exhibit 3** is a true and correct copy of the First Amended Complaint filed in Yu's second action against BDI on May 12, 2023, in the Superior Court of California, County of San Francisco, Case No. CGC-23-606246.

5.    I met and conferred with Yu's Counsel (Charles Jung and Jaime Dorenbaum) on multiple occasions regarding the anonymous declarant. Yu's Counsel refused to provide the declarant's name despite both extensive meet-and-confer efforts and the fact that the declaration itself contained the attestation that the declarant was "willing to testify as a witness in a trial in the future if [he or she] receive[d] a subpoena." During this time, Yu's Counsel threatened to seek sanctions against BDI's Counsel if we so much as mentioned the anonymous declarant's existence to this Court.

6.    On June 8, 2024, after consulting with Yu's prior counsel, Yu's Counsel disclosed via email that the anonymous declarant was named Haiyi Bao. A true and correct copy of this email communication is attached hereto as **Exhibit 4.**

7.    On December 5, 2024, Yu submitted a Demand for Arbitration ("Demand"). Attached hereto as **Exhibit 5** is a true and correct copy of the Demand.

8.    I am lead counsel in this matter. At all stages of this litigation, I have been directly involved in the staffing decisions for this matter, in which capacity I have tried to assign work in the most efficient manner possible, based on the complexity of the task relative to the skills and experience of the billing

attorneys on my team. This work included investigating Yu's claims; researching; attending numerous court hearings; review and analysis of hundreds of thousands of pages of documents, including documented correspondence; conducting oral and written discovery; engaging in various discovery disputes; drafting and responding to numerous discovery dispute letters; drafting dispositive motions in response to numerous pleadings; drafting and responding to motions; and drafting and responding to a multitude of discovery dispute statements.

9.    From the date Yu filed his Verified Complaint for Declaratory and Injunctive Relief on September 5, 2023 through January 31, 2025, I and the attorneys working at my direction have spent a total of 7,678.5 hours defending against Yu's Counsel's bad faith conduct as follows:

| Attorneys | 2023-2024 BDI Rates | 2025 BDI Rates | 2023-2025 Total Hours | Lodestar Total | Sum of Billed Fees |
|---|---|---|---|---|---|
| Beer, Naomi (Shareholder) | $715.00 | $751.50 | 1.7 | $1,216.35 | $1,212.51 |
| Bloch, David (Shareholder) | $1,000.00 | $1,332.00 | 616.1 | $627,393.60 | $586,965.03 |
| Bohmholdt, Karin (Shareholder) | $1,071.00 | $1,201.50 | 29.7 | $33,975.00 | $33,808.01 |
| Choumwer, Khushpreet (Associate) | $522.00 | $522.00 | 80.6 | $42,073.20 | $42,007.77 |
| Foster, Charles (Associate) | $675.00 | $675.00 | 42.5 | $28,687.50 | $28,612.73 |
| Guzman, Anthony E. (Associate) | $702.00 | $787.50 | 2,294.9 | $1,617,611.85 | $1,605,162.48 |
| Hashim, Bailey A. (Associate) | $585.00 | $585.00 | 33.5 | $19,597.50 | $19,541.13 |
| Horton, Sierra (Associate) | $580.50 | $580.50 | 7.5 | $4,353.75 | $4,236.44 |
| Huang, Ray (Associate) | $522.00 | $522.00 | 5.5 | $2,871.00 | $1,145.50 |
| Kelly, Brian B. (Shareholder) | $864.00 | $864.00 | 24.1 | $20,822.40 | $20,813.95 |
| Kelly, Catalina V. (Associate) | $927.00 | $927.00 | 20 | $18,540.00 | $18,493.14 |
| Kendra, Melissa | $742.50 | $787.50 | 1,383.9 | $1,032,972.75 | $1,000,464.25 |

| | | | | | |
|---|---|---|---|---|---|
| (Associate) | | | | | |
| Kolvek, Michael J. (Associate) | $630.00 | $630.00 | 3.4 | $2,142.00 | $2,136.58 |
| Krumbein, Vanessa (Of Counsel) | $783.00 | $981.00 | 1.1 | $861.30 | $861.30 |
| Lacarcel, Laura (Associate) | $580.50 | No longer with GT | 7.5 | $4,353.75 | $4,353.75 |
| Makris, Demetra (Associate) | $324.00 | $540.00 | 1,141.1 | $407,365.20 | $403,718.57 |
| May, Kevin (Associate) | $751.50 | $751.50 | .3 | $225.45 | $225.40 |
| McFadden, Diana (Law Clerk) | N/A | $630.00 | 11.2 | $7,056.00 | $7,041.74 |
| McNeiley, Cristina A. (Practice Group Attorney) | $373.50 | No longer with GT | 247 | $92,254.50 | $91,426.58 |
| Nowinski, Alexander (Practice Group Attorney) | $715.50 | $715.50 | 5.7 | $4,078.35 | $2,432.01 |
| Patel, Sajni (Associate) | $621.00 | $621.00 | 3.5 | $2,173.50 | $2,168.01 |
| Pickles, Todd (Shareholder) | $909.00 | $909.00 | 22.4 | $20,361.60 | $20,022.44 |
| Qi, George (Shareholder) | $1,237.50 | $1,237.50 | .2 | $247.50 | $246.87 |
| Steinberg, Howard J. (Shareholder) | $950.00 | $1,134.00 | 19.5 | $18,653.80 | $18,613.19 |
| Thompson, Charles O. (Shareholder) | $990.00 | $1,089.00 | 1,588 | $1,583,059.50 | $1,560,684.45 |
| Wittlake, Kate (Associate) | $868.50 | $868.50 | 84 | $72,954.00 | $72,808.24 |
| Woo Kee, Esteban (Associate) | $585.00 | $585.00 | 3.6 | $2,106.00 | $2,100.68 |
| **Total** | | | **7,678.5** | **$5,668,007.35** | **$5,551,302.75** |

10.    From September 5, 2023 through January 31, 2025, paralegals working at my direction have spent a total of 494.1 hours defending against the instant suit as follows:

///

///

**DECLARATION OF CHARLES O. THOMPSON ISO DEFENDANTS' MOTION FOR SANCTIONS AGAINST CHARLES JUNG AND JAIME DORENBAUM**

| Paralegal | 2023-2024 BDI Rates | 2025 BDI Rates | 2023-2025 Total Hours | Lodestar Total | Sum of Billed Fees |
|---|---|---|---|---|---|
| Hulet, Steve | $351.00 | $351.00 | 8.7 | $3,053.70 | $3,053.7 |
| Meraz, Dennis R. | $535.50 | $535.50 | .5 | $267.75 | $267.67 |
| Pham, Chrystal | $315.00 | $360.00 | 484.2 | $152,644.50 | $151,370.52 |
| Turtchin, Sidney | $225.00 | $225.00 | .7 | $157.50 | $157.47 |
| **Total** | | | **494.1** | **$156,123.45** | **$154,849.36** |

11.     From September 5, 2023 through January 31, 2025, legal support staff (excepting paralegal support) working at my direction have spent a total of 16.6 hours defending against the instant suit as follows:

| Other Staff | 2023-2024 BDI Rates | 2025 BDI Rates | 2023-2025 Total Hours | Lodestar Total | Sum of Billed Fees |
|---|---|---|---|---|---|
| Bell, Andrew K. (Litigation Support) | $225.00 | $225.00 | 10.8 | $2,430 | $2,426.57 |
| Elina, Julia (Research) | $247.50 | $247.50 | .1 | $24.75 | $24.69 |
| Goodell, Nicole K. (Research Analyst) | $247.50 | $247.50 | 1.1 | $272.25 | $272.18 |
| Keyes, Kristin Ichishta (Research) | $250.00 | $247.50 | 1.9 | $470.25 | $473.74 |
| On-Robinson, Huong L. | $180.00 | $180.00 | 2.4 | $432.00 | $430.88 |
| Schuyler, Lindsay K. | $247.50 | No longer with GT | .3 | $74.25 | $74.25 |

**DECLARATION OF CHARLES O. THOMPSON ISO DEFENDANTS' MOTION FOR SANCTIONS AGAINST CHARLES JUNG AND JAIME DORENBAUM**

| Total | | | 16.6 | $3,703.50 | $3,702.31 |
|---|---|---|---|---|---|

12.    To the extent the Court would find it helpful to review Greenberg Traurig's bills themselves, we are pleased to make them (or a spreadsheet summary of them, as the Court prefers) available *in camera* for the Court's review.

13.    Based on my review of Greenberg Traurig's actual billing records in conjunction with the Greenberg Traurig accounting team, from September 5, 2023 through January 31, 2025, BDI incurred in excess of **$5,709,854.42** in legal fees, covering approximately 7,678.5 hours of attorney time. This amount is less than the amount that would have been charged at Greenberg Traurig's standard rates, reflecting a global 10% discount off of all the attorneys' standard rates for the entirety of this litigation and certain write-offs made in my professional judgement. By comparison, this amount is also less than the Lodestar total of $5,827,834.30, which, by default, confirms the reasonableness of the amount we are seeking.

14.    BDI is represented by Greenberg Traurig's San Francisco, California office. The rates for the above attorneys are set by Greenberg Traurig based upon numerous factors, including comparable market rates, experience, expertise, and class levels. These rates are reasonable as compared to similar work in San Francisco as well as the Northern District of California, are commensurate with the skill and experience of the attorneys involved, are well within this Court's precedent, and are supported by case law.

15.    Based on my experience, the above attorneys' rates in this matter are reasonable and customary for attorneys practicing in San Francisco, California, at a global law firm such as Greenberg Traurig, and because of their skills and years of experience. Several of the above attorneys practice in jurisdictions outside of San Francisco where the rates are much lower, including Phoenix, Arizona. Such represents Greenberg Traurig's continued efforts to cut costs. True and correct copies of the attorneys' online biographies are attached hereto as **Exhibit 6**.[1]

16.    The rates are reasonable under both the lodestar method and under the circumstances of this case. Survey evidence, including the PricewaterhouseCoopers 2024 report,[2] also confirms that

---

[1] We are only including those attorneys who principally and consistently worked on this matter. We are glad to provide additional attorney biographies to the extent the Court would find it helpful.

[2] This survey was prepared for Greenberg Traurig subject to restrictions on third-party distribution. Thus, the relevant portions of the survey are quoted in this declaration but are not reproduced as an exhibit hereto. We are glad to provide the report to the Court for *in camera* review.

**DECLARATION OF CHARLES O. THOMPSON ISO DEFENDANTS' MOTION FOR SANCTIONS AGAINST CHARLES JUNG AND JAIME DORENBAUM**

Greenberg Traurig's quoted rates are reasonable. According to this report, the median rates for labor & employment at AmLaw 50 firms in San Francisco is as follows:

- Equity Partner: $1,580 per hour

- Associate (Law Class Year 2016): $893 per hour

- Paralegal: $354 per hour

Greenberg Traurig's average hourly rates were below-average compared to these levels. While this report does not list the median rates for labor & employment Of Counsel at AmLaw 50 firms in San Francisco, the rate listed above for senior associates ($893 per hour in 2024), is higher than Greenberg Traurig's average hourly rate for its Of Counsel attorney on this case.

17.    In addition to the global 10% discount applied to the above attorneys' standard billing rates, Greenberg Traurig applied the same discounted 2023 rate through the end of 2024, despite the above attorneys' standard rates increasing in 2024. In 2025, Greenberg Traurig provided BDI with a 10% discount off of the above attorneys' new 2025 standard billing rate.

18.    The legal services provided, the attorney(s) providing such services, and the time spent in providing those services were reasonable and necessary to defend against Yu's Counsel's consistently employed bad faith conduct. This includes the time spent preparing the instant Motion.

19.    I appropriately staffed this case with (1) five core attorneys representing BDI, including myself, David Bloch, Anthony Guzman, Melissa Kendra, and Demetra Makris; (2) one core paralegal Crystal Pham and a very limited number of other paralegals to assist when needed; and (3) a limited number of attorneys who assisted with discrete projects throughout 2023 and 2024.

20.    The billed hours are accurate and reflect the appropriate time spent by each respective attorney and paralegal on this matter. I reviewed each monthly bill for efficiency and appropriateness and made write-downs where appropriate. As such, the time billed was less than the time actually expended on this matter.

21.    The work I assigned to each partner, associate, and paralegal was allocated based on skill-level and expertise. For instance, partner-level attorneys were tasked with high-level motion drafting and reviewing, strategizing, consultations with experts in other areas of the law (including, bankruptcy), and client correspondence; mid- to senior- level associates were tasked with researching, motion drafting,

**DECLARATION OF CHARLES O. THOMPSON ISO DEFENDANTS' MOTION FOR SANCTIONS AGAINST CHARLES JUNG AND JAIME DORENBAUM**

strategizing, day-to-day client correspondence, and document review; and paralegals were tasked with collating exhibits and documents, case management, and hearing preparation work. Any motion work for which multiple attorneys were required to research, draft, and review the same motion or other similar filings was warranted given the nuanced motion-work and complex issues encompassed in this matter. Finally, clerical work, filings, and administrative tasks were assigned to legal secretaries.

22.    The amount of time expended on this matter was not only appropriate, it was critical in light of Yu and his counsel's egregious misconduct throughout these proceedings, which (as this Court has already noted) "vexatiously multiplied these proceedings." *See* ECF 246 at 10:17-19. This required Defendants to expend an inordinate amount of time (1) defending against this baseless action, (2) while investigating and revealing Yu and his counsel's pervasive misconduct during these proceedings, (3) and also defending against Yu's Counsel's myriad frivolous motions filed without investigation or due diligence and in order to prevent Defendants and/or this Court from learning of their misconduct. The bulk of counsel's time was devoted toward analysis, strategy, legal research, and drafting, which culminated in a successful dismissal of Yu's complaint for declaratory relief and default judgment in favor of Defendants' counterclaim based on Yu's misconduct.

23.    This case has consistently presented novel and complex issues, necessitating significant strategy, creativity, and motion practice. Yu and his counsel's egregious misconduct further necessitated considerable time spent on investigation, strategy, and motion practice to adequately defend against that misconduct. The quality of representation is well demonstrated by the extremely favorable results Defendants achieved in this action—i.e., terminating sanctions.

24.    I have personally reviewed the fees, expenses, costs, and vendor bills submitted in this matter. Based upon my experience and my familiarity with the rates charged by attorneys and staff of similar experience, our office location and expertise, my review of the pleadings, timesheets, and billing summaries, along with my conversations with the other attorneys working on this case and the client, it is my opinion that the time spent and the fees and costs incurred by BDI are reasonable and appropriate, and are consistent with the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

25.     BDI further seeks all costs necessarily incurred in defending against this baseless action, which totals **$570,222.96**. Below is a table showing the total costs incurred between September 5, 2023 and January 31, 2025 broken down into categories:

| Category | Total Amount |
|---|---|
| Filing Fees | $ 2,377.14 |
| Court Copies / Document Fees | $ 1,289.71 |
| Travel and Lodging Expenses | $ 140,118.97 |
| Professional and Legal Services Fees | $ 349,789.08 |
| Business Meal Expenses | $ 6,570.40 |
| United Parcel Service Fees | $ 309.90 |
| E-Discovery Hosting Fees | $ 15,269.80 |
| Deposition / Court Reporter Fees | $ 5,708.25 |
| Consulting Services Fees | $ 29,834.80 |
| Subpoena / Process Server Fees | $ 2,608.78 |
| Translation Services Fees | $ 3,096.33 |
| Transcript Charges | $ 12,072.41 |
| Court Call Charges | $ 360.00 |
| Messenger / Courier Services | $ 817.39 |
| **Grand Total** | **$ 570,222.96** |

26.     To the extent the Court would find it helpful to review each cost incurred, we are pleased to make those costs (or a spreadsheet summary of them, as the Court prefers) available for the Court's review.

\*     \*     \*

Pursuant to the laws of the State of California, I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of March 2025, in San Francisco, California.

*/s/ Charles O. Thompson*
CHARLES O. THOMPSON

# EXHIBIT 1

Yintao Yu
3245 Geary Blvd., #591846,
San Francisco, CA 94118
Email: roger@rogeryu.org

*Plaintiff in Pro Per*

ELECTRONICALLY
**F I L E D**
Superior Court of California,
County of San Francisco

**11/17/2022**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

# THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN FRANCISCO

**CGC-22-603019**

| | |
|---|---|
| YINTAO YU,<br><br>       Plaintiff,<br><br>vs.<br><br>BYTEDANCE, INC, and DOES 1 through 20, inclusive,<br><br>       Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff YINTAO YU complains and alleges as follows:

### NATURE OF THE CASE

1.      This case arises out of Plaintiff Yintao "Roger" Yu's termination of employment from Defendant BYTEDANCE, INC., after he had engaged in legally-protected whistleblowing activity, opposed disability discrimination, and shortly after his return from protected medical leave.

### PARTIES

2.      Plaintiff Yu was an employee of Defendant ByteDance, Inc. from approximately August 2017 until his termination in November 2018.  He is a resident of California.

3.      Upon information and belief, Defendant ByteDance, Inc., is a Delaware corporation, whose primary place of business is San Francisco County, California.

4.      The true names and capacities of Defendants named herein as Does 1 through 20, whether individual, corporate, associate or otherwise, and the true involvement of Defendants sued herein as Does 1 through 20, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show the true names, capacities, and involvement of Does 1 through 20 when ascertained.  Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a "Doe" is responsible in some manner for the events and happenings referred to herein, and that Plaintiff's injuries and damages as hereinafter set forth were proximately caused by said Defendants.

5.      Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein is or was the agent, employee, partner and/or representative of one or more of the remaining Defendants, and each of them was at all times acting within the purpose and scope of such agency and employment.  Plaintiff is further informed and believes that each of the Defendants herein gave consent to, ratified and authorized the acts alleged herein to each of the remaining Defendants.

### JURISDICTION AND VENUE

6.      Venue is proper in this judicial district pursuant to California Code of Civil Procedure § 395(a) and California Government Code § 12965.  Defendant ByteDance, Inc. is

COMPLAINT FOR DAMAGES AND JURY DEMAND

1   registered for business tax certificate with the Office of the Treasurer and Tax Collector, City and

2   County of San Francisco.  Defendant ByteDance, Inc. resides in and transacts business in the

3   County of San Francisco, and is within the jurisdiction of this Court for the purposes of service of

4   process.

5                    **FACTS COMMON TO ALL CAUSES OF ACTION**

6           7.      Plaintiff Yu was hired by Defendant ByteDance, Inc. ("ByteDance" or

7   "Defendant") on or around June 7, 2017, and began working in August 2017.  In addition to his

8   base salary and the option to purchase 220,000 shares of ByteDance stock, Mr. Yu's employment

9   agreement also entitled him to $600,000, to be "paid within 30 days since the offer was signed,"

10  for the IP from his company Tank Exchange.

11          8.      Within the first 30 days of receiving the offer letter, Mr. Yu spoke with

12  ByteDance's hiring manager and in-house counsel.  They told Mr. Yu that ByteDance had

13  concerns about paying him the $600,000 purchase price for Tank Exchange's intellectual

14  property without assurances that he would remain with ByteDance for the long term.

15  ByteDance's representatives encouraged him to sign a multi-year term employment agreement to

16  ensure his continued employment at ByteDance.  Ultimately, the parties agreed upon a 2-year

17  term agreement that was binding on both parties and which superseded the "at will" provision

18  contained in his earlier agreement.  On a visit to Beijing, Mr. Yu signed the employment contract.

19  ByteDance's representatives told him that he would receive a copy of this agreement, but it was

20  never shared with him.  Under the terms of the supplemental employment agreement, the

21  employment relationship was set to last until August 2019, unless Mr. Yu was terminated "for

22  cause."

23          9.      Shortly after beginning his employment, Mr. Yu became aware that ByteDance

24  had for years engaged in a worldwide scheme to steal and profit from the copyrighted works of

25  others.  The effort involved the use of software to strip copyrighted material from competitor's

26  websites — chiefly, Instagram and Snapchat — and populate its own video services with these

27  videos in an effort to make its own services appear more popular to end users.  These actions

28

2

COMPLAINT FOR DAMAGES AND JURY DEMAND

1    were taken without the permission of the content creators and represented an unlawful effort to

2    gain an edge against entrenched online video hosting websites.

3         10.    Upon learning of this program, Mr. Yu was troubled by ByteDance's efforts to

4    skirt legal and ethical lines, not to mention the tremendous class action liability that copyright

5    theft of this magnitude could create for the company. It was his understanding that stripping

6    copyrighted material from competitors' websites without the creator's permission violated the

7    Digital Millennium Copyright Act and other laws protecting copyrighted works. Mr. Yu raised

8    these concerns with Wenjia Zhu, formerly Senior VP of Engineering and current Global TikTok

9    R&D Chief at ByteDance, numerous times, as early as October 2017 and again in February and

10   March 2018. Mr. Zhu reports directly to ByteDance's CEO Yiming Zhang. When informed of

11   Mr. Yu's concerns with the program, Mr. Zhu was dismissive of them, and the copyright

12   infringement continued unabated.

13        11.    In addition, on or around December 2017, Mr. Yu learned of efforts to terminate a

14   U.S. based employee, Witness A,[1] who suffered from depression. Witness A, who had

15   demonstrably strong performance, had recently requested time off to address her medical

16   condition. Although Witness A's direct manager, Peiyu "Peggie" Li, was satisfied with her

17   performance and had recently given Witness A a score of "Meets Expectation" on her latest

18   performance review, her skip level manager, Ying Zhi, was not as accommodating. Without Ms.

19   Li's knowledge, Ms. Zhi had Witness A's performance score lowered to "Improvement Needed,"

20   and had informed HR to fire Witness A upon the formal release of the ratings. Upon learning of

21   this change, Mr. Yu confronted Ms. Zhi, who admitted that she had made the change because she

22   did not like Witness A taking time off work to address her depression and that she viewed her as

23   a "burden" she "wanted to get rid of." Ms. Zhi told him that due to Witness A's medical

24   condition, her "cost of management was too high." It is Mr. Yu's understanding that terminating

25   Witness A if she received a rating of "meets expectations" or above would violate ByteDance

26

27        [1] Plaintiff is not disclosing Witness A's name at this time to protect the privacy of the
     witness. Plaintiff will provide Witness A's name to ByteDance in the course of discovery and
28   under a protective order.

1  policy, which is why Ms. Zhi had intervened to lower her score. Mr. Yu was shocked by Ms.

2  Zhi's admission and requested that she reconsider. However, Ms. Zhi responded that she "won't

3  even consider keeping [Witness A]. Her cost of management is way too high." Following this

4  conversation, Mr. Yu complained to Wei "Ronnie" Hua, ByteDance's Head of HR, about the

5  legality of Ms. Zhi's actions.

6       12.    Ultimately, following Mr. Yu's reporting of the incident to HR, the company

7  decided not to terminate Witness A. However, Ms. Zhi's manager, Nan Zhang, was unhappy

8  with Mr. Yu's decision to intercede on Witness A's behalf, particularly given the fact he did not

9  even work in her department. Mr. Yu was later informed that several of Ms. Zhang's direct

10  reports viewed his actions as a challenge to Ms. Zhang's leadership and authority. Ms. Zhang

11  later became the general manager of ByteDance's entire video-"IES" division — the department

12  in which Mr. Yu worked — and was in a position to retaliate against Mr. Yu for his actions.

13       13.    On or around March 2018, in consultation with his doctor, Mr. Yu was required to

14  take his own medical leave for approximately seven months. On July 18, 2018, Mr. Yu mailed

15  three letters to various supervisors at ByteDance notifying them that, upon consultation with his

16  doctor, he expected to be able to return to work on September 11, 2018. ByteDance claims to

17  have mailed Mr. Yu a notice of termination on July 26, 2018, purportedly due to a reduction in

18  force. ByteDance also claims that on July 27, Bytedance e-mailed Mr. Yu a copy of the

19  termination notice. Mr. Yu never received any of these notices and ByteDance never called him

20  to notify him of his termination, even though the company acknowledges receiving his requests

21  to return to work.[2]

22       14.    In October 2018, Mr. Yu was finally cleared to return to work by his doctor.

23  However, upon returning to the office for the first time, he was told he did not "need to come to

24  work now" and that the company "will contact you later." Mr. Yu remained on ByteDance

25                        

26       [2] Mr. Yu never received either the written or electronic versions of these notices because the company sent them to old home addresses. The termination letter was sent to Mr. Yu's

27  former address in Seattle, even though his paystubs listed his current address in Palo Alto. Similarly, instead of using his current e-mail address, the company sent the termination notice to

28  old e-mail accounts he no longer used. There is no record of the company attempting to call Mr. Yu to notify him of his termination.

1  payroll through November 2018 and the first tranche of equity under his stock option award from

2  the company should have vested on August 30, 2017, though ByteDance never vested these

3  shares.  In November 2018, Mr. Yu was terminated.

4  **PROCEDURAL HISTORY**

5  15.  On July 25, 2019, Plaintiff filed a complaint of discrimination with California's

6  Department of Fair Employment and Housing (DFEH), pursuant to the California Fair

7  Employment and Housing Act ("FEHA"), Government Code section 12900 *et seq*.

8  16.  Pursuant to the Emergency Rules Related to COVID-19, Emergency Rule 9(a),

9  the statute of limitations on Plaintiff's claims was tolled an additional 178 days, until January 19,

10  2021.

11  17.  The Parties have entered into a series of Tolling Agreement, whereby the statute

12  of limitations for Plaintiff's claims was tolled through and including November 17, 2022.

13  **LEGAL CLAIMS**

14  **FIRST CAUSE OF ACTION**

15  **(Retaliation in Violation of Labor Code § 1102.5)**

16  18.  Plaintiff re-alleges and incorporates herein by reference each and every allegation

17  of the preceding paragraphs as though fully set forth herein, and alleges as follows:

18  19.  At all times relevant to this Complaint, Defendant has been subject to the

19  requirements of California Labor Code § 1102.5, which applied to Plaintiff as an employee of

20  Defendant.

21  20.  Defendant violated Section 1102.5 by abruptly terminating Plaintiff's employment

22  in retaliation for his reporting and refusals to participate in activity that violated federal and state

23  policy against misappropriating copyrighted material, including the Digital Millennium

24  Copyright Act and other laws protecting copyrighted works.  *See* California Civil Code Sec. 3426

25  *et seq*.  In addition, the confidential and proprietary information, including copyrighted material,

26  that Defendant sought to misappropriate were of significant economic value and Plaintiff refused

27  to participate in any action that could reasonably constitute grand theft.  *See* California Penal

28  Code § 487.

COMPLAINT FOR DAMAGES AND JURY DEMAND

21.    In addition, at all times herein mentioned, FEHA, Gov. Code, § 12940, *et seq.*, was in full force and effect and was fully binding upon Defendant.  Government Code § 12940(a) prohibits an employer from discharging or discriminating against an employee because of a disability or because they are regarded as having a disability.  Defendant violated Section 1102.5 by abruptly terminating Plaintiff's employment due to his taking medical leave and for reporting and objecting to Defendant's discrimination against Witness A on the basis of her medical condition.  Further, Defendant retaliated against Plaintiff for disclosing information that he had reasonable cause to believe constituted a violation of California's FEHA to a person with authority over him, or another employee who had the authority to investigate, discover, or correct the violation or noncompliance.

22.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses, along with attorney's fees and litigation costs.

23.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

24.    Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## SECOND CAUSE OF ACTION

### (Disability Discrimination: Violation of Government Code § 12940(a))

25.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

26.    At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900, *et seq.*, was in full force and effect and was fully binding upon Defendant.  Cal. Gov't Code § 12940(a) prohibits an employer from discharging an

COMPLAINT FOR DAMAGES AND JURY DEMAND

1   employee because of a physical or mental disability or because he is regarded as having a

2   physical or mental disability.

3       27.     Plaintiff was a qualified individual with a disability, able to perform the essential

4   job duties of his position, with reasonable accommodation. ByteDance's termination of

5   Plaintiff's employment because of his taking medical leave and need for treatment, violated

6   Government Code § 12940(a).

7       28.     As a direct, foreseeable, and proximate result of Defendant's unlawful actions,

8   Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment

9   benefits, and has incurred other economic losses.

10      29.     As a direct, foreseeable, and proximate result of Defendant's unlawful actions,

11  Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to

12  Plaintiff's damage in an amount to be proven at the time of trial.

13      30.     Defendant committed the acts herein despicably, maliciously, fraudulently, and

14  oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive

15  amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others.

16  Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to

17  proof.

18                          **THIRD CAUSE OF ACTION**

19      **(Failure to Prevent Discrimination:  Violation of Government Code § 12940(k))**

20      31.     Plaintiff re-alleges and incorporates herein by reference each and every allegation

21  of the preceding paragraphs as though fully set forth herein, and alleges as follows:

22      32.     At all times herein mentioned, FEHA, Gov. Code, § 12940, *et seq.*, was in full

23  force and effect and fully binding upon Defendant.  Plaintiff was a member of a group protected

24  by that statute in that he was an employee with a known medical condition and/or physical

25  disability who made a request for a reasonable accommodation to treat his medical condition

26  and/or disability.

27      33.     Defendant violated Government Code § 12940(k) because Defendant failed to

28  take all reasonable steps necessary to prevent discrimination from occurring.  Among other

1  things, Defendant failed to train and adequately supervise its employees in order to ensure that

2  these employees were not violating FEHA in their treatment of other employees.

3      34.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions,

4  Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment

5  benefits, and has incurred other economic losses.

6      35.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions,

7  Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to

8  Plaintiff's damage in an amount to be proven at the time of trial.

9      36.    Defendant committed the acts herein despicably, maliciously, fraudulently, and

10  oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive

11  amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others.

12  Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to

13  proof.

14                    **FOURTH CAUSE OF ACTION**

15          **(Retaliation in Violation of Government Code § 12940(h))**

16      37.    Plaintiff re-alleges and incorporates herein by reference each and every allegation

17  of the preceding paragraphs as though fully set forth herein, and alleges as follows:

18      38.    Government Code section 12940(h) makes it an unlawful employment practice for

19  an employer to discriminate against any person because the person has opposed any practices

20  forbidden under the FEHA, including discrimination on the basis of a disability.

21      39.    Plaintiff opposed and protested ByteDance's discrimination against Witness A and

22  attempts to eliminate her position. He made these complaints to HR and Witness A's managers.

23      40.    In response to his complaints, ByteDance terminated his employment.

24      41.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions,

25  Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment

26  benefits, and has incurred other economic losses.

27      42.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions,

28  Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to

Plaintiff's damage in an amount to be proven at the time of trial.

43. Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## FIFTH CAUSE OF ACTION

### (Interference with CFRA Rights:  Violation of Government Code § 12945.2(t))

44. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

45. Defendant was subject to the provisions of the CFRA because Defendant employed at least 50 part-time or full-time employees.  Plaintiff was entitled to the benefits of the CFRA because he worked more than twelve months for Defendant and had at least 1250 hours of service in the year preceding his CFRA leave.  Defendant employed at least 50 employees within 75 miles of San Francisco during the relevant time period.

46. The CFRA requires an employer to grant leave to an employee to care for the employee's own serious health condition.  The CFRA also requires the employer to reinstate the employee to the same or a comparable job upon completion of the leave.

47. Defendant violated Government Code § 12945.2(t) by failing to reinstate the employee to the same or a comparable job upon completion of the leave.

48. Defendant further violated Section 12945.2(t) by terminating Plaintiff following his return from medical leave.

49. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses.

50. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

51.    Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

**SIXTH CAUSE OF ACTION**

**(Retaliation in violation of the CFRA:  Violation of Government Code § 12945.2(l))**

52.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

53.    The CFRA requires employers to grant leave to employees to care for the employee's own serious health condition.  The CFRA also requires the employer to reinstate the employee to the same or a comparable job upon completion of the leave.

54.    Defendant violated Government Code § 12945.2(l) by failing to reinstate Plaintiff to the same or a comparable job upon completion of the leave.

55.    Defendant violated Government Code § 12945.2(l) by terminating Plaintiff following his return from medical leave.

56.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses.

57.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

58.    Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

**SEVENTH CAUSE OF ACTION**

**(Interference with FMLA Rights:  Violation of 29 U.S.C. § 2615(a)(1))**

59.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

60.     Defendant was subject to the FMLA because it employed at least 50 part-time or full-time employees.  Defendant employed at least 50 employees within 75 miles of San Francisco during the relevant time period.

61.     Plaintiff was entitled to the benefits of FMLA because he worked more than twelve months for Defendant and had at least 1250 hours of service in the year preceding his FMLA leave.

62.     The FMLA requires an employer to grant leave to an employee to care for the employee's own serious health condition.  Defendant violated 29 U.S.C. § 2615(a)(1) by terminating Plaintiff following his return from medical leave.  Plaintiff's taking of FMLA-protected leave constituted a negative factor in the decision to terminate him.

63.     As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered substantial losses in earnings and other employment benefits, and has incurred other economic losses.

64.     Plaintiff is entitled to liquidated damages pursuant to 29 U.S. Code § 2617(a)(1)(A).

**EIGHTH CAUSE OF ACTION**

**(Breach of Contract)**

65.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

66.     On or around September 30, 2017, Plaintiff and Defendant entered into a written stock incentive plan, whereby Plaintiff was awarded 220,000 shares in Defendant vesting over a four-year period.  Shortly thereafter, the Parties signed a 2-year term supplemental employment agreement in order to ensure Plaintiff's continued employment at Defendant.  The supplemental employment agreement lasted until August 2019, unless Mr. Yu was terminated "for cause."

67. Plaintiff completed all conditions necessary to satisfy his obligations under his operative employment agreement by continuing to work for Defendant until he was terminated without cause.

68. The first and second tranches of options under the incentive plan were set to vest on August 30, 2017 and 2018, respectively, though ByteDance never vested these shares. Defendant breached the contract by failing to award Plaintiff the options owed to him under the incentive plan.

69. Accordingly, Plaintiff is entitled to the compensation owed under the incentive plan, including the shares already vested at the time of his termination.

## NINTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

70. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

71. Plaintiff's employment agreement and stock incentive plan contained an implied-in-law covenant of good faith and fair dealing that neither party would do anything to injure the right of the other party to enjoy the actual benefits of those contracts.

72. Plaintiff performed all of the duties and obligations required of him by Defendant during his employment, including those duties and obligations that would entitle Plaintiff to receive the compensation described in the employment agreement and stock incentive plan.

73. Defendant breached the implied covenant when it took actions to prevent Plaintiff from earning their full compensation owed under these agreements.

74. Defendant's termination of Plaintiff was done in bad faith.

75. As a result of Defendant's bad faith and unfair dealing in performing the terms of the employment agreement and stock incentive plan, Defendant is liable for breaching the covenant of good faith and fair dealing inherent in those agreements.

76. Accordingly, Plaintiff is entitled to the compensation owed under the employment agreement and stock incentive plan, included continued stock option vesting for the term of the

1  agreements, and the compensation he lost because Defendant unlawfully terminated these
2  contracts.

3  **TENTH CAUSE OF ACTION**

4  **(Wrongful Termination In Violation Of Public Policy)**

5  77.    Plaintiff re-alleges and incorporates herein by reference each and every allegation
6  of the preceding paragraphs as though fully set forth herein, and alleges as follows:

7  78.    Plaintiff's employment was terminated by Defendant in violation of fundamental
8  public policies of the State of California, including without limitation, the right to refrain from
9  participating in unlawful conduct (or conduct reasonably believed to be unlawful).

10  79.    The conduct detailed herein was wrongful and in violation of fundamental public
11  policies of the State of California as reflected in laws that include, without limitation, the
12  California Labor Code, state and federal copyright laws, California Business & Professions Code
13  § 17200, and the California Penal Code.

14  80.    Defendant's actions were willful and malicious and were committed with the
15  wrongful intent to injure Plaintiff and in reckless disregard of Plaintiff's rights.

16  81.    As a proximate result of Defendant's actions, Plaintiff has suffered and will
17  continue to suffer damages that include his unvested stock options, loss of salary, bonuses, and
18  other losses along with attorney's fees and litigation costs.

19  **ELEVENTH CAUSE OF ACTION**

20  **(Unfair Business Practices – Business & Professions Code Section 17200)**

21  82.    Plaintiff re-alleges and incorporates herein by reference each and every allegation
22  of the preceding paragraphs as though fully set forth herein, and alleges as follows:

23  83.    California Business & Professions Code § 17200 prohibits any unlawful, unfair *or*
24  fraudulent business practices.  By promising Plaintiff valuable equity and then firing him for an
25  unlawful reason and taking back his unvested options, Defendant has engaged in unlawful,
26  unfair, and fraudulent business practices.  Plaintiff is entitled to restitution of the ByteDance
27  stock options that rightfully belong to him but which Defendant has deprived him of possessing.

28

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Yu prays for judgment against ByteDance as follows:

1.      For compensatory damages, including but not limited to, lost back pay (including, but not limited to, salary and bonus wages), equity, and fringe benefits and future lost earnings, equity, and fringe benefits, emotional distress, and legal interest, according to proof as allowed by law;

2.      Liquidated damages as allowed by law;

3.      For injunctive relief, including reinstatement and a prohibition on further discrimination or retaliation;

4.      For punitive damages as allowed by law;

5.      For an award to Plaintiff of costs of suit incurred herein and reasonable attorney's fees;

6.      For prejudgment interest and post-judgment interest as allowed by law;

7.      For an injunction to prevent future violations of Government Code § 12940; and,

8.      For an award of such other and further relief as the Court deems just and proper.

DATED:  November 17, 2022                    Respectfully submitted,


By: *Yintao Yu*
Yintao Yu (Nov 17, 2022 14:55 PST)
YINTAO YU
*Plaintiff in Pro Per*

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of each and every cause of action so triable.

DATED:  November 17, 2022                    Respectfully submitted,


By:  *Yintao Yu*
     Yintao Yu (Nov 17, 2022 14:55 PST)

     YINTAO YU
     *Plaintiff in Pro Per*

# EXHIBIT 2

1   CHARLES H. JUNG (217909)
    (charles@njfirm.com)
2   ANDREW R. KISLIK (118772)
    (andy@njfirm.com)
3   NASSIRI & JUNG LLP
    1700 Montgomery Street, Suite 207
4   San Francisco, California 94111
    Telephone: (415) 762-3100
5   Facsimile: (415) 534-3200

6   Attorneys for Plaintiff
    YINTAO YU

7

ELECTRONICALLY
**FILED**
*Superior Court of California,*
*County of San Francisco*

**05/01/2023**
**Clerk of the Court**
BY: JEFFREY FLORES
**Deputy Clerk**

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9           **FOR THE CITY AND COUNTY OF SAN FRANCISCO**

10                                                          **CGC-23-606246**

| | |
|---|---|
| YINTAO YU, an individual, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BYTEDANCE, INC., a Delaware Corporation; SHUYI (SELENE) GAO, an individual; and DOES 1 through 20, inclusive, | |
| Defendants. | |

1    YINTAO YU complains and alleges as follows:

2                           **I.    NATURE OF THE CASE**

3        1.     This case arises out of Plaintiff Yintao "Roger" Yu's termination of employment

4    from Defendant BYTEDANCE, INC., after he had engaged in legally-protected whistleblowing

5    activity, opposed disability discrimination, and shortly after his return from protected medical

6    leave.

7                           **II.    PARTIES**

8        2.     Plaintiff Yu was an employee of Defendant ByteDance, Inc. from approximately

9    August 2017 until his termination in November 2018.  He is a resident of California.

10        3.     Upon information and belief, Defendant ByteDance, Inc. is a Delaware

11    corporation, whose principal place of business is San Francisco County, California.  The majority

12    of the Company's executive and administrative functions are performed in California.

13        4.     Defendant Shuyi (Selene) Gao was the head of Human Resources for ByteDance,

14    Inc.  Gao lives in and is a citizen of California.

15        5.     The true names and capacities of Defendants named herein as Does 1 through 20,

16    whether individual, corporate, associate or otherwise, and the true involvement of Defendants

17    sued herein as Does 1 through 20, are unknown to Plaintiff who therefore sues said Defendants by

18    such fictitious names.  Plaintiff will amend this Complaint to show the true names, capacities, and

19    involvement of Does 1 through 20 when ascertained.  Plaintiff is informed and believes and

20    thereon alleges that each of the Defendants designated as a "Doe" is responsible in some manner

21    for the events and happenings referred to herein, and that Plaintiff's injuries and damages as

22    hereinafter set forth were proximately caused by said Defendants.

23        6.     Plaintiff is informed and believes and thereon alleges that each of the Defendants

24    sued herein is or was the agent, employee, partner and/or representative of one or more of the

25    remaining Defendants, and each of them was at all times acting within the purpose and scope of

26    such agency and employment.  Plaintiff is further informed and believes that each of the

27    Defendants herein gave consent to, ratified and authorized the acts alleged herein to each of the

28    remaining Defendants.

### III.    JURISDICTION AND VENUE

7.      Venue is proper in this judicial district pursuant to Cal. Civ. Proc. Code § 395(a) and Cal. Gov't Code § 12965.  Defendant ByteDance, Inc. is registered for business tax certificate with the Office of the Treasurer and Tax Collector, City and County of San Francisco.  Defendant ByteDance, Inc. resides in and transacts business in the County of San Francisco, and is within the jurisdiction of this Court for the purposes of service of process.

### IV.    FACTS COMMON TO ALL CAUSES OF ACTION

8.      Plaintiff Yu was hired by Defendant ByteDance, Inc. ("ByteDance" or "Defendant") on or around June 7, 2017, and began working in August 2017.  In addition to his base salary and the option to purchase 220,000 shares of ByteDance stock, Mr. Yu's employment agreement also entitled him to $600,000, to be "paid within 30 days since the offer was signed," for the IP from his company Tank Exchange.

9.      Within the first 30 days of receiving the offer letter, Mr. Yu spoke with ByteDance's hiring manager and in-house counsel.  They told Mr. Yu that ByteDance had concerns about paying him the $600,000 purchase price for Tank Exchange's intellectual property without assurances that he would remain with ByteDance for the long term.  ByteDance's representatives encouraged him to sign a multi-year term employment agreement to ensure his continued employment at ByteDance.  Ultimately, the parties agreed upon a 2-year term agreement that was binding on both parties and which superseded the "at will" provision contained in his earlier agreement.  On a visit to Beijing, Mr. Yu signed the employment contract.  ByteDance's representatives told him that he would receive a copy of this agreement, but it was never shared with him.  Under the terms of the supplemental employment agreement, the employment relationship was set to last until August 2019, unless Mr. Yu was terminated "for cause."

10.     Shortly after beginning his employment, Mr. Yu became aware that ByteDance had for years engaged in a worldwide scheme to steal and profit from the copyrighted works of others.  The effort involved the use of software to strip intellectual property from competitor's websites — chiefly, Instagram and Snapchat — and populate its own video services with these

2

1  videos in an effort to make its own services appear more popular to end users. These actions

2  were taken without the permission of the content creators and represented an unlawful effort to

3  gain an edge against entrenched online video hosting websites.

4       11.    Upon learning of this program, Mr. Yu was troubled by ByteDance's efforts to

5  skirt legal and ethical lines, not to mention the tremendous liability that intellectual property theft

6  of this magnitude could create for the company. It was his understanding that taking material

7  from competitors' websites without the creator's permission violated the law. Mr. Yu raised

8  these concerns with Wenjia Zhu, formerly Senior VP of Engineering and current CEO of Toutiao,

9  numerous times, as early as October 2017 and again in February and March 2018. Mr. Zhu

10  reports directly to ByteDance's CEO Yiming Zhang. When informed of Mr. Yu's concerns with

11  the program, Mr. Zhu was dismissive of them, and the intellectual property infringement

12  continued unabated.

13       12.    In addition, on or around December 2017, Mr. Yu learned of efforts to terminate a

14  U.S. based employee, Witness A, who suffered from depression. Witness A, who had

15  demonstrably strong performance, had recently requested time off to address her medical

16  condition. Although Witness A's direct manager, Peiyu "Peggie" Li, was satisfied with her

17  performance and had recently given Witness A a score of "Meets Expectation" on her latest

18  performance review, her skip level manager, Ying Zhi, was not as accommodating. Without Ms.

19  Li's knowledge, Ms. Zhi had Witness A's performance score lowered to "Improvement Needed,"

20  and had informed HR to fire Witness A upon the formal release of the ratings. Upon learning of

21  this change, Mr. Yu confronted Ms. Zhi, who admitted that she had made the change because she

22  did not like Witness A taking time off work to address her depression and that she viewed her as a

23  "burden" she "wanted to get rid of." Ms. Zhi told him that due to Witness A's medical condition,

24  her "cost of management was too high." It is Mr. Yu's understanding that terminating Witness A

25  if she received a rating of "meets expectations" or above would violate ByteDance policy, which

26  is why Ms. Zhi had intervened to lower her score. Mr. Yu was shocked by Ms. Zhi's admission

27  and requested that she reconsider. However, Ms. Zhi responded that she "won't even consider

28  keeping [Witness A]. Her cost of management is way too high." Following this conversation,

1    Mr. Yu complained to Wei "Ronnie" Hua, ByteDance's Head of HR, about the legality of Ms.

2    Zhi's actions. On information and belief Defendant Shuyi (Selene) Gao jointly developed the

3    strategy to mask the illegal motivation for terminating Witness A's employment.

4        13.    Ultimately, following Mr. Yu's reporting of the incident to HR, the company

5    decided not to terminate Witness A. However, Ms. Zhi's manager, Nan Zhang, was unhappy

6    with Mr. Yu's decision to intercede on Witness A's behalf, particularly given the fact he did not

7    even work in her department. Mr. Yu was later informed that several of Ms. Zhang's direct

8    reports viewed his actions as a challenge to Ms. Zhang's leadership and authority. Ms. Zhang

9    later became the general manager of ByteDance's entire video - "IES" division — the department

10   in which Mr. Yu worked — and was in a position to retaliate against Mr. Yu for his actions.

11       14.    On or around March 2018, in consultation with his doctor, Mr. Yu was required to

12   take his own medical leave for approximately seven months. On July 18, 2018, Mr. Yu mailed

13   three letters to various supervisors at ByteDance notifying them that, upon consultation with his

14   doctor, he expected to be able to return to work on September 11, 2018. ByteDance claims to

15   have mailed Mr. Yu a notice of termination on July 26, 2018, purportedly due to a reduction in

16   force. ByteDance also claims that on July 27, ByteDance e-mailed Mr. Yu a copy of the

17   termination notice. Mr. Yu never received any of these notices and ByteDance never called him

18   to notify him of his termination, even though the company acknowledges receiving his requests to

19   return to work.[1]

20       15.    In October 2018, Mr. Yu was finally cleared to return to work by his doctor.

21   However, upon returning to the office for the first time, he was told he did not "need to come to

22

23

24

25   [1] Mr. Yu never received either the written or electronic versions of these notices because the
     company sent them to old home addresses. The termination letter was sent to Mr. Yu's former
26   address in Seattle, even though his paystubs listed his current address in Palo Alto. Similarly,
     instead of using his current e-mail address, the company sent the termination notice to old e-mail
27   accounts he no longer used. There is no record of the company attempting to call Mr. Yu to
     notify him of his termination.
28

1  work now" and that the company "will contact you later."  Mr. Yu remained on ByteDance

2  payroll through November 2018 and the first tranche of equity under his stock option award from

3  the company should have vested on August 30, 2017, though ByteDance never vested these

4  shares.  In November 2018, Mr. Yu was terminated.

5                                **V.    PROCEDURAL HISTORY**

6      16.    On July 25, 2019, Plaintiff filed a complaint of discrimination with California's

7  Department of Fair Employment and Housing (DFEH), pursuant to the California Fair

8  Employment and Housing Act ("FEHA"), Cal. Gov't Code §12900 *et seq.*

9      17.    Pursuant to the Emergency Rules Related to COVID-19, Emergency Rule 9(a), the

10  statute of limitations on Plaintiff's claims was tolled an additional 178 days, until January 19,

11  2021.

12      18.    The Parties have entered into a series of Tolling Agreements, whereby the statute

13  of limitations for Plaintiff's claims was tolled through and including November 17, 2022.

14                                **VI.    CLAIMS**

15                        **FIRST CAUSE OF ACTION**
                  **(Retaliation in Violation of Labor Code § 1102.5)**
16                        **(Against All Defendants)**

17      19.    Plaintiff re-alleges and incorporates herein by reference each and every allegation

18  of the preceding paragraphs as though fully set forth herein, and alleges as follows:

19      20.    At all times relevant to this Complaint, Defendants have been subject to the

20  requirements of Cal. Lab. Code § 1102.5, which applied to Plaintiff as an employee of

21  Defendants.

22      21.    Defendants violated Cal. Lab. Code § 1102.5 by abruptly terminating Plaintiff's

23  employment in retaliation for his reporting and refusals to participate in activity that violated

24  laws, rules, and regulations against intellectual property misappropriation, anti-discrimination,

25  anti-retaliation, among others.

26      22.    In addition, at all times herein mentioned, FEHA, Cal. Gov't Code § 12940 *et seq.*,

27  was in full force and effect and was fully binding upon Defendant.  Cal. Gov't Code § 12940(a)

28  prohibits an employer from discharging or discriminating against an employee because of a

disability or because they are regarded as having a disability. Defendant violated Section 1102.5 by abruptly terminating Plaintiff's employment due to his taking medical leave and for reporting and objecting to Defendant's discrimination against Witness A on the basis of her medical condition. Further, Defendant retaliated against Plaintiff for disclosing information that he had reasonable cause to believe constituted a violation of California's FEHA to a person with authority over him, or another employee who had the authority to investigate, discover, or correct the violation or noncompliance.

23.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses, along with attorney's fees and litigation costs.

24.    As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

25.    Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

**SECOND CAUSE OF ACTION**
**(Disability Discrimination: Violation of Cal. Gov't Code § 12940(a))**
**(Against All Defendants)**

26.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

27.    At all times herein mentioned, California's Fair Employment and Housing Act, Cal. Gov't Code § 12900, *et seq.*, was in full force and effect and was fully binding upon Defendants. Cal. Gov't Code § 12940(a) prohibits an employer from discharging an employee because of a physical or mental disability or because he is regarded as having a physical or mental disability.

28.     Plaintiff was a qualified individual with a disability, able to perform the essential job duties of his position, with reasonable accommodation. ByteDance's termination of Plaintiff's employment because of his taking medical leave and need for treatment, violated Cal. Gov't Code § 12940(a).

29.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits, and has incurred other economic losses.

30.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

31.     Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## THIRD CAUSE OF ACTION

**(Failure to Prevent Discrimination:  Violation of Cal. Gov't Code § 12940(k))**
**(Against All Defendants)**

32.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

33.     At all times herein mentioned, FEHA, Gov. Code, § 12940, *et seq.*, was in full force and effect and fully binding upon Defendants.  Plaintiff was a member of a group protected by that statute in that he was an employee with a known medical condition and/or physical disability who made a request for a reasonable accommodation to treat his medical condition and/or disability.

34.     Defendants violated Cal. Gov't Code § 12940(k) because Defendants failed to take all reasonable steps necessary to prevent discrimination from occurring.  Among other things,

1     Defendants failed to train and adequately supervise its employees in order to ensure that these

2     employees were not violating FEHA in their treatment of other employees.

3          35.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions,

4     Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment

5     benefits, and has incurred other economic losses.

6          36.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions,

7     Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to

8     Plaintiff's damage in an amount to be proven at the time of trial.

9          37.     Defendants committed the acts herein despicably, maliciously, fraudulently, and

10     oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive

11     amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others.

12     Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to

13     proof.

14 **FOURTH CAUSE OF ACTION**

**(Retaliation in Violation of Cal. Gov't Code § 12940(h))**
15 **(Against All Defendants)**

16

17          38.     Plaintiff re-alleges and incorporates herein by reference each and every allegation

of the preceding paragraphs as though fully set forth herein, and alleges as follows:
18

19          39.     Cal. Gov't Code§ 12940(h) makes it an unlawful employment practice for an

employer to discriminate against any person because the person has opposed any practices
20

21 forbidden under the FEHA, including discrimination on the basis of a disability.

22          40.     Plaintiff opposed and protested ByteDance's and Gao's discrimination against

Witness A and attempts to eliminate her position.  He made these complaints to HR and Witness
23

24 A's managers.

25          41.     In response to his complaints, ByteDance and Gao terminated his employment.

26          42.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions,

27 Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment

benefits, and has incurred other economic losses.
28

43.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

44.     Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## FIFTH CAUSE OF ACTION

### (Interference with CFRA Rights: Violation of Cal. Gov't Code § 12945.2(t))
### (Against All Defendants)

45.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

46.     Defendant was subject to the provisions of Cal. Gov't Code § 12945.2(t), the CFRA, because Defendant ByteDance, Inc. employed at least 50 part-time or full-time employees.  Plaintiff was entitled to the benefits of the CFRA because he worked more than twelve months for Defendant and had at least 1250 hours of service in the year preceding his CFRA leave.  Defendant employed at least 50 employees within 75 miles of San Francisco during the relevant time period.

47.     The CFRA requires an employer to grant leave to an employee to care for the employee's own serious health condition.  The CFRA also requires the employer to reinstate the employee to the same or a comparable job upon completion of the leave.

48.     Defendants violated Cal. Gov't Code § 12945.2(t) by failing to reinstate the employee to the same or a comparable job upon completion of the leave.

49.     Defendants further violated Section 12945.2(t) by terminating Plaintiff following his return from medical leave.

50. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses.

51. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

52. Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## SIXTH CAUSE OF ACTION

### (Retaliation in violation of the CFRA:  Violation of Cal. Gov't Code § 12945.2(l)) (Against All Defendants)

53. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

54. The CFRA requires employers to grant leave to employees to care for the employee's own serious health condition.  The CFRA also requires the employer to reinstate the employee to the same or a comparable job upon completion of the leave.

55. Defendants violated Cal. Gov't Code § 12945.2(l) by failing to reinstate Plaintiff to the same or a comparable job upon completion of the leave.

56. Defendants violated Cal. Gov't Code § 12945.2(l) by terminating Plaintiff following his return from medical leave.

57. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses.

58.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

59.     Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## SEVENTH CAUSE OF ACTION

**(Breach of Contract)**
**(Against Defendant ByteDance, Inc.)**

60.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

61.     On or around September 30, 2017, Plaintiff and Defendant ByteDance, Inc. entered into a written stock incentive plan, whereby Plaintiff was awarded 220,000 shares in Defendant vesting over a four-year period.  Shortly thereafter, the Parties signed a two-year term supplemental employment agreement in order to ensure Plaintiff's continued employment at Defendant.  The supplemental employment agreement lasted until August 2019, unless Mr. Yu was terminated "for cause."

62.     Plaintiff completed all conditions necessary to satisfy his obligations under his operative employment agreement by continuing to work for Defendant until he was terminated without cause.

63.     The first and second tranches of options under the incentive plan were set to vest on August 30, 2017 and 2018, respectively, though ByteDance never vested these shares. Defendant breached the contract by failing to award Plaintiff the options owed to him under the incentive plan.

64.     Accordingly, Plaintiff is entitled to the compensation owed under the incentive plan, including the shares already vested at the time of his termination.

## EIGHTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)
### (Against Defendant ByteDance, Inc.)

65.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

66.     Plaintiff's employment agreement and stock incentive plan contained an implied-in-law covenant of good faith and fair dealing that neither party would do anything to injure the right of the other party to enjoy the actual benefits of those contracts.

67.     Plaintiff performed all of the duties and obligations required of him by Defendant during his employment, including those duties and obligations that would entitle Plaintiff to receive the compensation described in the employment agreement and stock incentive plan.

68.     Defendant breached the implied covenant when it took actions to prevent Plaintiff from earning their full compensation owed under these agreements.

69.     Defendant's termination of Plaintiff was done in bad faith.

70.     As a result of Defendant's bad faith and unfair dealing in performing the terms of the employment agreement and stock incentive plan, Defendant is liable for breaching the covenant of good faith and fair dealing inherent in those agreements.

71.     Accordingly, Plaintiff is entitled to the compensation owed under the employment agreement and stock incentive plan, included continued stock option vesting for the term of the agreements, and the compensation he lost because Defendant unlawfully terminated these contracts.

## NINTH CAUSE OF ACTION

### (Wrongful Termination in Violation of Public Policy)
### (Against All Defendants)

72.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

73.    Plaintiff's employment was terminated by Defendant in violation of fundamental public policies of the State of California, including without limitation, the right to refrain from participating in unlawful conduct (or conduct reasonably believed to be unlawful).

74.    The conduct detailed herein was wrongful and in violation of fundamental public policies of the State of California as reflected in laws that include, without limitation, the California Labor Code and California Business & Professions Code § 17200, and the California Penal Code.

75.    Defendants' actions were willful and malicious and were committed with the wrongful intent to injure Plaintiff and in reckless disregard of Plaintiff's rights.

76.    As a proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer damages that include his unvested stock options, loss of salary, bonuses, and other losses along with attorney's fees and litigation costs.

## TENTH CAUSE OF ACTION

### (Unfair Business Practices – Cal. Bus. & Prof. Code §17200)
### (Against All Defendants)

77.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

78.    Cal. Bus. & Prof. Code § 17200 prohibits any unlawful, unfair *or* fraudulent business practices.  By promising Plaintiff valuable equity and then firing him for an unlawful reason and taking back his unvested options, Defendants engaged in unlawful, unfair, and fraudulent business practices.  Plaintiff is entitled to restitution of the ByteDance stock options that rightfully belong to him, but which Defendants deprived him of possessing.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Yu prays for judgment against Defendants as follows:

1.    For compensatory damages, including but not limited to, lost back pay (including, but not limited to, salary and bonus wages), equity, and fringe benefits and future lost earnings, equity, and fringe benefits, emotional distress, and legal interest, according to proof as allowed by law;

13

2.  Liquidated damages as allowed by law;

3.  For injunctive relief, including reinstatement and a prohibition on further discrimination or retaliation;

4.  For punitive damages as allowed by law;

5.  For an award to Plaintiff of costs of suit incurred herein and reasonable attorney's fees;

6.  For prejudgment interest and post-judgment interest as allowed by law;

7.  For an injunction to prevent future violations of Cal. Gov't Code § 12940; and,

8.  For an award of such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action so triable.

DATED: May 1, 2023

Respectfully submitted,
NASSIRI & JUNG LLP

By:_____

Charles H. Jung
Attorneys for Plaintiff
YINTAO YU

14
COMPLAINT
CASE NO.

# EXHIBIT 3

CHARLES H. JUNG (217909)
(charles@njfirm.com)
ANDREW R. KISLIK (118772)
(andy@njfirm.com)
JAIME DORENBAUM (289555)
(jaime@njfirm.com)
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, California 94111
Telephone:  (415) 762-3100
Facsimile:   (415) 534-3200

Attorneys for Plaintiff
YINTAO YU

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**05/12/2023**
**Clerk of the Court**
BY: BOWMAN LIU
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| YINTAO YU, an individual,<br><br>            Plaintiff,<br><br>      v.<br><br>BYTEDANCE, INC., a Delaware Corporation; SHUYI (SELENE) GAO, an individual; and DOES 1 through 20, inclusive,<br><br>            Defendants. | Case No. CGC-23-606246<br><br>**FIRST AMENDED COMPLAINT FOR PUBLIC INJUNCTION & RETALIATION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff YINTAO YU, hereby complains and submits the allegations below against Defendants BYTEDANCE, INC., SHUYI GAO, and DOES 1 THROUGH 20. Plaintiff seeks a public injunction in accordance with the *McGill* Rule (*McGill v. Citibank, N.A.,* 2 Cal. 5th 945 (2017)).  Mr. Yu also seeks damages, restitution and injunctive relief.  Mr. Yu will donate a substantial portion of any monetary proceeds to causes that vindicate Asian American civil rights.

## I.    NATURE OF THE CASE

1.    This case arises out of Plaintiff Yintao "Roger" Yu's employment with Defendant BYTEDANCE, INC., his observation and reporting of illegal conduct, and consequent retaliatory termination.

## II.   PARTIES

2.    Plaintiff Yintao "Roger" Yu was the head of engineering of the U.S. offices of Defendant ByteDance, Inc. from approximately August 2017 until his termination in November 2018.  Bytedance gives employees numerical rankings to signify their seniority. As head of engineering, Mr. Yu was given the level "4-2," with fewer than 20 employees in the entire company having a higher designation.  ByteDance employs well over 100,000 individuals today. Mr. Yu is a resident of California.

3.    Upon information and belief, Defendant ByteDance, Inc. is a Delaware corporation, whose principal place of business is San Francisco County, California.  The majority of the Company's executive and administrative functions are performed in California.

4.    Defendant Shuyi (Selene) Gao was the head of Human Resources for ByteDance, Inc.  Gao lives in and is a citizen of California.

5.    The true names and capacities of Defendants named herein as Does 1 through 20, whether individual, corporate, associate or otherwise, and the true involvement of Defendants sued herein as Does 1 through 20, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show the true names, capacities, and involvement of Does 1 through 20 when ascertained.  Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a "Doe" is responsible in some manner

FIRST AMENDED COMPLAINT
CASE NO. CGC-23-606246

1   for the events and happenings referred to herein, and that Plaintiff's injuries and damages as

2   hereinafter set forth were proximately caused by said Defendants.

3          6.      Plaintiff is informed and believes and thereon alleges that each of the Defendants

4   sued herein is or was the agent, employee, partner and/or representative of one or more of the

5   remaining Defendants, and each of them was at all times acting within the purpose and scope of

6   such agency and employment.  Plaintiff is further informed and believes that each of the

7   Defendants herein gave consent to, ratified and authorized the acts alleged herein to each of the

8   remaining Defendants.

9   **III.    JURISDICTION AND VENUE**

10         7.      Venue is proper in this judicial district pursuant to Cal. Civ. Proc. Code § 395(a)

11  and Cal. Gov't Code § 12965.  Defendant ByteDance, Inc. is registered for business tax certificate

12  with the Office of the Treasurer and Tax Collector, City and County of San Francisco.  Defendant

13  ByteDance, Inc. resides in and transacts business in the County of San Francisco, and is within

14  the jurisdiction of this Court for the purposes of service of process.

15  **IV.    FACTS COMMON TO ALL CAUSES OF ACTION**

16         **A.    Mr. Yu Is Hired by Defendant ByteDance.**

17         8.      Plaintiff Yu was hired by Defendant ByteDance, Inc. ("ByteDance" or

18  "Defendant") on or around June 7, 2017, and began working in August 2017.  In addition to his

19  base salary and the option to purchase 220,000 shares of ByteDance stock, Mr. Yu's employment

20  agreement also entitled him to $600,000, to be "paid within 30 days since the offer was signed,"

21  for the IP from his company Tank Exchange.

22         9.      Within the first 30 days of receiving the offer letter, Mr. Yu spoke with

23  ByteDance's hiring manager and in-house counsel.  They told Mr. Yu that ByteDance had

24  concerns about paying him the $600,000 purchase price for Tank Exchange's intellectual property

25  without assurances that he would remain with ByteDance for the long term.  ByteDance's

26  representatives encouraged him to sign a multi-year term employment agreement to ensure his

27  continued employment at ByteDance.  Ultimately, the parties agreed upon a 2-year term

28  agreement that was binding on both parties and which superseded the "at will" provision

FIRST AMENDED COMPLAINT
CASE NO. CGC-23-606246

contained in his earlier agreement.  On a visit to Beijing, Mr. Yu signed the employment contract. ByteDance's representatives told him that he would receive a copy of this agreement, but it was never shared with him.  Under the terms of the supplemental employment agreement, the employment relationship was set to last until August 2019, unless Mr. Yu was terminated "for cause."

**B.      Mr. Yu Discovers Defendant ByteDance's Practice of Scraping User Content From Its Competitors for Its Own Profit.**

10.      Shortly after beginning his employment, Mr. Yu became aware that ByteDance had for years engaged in a worldwide scheme (including in California) to steal and profit from the content of others.  The effort involved the use of software purposely unleashed to systematically strip user content from competitor's websites — chiefly, Instagram and Snapchat — and populate its own video services with these videos in an effort to make its own services appear more popular to end users.  These actions were taken without the permission of the content creators and represented an unlawful effort to gain an edge against entrenched online video hosting websites.

11.      Specifically, ByteDance developed software that would scrape content posted by end users on competitors' websites without permission, and upon information and belief, in violation of the competitors' terms of use. ByteDance would then post the misappropriated content on its own websites via fake social media accounts to attract greater engagement with those accounts, and by extension, ByteDance's websites.

12.      The content ByteDance scraped from its competitors had been posted by users of those competitors' websites. ByteDance's software used to scrape the users' content did not ask the users for their permission.

**C.      Mr. Yu Reports His Concerns About ByteDance's Unlawful Activity to His Manager.**

13.      Upon learning of this program, Mr. Yu was troubled by ByteDance's efforts to skirt legal and ethical lines, not to mention the tremendous liability that content scraping of this magnitude could create for the company.  It was his understanding that taking material from competitors' websites without the creator's permission violated the law.  Mr. Yu raised these

concerns with Wenjia Zhu, formerly Senior VP of Engineering and current Global TikTok R&D Chief at ByteDance, numerous times, as early as October 2017 and again in February and March 2018. Mr. Zhu is and was in charge of the TikTok algorithm. Mr. Zhu reported directly to ByteDance's CEO Yiming Zhang. When informed of Mr. Yu's concerns with the program, Mr. Zhu was dismissive of them, remarking that it was not a big deal.

14.     At the same time, however, Mr. Zhu asked Mr. Yu to hide the illegal program, especially to ByteDance employees in the United States, because, according to Mr. Zhu, the United States has stricter intellectual property laws and has class actions. Thus, it seemed to Mr. Yu from Mr. Zhu's responses that, while Mr. Zhu felt comfortable proceeding with the scheme, he also believed it was illegal in the United States.

15.     After Mr. Yu reported his concerns to Mr. Zhu, the scraping activity continued unabated. Worried that his concerns had not been addressed, Mr. Yu told U.S.-based colleagues that he had reported the illegal activities to the higher executive team, but that nothing had changed to that point.

16.     Mr. Yu learned that this program was vital to ByteDance's ceaseless efforts to attract users to its social media platforms. By scraping the content from its competitor's sites, ByteDance sought to lure participation away from competitors towards its websites. Such participation can raise numerous real world risks, which have played out in the context of ByteDance.

17.     For example, with increased participation, ByteDance has served as a useful propaganda tool for the Chinese Communist Party ("CCP"). In one instance, Mr. Yu observed that ByteDance promoted content that expressed hatred for Japan. In another instance, Mr. Yu observed that ByteDance demoted content that expressed support for the protests in Hong Kong ("Umbrella Revolution"), while it promoted content that expressed criticisms of the protests in Hong Kong. Such nationalistic content served to both increase engagement on ByteDance's websites and to promote support of the CCP. More generally, Mr. Yu observed that ByteDance has been responsive to the CCP's requests to share information, and even to elevate or remove content at the request of the CCP.

FIRST AMENDED COMPLAINT
CASE NO. CGC-23-606246

18.     ByteDance is similarly positioned to exploit nationalistic sentiments in other countries like the United States as well, since it collects data from its users in those countries – data which Mr. Yu observed it makes accessible to the CCP via a backdoor channel.

19.     Mr. Yu saw the backdoor channel in the code, which allows certain high level persons to access user data, no matter where the data is located, even if hosted by a U.S. company with servers located in the U.S. Chinese law requires the company to grant access to user data to the Chinese government. The company was aware that if the Chinese government's backdoor was removed from the international/U.S. version of the app, the Chinese government would, it feared, ban the company's valuable Chinese-version apps.  While the international/U.S. version of TikTok may be the most valuable in the company, the Chinese version of TikTok ("Douyin") and other apps exclusively for China also are valuable.  The company is vulnerable to the threat to shut down all the Chinese apps for failure to comply with the CCP's directives.

20.     At some point after expressing his concerns to U.S.-based employees regarding the scraping program, Mr. Yu noticed that ByteDance had modified the illegal content scraping program.  At a minimum it continued to scrape content from U.S-based users, including California based users, when they are abroad. Mr. Yu observed that the individual who modified the program's application to U.S. accounts was a software engineer in China under the report chain of Mr. Zhu.

**D.     Mr. Yu Discovered ByteDance Uses Bots to Artificially Inflate Its User Engagement Metrics That Would Violate the Law.**

21.     At or around the same time he discovered ByteDance's program to systematically scrape content from its competitors' websites, Mr. Yu learned that ByteDance also systematically created fabricated users to exaggerate its metrics, including its key engagement metrics. Potential investors considering investing in social media platforms heavily rely on such key metrics when making investment decisions.

22.     ByteDance programmed the fabricated users to "like" and "follow" real user accounts. The fake "likes", "follows" and similar fabrications would trigger push notifications to real users that would entice the users back to ByteDance's applications, thereby boosting many

5

1    engagement metrics including user retention rate, which is one of the key metrics relied on by

2    potential investors.

3        23.    Mr. Yu observed that the fabricated user accounts had a substantial impact on

4    retaining real world users. Thus, the program served ByteDance's commercial interests, while at

5    the same time serving to provide the CCP, through its backdoor and influence at ByteDance, with

6    a larger and more engaged audience for propaganda.

7        **E.    Mr. Yu Reports to His Manager ByteDance's Fraudulent Scheme to Inflate
       Its Key Engagement Metrics.**

8

9        24.    Mr. Yu reported and raised concerns regarding ByteDance's use of fabricated

10   users to Mr. Zhu numerous times from October 2017 and into 2018. Mr. Yu expressed concerns

11   regarding the legal consequences of relying on such practices to inflate data that would be passed

12   on to potential investors and lenders. Specifically, Mr. Yu was concerned that providing the false

13   data to investors and lenders would implicate the company with fraudulent conduct. While Mr.

14   Zhu acknowledged the practice of creating fabricated users, he simply noted that the practice was

15   helpful to boosting ByteDance's engagement metrics. The practice of fabricating users continued.

16       **F.    ByteDance Discriminates Against Employees on Necessary Medical Leave.**

17       25.    In addition, on or around December 2017, Mr. Yu learned of efforts to terminate a

18   U.S. based employee, Witness A, who suffered from depression.  Witness A, who had

19   demonstrably strong performance, had recently requested time off to address her medical

20   condition.  Although Witness A's direct manager, Peiyu "Peggie" Li, was satisfied with her

21   performance and had recently given Witness A a score of "Meets Expectation" on her latest

22   performance review, her skip level manager, Ying Zhi, was not as accommodating.  Without Ms.

23   Li's knowledge, Ms. Zhi had Witness A's performance score lowered to "Improvement Needed,"

24   and had informed HR to fire Witness A upon the formal release of the ratings.  Upon learning of

25   this change, Mr. Yu confronted Ms. Zhi, who admitted that she had made the change because she

26   did not like Witness A taking time off work to address her depression and that she viewed her as a

27   "burden" she "wanted to get rid of."  Ms. Zhi told him that due to Witness A's medical condition,

28   her "cost of management was too high."  It is Mr. Yu's understanding that terminating Witness A

if she received a rating of "meets expectations" or above would violate ByteDance policy, which is why Ms. Zhi had intervened to lower her score.  Mr. Yu was shocked by Ms. Zhi's admission and requested that she reconsider.  However, Ms. Zhi responded that she "won't even consider keeping [Witness A].  Her cost of management is way too high."  Following this conversation, Mr. Yu complained to Wei "Ronnie" Hua, ByteDance's Global Head of HR, about the legality of Ms. Zhi's actions. On information and belief Defendant Shuyi (Selene) Gao jointly developed the strategy to mask the illegal motivation and plan for terminating Witness A's employment.

26.     Ultimately, following Mr. Yu's reporting of the incident to HR, the company decided not to terminate Witness A.  However, Ms. Zhi's manager, Nan Zhang (aka Kelly Zhang), was unhappy with Mr. Yu's decision to intercede on Witness A's behalf, particularly given the fact he did not even work in her department.  Mr. Yu was later informed that several of Ms. Zhang's direct reports viewed his actions complaining about illegal conduct as problematic and as a challenge to Ms. Zhang's leadership and authority.  Ms. Zhang later became the general manager of ByteDance's entire video - "IES" division — the department in which Mr. Yu worked — and was in a position to retaliate against Mr. Yu for his actions.  Ms. Zhang is now the chief executive officer of ByteDance China. She is responsible for overseeing the operations and management of the company's China portfolio, including the video-sharing platform Douyin (Chinese version of TikTok), the news aggregator Toutiao, and many other apps.

**G.     CCP Control of ByteDance, a Culture of Lawlessness Within ByteDance, and Retaliation.**

27.     As a member of the executive team, Mr. Yu had visibility into the company's decisions, and he was concerned about the company's compliance with U.S. laws.  It was known within the company that the CCP (the "Government") had a special office or unit in the company, which was sometimes referred to as the "Committee."  While the Government office or Committee did not "work for" the company, it played a significant role.  The Committee (1) guided how the company advanced core Communist values; and (2) regulated and monitored the company.  For the Chinese version of the apps, the Committee possessed a "death switch" that could turn off the apps entirely.

28.     The Committee maintained supreme access to all the company data, even data stored in the United States.  Any engineer in Beijing could access U.S. user data located in the U.S.  After receiving criticism about access from abroad, individual engineers in China were restricted from accessing U.S. user data, but the Committee continued to have access.

29.     Listening to the TikTok CEO's Congressional testimony in March, 2023, Mr. Yu was struck by the misdirection by the CEO.  The location of the servers doesn't protect U.S. data: what matters is whether the backdoor has been closed.

30.     During his employment, Mr. Yu felt qualms about Government control over ByteDance and TikTok. In addition to the presence of the Committee inside the company, the top executives all reported to the CEO who reported, directly or indirectly, to the CCP.

31.     While employed, Mr. Yu observed that to address criticisms about CCP control of the company, the company moved its engineers from Beijing to locations outside the country, such as Singapore. However, there was no substantive change, as the engineering duties were performed by the same persons, simply from outside of the geographic bounds of China.

32.     In addition, Mr. Yu observed a culture of lawlessness within the company.  This ByteDance culture focused on growth at all costs.  The attitude was to violate the law first, continue to grow, and pay fines later.  Legal compliance and ethics were lesser considerations or even obstacles to overcome. Among the examples of this culture are the following:

a.     Mr. Yu observed one senior executive bristle at the critique that TikTok's algorithm is like "digital cocaine," while acknowledging that time spent on the platform is the ultimate goal, and in fact the only thing the company cares about.

b.     During a trip to ByteDance's California offices, ByteDance's CEO, Yiming Zhang, expressly requested US-based employees to scrape content from YouTube and BuzzFeed to use as content on TopBuzz, ByteDance's International/U.S. version of news aggregator app Toutiao.  This was in furtherance of ByteDance's goal of making TopBuzz as successful as Toutiao, ByteDance's flagship news aggregator app for Chinese users.  This goal was pursued by employing the same unlawful and unethical tactics that

FIRST AMENDED COMPLAINT
CASE NO. CGC-23-606246

1    contributed to Toutiao's success, which conduct had resulted in numerous lawsuits in

2    China.

3            c.      In 2017, Mr. Yu learned that the CEO of ByteDance, Yiming Zhang,

4    facilitated bribes to Lu Wei who, at the time, served as the deputy head of the Propaganda

5    Department of the CCP and was the head of the Cyberspace Administration of China

6    ("CAC"), which regulates Internet-related matters and is one of the most powerful

7    agencies in China. In 2015, Lu Wei had been named by Time magazine as one of the

8    world's 100 most influential people. This bribe ensured that ByteDance would receive

9    protection and support from Lu Wei and the CAC. It also provided ByteDance a

10   competitive advantage in China. For example, Lu Wei protected ByteDance from

11   accusations that ByteDance scraped online news articles from its competitors without their

12   permission and posted the scraped articles to its own news aggregator app, Toutiao. Lu

13   Wei also warned other Chinese companies words to the effect of, "do not mess with

14   ByteDance;" "work with and cooperate with ByteDance" because "I like ByteDance;"

15   "ByteDance is supported by my agency the CAC."  Lu Wei was arrested around early

16   2018. Soon after Lu Wei was arrested, the Chinese Government permanently banned one

17   of ByteDance's major apps ("NeiHan DuanZi") and fined the company.  In 2019, it was

18   reported that Lu Wei had been convicted by a Chinese court for bribery and sentenced to

19   14 years in prison.

20       33.    This and other illegal conduct shocked Mr. Yu. He was surprised by the brazenly

21   unlawful conduct within the company, which was euphemistically excused as "entrepreneurship."

22   Mr. Yu was upset by the company's disregard for, *inter alia*, California's laws and practices.

23       **H.    In Retaliation for Disclosing ByteDance's Wrongful Conduct, ByteDance**
         **Unlawfully Discharges Mr. Yu.**
24

25       34.    On or around March 2018, in consultation with his doctor, Mr. Yu was required to

26   take his own medical leave for approximately seven months.  On July 18, 2018, Mr. Yu mailed

27   three letters to various supervisors at ByteDance notifying them that, upon consultation with his

28   doctor, he expected to be able to return to work on September 11, 2018.  ByteDance claims to

1    have mailed Mr. Yu a notice of termination on July 26, 2018, purportedly due to a reduction in

2    force.  ByteDance also claims that on July 27, ByteDance e-mailed Mr. Yu a copy of the

3    termination notice.  Mr. Yu never received any of these purported notices and ByteDance never

4    called him to notify him of his termination, even though the company acknowledges receiving his

5    requests to return to work.

6        35.    In October 2018, Mr. Yu was finally cleared to return to work by his doctor.

7    However, upon returning to the office for the first time, he was told he did not "need to come to

8    work now" and that the company "will contact you later."  Mr. Yu remained on ByteDance's

9    payroll through November 2018 and the first tranche of equity under his stock option award from

10   the company should have vested on August 30, 2017, though ByteDance never vested these

11   shares.

12       36.    In November 2018, the company retaliated against Mr. Yu by terminating him.

13   **V.    TOLLING**

14       37.    On July 25, 2019, Plaintiff filed a complaint of discrimination with California's

15   Department of Fair Employment and Housing ("DFEH"), pursuant to the California Fair

16   Employment and Housing Act ("FEHA"), Cal. Gov't Code §12900 *et seq.*

17       38.    Pursuant to the Emergency Rules Related to COVID-19, Emergency Rule 9(a), the

18   statute of limitations on Plaintiff's claims was tolled an additional 178 days, until January 19,

19   2021.

20       39.    The Parties have entered into a series of Tolling Agreements, whereby the statute

21   of limitations for Plaintiff's claims was tolled through and including November 17, 2022.

22       40.    On May 1, 2023, Plaintiff filed his complaint for damages and injunctive relief

23   against Defendants.

24   ///

25   ///

26   ///

27   ///

28   ///

1   **VI.     CLAIMS**

2                                **FIRST CAUSE OF ACTION**

3                                    **Public Injunction**
     **Unfair Business Practices – Cal. Bus. & Prof. Code §§ 17200, 17203)**
4                           **(Against Defendant ByteDance, Inc.)**

5          41.     Plaintiff re-alleges and incorporates herein by reference each and every allegation

6   of the preceding paragraphs as though fully set forth herein, and alleges as follows:

7          42.     California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200,

8   *et seq.*, prohibits any unlawful, unfair *or* fraudulent business practices. Under the UCL, any

9   person who engages, has engaged, or purposes to engage in unfair competition may be enjoined.

10         43.     By scraping the content belonging to individuals who reside in California,

11  including social media content that Plaintiff posted on his own Instagram profile, and by

12  subsequently posting that content on Defendant's websites without the content creators' consent,

13  Defendant engaged in unlawful, unfair, or fraudulent business practices.  Plaintiff is entitled to a

14  public injunction to stop Defendant from scraping social media content belonging to residents of

15  California.

16         44.     ByteDance also engaged in unlawful, unfair, or fraudulent conduct by

17  systematically creating fabricated users to "like" and "follow" real user accounts, including

18  Plaintiff's TikTok account, triggering push notifications that would entice users back to

19  ByteDances' apps. By doing this, ByteDance artificially exaggerated key engagement metrics,

20  which potential investors consider when investing in social media platforms.

21         45.     Defendant's violations of the UCL continue to this day. As a direct and proximate

22  result of Defendant's violation of the UCL, Plaintiff has suffered actual damage.

23         46.     Unless restrained and enjoined, Defendant will continue to engage in the unlawful,

24  unfair and fraudulent conduct described herein.

25         47.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order of this Court

26  enjoining Defendants from continuing to engage, use, or employ the unlawful, unfair, and

27  fraudulent practice of scraping content produced by individuals residing in California from its

28  competitors' websites and posting that content on Defendant's websites without the consent of the

                                              11

owners of that content. ByteDance also should be enjoined from fabricating users and from using fabricated user accounts to create fake engagement and push notifications.

## SECOND CAUSE OF ACTION

**Retaliation (Including, *Inter Alia*, Violation of Cal. Lab. Code § 1102.5)**
**(Against Defendant ByteDance, Inc.)**

48.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

49.     At all times relevant to this Complaint, Defendants have been subject to the requirements of Cal. Lab. Code § 1102.5, which applied to Plaintiff as an employee of Defendants.

50.     Defendants violated Cal. Lab. Code § 1102.5 by abruptly terminating Plaintiff's employment in retaliation for his reporting and refusals to participate in activity that violated laws, rules, and regulations against invasion of privacy, misappropriation, anti-discrimination, anti-retaliation, among others.

51.     In addition, at all times herein mentioned, FEHA, Cal. Gov't Code § 12940 *et seq.*, was in full force and effect and was fully binding upon Defendant. Cal. Gov't Code § 12940(a) prohibits an employer from discharging or discriminating against an employee because of a disability or because they are regarded as having a disability. Defendant retaliated against Plaintiff for disclosing information that he had reasonable cause to believe was unlawful to a person with authority over him, or another employee who had the authority to investigate, discover, or correct the violation or noncompliance. Additionally Defendant retaliated against Plaintiff for reporting discrimination and/or harassment and for refusing to participate in illegal activity.

52.     As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses, along with attorney's fees and litigation costs.

FIRST AMENDED COMPLAINT
CASE NO. CGC-23-606246

53.     As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

54.     Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## THIRD CAUSE OF ACTION

**Failure to Prevent Discrimination:  Violation of Cal. Gov't Code § 12940(k)**
**(Against Defendant ByteDance, Inc.)**

55.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

56.     At all times herein mentioned, FEHA, Gov. Code, § 12940, *et seq*., was in full force and effect and fully binding upon Defendants.  Witness A was a member of a group protected by that statute in that he was an employee with a known medical condition and/or physical disability who made a request for a reasonable accommodation to treat her medical condition and/or disability.

57.     Defendants violated Cal. Gov't Code § 12940(k) because Defendants failed to take all reasonable steps necessary to prevent discrimination from occurring.  Among other things, Defendants failed to train and adequately supervise its employees in order to ensure that these employees were not violating FEHA in their treatment of other employees. Defendants also failed to prevent retaliation against Plaintiff for reporting discrimination against Witness A, an employee with a known medical condition who made a request for a reasonable accommodation.

58.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits, and has incurred other economic losses.

1    59.    As a direct, foreseeable, and proximate result of Defendants' unlawful actions,

2    Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to

3    Plaintiff's damage in an amount to be proven at the time of trial.

4    60.    Defendants committed the acts herein despicably, maliciously, fraudulently, and

5    oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive

6    amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others.

7    Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to

8    proof.

9    **FOURTH CAUSE OF ACTION**

10   **Retaliation in Violation of Cal. Gov't Code § 12940(h)**
     **(Against Defendant ByteDance, Inc.)**

11

12   61.    Plaintiff re-alleges and incorporates herein by reference each and every allegation

13   of the preceding paragraphs as though fully set forth herein, and alleges as follows:

14   62.    Cal. Gov't Code§ 12940(h) makes it an unlawful employment practice for an

15   employer to discriminate against any person because the person has opposed any practices

16   forbidden under the FEHA, including discrimination on the basis of a disability.

17   63.    Plaintiff opposed and protested ByteDance's and Gao's discrimination against

18   Witness A and attempts to eliminate her position.  He made these complaints to HR and Witness

19   A's managers.

20   64.    In response to his complaints, ByteDance terminated his employment.

21   65.    As a direct, foreseeable, and proximate result of Defendants' unlawful actions,

22   Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment

23   benefits, and has incurred other economic losses.

24   66.    As a direct, foreseeable, and proximate result of Defendants' unlawful actions,

25   Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to

26   Plaintiff's damage in an amount to be proven at the time of trial.

27   67.    Defendants committed the acts herein despicably, maliciously, fraudulently, and

28   oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive

14

1  amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others.

2  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to

3  proof.

4  ### FIFTH CAUSE OF ACTION

5  **Breach of Contract**
   **(Against Defendant ByteDance, Inc.)**

6

7  68.    Plaintiff re-alleges and incorporates herein by reference each and every allegation

8  of the preceding paragraphs as though fully set forth herein, and alleges as follows:

9  69.    On or around September 30, 2017, Plaintiff and Defendant ByteDance, Inc.

10  entered into a written stock incentive plan, whereby Plaintiff was awarded 220,000 shares in

11  Defendant vesting over a four-year period.  Shortly thereafter, the Parties signed a two-year term

12  supplemental employment agreement in order to ensure Plaintiff's continued employment at

13  Defendant.  The supplemental employment agreement lasted until August 2019, unless Mr. Yu

14  was terminated "for cause."

15  70.    Plaintiff completed all conditions necessary to satisfy his obligations under his

16  operative employment agreement by continuing to work for Defendant until he was terminated

17  without cause.

18  71.    The first and second tranches of options under the incentive plan were set to vest

19  on August 30, 2017 and 2018, respectively, though ByteDance never vested these shares.

20  Defendant breached the contract by failing to award Plaintiff the options owed to him under the

21  incentive plan and by terminating Plaintiff without cause.

22  72.    Accordingly, Plaintiff is entitled to the compensation owed under the incentive

23  plan, including the shares already vested at the time of his termination.

24  ### SIXTH CAUSE OF ACTION

25  **Breach of the Covenant of Good Faith and Fair Dealing**
   **(Against Defendant ByteDance, Inc.)**

26

27  73.    Plaintiff re-alleges and incorporates herein by reference each and every allegation

28  of the preceding paragraphs as though fully set forth herein, and alleges as follows:

15

FIRST AMENDED COMPLAINT
CASE NO. CGC-23-606246

74.     Plaintiff's employment agreement and stock incentive plan contained an implied-in-law covenant of good faith and fair dealing that neither party would do anything to injure the right of the other party to enjoy the actual benefits of those contracts.

75.     Plaintiff performed all of the duties and obligations required of him by Defendant during his employment, including those duties and obligations that would entitle Plaintiff to receive the compensation described in the employment agreement and stock incentive plan.

76.     Defendant breached the implied covenant when it took actions to prevent Plaintiff from earning their full compensation owed under these agreements.

77.     Defendant's termination of Plaintiff was done in bad faith.

78.     As a result of Defendant's bad faith and unfair dealing in performing the terms of the employment agreement and stock incentive plan, Defendant is liable for breaching the covenant of good faith and fair dealing inherent in those agreements.

79.     Accordingly, Plaintiff is entitled to the compensation owed under the employment agreement and stock incentive plan, included continued stock option vesting for the term of the agreements, and the compensation he lost because Defendant unlawfully terminated these contracts.

## SEVENTH CAUSE OF ACTION

### Wrongful Termination in Violation of Public Policy
### (Against Defendant ByteDance, Inc.)

80.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

81.     Plaintiff's employment was terminated by Defendant in violation of fundamental public policies of the State of California, including without limitation, the right to refrain from participating in unlawful conduct (or conduct reasonably believed to be unlawful).

82.     The conduct detailed herein was wrongful and in violation of fundamental public policies of the State of California as reflected in laws that include, without limitation, the California Labor Code and Cal. Bus. & Prof. Code § 17200, *et seq.*, and the California Penal Code.

83.     Defendants' actions were willful and malicious and were committed with the wrongful intent to injure Plaintiff and in reckless disregard of Plaintiff's rights.

84.     As a proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer damages that include his unvested stock options, loss of salary, bonuses, and other losses along with attorney's fees and litigation costs.

## <u>EIGHTH CAUSE OF ACTION</u>

**Unfair Business Practices – Cal. Bus. & Prof. Code §17200, *et seq*.**
**(Against All Defendants)**

85.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

86.     Cal. Bus. & Prof. Code § 17200 prohibits any unlawful, unfair *or* fraudulent business practices.  By promising Plaintiff valuable equity and then firing him for an unlawful reason and taking back his unvested options, Defendants engaged in unlawful, unfair, and fraudulent business practices.  Plaintiff is entitled to restitution of the ByteDance stock options that rightfully belong to him, but which Defendants deprived him of possessing.

## <u>NINTH CAUSE OF ACTION</u>
**Failure to Pay Wages, Including Failure to Pay All Wages Due Immediately Upon Termination**
**Cal. Lab. Code §§ 201, 202, 203, 588.1**
**(Against All Defendants)**

87.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

88.     Cal. Lab. Code § 201 provides that any discharged employee is entitled to all wages due at the time of discharge.

89.     Where an employer willfully fails to pay discharged or quitting employees all wages due as required under the California Labor Code, the employer is liable to such employees under Cal. Lab. Code § 203 for waiting time penalties in the amount of one (1) day's compensation at the employees' regular rate of pay for each day the wages are withheld, up to thirty (30) days.

90.     Cal. Lab. Code § 558.1 provides that any person acting on behalf of the employer, who violates, or causes to be violated Cal. Lab. Code § 203, *inter alia*, may be held liable as the employer for such violation. At all relevant times herein, Defendant Gao acted as a managing agent as defined by Cal. Civ. Code § 3294 over Defendants' failure to pay Plaintiff all wages owed as alleged herein after he was discharged. Defendant Gao therefore violated or caused  Cal. Lab. Code § 203 to be violated.

91.      During all relevant times, Defendants knowingly and willfully violated Cal. Lab. Code §§ 201 and 202 by failing to pay Plaintiff all wages owed as alleged herein after he was discharged.  Defendants are therefore liable to Plaintiff for waiting time penalties as required by Cal. Lab. Code § 203.

92.     Plaintiff respectfully requests that the Court award all waiting time penalties due and the relief requested below in the Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Yu prays for judgment against Defendants as follows:

1.     A public injunction prohibiting ByteDance from continuing to engage, use, or employ the unlawful, unfair, and fraudulent practice of scraping content produced by individuals residing in California from its competitors' websites and posting that content on Defendant's websites without the consent of the owners of that content; and ByteDance also should be enjoined from fabricating users and from using fabricated user accounts to create fake engagement and push notifications.

2.     For compensatory damages, including but not limited to, lost back pay (including, but not limited to, salary and bonus wages), equity, and fringe benefits and future lost earnings, equity, and fringe benefits, emotional distress, and legal interest, according to proof as allowed by law;

3.     Liquidated damages as allowed by law;

4.     For injunctive relief, including reinstatement and a prohibition on further discrimination or retaliation;

5.     For punitive damages as allowed by law;

18

1      6.      For an award to Plaintiff of costs of suit incurred herein and reasonable attorney's

2   fees;

3      7.      For prejudgment interest and post-judgment interest as allowed by law;

4      8.      For an injunction to prevent future violations of Cal. Gov't Code § 12940;

5      9.      For an injunction to prevent future violations of Cal. Bus. & Prof. Code § 17200;

6   and

7      10.      For an award of such other and further relief as the Court deems just and proper.

8                          **DEMAND FOR JURY TRIAL**

9      Plaintiff hereby demands a trial by jury on all causes of action so triable.

10

11   DATED: May 12, 2023                           Respectfully submitted,
                                                  NASSIRI & JUNG LLP
12

13

14                                      By:_____

15                                              Charles H. Jung
                                              Attorneys for Plaintiff
16                                               YINTAO YU

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

**From:** Jaime@njfirm.com
**Sent:** June 9, 2024 4:35 AM
**To:** Charles.Thompson@gtlaw.com; David.Bloch@gtlaw.com; guzmanan@gtlaw.com
**Cc:** charles@njfirm.com
**Subject:** Yu v. ByteDance et al. -- Declarant's Identity

**\*EXTERNAL TO GT\***

All -- We have determined that the identity of the anonymous declarant is Haiyi Bao. We ask that you keep the identity of the declarant confidential under the protective order. Further, we ask that you not disclose the declarant's identity beyond your litigation team as needed to litigate this matter. Thank you, Jaime.

# EXHIBIT 5

**AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please file online at www.adr.org/support. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

| **Parties (Claimant)** | | |
|---|---|---|
| Name of Claimant:  Yintao Yu | | |
| Address:  3245 Geary Blvd Unit 591846 | | |
| City:  San Francisco | State:  California | Zip Code:  94118 |
| Phone No.: | Email Address:  yintaoyusanfrancisco@gmail.com | |
| Representative's Name (if known):  Charles H. Jung | | |
| Firm (if applicable):  Nassiri & Jung LLP | | |
| Representative's Address:  1700 Montgomery St., Ste. 207 | | |
| City:  San Francisco | State:  California | Zip Code:  94111 |
| Phone No.:  (415) 762-3100 | Email Address:  charles@njfirm.com | |
| **Parties (Respondent)** | | |
| Name of Respondent:  ByteDance, Inc. | | |
| Address:  1199 COLEMAN AVENUE | | |
| City:  San Jose | State:  California | Zip Code:  95110 |
| Phone No.: | Email Address: | |
| Representative's Name (if known):  Charles Thompson | | |
| Firm (if applicable):  Greenberg Traurig LLP | | |
| Representative's Address:  101 Second Street, Suite 2200 | | |
| City:  San Francisco | State:  California | Zip Code:  94105 |
| Phone No.:  415.655.1300 | Email Address:  thompsoncha@gtlaw.com | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box    .

Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000 ☑ $100,000-$250,000 ☐ Over $250,000
*Note: This question is required by California law.*

Amount of Claim:  220,000 ByteDance shares, unpaid wages, punitive damages, penalties, fees, & other amounts to be determined at arbitration

Claim involves: ☑ Statutorily Protected Rights ☐ Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

Please see attached Exhibit A.
Additional Respondents attached as Exhibit B.

AMERICAN ARBITRATION ASSOCIATION®

**EMPLOYMENT ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Punitive/ Exemplary
☑ Other:  Lost Wages, Equity, Public Injunction

Please describe the qualifications for arbitrator(s) to hear this dispute:

Arbitrator experienced in employment, disputes, and executive compensation.

Hearing: Estimated time needed for hearings overall:                     hours  or  **20**                     days

Hearing Locale:  **Los Angeles, CA**

*(check one)* ☑ Requested by Claimant  ☐ Locale provision included in the contract

Filing Fee requirement or $350 (max amount per AAA)

Filing by Company:  ☐ $2,450 single arbitrator  ☐ $3,050 three arbitrator panel

Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

Signature (may be signed by a representative):

Date:
**December 5, 2024**

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Customer Service can be reached at 1-800-778-7879. Please visit our website at www.adr.org/support to file this case online.

# EXHIBIT A

1

CHARLES H. JUNG (217909)
(charles@njfirm.com)

2

NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207

3

San Francisco, California 94111
Telephone:  (415) 762-3100

4

Facsimile:   (415) 534-3200

5

Attorneys for Claimant
YINTAO YU

6

7

**AMERICAN ARBITRATION ASSOCIATION**

8

**COUNTY OF LOS ANGELES**

9

10

YINTAO YU, an individual,

Case No.

11

Claimant,

**DEMAND FOR ARBITRATION**

12

v.

13

BYTEDANCE, INC., a Delaware
Corporation; BYTEDANCE, LTD., a

14

Cayman Islands Company. SHUYI
(SELENE) GAO, an individual; and DOES
1 through 20, inclusive,

15

16

Respondents.

17

18

19

20

21

22

23

24

25

26

27

28

Claimant YINTAO YU, hereby complains and submits the allegations below against Respondents BYTEDANCE, INC., BYTEDANCE, LTD., SHUYI GAO, and DOES 1 THROUGH 20. Claimant seeks a public injunction in accordance with the *McGill* Rule (*McGill v. Citibank, N.A.,* 2 Cal. 5th 945 (2017)).  Mr. Yu also seeks damages, restitution and injunctive relief.

**I.    NATURE OF THE CASE**

1.    This case arises out of Claimant Yintao Yu's employment with Respondent BYTEDANCE, INC., his observation and reporting of illegal conduct, and consequent retaliatory termination.

**II.    PARTIES**

2.    Claimant Yintao Yu was the head of engineering of the U.S. offices of Respondent ByteDance, Inc. from approximately August 2017 until his termination in November 2018. ByteDance gives employees numerical rankings to signify their seniority. As head of engineering, Mr. Yu was given the level "4-2," with fewer than 20 employees in the entire company having a higher designation.  ByteDance employs well over 100,000 individuals today. Mr. Yu is a resident of California.

3.    Upon information and belief, Respondent ByteDance, Inc. is a Delaware corporation, whose principal place of business is San Francisco County, California.  The majority of the Company's executive and administrative functions are performed in California.

4.    Upon information and belief, Respondent ByteDance, Ltd. is a Cayman Islands company. It has had offices in the United States and in other countries. ByteDance Ltd. transacts or has transacted business in California and throughout the United States.

5.    Respondent Shuyi (Selene) Gao was the head of Human Resources for ByteDance, Inc.  Gao lives in and is a citizen of California.

6.    The true names and capacities of Respondents named herein as Does 1 through 20, whether individual, corporate, associate or otherwise, and the true involvement of Respondents sued herein as Does 1 through 20, are unknown to Claimant who therefore sues said Respondents by such fictitious names.  Claimant will amend this Demand to show the true names, capacities,

1

and involvement of Does 1 through 20 when ascertained.  Claimant is informed and believes and thereon alleges that each of the Respondents designated as a "Doe" is responsible in some manner for the events and happenings referred to herein, and that Claimant's injuries and damages as hereinafter set forth were proximately caused by said Respondents.

7.    Claimant is informed and believes and thereon alleges that each of the Respondents sued herein is or was the agent, employee, partner and/or representative of one or more of the remaining Respondents, and each of them was at all times acting within the purpose and scope of such agency and employment.  Claimant is further informed and believes that each of the Respondents herein gave consent to, ratified and authorized the acts alleged herein to each of the remaining Respondents.

III.    **JURISDICTION AND VENUE**

8.    Claimant does not contest the arbitration clause of the Employee Confidentiality Inventions and Assignment Agreement ("ECIAA"). Pursuant to the ECIAA, "any dispute, controversy or claim arising out of or relating to or resulting from Employee's employment with Employer, including any alleged violation of statute, common law or public policy shall be submitted to final and binding arbitration before the American Arbitration Association ("AAA") to be held in Los Angeles County, California before a single arbitrator, in accordance with the then-current Employment Arbitration Rules and Mediation Procedures of the AAA and the Federal Arbitration Act . . . ."

IV.    **FACTS COMMON TO ALL CAUSES OF ACTION**

A.    **Mr. Yu Is Hired by Respondent ByteDance.**

9.    Claimant Yu was hired by Respondent ByteDance, Inc. on or around June 7, 2017, and began working in August 2017.  In addition to his base salary and the option to purchase 220,000 shares of ByteDance stock, Mr. Yu's employment agreement also included a $600,000 acquisition payment, to be "paid within 30 days since the offer was signed . . . ."

10.    ByteDance later told Mr. Yu that ByteDance had concerns about fulfilling the $600,000 payment requirement, without assurances that he would remain with ByteDance for the long term.  ByteDance's representatives encouraged him to sign a multi-year term employment

agreement to ensure his continued employment at ByteDance.  Ultimately, the Parties agreed upon a 2-year term agreement that was binding on both Parties and which superseded the "at will" provision contained in his earlier agreement.  On a visit to Beijing, Mr. Yu signed the employment contract.  ByteDance's representatives told him that he would receive a copy of this agreement, but it was never shared with him.  Under the terms of the supplemental employment agreement, the employment relationship was set to last until August 2019, unless Mr. Yu was terminated "for cause."

**B.      Mr. Yu Discovers Defendant ByteDance's Practice of Scraping User Content From Its Competitors for Its Own Profit.**

11.      Shortly after beginning his employment, Mr. Yu became aware that ByteDance had for years engaged in a worldwide scheme (including in California) to steal and profit from the content of others.  The effort involved the use of software purposely unleashed to systematically strip user content from competitor's websites — chiefly, Instagram and Snapchat — and populate its own video services with these videos in an effort to make its own services appear more popular to end users.  These actions were taken without the permission of the content creators and represented an unlawful effort to gain an edge against entrenched online video websites.

12.      Specifically, ByteDance developed software that would scrape content posted by end users on competitors' websites without permission, and upon information and belief, in violation of the competitors' terms of use. ByteDance would then post the misappropriated content on its own applications via fake social media accounts to attract greater engagement with those accounts, and by extension, ByteDance's applications.

13.      The content ByteDance scraped from its competitors had been posted by users of those competitors' websites. ByteDance's software used to scrape the users' content did not ask the users for their permission.

**C.      Mr. Yu Reports His Concerns About ByteDance's Unlawful Activity to His Manager.**

14.      Upon learning of this program, Mr. Yu was troubled by ByteDance's efforts to skirt legal and ethical lines, not to mention the tremendous liability that content scraping of this

magnitude could create for the company.  It was his understanding that taking material from competitors' websites without the creator's permission violated the law.  Mr. Yu raised these concerns with Wenjia Zhu, formerly Senior VP of Engineering and later Global TikTok R&D Chief at ByteDance, numerous times, as early as October 2017 and again in February and March 2018.  Mr. Zhu was in charge of the TikTok algorithm.  Mr. Zhu reported directly to ByteDance's then-CEO Yiming Zhang.  When informed of Mr. Yu's concerns with the program, Mr. Zhu was dismissive of them, remarking that it was not a big deal.

15.     At the same time, however, Mr. Zhu asked Mr. Yu to hide the illegal program, especially to ByteDance employees in the United States, because, according to Mr. Zhu, the United States has stricter intellectual property laws and has class actions. Thus, it seemed to Mr. Yu from Mr. Zhu's responses that, while Mr. Zhu felt comfortable proceeding with the scheme, he also believed it was illegal in the United States.

16.      After Mr. Yu reported his concerns to Mr. Zhu, the scraping activity continued unabated. Worried that his concerns had not been addressed, Mr. Yu told U.S.-based colleagues that he had reported the illegal activities to the higher executive team, but that nothing had changed to that point.

17.     At some point after expressing his concerns, Mr. Yu noticed that ByteDance had modified the illegal content scraping program.  At a minimum it continued to scrape content from U.S-based users, including California based users, when they are abroad. Mr. Yu observed that the individual who modified the program's application to U.S. accounts was a software engineer in China under the report chain of Mr. Zhu.

**D.     Mr. Yu Discovered ByteDance Uses Bots to Artificially Inflate Its User Engagement Metrics That Would Violate the Law.**

18.     At or around the same time he discovered ByteDance's program to systematically scrape content from its competitors' websites, Mr. Yu learned that ByteDance also systematically created fabricated users to exaggerate its metrics, including its key engagement metrics. Potential investors considering investing in social media platforms heavily rely on such key metrics when making investment decisions.

19.     ByteDance programmed the fabricated users to "like" and "follow" real user accounts. The fake "likes", "follows" and similar fabrications would trigger push notifications to real users that would entice the users back to ByteDance's applications, thereby boosting many engagement metrics including user retention rate, which is one of the key metrics relied on by potential investors.

20.     Mr. Yu observed that the fabricated user accounts had a substantial impact on retaining real world users. Thus, the program served ByteDance's commercial interests.

**E.      Mr. Yu Reports to His Manager ByteDance's Fraudulent Scheme to Inflate Its Key Engagement Metrics.**

21.     Mr. Yu reported and raised concerns regarding ByteDance's use of fabricated users to Mr. Zhu numerous times from October 2017 and into 2018. While Mr. Zhu acknowledged the practice of creating fabricated users, he simply noted that the practice was helpful to boosting ByteDance's engagement metrics. The practice of fabricating users continued.

**F.      ByteDance Discriminates Against Employees on Necessary Medical Leave.**

22.     In addition, on or around December 2017, Mr. Yu learned of efforts to terminate a U.S. based employee, Witness A, who suffered from depression.  Witness A, who had demonstrably satisfactory performance, had recently requested time off to address her medical condition.  Although Witness A's direct manager, Peiyu "Peggie" Li, was satisfied with her performance and had recently given Witness A a score of "Meets Expectation" on her latest performance review, her skip level manager, Ying "Fiona" Zhi, was not as accommodating. Without Ms. Li's knowledge, Ms. Zhi had Witness A's performance score lowered to "Improvement Needed," and had informed HR to fire Witness A upon the formal release of the ratings.  Upon learning of this change, Mr. Yu confronted Ms. Zhi, who admitted that she had made the change because she did not like Witness A taking time off work to address her depression and that she viewed her as a "burden" she "wanted to get rid of."  Ms. Zhi told him that due to Witness A's medical condition, her "cost of management was too high."  Ms. Zhi told Mr. Yu that terminating Witness A if she received a rating of "meets expectations" or above would violate ByteDance policy, which is why Ms. Zhi had intervened to lower her score.  Mr.

Yu was shocked by Ms. Zhi's admission and requested that she reconsider. However, Ms. Zhi responded that she "won't even consider keeping [Witness A]. Her cost of management is way too high." Following this conversation, Mr. Yu complained to Wei "Ronnie" Hua, ByteDance's Global Head of HR, about the legality of Ms. Zhi's actions. On information and belief Respondent Shuyi (Selene) Gao jointly developed the strategy to mask the illegal motivation and plan for terminating Witness A's employment.

23.    Ultimately, following Mr. Yu's reporting of the incident to HR, the company decided not to terminate Witness A. However, Ms. Zhi's manager, Nan "Kelly" Zhang was unhappy with Mr. Yu's decision to intercede on Witness A's behalf, particularly given the fact he did not even work in her department. Mr. Yu was later informed that several of Ms. Zhang's direct reports viewed his actions complaining about illegal conduct as problematic and as a challenge to Ms. Zhang's leadership and authority. Ms. Zhang later became the general manager of ByteDance's entire video - "IES" division — the department in which Mr. Yu worked — and was in a position to retaliate against Mr. Yu for his actions. Ms. Zhang later served as the Chief Executive Officer of ByteDance China. She was responsible for overseeing the operations and management of the company's China portfolio, including the video-sharing platform Douyin (Chinese version of TikTok), the news aggregator Toutiao, and many other apps.

**G.    In Retaliation for Disclosing ByteDance's Wrongful Conduct, ByteDance Unlawfully Discharges Mr. Yu.**

24.    On or around March 2018, in consultation with his doctor, Mr. Yu was required to take his own medical leave for approximately seven months. On or around July 18, 2018, Mr. Yu mailed three letters to various supervisors at ByteDance notifying them that, upon consultation with his doctor, he expected to be able to return to work on September 11, 2018. ByteDance claims to have mailed Mr. Yu a notice of termination on July 26, 2018, purportedly due to a reduction in force. ByteDance also claims that on July 27, ByteDance e-mailed Mr. Yu a copy of the termination notice. Mr. Yu never received any of these purported notices and ByteDance never called him to notify him of his termination, even though the company acknowledges receiving his requests to return to work.

6

25.     In October 2018, Mr. Yu was finally cleared to return to work by his doctor. However, upon returning to the office for the first time, he was told he did not need to come to work and that the company would contact him later.  Mr. Yu remained on ByteDance's payroll through November 2018 and the first tranche of equity under his stock option award from the company should have vested on August 30, 2017, though ByteDance never vested these shares.

26.     In November 2018, the company retaliated against Mr. Yu by terminating him.

## V.     TOLLING

27.     On July 25, 2019, Claimant filed a complaint of discrimination with California's Department of Fair Employment and Housing ("DFEH"), pursuant to the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §12900 *et seq.*

28.     Pursuant to the Emergency Rules Related to COVID-19, Emergency Rule 9(a), the statute of limitations on Claimant's claims was tolled an additional 178 days, until January 19, 2021.

29.     The Parties have entered into a series of Tolling Agreements, whereby the statute of limitations for Claimant's claims was tolled through and including November 17, 2022.

30.     On May 1, 2023, Claimant filed his complaint for damages and injunctive relief against Respondents in San Francisco Case No. CGC-23-606246.

31.     On November 2, 2023, the Superior Court stayed the matter. The matter remains stayed.

## VI.     CLAIMS

### FIRST CAUSE OF ACTION

**Public Injunction**
**Unfair Business Practices – Cal. Bus. & Prof. Code §§ 17200, 17203)**
**(Against Respondents ByteDance, Inc. and ByteDance, Ltd.)**

32.     Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

33.     California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits any unlawful, unfair *or* fraudulent business practices. Under the UCL, any person who engages, has engaged, or purposes to engage in unfair competition may be enjoined.

7

34.    ByteDance, Inc. and ByteDance, Ltd. engaged in unlawful, unfair, or fraudulent conduct by systematically creating fabricated users to "like" and "follow" real user accounts, including Claimant's TikTok account, triggering push notifications that would entice users back to Respondents' apps. By doing this, ByteDance, Inc. and ByteDance, Ltd. artificially exaggerated key engagement metrics, which potential investors consider when investing in social media platforms.

35.    Respondents' violations of the UCL continue to this day. As a direct and proximate result of Respondent's violation of the UCL, Claimant has suffered actual damage.

36.    Unless restrained and enjoined, Respondents will continue to engage in the unlawful, unfair and fraudulent conduct described herein.

37.    Pursuant to Cal. Bus. & Prof. Code § 17203, Claimant seeks an order of this Court enjoining Respondents from continuing to engage, use, or employ the unlawful, unfair, and fraudulent practice of scraping content produced by individuals residing in California from its competitors' websites and posting that content on Respondents' websites without the consent of the owners of that content. ByteDance, Inc. and ByteDance, Ltd. also should be enjoined from fabricating users and from using fabricated user accounts to create fake engagement and push notifications.

## SECOND CAUSE OF ACTION

**Retaliation (Including, *Inter Alia*, Violation of Cal. Lab. Code § 1102.5)**
**(Against Respondents ByteDance, Inc. and ByteDance, Ltd.)**

38.    Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

39.    At all times relevant to this Demand, Respondents have been subject to the requirements of Cal. Lab. Code § 1102.5, which applied to Claimant as an employee of Respondents.

40.    Respondents violated Cal. Lab. Code § 1102.5 by abruptly terminating Claimant's employment in retaliation for his reporting and refusals to participate in activity that violated

laws, rules, and regulations against invasion of privacy, misappropriation, anti-discrimination, anti-retaliation, among others.

41.    In addition, at all times herein mentioned, FEHA, Cal. Gov't Code § 12940 *et seq.*, was in full force and effect and was fully binding upon Respondents.  Cal. Gov't Code § 12940(a) prohibits an employer from discharging or discriminating against an employee because of a disability or because they are regarded as having a disability.  Respondents retaliated against Claimant for disclosing information that he had reasonable cause to believe was unlawful to a person with authority over him, or another employee who had the authority to investigate, discover, or correct the violation or noncompliance. Additionally Respondents retaliated against Claimant for reporting discrimination and/or harassment and for refusing to participate in illegal activity.

42.    As a direct, foreseeable, and proximate result of Respondents' unlawful actions, Claimant has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses, along with attorney's fees and litigation costs.

43.    As a direct, foreseeable, and proximate result of Respondents' unlawful actions, Claimant has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Claimant's damage in an amount to be proven at the time of trial.

44.    Respondents committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Claimant, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Claimant and others. Claimant is thus entitled to recover punitive damages from Respondents in an amount according to proof.

### THIRD CAUSE OF ACTION

**Failure to Prevent Discrimination:  Violation of Cal. Gov't Code § 12940(k)**
**(Against Respondents ByteDance, Inc. and ByteDance, Ltd.)**

45.    Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

46.    At all times herein mentioned, FEHA, Gov. Code, § 12940, *et seq*., was in full force and effect and fully binding upon Respondents.  Witness A was a member of a group protected by that statute in that he was an employee with a known medical condition and/or physical disability who made a request for a reasonable accommodation to treat her medical condition and/or disability.

47.    Respondents violated Cal. Gov't Code § 12940(k) because Respondents failed to take all reasonable steps necessary to prevent discrimination from occurring.  Among other things, Respondents failed to train and adequately supervise its employees in order to ensure that these employees were not violating FEHA in their treatment of other employees. Respondents also failed to prevent retaliation against Claimant for reporting discrimination against Witness A, an employee with a known medical condition who made a request for a reasonable accommodation.

48.    As a direct, foreseeable, and proximate result of Respondents' unlawful actions, Claimant has suffered and continues to suffer substantial losses in earnings and other employment benefits, and has incurred other economic losses.

49.    As a direct, foreseeable, and proximate result of Respondents' unlawful actions, Claimant has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Claimant's damage in an amount to be proven at the time of trial.

50.    Respondents committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Claimant, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Claimant and others. Claimant is thus entitled to recover punitive damages from Respondents in an amount according to proof.

## FOURTH CAUSE OF ACTION

### Retaliation in Violation of Cal. Gov't Code § 12940(h)
### (Against Respondents ByteDance, Inc. and ByteDance, Ltd.)

51.    Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

52.     Cal. Gov't Code§ 12940(h) makes it an unlawful employment practice for an employer to discriminate against any person because the person has opposed any practices forbidden under the FEHA, including discrimination on the basis of a disability.

53.     Claimant opposed and protested ByteDance's and Gao's discrimination against Witness A and attempts to eliminate her position.  He made these complaints to HR and Witness A's managers.

54.     In response to his complaints, ByteDance, Inc. and ByteDance, Ltd.  terminated his employment.

55.     As a direct, foreseeable, and proximate result of Respondents' unlawful actions, Claimant has suffered and continues to suffer substantial losses in earnings and other employment benefits, and has incurred other economic losses.

56.     As a direct, foreseeable, and proximate result of Respondents' unlawful actions, Claimant has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to Claimant's damage in an amount to be proven at the time of trial.

57.     Respondents committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Claimant, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Claimant and others. Claimant is thus entitled to recover punitive damages from Respondents in an amount according to proof.

### FIFTH CAUSE OF ACTION

**Breach of Contract**
**(Against Respondents ByteDance, Inc. and ByteDance, Ltd.)**

58.     Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

59.     Claimant and Respondents entered into a written stock incentive agreement, whereby Claimant was awarded 220,000 shares in Respondent vesting over a four-year period. The Parties thereafter signed a two-year term supplemental employment agreement in order to

ensure Claimant's continued employment at Respondent. The supplemental employment agreement lasted until August 2019, unless Mr. Yu was terminated "for cause."

60.    Claimant completed all conditions necessary to satisfy his obligations under his operative employment agreement by continuing to work for Respondents until he was terminated without cause.

61.    The first and second tranches of options agreement were set to vest on August 30, 2017 and 2018, respectively, though ByteDance never vested these shares. Respondents breached the contract by failing to award Claimant the options owed to him under the incentive plan and by terminating Claimant without cause.

62.    Accordingly, Claimant is entitled to the compensation owed under the incentive plan, including the shares already vested at the time of his termination.

<u>**SIXTH CAUSE OF ACTION**</u>

**Breach of the Covenant of Good Faith and Fair Dealing**
**(Against Respondents ByteDance, Inc. and ByteDance, Ltd.)**

63.    Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

64.    Claimant's employment agreement and stock incentive plan contained an implied-in-law covenant of good faith and fair dealing that neither party would do anything to injure the right of the other party to enjoy the actual benefits of those contracts.

65.    Claimant performed all of the duties and obligations required of him by Respondents during his employment, including those duties and obligations that would entitle Claimant to receive the compensation described in the employment agreement and stock incentive plan.

66.    Respondents breached the implied covenant when it took actions to prevent Claimant from earning their full compensation owed under these agreements.

67.    Respondents' termination of Claimant was done in bad faith.

12

68.     As a result of Respondents' bad faith and unfair dealing in performing the terms of the employment agreement and stock incentive plan, Respondents are liable for breaching the covenant of good faith and fair dealing inherent in those agreements.

69.     Accordingly, Claimant is entitled to the compensation owed under the employment agreement and stock incentive plan, included continued stock option vesting for the term of the agreements, and the compensation he lost because Respondents unlawfully terminated these contracts.

### SEVENTH CAUSE OF ACTION

**Wrongful Termination in Violation of Public Policy
(Against Respondents ByteDance, Inc. and ByteDance, Ltd.)**

70.     Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

71.     Claimant's employment was terminated by Respondents in violation of fundamental public policies of the State of California, including without limitation, the right to refrain from participating in unlawful conduct (or conduct reasonably believed to be unlawful).

72.     The conduct detailed herein was wrongful and in violation of fundamental public policies of the State of California as reflected in laws that include, without limitation, the California Labor Code and Cal. Bus. & Prof. Code § 17200, *et seq*., and the California Penal Code.

73.     Respondents' actions were willful and malicious and were committed with the wrongful intent to injure Claimant and in reckless disregard of Claimant's rights.

74.     As a proximate result of Respondents' actions, Claimant has suffered and will continue to suffer damages that include his unvested stock options, loss of salary, bonuses, and other losses along with attorney's fees and litigation costs.

//
//
//
//

13

**EIGHTH CAUSE OF ACTION**

**Unfair Business Practices – Cal. Bus. & Prof. Code §17200,** *et seq.*
**(Against All Respondents)**

75.    Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

76.    Cal. Bus. & Prof. Code § 17200 prohibits any unlawful, unfair *or* fraudulent business practices.  By promising Claimant valuable equity and then firing him for an unlawful reason and taking back his unvested options, Respondents engaged in unlawful, unfair, and fraudulent business practices.  Claimant is entitled to restitution of the ByteDance stock options that rightfully belong to him, but which Respondents deprived him of possessing.

**NINTH CAUSE OF ACTION**
**Failure to Pay Wages, Including Failure to Pay All Wages Due Immediately Upon Termination**

**Cal. Lab. Code §§ 201, 202, 203, 588.1**
**(Against All Respondents)**

77.    Claimant re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein, and alleges as follows:

78.    Cal. Lab. Code § 201 provides that any discharged employee is entitled to all wages due at the time of discharge.

79.    Where an employer willfully fails to pay discharged or quitting employees all wages due as required under the California Labor Code, the employer is liable to such employees under Cal. Lab. Code § 203 for waiting time penalties in the amount of one (1) day's compensation at the employees' regular rate of pay for each day the wages are withheld, up to thirty (30) days.

80.    Cal. Lab. Code § 558.1 provides that any person acting on behalf of the employer, who violates, or causes to be violated Cal. Lab. Code § 203, *inter alia*, may be held liable as the employer for such violation. At all relevant times herein, Respondent Gao acted as a managing agent as defined by Cal. Civ. Code § 3294 over Respondents' failure to pay Claimant all wages

14

1  owed as alleged herein after he was discharged. Respondent Gao therefore violated or caused Cal.

2  Lab. Code § 203 to be violated.

3       81.    During all relevant times, Respondents knowingly and willfully violated Cal. Lab.

4  Code §§ 201 and 202 by failing to pay Claimant all wages owed as alleged herein after he was

5  discharged.  Respondents are therefore liable to Claimant for waiting time penalties as required

6  by Cal. Lab. Code § 203.

7       82.    Claimant respectfully requests that the Court award all waiting time penalties due

8  and the relief requested below in the Prayer for Relief.

9  **PRAYER FOR RELIEF**

10      WHEREFORE, Mr. Yu prays for judgment against Respondents as follows:

11      1.    A public injunction prohibiting ByteDance, Inc. and ByteDance, Ltd. from

12  continuing to engage, use, or employ the unlawful, unfair, and fraudulent practice of fabricating

13  users and from using fabricated user accounts to create fake engagement and push notifications.

14      2.    For compensatory damages, including but not limited to, lost back pay (including,

15  but not limited to, salary and bonus wages), equity, and fringe benefits and future lost earnings,

16  equity, and fringe benefits, emotional distress, and legal interest, according to proof as allowed by

17  law;

18      3.    Liquidated damages as allowed by law;

19      4.    For injunctive relief, including reinstatement and a prohibition on further

20  discrimination or retaliation;

21      5.    For punitive damages as allowed by law;

22      6.    For an award to Claimant of costs of suit incurred herein and reasonable attorney's

23  fees;

24      7.    For prejudgment interest and post-judgment interest as allowed by law;

25      8.    For an injunction to prevent future violations of Cal. Gov't Code § 12940;

26      9.    For an injunction to prevent future violations of Cal. Bus. & Prof. Code § 17200;

27  and

28

15

10.     For an award of such other and further relief as the Arbitrator deems just and proper.


DATED: December 5, 2024

Respectfully submitted,
NASSIRI & JUNG LLP


By: _____

Charles H. Jung
Attorneys for Claimant
YINTAO YU

16

# EXHIBIT B

**AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please file online at **www.adr.org/support**. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

| Parties (Claimant) | | |
|---|---|---|
| Name of Claimant: | | |
| Address: | | |
| City: | State: **Select...** | Zip Code: |
| Phone No.: | Email Address: | |
| Representative's Name (if known): | | |
| Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State: **Select...** | Zip Code: |
| Phone No.: | Email Address: | |

| Parties (Respondent) | | |
|---|---|---|
| Name of Respondent:  ByteDance Ltd. | | |
| Address:  Zhonghang Plaza, 43 North 3rd Ring West Road | | |
| City:  Beijing, China | State:  **Select...** | Zip Code:  100089 |
| Phone No.: | Email Address: | |
| Representative's Name (if known): | | |
| Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State:  **Select...** | Zip Code: |
| Phone No.: | Email Address: | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box  .

Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000 ☐ $100,000-$250,000 ☐ Over $250,000
*Note: This question is required by California law.*

Amount of Claim:

Claim involves: ☐ Statutorily Protected Rights ☐ Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

**AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please file online at **www.adr.org/support**. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

| **Parties (Claimant)** | | |
|---|---|---|
| Name of Claimant: | | |
| Address: | | |
| City: | State: **Select…** | Zip Code: |
| Phone No.: | Email Address: | |
| Representative's Name (if known): | | |
| Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State: **Select…** | Zip Code: |
| Phone No.: | Email Address: | |
| **Parties (Respondent)** | | |
| Name of Respondent:  Shuyi (Selene) Gao | | |
| Address: | | |
| City: | State: **Select…** | Zip Code: |
| Phone No.: | Email Address: | |
| Representative's Name (if known):  Gregory Iskander | | |
| Firm (if applicable):  Littler Mendelson, P.C. | | |
| Representative's Address:  Treat Towers 1255 Treat Blvd., Ste. 600 | | |
| City:  Walnut Creek | State:  **California** | Zip Code:  94597 |
| Phone No.:  925.932.2468 | Email Address:  giskander@littler.com | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box  ☐.

Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000  ☐ $100,000-$250,000  ☐ Over $250,000
*Note: This question is required by California law.*

Amount of Claim:

Claim involves: ☐ Statutorily Protected Rights  ☐ Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

# EXHIBIT 6

**GT** GreenbergTraurig



# David S. Bloch

SHAREHOLDER
David.Bloch@gtlaw.com

SAN FRANCISCO
D +1 415.590.5110
T +1 415.655.1300

David S. Bloch is a Shareholder in Greenberg Traurig's San Francisco office. He is an intellectual property litigator. A prolific writer and frequent public speaker (more than 100 invited lectures and 50 published articles), David also is the co-author of *IP and Technology in Government Contracts* (now in its seventh edition).

Concentrations

- Intellectual property
- Trade secrets
- Space & Emerging Technologies
- Litigation
- Patent litigation
- Aerospace & Defense

## Capabilities

Intellectual Property Litigation  |  Intellectual Property & Technology  |  Government Contracts  |  Trade Secrets  |  Antitrust Litigation & Competition Regulation  |  Venture Capital & Emerging Technology  |  Defense, Aviation & Space  |  Space & Satellite

## Experience

### Teaching Experience

- Lecturer and Field Work Supervisor, University of California, Berkeley School of Law – Boalt Hall, 2015-2016 and 2018

## Recognition & Leadership

### Awards & Accolades

- Listed, *The Best Lawyers in America*, Litigation - Intellectual Property, 2023-2025

- Listed, *The Legal 500* United States, 2022-2024

  - Intellectual Property > Trade Secrets (Litigation and Non-Contentious Matters), 2022-2024

GT **GreenbergTraurig**                                                  **David S. Bloch**

- Intellectual Property > Patents: Litigation (Full Coverage), 2024
- Listed, *IAM magazine*, "IAM Patent 1000," Litigation, 2015-2018 and 2020-2024
- Listed, *Who's Who Legal*, "Global Elite Thought Leaders," IP-USA, 2024
- Selected, *Super Lawyers* magazine, "*Northern California Super Lawyers*," 2013-2019 and 2023-2024
- Selected, *The Daily Journal*, "Top 75 Intellectual Property Litigators in California," 2012

## Professional & Community Involvement

- Elected Member, International Institute of Space Law, 2024
- Member, American Bar Association, Public Contracts Law Section
  - Vice Chair, Intellectual Property Committee, 2023-2024
- Advisory Committee, Berkeley Center for Law & Technology, 2015-Present
- Member, Intellectual Property Law Board, Strafford Publications, Inc., 2007-Present
- Committee Member, Committee on Jury Instructions State Bar Litigation Section Comments, Judicial Council Task Force on Jury Instructions, Civil Jury Instructions, Fourth Set, 2003

# Credentials

## Education

- Fellow, International Trade Law, Istituto Universitario di Studi Europei, International Labour Organisation, United Nations, 1997
- J.D., with honors, The George Washington University Law School, 1996
- M.P.H., Health Policy, The George Washington University, 1996
- B.A., Political Science, Reed College, 1993
  - Phi Beta Kappa

## Admissions

- California
- District of Columbia
- U.S. District Court for the Central District of California
- U.S. District Court for the Eastern District of California
- U.S. District Court for the Northern District of California
- U.S. District Court for the Southern District of California
- U.S. District Court for the Northern District of Illinois

GT **Greenberg**Traurig                                          **David S. Bloch**

- U.S. District Court for the Eastern District of Michigan

- U.S. District Court for the Eastern District of Texas

- U.S. Court of Appeals for the Federal Circuit

- U.S. Court of Appeals for the Ninth Circuit

- Supreme Court of the United States

## News, Insights & Events

David is the author of *IP and Technology in Government Contracts* and more than 50 published articles. He is frequently invited to speak on issues related to intellectual property.

June 07, 2024   PRESS RELEASE

**44 Greenberg Traurig Attorneys Recognized in the 2024 Edition of IAM Patent 1000**

November 17, 2023   PRESS RELEASE

**4 Greenberg Traurig Government Contracts Attorneys Named to ABA Public Contract Law Leadership Positions**

June 28, 2023 - July 01, 2023   EVENT

**Federal Circuit Bar Association's 2023 Bench & Bar Conference**

June 26, 2023   PRESS RELEASE

**Greenberg Traurig's David S. Bloch to Speak at FCBA's 25th Annual Bench & Bar Conference**

January 23, 2023   MEDIA COVERAGE

**Tobacco Cos. Settle Nicotine Trade Secret Fight Before Trial**

December 09, 2021 - December 10, 2021   EVENT

**PLI: Government and Regulatory Issues in Licensing**

October 20, 2020   PRESS RELEASE

**Greenberg Traurig's David Bloch Presents in DC Bar Virtual Class: "Preserving Intellectual Property Rights in Government Contracts 2020"**

**David S. Bloch**

May 12, 2020   GT ALERT

**DOJ and FTC Issue Joint Antitrust Statements for Businesses and Workers in Response to COVID-19 Pandemic**

---

March 11, 2020   PRESS RELEASE

**Greenberg Traurig Earns Antitrust Trial Victory on Behalf of StarStar Number Pioneer**

---

December 04, 2019, 9:00 AM - 4:50 PM PT   EVENT

**Managing Intellectual Property 6th Annual European Patent Forum USA 2019**

---

November 26, 2019   PRESS RELEASE

**Greenberg Traurig's David Bloch Speaks at Understanding the Intellectual Property License Conference 2019**

---

October 09, 2019   PUBLISHED ARTICLE

**The DTSA and the China Initiative**

---

August 09, 2019   MEDIA COVERAGE

**Iron Maiden Won't Take Him, So IP Atty Heads To Greenberg**



# GT GreenbergTraurig

## Anthony E. Guzman II

ASSOCIATE
guzmanan@gtlaw.com

SAN FRANCISCO
D +1 415.655.1253
T +1 415.655.1300

Anthony Guzman represents employers in traditional labor disputes and complex wage and hour class and collective actions. He regularly works with employers in the health care, energy, logistics, and agricultural sectors in developing strategies for union-election campaigns, workplace litigation, and executive employment agreements. He has argued in both federal and state court, as well as before government agencies such as the Division of Labor Standards Enforcement and National Labor Relations Board.

Anthony is an active member of the legal community. He regularly writes published articles for major legal news outlets, on a variety of emerging arguments and legal trends. He also serves as one of the coaches for U.C. Berkeley, School of Law mock trial program, where he coached their Labor & Employment trial team to a national championship during his first competitive season.

## Capabilities

Labor & Employment   |   Wage & Hour Class and Collective Litigation

## Experience

### Representative Matters

- Represented international logistics company in a wage & hour class action, involving claims under California's Private Attorneys General Act. Following an aggressive declaration drive that undercut significant aspects of the representative plaintiff's certification theory, the parties settled for less than 1/15th of projected liability.°

- Represented one of the nation's largest package delivery companies in two concurrently filed sexual harassment lawsuits involving emotionally charged allegations against the employee of one of the company's on-site third-party security vendors. After outlining the company's lack of knowledge and lack control over the vendor's personnel under the established contract to Plaintiff, the company was able to settle the matters before they proceeded to discovery.°

- Represented prominent data-security and tech company and a large professional employer organization in a complex lawsuit, involving multiple defendants and cross-complaints on issues of trade secret misappropriation, whistleblowing, and breach of stock option and confidentiality contracts. After compelling the matter to arbitration and filing a motion for summary judgment, the arbitrator

© 2025 Greenberg Traurig, LLP

tentatively dismissed the professional employer organization altogether and all but two claims against the data-security and tech company. Plaintiff accepted a settlement proposal soon thereafter, before the arbitrator issued the final decision.°

°*The above representations were handled by Mr. Guzman prior to his joining Greenberg Traurig, LLP.*

## Internship

- Law Clerk, Institute for Justice, 2014

# Recognition & Leadership

## Awards & Accolades

- Listed, *The Best Lawyers in America*, "Ones to Watch," 2022-2025

  - Labor and Employment Law - Management, 2022-2025

  - Litigation - Labor and Employment, 2022-2025

- Selected, Leadership Council on Legal Diversity (LCLD), "Pathfinder," 2023

- Recipient, Minority Bar Coalition (MBC) of the San Francisco Bay Area, MBC Unity Award, 2022

- Listed, *Super Lawyers* magazine, *Northern California Super Lawyers*, "Rising Stars," 2022-2024

- National Champions, ABA Labor & Employment Trial Advocacy Competition, 2020

## Professional & Community Involvement

- Board Member, The Bar Association of San Francisco's (BASF) Barristers Club, 2022-Present

  - Diversity Director, 2022-Present

  - Diversity & Inclusion Committee Chair, 2022-Present

  - Diversity Conference Planning Chair, 2022-Present

- Member, National Association of Legal Advocacy Educators, 2020-Present

- Coach, Trial Team, University of California, Berkeley School of Law, 2019-Present

# Credentials

## Education

- J.D., University of California, Berkeley School of Law (Boalt Hall), 2016

- B.A., *summa cum laude*, California State University, Fresno, 2013

## Admissions

- California

**GT** GreenbergTraurig                                    Anthony E. Guzman II

• Nevada

## News, Insights & Events

April 27, 2023   PUBLISHED ARTICLE

**How Unions Could Stem Possible Wave Of California PAGA Claims**

March 01, 2023   PRESS RELEASE

**Anthony Guzman Re-elected as BASF Barristers Club Board of Directors' Diversity Director**

February 08, 2023   PRESS RELEASE

**Leadership Council on Legal Diversity Names 3 Greenberg Traurig Attorneys Fellow, Pathfinders**

November 10, 2022   PRESS RELEASE

**Anthony E. Guzman II Wins 2022 Minority Bar Coalition Unity Award**

October 14, 2022   PUBLISHED ARTICLE

**How the NLRA May Slow Down the FAST Act**

January 19, 2022, 5:00 PM - 6:15 PM PT   EVENT

**An Inequitable Pandemic Panel**

October 20, 2021   PRESS RELEASE

**Anthony Guzman Nominated to Bar Association of San Francisco Barristers Board of Directors**

September 21, 2021   PUBLISHED ARTICLE

**Vaccine Passport Efforts Need To Stay Mindful Of ADA Title III**

August 05, 2021   MEDIA COVERAGE

**PAGA-Like Efforts Expected To Continue Despite Maine Veto**

GT GreenbergTraurig                                   **Anthony E. Guzman II**

July 14, 2021, 5:00 PM - 6:00 PM PT   EVENT

**Law Firm Interviewing - Bar Association of San Francisco**

June 18, 2021   PUBLISHED ARTICLE

**Employers Must Brace For PAGA-Like Bills Across US**

February 12, 2021   PUBLISHED ARTICLE

**The Rise of Minority Unions: How Social Movements and Tech Giants Could Be Showing Signs of Things To Come**

 GreenbergTraurig

# Melissa J. Kendra

ASSOCIATE
Melissa.Kendra@gtlaw.com

SAN FRANCISCO
T +1 415.655.1300



Melissa J. Kendra defends employers in all phases of employment litigation against claims arising from allegations of wrongful termination, discrimination, harassment, retaliation and whistleblower claims, and wage-and-hour violations. She advises employers on a range of issues and provides preventative counseling. Her clients include organizations, executives, and supervisors from a range of industries, including technology, health care, food and beverage, education, and nonprofit organizations.

Melissa also regularly defends claims before administrative agencies, such as the Equal Employment Opportunity Commission, the Department of Labor Standards Enforcement, and the Department of Fair Employment and Housing.

Melissa is a former prosecutor and veteran trial attorney. Prior to joining Greenberg Traurig, Melissa served as an Assistant District Attorney, during which time she conducted more than 25 jury trials, performed hundreds of evidentiary hearings, and negotiated countless settlements. Melissa also served as a California Deputy Attorney General in the Appeals Writs and Trials unit, where she briefed and argued complex criminal matters before the California Courts of Appeal.

## Capabilities

Labor & Employment

## Experience

### Government Experience

- Deputy Attorney General, California Attorney General's Office, 2018-2020

- San Francisco District Attorney's Office, 2013-2018

    - Assistant District Attorney, 2013-2018

    - Post Bar Clerk, 2013

    - Certified Law Clerk, 2013

### Teaching Experience

GT **GreenbergTraurig**

**Melissa J. Kendra**

- Adjunct Professor, University of California, Hastings College of Law, 2016-2019

### Internships

- Legal Intern, Harris County District Attorney's Office, 2012

- Legal Extern, Ninth Circuit Court of Appeals, 2011

## Credentials

### Education

- J.D., University of California, Hastings College of the Law, 2013

  - Member, Hastings Moot Court Board

  - Executive Articles Editor, *Hastings Constitutional Law Quarterly*

- B.A., University of Texas at Austin, 2010

### Admissions

- California

### Languages

- Spanish

- English

## News, Insights & Events

December 13, 2024   MEDIA COVERAGE

**ByteDance Ex-Coder Perjured Himself In Suit, Judge Finds**

May 20, 2024   BLOG

**Challengers Take on FTC's Nationwide Ban on Noncompete Agreements**



# GreenbergTraurig

## Demetra Makris

**ASSOCIATE**
Demetra.Makris@gtlaw.com

PHOENIX
D +1 602.445.8014
T +1 602.445.8000

Demetra Makris is an associate in the Labor and Employment Practice. Demetra focuses her practice on defending employers of all sizes against claims of discrimination, retaliation, harassment, wage and hour, and other employment-related claims arising under federal and state statutes. Demetra represents employers in federal and state court, arbitrations, and before various administrative agencies, including the Equal Employment Opportunity Commission (EEOC). Demetra further advises and counsels employers on matters related to assessing reasonable accommodations, administering leaves of absences and sick leave, FMLA usage, COVID-19, disciplinary actions, terminations, proper employee classifications, drug and alcohol tests, reductions in force, employee handbooks, workplace policies, and a variety of other employment-related topics.

Prior to joining Greenberg Traurig, Demetra served as in-house counsel for labor and employment at a Fortune 500 company, where she supported the company's internal employment law matters, including defending matters before state and federal agencies, and providing internal advice and counsel on virtually all employment law matters.

## Capabilities

Labor & Employment

## Experience

### In-House Experience

- Associate Corporate Counsel, Labor & Employment, Carvana, LLC, 2022-2023

## Credentials

## Education

- J.D., University of Arizona James E. Rogers College of Law, 2017

    - Note and Comment Editor, *Arizona Journal of International and Comparative Law*

- B.A., *magna cum laude*, Arizona State University, Barrett Honors College, 2014

## Clerkships

- Hon. Michael J. Brown and Hon. Jennifer B. Campbell, 2018, Arizona Court of Appeals, Division One, 2018

- Hon. James B. Morse, Arizona Court of Appeals, Division One, 2018-2019

## Admissions

- Arizona

- Illinois

- New York

## Languages

- Greek, Conversational



# GreenbergTraurig

## Charles O. Thompson

SHAREHOLDER
Charles.Thompson@gtlaw.com

SAN FRANCISCO
D +1 415.655.1316
T +1 415.655.1300

Charles Thompson is a dynamic and creative trial lawyer serving national and global clients in high-stakes litigation. He focuses his practice on employment litigation and counseling representing clients through all phases of Class Actions and Single Plaintiff cases. Charles has wide-ranging experience litigating employment-related issues for public and private companies, having handled over 1,000 employment matters for clients ranging from *Fortune* 500 companies to Silicon Valley startups. He has tried employment, commercial, and professional liability cases to verdict and directed verdict, has litigated and appealed cases from California State Courts to the United States Supreme Court, and is a Fellow of the prestigious College of Labor and Employment Lawyers.

Charles represents employers in wage and hour cases, as well as EEOC class actions, in state and federal courts across the United States and has broad experience appearing before the California Civil Rights Department, the Division of Labor Standards Enforcement, the Employment Development Department, and the United States Equal Employment Opportunity Commission and the Department of Labor.

In addition to his trial and counseling work, Charles serves as a private and judicial mediator and arbitrator, and has acted as a pro-tem judge upon request of the court. He has broad experience in binding arbitrations and trial. He has taught trial advocacy, diversity, employment and substance abuse to clients and industry organizations.

Throughout his career, Charles has been a champion for diversity and has served on the Executive Committee of the board of Directors for the Justice & Diversity Center of The Bar Association of San Francisco. He actively supports and promotes diversity efforts and collaborates with clients on diversity issues.

## Concentrations

- Class Action
- Sexual harassment

- Sexual assault
- Catastrophic cases

- Americans with Disabilities Act
- Discrimination and wrongful termination matters
- Wage and hour

## Capabilities

**GT** GreenbergTraurig                                    Charles O. Thompson

Labor & Employment  |  Wage & Hour Class and Collective Litigation  |  Employment Litigation & Trials
 |  Workplace Compliance & Counseling  |  Labor & Employment Due Diligence

## Experience

### Representative Matters

- **Social Media.** Represents international short form platform clients in state and federal courts and has won terminating sanctions motions in federal court.

- **Insurance.** Won a three-week trial in San Francisco in February 2020 recovering $2.5m for a transportation client.

- **Agribusiness.** Defense of two class and collective class actions and PAGA actions on behalf of an agribusiness in Merced County for a high-profile client. Class size is 450 workers with 22 causes of action and PAGA.

- **Food Service Company.** Defense of two class and collective class actions and PAGA actions on behalf of a food service company in San Diego Superior Court. Class size is 400 workers.

- **Telecom.** Defended a class and collective class action and PAGA action for class of 200 with settlement after law and motion.

- **Agribusiness.** Defended a PAGA only action for large agribusiness with early mediation.°

- **Hi-tech** Defended a very large national class and collective class action and PAGA action. Resolved for five percent of exposure.°

- **Cosmetic/Beauty Industry.** Defended a class and collective class action and PAGA action for 300 workers. Settled for 10 percent of exposure.°

- **Hi-Tech.** Defended a class and collective class action and PAGA action. Resolved in mediation.°

- **Steel Industry.** Defended a class and collective class action and PAGA action with settlement post law and motion at seven percent of exposure.°

*°The above representations were handled by Mr. Thompson prior to his joining Greenberg Traurig, LLP.*

## Recognition & Leadership

### Awards & Accolades

- Fellow, College of Labor and Employment Lawyers

- Six Sigma Greenbelt

- Listed, *The Best Lawyers in America*, Litigation - Labor & Employment, 2025

- Listed, *The Legal 500 United States*, Labor and Employment Disputes (Including Collective Actions): Defense, 2021-2024

- Listed, *Benchmark Litigation*, "Labor & Employment Star," 2020-2024

- Recognized, *National Law Review*, "Go-To Thought Leader," 2020

**GT** GreenbergTraurig                                          Charles O. Thompson

- Fellow, American Bar Foundation

**Professional & Community Involvement**

- Member, American Health Lawyers Association, 2017-Present
  - Vice Chair, Labor and Employment Practice Group, 2018-2021
- Member, Association of Corporate Council, 2004-Present
- Volunteer Arbitrator, San Francisco and Marin County Courts, 2000-Present
- Member, International Association of Defense Counsel, 2000-Present
  - Member, Multinational Committee, 2000-2006
  - Member, Employment Committee, 2000-Present
- Member, Risk and Insurance Management Society, 2000-2014
- Member, Professional Liability Underwriting Society, 2000-2012
- Member, Defense Research Institute, 2000-2010
- Member, Association of Defense Counsel of Northern California and Nevada, 1995-2005
  - Member, Board of Directors, 2000-2005
- Member, Bar Association of San Francisco, 1990-Present
  - Executive Committee, Board Member, and Finance Committee Member, The Bar Association of San Francisco, 2021-Present
  - Executive Committee & Board Member, Justice & Diversity Center 2018-2020
- Member, American Bar Association, 1989-Present
- Member, State Bar of California, 1989-Present
  - Board Member, Labor and Employment Section, 1989-2018

## Credentials

### Education

- J.D., Golden Gate University School of Law, 1988
- B.S., University of San Francisco, 1983

### Admissions

- California

## News, Insights & Events

**GT** GreenbergTraurig

Charles O. Thompson

Charles is a contributor to the GT L&E blog

January 19, 2022, 5:00 PM - 6:15 PM PT   EVENT

**An Inequitable Pandemic Panel**

September 28, 2021   PUBLISHED ARTICLE

**What 6th, 8th Circ. Rulings Mean For FLSA Collective Actions**

September 21, 2021   PUBLISHED ARTICLE

**Vaccine Passport Efforts Need To Stay Mindful Of ADA Title III**

August 05, 2021   MEDIA COVERAGE

**PAGA-Like Efforts Expected To Continue Despite Maine Veto**

June 18, 2021   PUBLISHED ARTICLE

**Employers Must Brace For PAGA-Like Bills Across US**

December 29, 2020   PRESS RELEASE

**Greenberg Traurig Attorneys Recognized as National Law Review 'Go-To Thought Leader'**

October 28, 2020   PRESS RELEASE

**Greenberg Traurig's Charles Thompson Elected to BASF Board of Directors**

October 19, 2020   PRESS RELEASE

**17 Greenberg Traurig Attorneys Recognized as Labor and Employment Stars in 2020 Benchmark Litigation Labor and Employment Rankings**

May 26, 2020   MEDIA COVERAGE

**How to Handle a Bad Hire**